# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

SPEECH FIRST, INC.,

                     Plaintiff,

v.

MARK SCHLISSEL, in his official capacity as President of the University of Michigan; E. ROYSTER HARPER, in her official capacity as Vice President for Student Life at the University of Michigan; ERIK WESSEL, in his official capacity as Director of the Office of Student Conflict Resolution; JULIO CARDONA, in his official capacity as Interim Assistant Dean of Students; EDDIE L. WASHINGTON, JR., in his official capacity as Executive Director of the Division of Public Safety & Security; ROBERT SELLERS, Vice Provost for Equity and Inclusion; and MICHAEL J. BEHM, MARK J. BERNSTEIN, SHAUNA RYDER DIGGS, DENISE ILITCH, ANDREA FISCHER NEWMAN, ANDREW C. RICHNER, RON WEISER, KATHERINE E. WHITE, all in their official capacities as members of the University of Michigan Board of Regents,

                     Defendants.

**COMPLAINT**

Civil Action No. _____

Plaintiff Speech First, Inc. brings this action under the First and Fourteenth Amendments to the United States Constitution against Defendants for declaratory and injunctive relief and alleges as follows.

## INTRODUCTION

1.       "The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). After all, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979).

2.       Yet the University of Michigan ("the University") and its officials have created an elaborate investigatory and disciplinary apparatus to suppress and punish speech other students deem "demeaning," "bothersome," or "hurtful." This Court found the University's previous iteration of a speech code to violate the First and Fourteenth Amendments. *See Doe v. University of Michigan*, 721 F. Supp. 852 (E.D. Mich. 1989). The University's latest attempts at censorship should fare no better.

3.       First, the University's disciplinary code prohibits "harassment" and "bullying," and further increases the potential penalties if such actions were motivated by "bias." All of those concepts, as the University interprets and applies them, can capture staggering amounts of protected speech and expression. For example, the University defines "harassment" as "unwanted negative attention perceived as

intimidating, demeaning, or bothersome to an individual." A student can thus be subject to significant penalties (up to and including expulsion) if another student *perceives* his or her speech as "demeaning" or "bothersome." Under this regime, the most sensitive student on campus effectively dictates the terms under which others may speak. The University's expansive and amorphous prohibitions on "harassment," "bullying," and "bias-related misconduct" are having—and will continue to have—a profound chilling effect on protected expression, and are void for vagueness due to the utter lack of clear notice about the line between permissible and prohibited conduct.

4.     Second, the University has created a "Bias Response Team" (BRT) that receives complaints of "bias" and "bias incidents" from offended students and is tasked with investigating and punishing those who commit such offenses. According to the University, "[b]ias comes in many forms," can be intentional or unintentional, and "can be a hurtful action based on who someone is as a person." In determining whether a bias incident has occurred, "[*t*]*he most important indication of bias is your own feelings.*" As a result, a student whose speech is seen by another student as "hurtful" to his or her "feelings" may receive a knock on the door from a team of University officials threatening to refer the student to formal disciplinary authorities unless he or she submits to "restorative justice," "individual education," or "unconscious bias training." The BRT and its highly subjective definitions of "bias" and "bias incident" pose a grave threat to free expression at the University, and are unconstitutional under the doctrines of overbreadth, vagueness, and prior restraints.

## JURISDICTION AND VENUE

5.     This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. §§ 1983 and 1988.

6.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

7.     Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391 because the events giving rise to the claims detailed herein occurred in the Eastern District of Michigan.

## PARTIES

8.     Plaintiff Speech First, Inc. ("Speech First") is a nationwide membership organization of students, alumni, and others that is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment to the U.S. Constitution. In particular, Speech First seeks to protect the rights of students and others at colleges and universities, through litigation and other lawful means.

9.     Speech First has members who attend the University, which is a public university organized and existing under the laws of the State of Michigan.

10.     Defendant Mark Schlissel is the President of the University. Schlissel is responsible for the enactment and enforcement of University policies, including the policies and procedures challenged herein. Schlissel is sued in his official capacity.

- 4 -

11.     Defendant E. Royster Harper is the Vice President for Student Life at the University. Harper is responsible for administration and policymaking at the University, including the policies and procedures challenged herein. She is sued in her official capacity.

12.     Defendant Erik Wessel is the Director of the Office of Student Conflict Resolution at the University. He is responsible for the investigation, enforcement, and punishment of students for violations of the student code, including the speech codes and prohibitions on "bias incidents" challenged herein. Wessel is sued in his official capacity.

13.     Defendant Julio Cardona is the Interim Assistant Dean of Students at the University of Michigan. He is responsible for the operation of the Bias Response Team and the investigation, enforcement, and punishment of students for "bias incidents." Cardona is sued in his official capacity.

14.     Defendant Eddie L. Washington, Jr., is the Executive Director of the Division of Public Safety & Security, which is a component of the Bias Response Team and is involved in investigating alleged bias incidents. Washington is sued in his official capacity.

15.     Defendant Robert Sellers is the Vice Provost for Equity and Inclusion and Chief Diversity Officer at the University. Sellers oversees the Office of Diversity, Equity & Inclusion, which is a component of the Bias Response Team and is involved in investigating alleged bias incidents. Sellers is sued in his official capacity.

16.     Defendants Michael J. Behm, Mark J. Bernstein, Shauna Ryder Diggs, Denise Ilitch, Andrea Fischer Newman, Andrew C. Richner, Ron Weiser, Katherine E. White, and Mark S. Schlissel are members of the University of Michigan Board of Regents (herein collectively, "Regent Defendants"). The Regent Defendants are responsible for the adoption and authorization of policies that govern students at the University, including the policies and procedures challenged herein. The Regent Defendants are sued in their official capacity.

## STATEMENT OF FACTS

### I.    The First Amendment Rights of Students

17.     "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010).

18.     The First Amendment's importance is at its apex at our nation's colleges and universities. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher education]. The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 476 (1960)).

- 6 -

19.     The core principles of the First Amendment "acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission." *Doe*, 721 F. Supp. at 863 (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957). The First Amendment's protections, moreover, are "not confined to the supervised and ordained discussion which takes place in the classroom" but extend throughout a university's campus. *Solid Rock Found.*, 478 F. Supp. at 102.

20.     Put simply, "First Amendment protections [do not] apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. "The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish*, 410 U.S. at 670. Indeed, "the point of all speech protection ... is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995).

## II.     The University's Statement of Student Rights and Responsibilities Chills Speech.

21.     The University is a public institution whose policies must comply with the First and Fourteenth Amendments to the Constitution. Yet the University and its

officials have a long record of seeking to limit some students' speech and expression in order to prevent other students from taking offense.

22.     This Court previously enjoined University officials from implementing an earlier iteration of a speech code. *See Doe*, 721 F. Supp. at 864-67 (holding that speech code prohibiting "verbal conduct" that "victimizes" or "stigmatizes" certain groups was unconstitutionally overbroad in violation of the First Amendment and void for vagueness under the Fourteenth Amendment).  Despite that holding, the University and its officials have continued to maintain policies and take actions that have the purpose and effect of limiting speech that certain students might find offensive.

23.     The University's Statement of Student Rights and Responsibilities ("Statement") "describes possible behaviors which are inconsistent with the values of the University community."  The Statement "outlines procedures to respond to such behaviors" and "suggests possible sanctions/interventions which are intended to educate and to safeguard members of the University Community." In short, the Statement prohibits certain actions and sets forth procedures and remedies for alleged violations. The University claims authority to punish misconduct that "occurs in the city of Ann Arbor, on University controlled property, or at University sponsored events/programs."

24.     Unsurprisingly, the Statement provides that students may be disciplined for conduct such as physically harming another person, illegally possessing drugs or alcohol, falsifying documents or records, theft, and vandalism.

25.     The Statement also prohibits "[h]arassing or bullying another person—physically, verbally, or through other means."

26.     Although the Statement does not define "harassment," it does cite a definition of that term from the University's "Expect Respect" initiative, which is a program designed to create a "[c]ampus social climate" that is "safe and inclusive." That program defines "harassment" as "unwanted negative attention *perceived* as intimidating, demeaning, or bothersome to an individual." The Statement also cross-references Merriam-Webster's Dictionary, which defines "harassing" as "(1) to annoy persistently; (2) to create an unpleasant or hostile situation, especially by uninvited or unwelcome verbal or physical conduct." In other words, a student may violate the University's prohibition on so-called "harassment" if he or she engages in "verbal[]" conduct (*i.e.*, speech) that another student *perceives* as being "demeaning," "bothersome," or "annoying."

27.     The only definition of "bullying" the University has provided is a link to Merriam-Webster's Dictionary, which defines that term as: "(1) to frighten, hurt, or threaten (a smaller weaker person), (2) to act like a bully toward (someone), (3) to cause (someone) to do something by making threats or insults or by using force, (4) to treat abusively, (5) to affect by means of force or coercion." A student could thus be reported, investigated, and punished for "bullying" if she "verbally" or through "other means" (*e.g.*, the Internet) engages in conduct that another student finds "frightening," "abusive," or "hurtful."

- 9 -

28.     Any student, faculty member, or staff member may submit a complaint to the Office of Student Conflict Resolution ("OSCR") alleging a violation of the Statement. The OSCR will then investigate and decide whether to bring charges against the student.

29.     A student who violates the Statement can suffer a wide range of punishments. The OSCR can, among other things, formally reprimand the student; put the student on probation; prohibit the student from working at the University; order the student to attend a class, complete an "educational project," or perform "community tasks" that will teach the student "why certain behavior is inappropriate"; place the student in another dorm room or remove him or her from University housing; suspend the student for a specific time; or permanently expel the student from the University.

30.     In April 2018, the University announced amendments to the Statement that will take effect on July 1, 2018. Under those amendments, there will be a separate, additional prohibition on "bias-related misconduct," which is defined as a violation of any of the other enumerated offenses in the Statement (including "bullying" or "harassment") that is "motivated by bias or prejudice," including "behavior motivated on the basis of any person's identity as protected by the University of Michigan's Nondiscrimination Policy (race, color, national origin, age, marital status, sex, sexual orientation, gender identity, gender expression, disability, religion, height, weight, or veteran status)." Under this amendment, an action that violates the Statement that is

"motivated on the basis" of alleged "bias" can be subject to *two* sanctions—one for the underlying offense and one for the "bias." As explained in greater detail below, the University's definitions of "bias" are every bit as vague and amorphous as its prohibitions on "bullying" or "harassment."

31.     The effect of these amorphous prohibitions on "bullying," "harassment," and "bias-motivated misconduct" is to profoundly chill free speech and open discourse at the University.

32.     A student who voices a controversial or unpopular opinion—or who seeks to use humor, parody, or satire when discussing sensitive topics—could face severe punishment up to and including expulsion if even one other student perceives that speech to be "demeaning" or "bothersome." Put differently, students must be certain before speaking that their words will not be perceived as offensive by even the most sensitive student on campus.

33.     Many students will inevitably choose not to speak—or to speak less forcefully about controversial topics—rather than face the risk of disciplinary proceedings and punishment if another student takes offense at their words and files a complaint alleging violations of the Statement's ban on "bullying," "harassment," and "bias-motivated misconduct."

## III.    Chilling of Speech by the "Bias Response Team"

34.     The University has further supplemented the bullying/harassment provisions of the Statement with a "Bias Response Team" (BRT).

35.     The BRT is comprised of University administrators and law enforcement. It also may include students and "community representatives who serve the U-M community." The BRT is tasked with managing "the response and management of bias incidents."

36.     Like the definitions of harassment and bullying in the Statement, the University has adopted an extremely vague, open-ended, and subjective definition of bias that can encompass a wide array of conduct, including speech and expression protected by the First Amendment.

37.     The University defines "bias" as "a pre-formed negative *opinion* or *attitude* toward a group of persons who possess common physical characteristics, such as skin color; or cultural experiences, such as religion or national origin." Such "bias," according to the University, "often stems from fear, misunderstanding, hatred, and stereotypes, *and may be intentional or unintentional*."

38.     The University's definitions of "bias" encompass countless instances of protected speech and expression on all manner of topics. Under the plain text of these definitions, a student may be deemed to have acted with "bias" if, for example, she gives a speech sharply criticizing the Catholic Church and its adherents for not allowing women to become priests; this student has expressed a "negative opinion" or "attitude" about a certain group of people based on their "cultural experience" of religion.

39.     The University further defines "bias incident" as "non-criminal activity committed against a person or property that is motivated, in whole or in part, by the

offender's bias against a race, color, ethnicity, national origin, sex, gender identity or expression, sexual orientation, disability, age or religion." The BRT's website similarly defines "bias incident" as "conduct that discriminates, stereotypes, excludes, harasses, or harms anyone in our community based on their identity (such as race, color, ethnicity, national origin, sex, gender identity or expression, sexual orientation, disability, age, or religion)."

40.     The University has emphasized that "[b]ias comes in many forms," and "can be a hurtful action based on who someone is as a person." That standard is completely subjective: according to the University, after all, "[*t*]*he most important indication of bias is your own feelings*." And the University has emphasized that "[b]ias-related incidents … do not always result in unfair treatment that violates nondiscrimination laws."

41.     Returning to the example discussed above, the student who holds a negative opinion of the Catholic Church and its adherents could be deemed to engage in a "bias incident" if she gives a speech in the Diag or passes out fliers articulating her strongly held views that the Church is wrong to prohibit women from becoming priests. The speech or fliers would be an "activity" based on this student's "negative opinion" of the Catholic Church that could be seen as "hurtful" to the "feelings" of students who share the "cultural experience" of belonging to the Catholic faith.

42.     The University has adopted an elaborate system through which "bias incidents" are reported, investigated, and potentially punished by the BRT.

43.     Students can file reports of "bias, intolerance, or discrimination" with the BRT anonymously or on the record. The University allows students to submit such information online, by phone, or in person at multiple locations. The University widely promotes the BRT system and strongly encourages students to report other students' "expression of bias."

44.     After receiving a report of "bias," the BRT opens an investigation. The BRT is comprised of representatives from various units within the University, many of whom wield significant power over students. For example, the BRT includes representatives from the Dean of Students Office, the OSCR (which is responsible for handling disciplinary issues), the University Housing Office, and the Division of Public Safety and Security (which is a law-enforcement unit that "conduct[s] all police and security operations" on campus).

45.     The BRT also includes a full-time "Bias Incident Prevention and Response Coordinator," whose duties include reviewing reported incidents for "investigation and response," "[p]artner[ing] with other campus and divisional social justice initiatives," "enact[ing] cultural appropriation prevention initiatives," and maintaining "strong working relationships with identity-based student organizations."

46.     When it receives a report of "bias," the BRT conducts a full investigation into the incident. The BRT will speak with the student who provided the information (if the student's identity is available) and will confront the student or students whose speech was deemed to be "biased."

47.     If the identity of the individual who expressed "bias" is unknown, the BRT will investigate the incident in an attempt to learn the individual's identity.

48.     The University has stated in no uncertain terms that students who engage in so-called "bias incidents" may be found to have "violated University policies or community standards." And the University has further emphasized that "bias incidents" will be addressed through "a range of remedies that *may include disciplinary action* as well as community education and dialogue."  Bias incidents may also "result in individual education." Thus, even if a student accused of "bias" is not referred to the OSCR for formal discipline, the student may be subjected to so-called "individual education" about his or her purported bias.

49.     The BRT publishes online a "Bias Incident Report Log" in which it documents (at a high level of generality) its investigations and responses to incidents of "bias."

50.     This log identifies: (1) the date of the bias incident; (2) the "method of expression of bias"; (3) the nature of the bias expressed; (4) the location of the bias incident; (5) and the BRT's response.

51.     Since April 2017, the BRT has investigated and responded to more than 150 reports of "written," "verbal," "electronic," and "other" "expressions of bias."

52.     The alleged "expressions of bias" have occurred through numerous modes of expression, both on and off campus, including (1) posters, (2) social media, (3) whiteboards, (4) email, (5) online posts, (6) pictures on dorm-room doors, (7) fliers,

(8) verbal comments, (9) "statements and drawings," (10) group chat, (11) group text that was posted online, (12) Twitter, (13) articles published online, (14) Facebook invitations and Facebook posts, and (15) "classroom behavior."

53.     The alleged "expressions of bias" have concerned a wide array of subjects, including issues of race, religion, sexual orientation, color, national origin, sex, disability, gender identity, socio-economic status, organizational affiliation, political status, "race/politics," "cultural appropriation," "gender expression," and "other" topics. For reasons that are unclear, the BRT also was called to investigate when a group of students made a phallic-shaped sculpture out of snow.

54.     In connection with these investigations, the BRT has acted aggressively to censor what it considers "expression of bias." For example, the BRT has taken down signs, removed flyers, confronted faculty members, erased speech on whiteboards, and interrogated students accused of expressions of bias (whom the University calls "offenders").

55.     The BRT has also imposed various forms of punishment on students whose speech purportedly expressed bias, including requiring students to perform "ongoing educational work," requiring students to attend "unconscious bias training," and imposing "restorative justice" on offenders. Such disciplinary measures unquestionably constitute punishment for disfavored expression: regardless of whether the University and the BRT consider these measures to be formal disciplinary actions,

they stigmatize students as wrongdoers, impose unwanted burdens on students' time, and distract them from their studies and other activities.

56.     Senior University officials also have repeatedly threatened to punish under the Statement those who engage in speech that exhibits "bias" (which, again, includes any speech that may be "hurtful" to someone's "feelings").

57.     For example, Defendant Harper has made clear that students who commit "bias incidents" are subject to punishment under the Statement. According to Harper, the BRT includes officials from the OSCR—who are charged with enforcing the Statement and overseeing disciplinary proceedings—because, although an act of "bias" may "not [be] a crime in the criminal kind, it is a violation of our own values and standards."

58.     Defendant Schlissel also has made clear in interviews with the student newspaper that certain "expressions of bias" will be treated as a violation of the Statement and will be handled in conjunction with the OSCR.  Schlissel has stated that students whose speech "exhibit[s] bias" will face discipline ranging from "restorative justice" to official punishment, such as suspensions, under the Statement.

59.     According to Schlissel, "[m]y job is to make sure that we have structures established and the right set of rules to make sure when bad events do happen, we can investigate them, attempt to figure out who's responsible and then, once we've done that, find the appropriate punishment, be it restorative justice or, on the other extreme, sanctions against the people who are responsible."  Schlissel described "restorative

justice" as a process in which the students in question "learn from" the incident and are "remediated."

60.     Defendant Erik Wessel, Director of the OSCR, has acknowledged that, as of October 2017, the OSCR—which is tasked with enforcing the student code—already had handled multiple cases of "bias" that school year.

61.     As noted above, the University amended the Statement in April 2018 to add "bias-motivated misconduct" as a *separate* and independent offense that can enhance the penalties for other violations of the Statement (such as "bullying" or "harassment"). This amendment to the Statement makes crystal clear that the University intends to use its formal disciplinary apparatus to punish students deemed to have engaged in "bias."

62.     Representatives of several student groups at the University, including the Central Student Government, also recently created a "Bias Incident Rapid Response Group." The purpose of the group is "to inform one another about hateful flyers, posters, chalking, vandalism, misconduct, or upcoming potentially controversial campus events and take shared responsibility to respond with positive messaging; this can occur in various forms, including empowering flyers/posters/chalking, hosting a different event on the same night as the controversial one, and *reporting bias incidents*, which are *reported to the Dean of Students office in the event that an act of University misconduct … occurs*."

63.     The University also created the "Response, Education and Awareness Community Taskforce" ("REACT"), which is a "student taskforce" that works with the BRT.  Students on REACT are "trained in one of two areas: preventative planning or bias incident training," and they "learn how to handle issues involving identity, bias, and social and restorative justice ideas." This new group will also "share resources about reporting a bias incident" to the BRT.

64.     The BRT has a profound chilling effect on speech and expression at the University.

65.     Based on a vague and highly subjective definition of "bias," any student who offers an opinion that may be deemed by another student to be "hurtful" to his or her "feelings" risks an investigation from the University's disciplinary apparatus and the potential for punishment ranging from "restorative justice" and "individual education" to formal disciplinary action. The inevitable result is that many students will be deterred from speaking at all, especially on controversial topics that another student may find "hurtful" or "offensive."

66.     The mere existence of the BRT mechanism chills protected expression even apart from any punishments that may result at the end of the process. The University has created and promoted a system in which students can file anonymous reports of "bias" under an amorphous definition based on anything that harms their "feelings," which will then lead a team of University officials to spring into action to investigate. Students voicing controversial or unpopular opinions, or seeking to engage

- 19 -

in humor, satire, or parody, may credibly fear that the BRT will be summoned in response to their speech and that they will be forced to defend themselves against accusations of "bias." The prospect of facing such an investigation will inevitably lead many students to refrain from speaking altogether, to articulate their views less forcefully, or to steer clear of controversial topics. This chilling of protected speech and expression will exist *regardless* of whether a student is ultimately exonerated at the end of the BRT process.

67.     As Professors Jeffrey Snyder and Amna Khalid recently explained, "the proliferation of [bias response teams] is a grave mistake. They degrade education by encouraging silence instead of dialogue, the fragmentation of campuses into groups of like-minded people, and the deliberate avoidance of many of the most important—and controversial—topics across all academic disciplines. They are inherently anti-intellectual enterprises, fundamentally at odds with the mission of higher education. And ultimately they will undermine a bedrock principle of the modern university: that more diversity leads to better learning." Jeffrey Aaron Snyder & Amna Khalid, *The Rise of "Bias Response Teams" on Campus*, The New Republic (Mar. 30, 2016), *available at* https://newrepublic.com/article/132195/rise-bias-response-teams-campus.

"[W]ithout the space to debate and argue, students won't ever be forced to confront the underlying assumptions framing their worldviews." *Id.* In short, bias response teams "result in a troubling silence: Students, staff, and faculty [are] afraid to speak their minds, and individuals or groups [are] able to leverage bias reporting policies to shut down

unpopular or minority viewpoints." *Id.* Bias response teams "substitute diktats for debate when what we need most is constant, frank conversation." *Id.*

68.    A recent report from the Foundation for Individual Rights in Education similarly found that bias response teams lead to "a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration." FIRE, *Bias Response Team Report 2017* at 28 (Feb. 2017),       *available       at       https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2017/03/01012623/2017-brt-report-corrected.pdf.       "While universities should certainly be listening to their students and offering resources to those who encounter meaningful difficulties in their life on campus, the posture taken by many Bias Response Teams is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus." *Id.* at 5.

## IV.    University Policies Are Fostering a Campus Environment That Chills Protected Expression and Fails to Protect Students' First Amendment Rights.

69.    The University's policies and actions are irreparably harming countless students who seek to express themselves and voice their opinions without fear of investigation or punishment. The University's actions are especially likely to chill or deter speech on controversial or politically charged topics, as well as humor, satire, and parody. The result is that all University students lose the opportunity to challenge, debate, and learn from the views and experiences of their classmates.

70.     Students at the University have a credible fear that mere expression of certain viewpoints will be treated as "bias," "hate," or "bullying," thereby subjecting them to investigation or discipline by the OSCR or BRT. In a speech attended by more than 1,000 students the night of the 2016 election, Defendant Schlissel stated that "[y]our voices worked out to be a 90/10 decision in favor of the unsuccessful candidate yesterday," and thus "[n]inety percent of you rejected the kind of hate and the fractiousness and the longing for some kind of idealized version of a non-existent yesterday that was expressed during the campaign." Schlissel thus appears to have equated support for the winning candidate in the 2016 presidential election with "hate"—which tracks almost verbatim the University's definitions of the types of action that could subject students to OSCR discipline or an investigation by the BRT.

71.     The University has also repeatedly condoned conduct by students that has resulted in the suppression of speech offering disfavored viewpoints or opinions.

72.     In October 2017, the University's chapter of Young Americans for Freedom invited author Charles Murray to an event. Murray's speech was "met with chants, music, intentionally annoying cell phone sounds, an overhead projector displaying an arrow pointing to him along with the words 'white supremacist,' and hostile questions from students." Despite pleas from the students hosting the event, University officials did nothing to stop this suppression of speech. No student was ever punished for these disruptions.

73.     The Charles Murray event was not an isolated incident. In the fall of 2016, a debate club at the University hosted a discussion of whether "Black Lives Matter is harmful to racial relations in the United States." Rather than engaging in a frank and candid discussion of this important topic, approximately 400 students "stormed the debate hall chanting, holding signs, and stomping their feet – effectively ending the debate." No student was ever punished for these disruptions. Indeed, the Central Student Government apparently *supported* those who disrupted the event, stating that the topic itself was "bigoted" and that holding this debate would "devalue the #BlackLivesMatter movement."

74.     Groups offering views that are disfavored on campus, such as Young Americans for Freedom, College Republicans, and the Michigan Review also routinely have their signs and posters (which are expensive and time-consuming to produce) torn down or defaced. These groups have also faced the theft or vandalism of written materials such as booklets, stickers, and email signup sheets. Ironically, the perpetrators of these acts will often then declare that *they* have been victims of "hate" or "violence."

75.     As one student from the Class of 2020 explains: "There is a portion of the student body that feels as though the University goes to great lengths to blow their candle out to make others' brighter…. This is not the campus I thought I was going to be a part of when I came here in the fall. I thought I was coming to a place open to all people from all walks of life with all ideas. It turns out that statement is true, but only if your ideals align with those the University imposed upon us. In other words, people

have their right to freedom of speech and expression, but only until their beliefs no longer align with the so-called 'correct' beliefs, then people are not allowed to freely express those opinions. In one word, this oppression of the diverse thoughts Michigan pushes so greatly is disheartening. I thought I was coming into a place where diversity and debate was encouraged for the intellectual enlightenment of all. I was wrong."

76.    According to another student from the Class of 2019, "[b]orn to immigrant parents and from one of the most liberal cities on the West Coast, I understand how we can disagree politically but be friends, neighbors, family, and part of a welcoming community. That community is not here. It is unacceptable to our peers, students and professors to have a different viewpoint."

77.    Another student expressed similar concerns: "As many signs as there are plastered around campus promoting open discourse, the free spreading of ideas, and embracing diversity, I am taken aback that the university community that I am a part of utterly fails to live up to a single one of those arbitrary claims. I have, until this week, hidden my political views and opinions from nearly everyone I have encountered here at the university. Meanwhile, I have chosen to be tolerant of others as they freely voice opinions diametrically opposed to my own. In my residence hall, I have been relegated to a small private group chat of like-minded individuals, too scared to discuss in public our commonly held beliefs."

78.    According to another student, "Coming from a Hispanic family in Miami, I was completely unaware of how the people in Michigan would act towards Hispanics

and I was reassured by a family friend that Michigan was one of the most diverse and inclusive schools in the country. However, once I got on campus, I realized that this could not be further from the truth. I have received more hate in my entire life at this university for my political and religious beliefs than I have for being a Latino in my entire life."

79.     According to another student, "Posters and advertising for conservative student organizations are frequently vandalized and torn down, yet the university only seems to be concerned with the extremely infrequent and isolated instances of racism that are completely uncharacteristic of this campus…. I should be able to openly discuss my political viewpoints in the classroom setting without fear of being academically penalized. I should be able to wear a "Make America Great Again" hat around campus without fear of being attacked (this has happened at a presidential debate watch party)…. I love this university. I love the students here. But I can't say with any certainty that they love me back. We look just like everyone else, we come from many backgrounds, but our thoughts and opinions are not accepted here."

80.     According to another student, "As an incoming freshman to the University of Michigan, … I eagerly anticipated being part of a community that would challenge my views and allow me to do the same, knowing that I would learn more about others and myself in doing so. This perhaps naive aspiration for my college education was crushed within my first week of classes. My fellow students were intolerant to conservative views and some of my professors condoned and voiced their

- 25 -

agreement for this intolerance. Since the election of Mr. Donald J. Trump, this attitude has spread and augmented throughout campus. Not only has the University and its president endorsed this intolerance, but it has also been so hypocritical as to preach diversity, equity, and inclusion while doing so."

81.    According to a student in the Class of 2020, "It bothers me that I am willing to accept other people for their political views but do not feel that reciprocated in many instances. In those instances, it usually leads into accusations of me being a racist, deplorable, and ignorant, among other things…. I was talking to a friend in the hallway today, whom also supported Donald Trump, and someone was listening into our conversation. After about thirty seconds of my friend and I having a private discussion, we were both called racists, which is simply not true."

82.    A former student shared similar concerns: "The University has only made it a safe place for those who have the same democratic views that the University promotes. I spent three years of my life at this school scared of speaking out about my political views because I like many republicans would get labeled as a racist, sexist, homophobic person which I am very far from."

83.    As another student explained, "I wear my hat with Trump's slogan on it, 'Make America Great Again', around campus and I might as well be in full KKK ensemble judging by how I am treated. … I will be walking around in the light of day, proudly supporting the next president of the United States, minding my own business, and I have been called every name in the book. I have been shoved, had my hat thrown

off my head, drinks dumped on me, things knocked out of my hand, been spit on, been told to kill myself, get the f**k off this campus, and much, much more. These actions were performed by fellow students, in the presence of fellow students, and not even once has anyone stepped in to defend me, ask the aggressor to step down, or offer me any sort of support. More often than not, once someone has begun ridiculing me or knocking my hat off, or whatever form of aggression that is taken, people will join in."

84.     Says another Michigan student: "I am disappointed to be a student on a campus where diversity is embraced, unless you are a conservative. If you are a conservative, you are labeled as homophobic, Islamophobic, racist and sexist. I am none of these things. I am simply a student who cannot speak transparently about their views even though I embrace diversity."

## V.     The University's Unconstitutional Policies Are Causing Concrete and Direct Injuries to Speech First's Members

85.     Speech First's members who attend the University are incurring concrete injuries as a direct result of the University's unconstitutional policies and actions.

86.     One Speech First member ("Student A") is a rising sophomore at the University. Student A enrolled in the University because he wanted to learn in an intellectually challenging environment in which students and faculty are free to engage in lively, fearless debate and deliberation.

87.     Student A has views that are unpopular and in the minority on campus. He has especially strong view about gun rights, illegal immigration, and abortion.

88.     Student A supports President Trump and believes the United States has a moral obligation to build the border wall and deport illegal immigrants. He believes that many illegal immigrants take advantage of government services that are paid for by U.S. taxpayers.

89.     Student A believes that #Blacklivesmatter might have once been a good idea, but has devolved into a hateful group that promotes racial division. He believes that #Blacklivesmatter groups on campus have sowed division through intimidation by, for example, disrupting speakers and events and vandalizing student displays.

90.     Student A believes that abortion should be illegal.

91.     Student A believes that the welfare system is being abused, and that the government should impose work requirements and drug testing on welfare recipients.

92.     Student A believes in a race-neutral society in which people receive neither preferences nor penalties based on the color of their skin. He believes that affirmative action undermines a merit-based education system.

93.     Student A believes that the "gender identity" movement is seeking to coerce and intimidate others. He does not believe that he should be coerced into referring to a man as a woman simply because the student declares that his gender has now changed.

94.     Student A believes that there is no "wage gap" between men and women and that any differences in salary are based on men's and women's choices about the

number of hours they work, the amount of time they spend away from work caring for family, and the types of jobs they choose to do.

95. Student A strongly supports gun rights, and believes anyone who is not found to be dangerous should be able to store and carry semi-automatic weapons, handguns, shotguns, pistols, and rifles.

96. Student A disagrees with students who advocate for views opposing his own. In particular, Student A disagrees with students who believe that women should be permitted to have abortions, who do not support the President, and who advocate for open borders and the protection of illegal immigrants.

97. Student A wants to engage in open and robust intellectual debate with his fellow students about these topics in the classroom, online, in University housing, in other areas of the campus, and in the city of Ann Arbor.

98. Because Student A has strong views on these issues, he wants to speak passionately and repeatedly about these matters. Student A wants to point out the flaws in his fellow students' arguments and encourage his fellow students to change their minds or, at a minimum, understand his point of view.

99. Student A wants to use humor, satire, and parody to highlight what he believes to be the absurdities in his fellow students' arguments.

100. Despite these desires, Student A has been chilled and deterred from speaking openly about issues that are important to him.

101.   Student A credibly fears expression of his views may be considered "harassment" or "bullying" under the Statement. He credibly fears that another student will find his views "unwanted," "demeaning," or "bothersome," and will report him to the OSCR. Student A credibly fears that he would be investigated and/or face punishment from the OSCR for articulating his views.

102.   Student A also credibly fears that expression of his views may result in other students calling the BRT, thereby subjecting Student A to investigations and potential sanctions such as "restorative justice," "individual education," or referral for formal discipline.

103.   Under the vague and amorphous definitions the BRT employs, Student A credibly fears that his speech would be deemed a "bias incident." Countless members of the University community, including faculty, staff, other students—*and even the President of the University*—have repeatedly stated that views and opinions such as those held by Student A are hateful, racist, bigoted, and misogynistic. Student A thus has a credible fear that forceful expression of his views would lead another student or staff member to report him to the BRT for an "expression of bias" or "bias incident."

104.   The only ways for Student A to avoid these risks of investigation and/or punishment are to refrain from expressing his sincerely held views; to articulate his views less forcefully; or to articulate his opinions only in the company of students who already share his views.

105.    Because of his credible fears that his speech will be deemed "harassment," "bullying," or "bias," Student A voices his opinions only in small groups when he is confident the students listening to his speech will not report him to the BRT or OSCR. When speaking to students he does not know well, Student A tries to avoid controversial topics.

106.    Student A also wants to have the opportunity to *listen* to vigorous debates involving students with opposing views on all sides of controversial issues, and to be exposed to humor, satire, and parody. Yet due to the pervasive speech-chilling effects of the University's policies and actions, Student A is being deprived of his right to listen, read, and receive speech that might be seen by some as "offensive" or "hurtful."

107.    Another Speech First member ("Student B") is a rising sophomore at the University. Student B holds views that are unpopular and in the minority on campus.

108.    Student B strongly supports the border wall and believes that immigration laws, like all laws, should be strictly and vigorously enforced. He further believes that English should be the official language of the United States for all official documents and communications.

109.    Student B believes strongly in welfare reform and work requirements for welfare benefits. He believes that there are significant abuses of welfare programs that need to be reined in.

110.    Student B believes that it is irresponsible for people to have children out of wedlock, and that people who have children out of wedlock contribute to a number of major social problems.

111.    Student B believes that aborting any baby after 12 weeks is murder and that certain types of abortion practices are morally indistinguishable from genocide.

112.    Student B believes that it is biologically impossible for a person to change or "transition" their gender. He believes that a person may seek to appear as someone from the opposite gender, but cannot change the fact that he or she is biologically male or biologically female.

113.    Student B believes that the much-touted "wage gap" between men and women is a myth and is based on overly simplistic calculations that do not account for critical factors such as hours worked and choice of occupation.

114.    Student B believes that Title IX has gone much too far in forcing universities to drop men's athletic programs. He also believes that the conventional narrative about an "epidemic" of sexual assault on campuses has been blown out of proportion. Student B further believes that any accusations of sexual assault should be addressed by the police, not by universities.

115.    Student B believes passionately in the Second Amendment. He believes that anyone who has not committed a violent crime should be able to own a firearm, including automatic firearms. He believes that both open carry and concealed carry should be allowed on the University's campus.

116.    Student B recognizes that race and ethnicity exist and play specific roles within society. However, Student B also believes that such roles should not include any benefits or detriments based on an individual's racial background, particularly in government and university programs.

117.    Student B believes that satire, parody, and humor can be especially effective tools for making an argument.

118.    Student B wants to engage in open and robust intellectual debate with his fellow students about his beliefs in the classroom, online, in University housing, in other areas of the campus, and in the city of Ann Arbor. Because Student B believes in these topics, he wants to speak passionately and regularly about these issues. Student B wants to point out the flaws in his fellow students' arguments and encourage his fellow students to change their minds about these topics or, at a minimum, understand his point of view.

119.    Student B credibly fears that articulation of his strongly held views—or using humor, satire, or parody to point out the absurdities of contrary views—could be deemed "harassment," "bullying," or a "bias incident." Student B fears that articulation of these views could lead him to be reported, investigated, and potentially punished by the OSCR or the BRT.

120.    Because of these credible fears of investigation and/or punishment, Student B largely keeps his views to himself and does not forcefully articulate his views in the presence of students who may disagree with him.

121.    Another Speech First member ("Student C") is a rising senior at the University and writes for one of the campus newspapers.

122.    Student C values an open exchange of ideas on campus, and thinks that controversial points of view must be confronted directly. For example, Student C wrote an article defending a highly unpopular speaker's right to lecture on campus. But due to fear of backlash or bias reporting, Student C published that article anonymously.

123.    Student C often hears professors and students disparage the Western canon due to its authorship by "dead white men." Student C believes that canonical writers and thinkers offer important views and are worth studying. Student C also disagrees with what he sees as the gratuitous insertion of identity politics into discussions of topics such as Shakespeare's plays. In both cases, however, Student C refrains from voicing his views due to a credible fear that he will be accused of racism or sexism and reported to the bias response team.

124.    Student C disagrees with many of the University's "diversity" initiatives. But when Student C has previously voiced those opinions, he was publicly accused of racism by other students. Student C thus credibly fears that he will be reported to the bias response team or the OSCR if he expresses similar views in the future.

125.    Student C wants to use humor, satire, and parody in discussions and debates with fellow students without fear of punishment for making statements that might be perceived as offensive.

126.    Student C wants to be able to articulate his views publicly under his own name, without having to write anonymously due to fear of being accused of harassment, bullying, or a bias incident.

127.    Student C wants to engage in open and robust intellectual debate with his fellow students about his beliefs in the classroom, online, in University housing, in other areas of the campus, and in the city of Ann Arbor.

128.    To avoid the risk of an investigation or punishment, or harassment from fellow students, Student C simply refrains from discussing many controversial topics. The University's policies and actions are chilling Student C from engaging in open discussion of controversial issues and are denying him the opportunity to hear views that differ from the campus orthodoxy.

129.    Student A, Student B, and Student C are examples of Speech First members at the University who are suffering concrete harm to their First and Fourteenth Amendment rights as a direct result of Defendants' actions.

130.    Student A, Student B, and Student C face a credible threat that the speech in which they seek to engage would be considered "harassment," "bullying," or a "bias incident" and would lead to investigation or punishment by the BRT and/or the OSCR. Indeed, Defendant Schlissel has prominently announced that certain political views, such as some of the views held by Students A, B, and C, are tantamount to "hatred."

## COUNT I
### Violation of the First Amendment
### (Harassment/Bullying Speech Code)

131.   Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

132.   The First Amendment prohibits State officials at public universities from adopting regulations that outlaw certain student conduct when the regulation "is so broad as to chill the exercise of free speech and expression." *Dambrot v. Cent. Michigan University*, 55 F.3d 1177, 1182 (6th Cir. 1995).

133.   "Because First Amendment freedoms need breathing space to survive, a state may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). A public university must carefully craft its regulations "to punish only unprotected speech and not be susceptible of application to protected expression." *Id.*

134.   "'[I]f it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.'" *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 243 (6th Cir. 2015) (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988)). Moreover, humor, satire, and parody play an important role in a democratic society, and "it is clear that our political discourse would have been considerably poorer without them." *Hustler Magazine, Inc.*, 485 U.S. at 55-56. It is thus "firmly settled" that "the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York*, 394 U.S. 576, 592 (1969).

135.    A regulation is unconstitutionally overbroad if "a substantial number of instances exist in which the [regulation] cannot be applied constitutionally." *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013). The Court must find such regulations facially unconstitutional because "the threat of enforcement of an overbroad [regulation] may deter or 'chill' constitutionally protected speech," as "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

136.    Moreover, "regulations that prohibit speech on the basis of listener reaction alone are unconstitutional both in public high school and university settings." *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 369 (M.D. Pa. 2003). The government may not prohibit speech "based solely on the emotive impact that its offensive content may have on a listener." *Saxe v. State College Area School Dist.*, 240 F.3d 200, 209 (3d Cir. 2001) (Alito, J.).

137.    The Statement's bans on "harassment" and "bullying"—and its recent amendment imposing additional penalties for "bias-motivated misconduct"—are unconstitutionally overbroad because a substantial number of instances exist in which those prohibitions would reach speech or expression the First Amendment protects.

138.    The Statement bans "[h]arassing or bullying another person—physically, verbally, or through other means." The Expect Respect initiative, in turn, has adopted

- 37 -

an amorphous and expansive interpretation of "harassment," defining that term as "unwanted negative attention *perceived* as intimidating, demeaning, or bothersome to an individual." In other words, a student may violate the ban on so-called harassment if he or she engages in "unwanted" "verbal[]" conduct (*i.e.*, speech) that another student *perceives* as being "demeaning" or "bothersome."

139.   The April 2018 amendment to the Statement adds another offense and further increases the potential penalties if a student engages in "harassment" or "bullying" while "motivated by bias" on the basis of "race, color, national origin, age, marital status, sex, sexual orientation, gender identity, gender expression, disability, religion, height, weight, or veteran status."

140.   The University's ban on "harassment" could be applied to a wide swath of protected expression and is thus unconstitutionally overbroad. There are countless instances in which a student's protected speech or expression about matters such as race, sex, gender identity, immigration, religion, politics, and numerous other topics may be *perceived* by another student as "demeaning" or "bothersome." Similarly, many students may find protected expression involving humor, satire, or parody to be "demeaning" or "bothersome."

141.   The Statement's prohibition on "bullying" also is unconstitutionally overbroad. The Statement does not define "bullying," but it does cite a definition from Merriam-Webster's Dictionary defining that term as: "(1) to frighten, hurt, or threaten (a smaller weaker person), (2) to act like a bully toward (someone), (3) to cause

(someone) to do something by making threats or insults or by using force, (4) to treat abusively, (5) to affect by means of force or coercion." A student could thus be reported, investigated, and punished for "bullying" if she "verbally" or through "other means" (*e.g.*, the Internet) engages in protected speech or expression that another student finds "frightening," "abusive," or "hurtful."

142.   The Statement's recently enacted penalty enhancement for "bias-related misconduct" also is unconstitutionally overbroad. The University defines "bias" as "a pre-formed negative *opinion* or *attitude* toward a group of persons who possess common physical characteristics, such as skin color; or cultural experiences, such as religion or national origin." There are countless instances of protected speech in which a student might express a "negative opinion" about a group of people with shared "cultural experiences" that another student would find to be "demeaning" or "bothersome"— *e.g.*, the statement "the federal government should deport more illegal immigrants" could certainly be seen as "demeaning" or "bothersome" to students with the shared "cultural experience" of having undocumented immigrants in their families or communities.

143.   The Statement's prohibitions on "harassment," "bullying," and "bias-related misconduct" likewise are unconstitutionally overbroad because they punish speech or expression based on the reaction of the listener.

144.   The threat of potentially serious penalties for "harassment" or "bullying" is chilling Plaintiff's members and countless other students from speaking openly and

forcefully about matters of public concern, especially matters that are seen as sensitive or controversial. And the Statement's new prohibition on "bias-related misconduct," which goes into force on July 1, 2018, will only exacerbate that chilling effect by further increasing the potential penalties for offenses that can include protected expression.

145.   The chilling effect from the Statement's overbroad prohibitions on "harassment," "bullying," and "bias-related misconduct" also is depriving Plaintiff's members and other students of their right to be exposed to speech and expression that is protected by the First Amendment but is being stifled due to Defendants' unconstitutional actions.

146.   Defendants adopted these unconstitutional policies and took these unconstitutional actions while acting under color of state law.

## COUNT II
### Violation of the First and Fourteenth Amendments – Void-for-Vagueness (Harassment/Bullying Speech Code)

147.   Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

148.   "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[T]he vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement [by officials]." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007).

149.   "With respect to the first goal, … [a] statute which either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Id.* (citation omitted).

150.   "With respect to the second goal, … if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis." *Id.* (citation omitted).

151.   This principle of clarity is especially demanding when First Amendment freedoms are at stake. If the challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Commonwealth of Va. ex rel. Comm. on Law Reform and Racial Activities*, 359 U.S. 344, 353 (1959); *see also Leonardson v. City of East Lansing*, 896 F.2d 190, 195-96 (6th Cir. 1990) (considering whether the challenged policy "provides fair notice of the standard of conduct to which a citizen is held accountable," or instead "leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory, and overzealous enforcement").

152.   The Statement's prohibitions on "harassment," "bullying," and "bias-related misconduct" are unconstitutionally vague because they impose potentially severe penalties—up to and including expulsion from the University—based on terms so vague that students of ordinary intelligence have no clear or meaningful standards or guidance about the line between permissible and prohibited conduct.

153.   The absence of any clear or meaningful standards for "harassment," "bullying," and "bias-related misconduct" results in a serious risk that these prohibitions will be enforced in an arbitrary or discriminatory manner, or will be used to target speech based on the viewpoint the speaker expresses.

154.   Due to the inherent vagueness of the prohibitions on "harassment," "bullying," and "bias-related misconduct," Plaintiff's members and many other students will choose not to speak about certain topics, or to speak less forcefully, to avoid the risk of an investigation or punishment for their speech.

155.   Defendants adopted these unconstitutionally vague prohibitions under color of state law.

## COUNT III
### Violation of the First Amendment
### (Bias Response Team)

156.   Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

157.   The definitions of "bias" and "bias incident," as enforced by the University's Bias Response Team, are unconstitutionally overbroad because a

substantial number of instances exist in which those prohibitions cannot be applied consistent with the First Amendment.

158.   The University defines "bias" as "a pre-formed negative *opinion* or *attitude* toward a group of persons who possess common physical characteristics, such as skin color; or cultural experiences, such as religion or national origin." According to the University, such "bias" "often stems from fear, misunderstanding, hatred, and stereotypes, and may be intentional or unintentional."

159.   The University has further defined "bias incident" as "non-criminal activity committed against a person or property that is motivated, in whole or in part, by the offender's bias against a race, color, ethnicity, national origin, sex, gender identity or expression, sexual orientation, disability, age or religion." The BRT's website similarly defines "bias incident" as "conduct that discriminates, stereotypes, excludes, harasses, or harms anyone in our community based on their identity (such as race, color, ethnicity, national origin, sex, gender identity or expression, sexual orientation, disability, age, or religion)."

160.   The University has emphasized that "[b]ias comes in many forms," and "can be a hurtful action based on who someone is as a person." According to the University, "[*t*]*he most important indication of bias is your own feelings*." And the University has emphasized that "[b]ias-related incidents … do not always result in unfair treatment that violates nondiscrimination laws."

161.   Under the University's definitions, in short, a student may be deemed to have committed a "bias incident" if he or she engages in an "activity" (*i.e.*, speech) that is motivated by the student's "negative opinion or attitude" toward a group of people with shared "cultural experiences" if such activity is "hurtful" to someone's "feelings."

162.   These expansive and highly subjective definitions of "bias" and "bias incident" can unquestionably extend to protected speech and expression. Under these definitions, speech critical of certain tenets of the Islamic faith could be deemed "hurtful" to Muslims. Speech questioning whether a biological man can actually transition to a woman could be deemed "hurtful" to transgender students. Speech criticizing the tactics or methods of the #Blacklivesmatter movement could be deemed "hurtful" to African-American students. Speech encouraging a tough policy towards illegal immigration could be deemed "hurtful" to Latino students. And protected speech involving humor, satire, or parody is particularly likely to cause offense to some group of students and thus be deemed a "bias incident."

163.   There is a credible threat that the BRT will take action to punish students, including Plaintiff's members, for protected expression. The University has actively encouraged students to report alleged "bias incidents" to the BRT. The BRT then conducts an investigation, which may result in "restorative justice," "unconscious bias training," "individualized education," or a referral to the University's formal disciplinary system.

164.    Informal discipline such as "individualized education," "unconscious bias training," or "restorative justice" imposes First Amendment harms every bit as serious as formal punishment such as a reprimand or suspension. A student may accept such lesser sanctions to avoid even the mere *threat* of being referred for formal discipline. And these measures impose unwanted burdens on students' time, distract them from their studies and other activities, and stigmatize students for having engaged in purported wrongdoing.

165.    Moreover, even apart from any formal or informal sanctions at the end of the BRT process, the mere threat of being *investigated* by the BRT (which includes university officials *and law enforcement officers*) for alleged incidents of bias will cause many students to err on the side of caution before expressing an opinion that could cause someone to take offense. The University and several student groups broadly promote the BRT and encourage aggressive reporting of "bias incidents."

166.    In sum, the BRT and its expansive definitions of "bias" and "bias incident" unquestionably reach a substantial amount of constitutionally protected speech and expression.  These policies and procedures are chilling Plaintiff's members and countless other students from speaking openly and forcefully about matters of public concern, especially matters that are seen as controversial or sensitive.

167.    In addition to being overbroad and highly subjective, these prohibitions impermissibly define "bias" and "bias incident" based on the reaction of the listener.

168.   The chilling effect of the BRT's overbroad prohibitions on "bias incidents" also is depriving Plaintiff's members and other students of their right to be exposed to speech and expression that is protected by the First Amendment but is being stifled due to Defendants' unconstitutional actions.

169.   Defendants adopted these unconstitutional policies and took these unconstitutional actions while acting under color of state law.

## COUNT IV
**Violation of the First and Fourteenth Amendments – Void-for-Vagueness**
**(Bias Response Team)**

170.   Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

171.   The BRT's definitions of "bias" and "bias incident" are unconstitutional because they employ terms so vague that students of ordinary intelligence have no clear or meaningful standards or guidance about the line between permissible and prohibited conduct.

172.   Based on these hopelessly vague definitions, the BRT can subject students to burdensome investigations; impose sanctions such as "restorative justice," "individual education," or "remediation"; or refer students to the OSCR for formal disciplinary proceedings.

173.   The absence of any clear or meaningful standards for "bias" and "bias incidents" results in a serious risk that these prohibitions will be enforced in an arbitrary

or discriminatory manner, or will be used to target speech based on the viewpoint expressed.

174.   Due to the vagueness of the concepts of "bias" and "bias incident," Plaintiff's members and many other students will choose not to speak about certain topics, or to speak less forcefully, in order to avoid the risk of an investigation by the BRT or punishment for their speech.

175.   Defendants adopted these unconstitutionally vague prohibitions under color of state law.

<u>COUNT V</u>
**Violation of the First Amendment – Prior Restraint of Speech**
**(Bias Response Team)**

176.   Plaintiff repeats and realleges each of the foregoing allegations in this Complaint.

177.   The First Amendment prohibits State officials from using "administrative methods to prevent the dissemination of ideas or opinions thought dangerous or offensive." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 235 (7th Cir. 2015). "Threatening penalties for future speech goes by the name of 'prior restraint,' and a prior restraint is the quintessential first-amendment violation." *Id* (citation omitted).

178.   State officials violate the First Amendment when their actions or statements "can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow" if the individual engages in protected speech. *Okwedy v. Molinari*, 333 F.3d 339, 342 (2d Cir. 2002).

179. Because prior restraints of speech are "the essence of censorship," *Near v. Minnesota*, 283 U.S. 697, 713 (1931), and "the most serious and the least tolerable infringement on First Amendment rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), "[a]ny system of prior restraints of expression … bears a heavy presumption against its constitutional validity." *Bantam Books*, 372 U.S. at 70. "Prior restraints of free speech require the most exigent circumstances for justification." *ACLU v. City of Pittsburgh*, 586 F. Supp. 417, 421 (W.D. Pa. 1984).

180. Defendants have violated the First Amendment because they have used administrative methods, including the operation of the BRT, to prevent the dissemination of ideas and opinions that the University deems offensive.

181. Students engaging in protected speech or expression about controversial or sensitive topics face a credible risk that their speech will be reported to the BRT and that the students will face burdensome investigations or administrative proceedings to respond to allegations of "bias."

182. Even if such students are ultimately exonerated, the BRT operates as an unconstitutional prior restraint by forcing students to undergo a burdensome administrative process in order to obtain permission to speak.

183. Defendants adopted this unconstitutional mechanism while acting under color of state law.

**WHEREFORE**, Plaintiff Speech First, Inc. respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants and provide the following relief:

A.   A declaratory judgment that the Statement's prohibitions on "harassment" and "bullying"—and its recently adopted amendments prohibiting "bias-related misconduct"—violate the First and Fourteenth Amendments;

B.   A declaratory judgment that the BRT and its prohibitions on "bias" and "bias incidents" violate the First and Fourteenth Amendments;

C.   A permanent injunction prohibiting Defendants from taking any actions to investigate, threaten, or punish students for violations of the Statement's prohibitions on "harassment," "bullying," and "bias-related misconduct";

D.   A permanent injunction prohibiting Defendants from using the BRT to investigate, threaten, or punish students (including informal punishments such as "restorative justice" or "individual education") for "bias incidents";

E.   A preliminary injunction granting the relief specified above during the pendency of this action;

F.   Plaintiff's reasonable costs and expenses of this action, including

attorneys' fees, in accordance with 42 U.S.C. 1988 and all other applicable

laws; and

G.   All other further relief to which Plaintiff might be entitled.

Respectfully submitted,

Dated: May 8, 2018

/s/ John A. Di Giacomo
John A. Di Giacomo (P73056)
REVISION LEGAL, PLLC
5024 Territorial Road
Grand Blanc, MI 48439
(231) 714-0100
john@revisionlegal.com

*Local Counsel*

William S. Consovoy (application for admission
forthcoming)
Jeffrey M. Harris (application for admission
forthcoming)
J. Michael Connolly (application for admission
forthcoming)
CONSOVOY MCCARTHY PARK PLLC
3301 Wilson Boulevard
Suite 700
Arlington, VA 22201
(703) 243-9423

*Counsel for Plaintiff Speech First, Inc.*