# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

SPEECH FIRST, INC.,

*Plaintiff,*

v.

Civil Action 2:18-cv-11451-LVP-EAS

MARK SCHLISSEL, et al. ,

*Defendants.*

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff Speech First, Inc. ("Speech First") hereby moves the Court to issue a preliminary injunction enjoining Defendants Mark Schlissel, et al., from: (1)  taking any actions to investigate, threaten, or punish students for violations of the prohibitions on "harassment," "bullying," and "bias-related misconduct" set forth in the University's Statement of Student Rights and Responsibilities; and (2) using the Bias Response Team to investigate, threaten, or punish students (including informal punishments such as "restorative justice" or "individual education") for "bias incidents."

Speech First respectfully asks that the Court expedite resolution of this motion to the extent necessary to ensure that a decision by this Court and by the Sixth Circuit,

should either party decide to appeal this Court's ruling, is reached before the new school year begins on September 4, 2018.

Pursuant to Local Rule 7.1(a), Speech First conferred with Defendants' counsel. Defendants do not concur in the relief sought and oppose Speech First's request for a preliminary injunction.

Respectfully submitted,

By: /s/ John A. Di Giacomo

Dated: May 11, 2018

John A. Di Giacomo (P73056)
REVISION LEGAL, PLLC
5024 Territorial Road
Grand Blanc, MI 48439
(231) 714-0100
john@revisionlegal.com

*Local Counsel*

William S. Consovoy
Jeffrey M. Harris
J. Michael Connolly
CONSOVOY MCCARTHY PARK PLLC
3301 Wilson Boulevard
Suite 700
Arlington, VA 22201
(703) 243-9423

*Counsel for Plaintiff Speech First, Inc.*

2

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2018, I electronically filed the foregoing with the Clerk of the Court using the ECF system. Pursuant to agreement with Defendants' counsel, an electronic copy of the foregoing was emailed to Defendants' counsel on May 11, 2018.

By: /s/ John A. Di Giacomo

John A. Di Giacomo (P73056)
REVISION LEGAL, PLLC
5024 Territorial Road
Grand Blanc, MI 48439
(231) 714-0100
john@revisionlegal.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

SPEECH FIRST, INC.,

*Plaintiff,*

v.

Civil Action 2:18-cv-11451-LVP-EAS

MARK SCHLISSEL, et al. ,

*Defendants.*

# PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

John A. Di Giacomo (P73056)
REVISION LEGAL, PLLC
5024 Territorial Road
Grand Blanc, MI 48439
(231) 714-0100
john@revisionlegal.com

William S. Consovoy (application for admission forthcoming)
Jeffrey M. Harris (application for admission forthcoming)
J. Michael Connolly (application for admission forthcoming)
CONSOVOY MCCARTHY PARK PLLC
3301 Wilson Boulevard
Suite 700
Arlington, VA 22201
(703) 243-9423

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iii

CONSISE STATEMENT OF ISSUES PRESENTED ....................................................v

CONTROLLING AUTHORITY FOR RELIEF SOUGHT..........................................v

STATEMENT PURSUANT TO L.R. 7.1(a) ......................................................................v

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................1

BACKGROUND ..................................................................................................................4

I.    The University's Expansive and Ill-Defined Bans on "Harassment," "Bullying," and "Bias-Motivated Misconduct."...........................................................4

II.   The University's "Bias Response Team" and its Expansive and Ill-Defined Ban on "Bias Incidents." ...................................................................................................7

III.  Speech First and This Litigation.............................................................................. 11

ARGUMENT ...................................................................................................................... 12

I.    Speech First Is Likely To Prevail On The Merits Of Its Claims. ........................... 12

   A.   The First Amendment Prohibits Vague and Overbroad Regulations Capturing Substantial Amounts of Protected Speech. ..................................... 12

   B.   The Statement's Bans on "Harassment," "Bullying," and "Bias-Related Misconduct" Are Unconstitutionally Overbroad and Void for Vagueness. . 14

   C.   The Bias Response Team's Ban on "Bias Incidents" Is Unconstitutionally Overbroad and Void for Vagueness.................................................................... 19

II.   Speech First Meets The Remaining Preliminary-Injunction Criteria. ................ 23

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Bair v. Shippensburg Univ.*,
280 F. Supp. 2d 357 (M.D. Pa. 2003) .................................................. 13, 17, 23, 24

*Dambrot v. Central Mich. Univ.*,
55 F.3d 1177 (6th Cir. 1995) ..................................................................... 14, 15, 16

*Dayton Area Visually Impaired Persons, Inc. v. Fisher*,
70 F.3d 1474 (6th Cir. 1995) ................................................................................. 25

*DeJohn v. Temple Univ.*,
537 F.3d 301 (3d Cir. 2008) ............................................................................ 16, 18

*Doe v. University of Michigan*,
721 F. Supp. 852 (E.D. Mich. 1989) ...........................................................*passim*

*Elrod v. Burns*,
427 U.S. 347 (1976) ............................................................................................... 24

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
23 F.3d 1071 (6th Cir. 1994) .......................................................................... 24, 25

*Hustler Magazine, Inc. v. Falwell*,
485 U.S. 46 (1988) ................................................................................................. 13

*Jones v. Caruso*,
569 F.3d 258 (6th Cir. 2009) ................................................................................ 24

*Leonardson v. City of East Lansing*,
896 F.2d 190 (6th Cir. 1990) .......................................................................... 14, 16

*Marshall v. Ohio University*,
2015 WL 1179955 (S.D. Ohio 2015) .................................................................... 18

*Monaghan v. Sebelius*,
916 F. Supp. 2d 802 (E.D. Mich. 2012) ............................................................... 24

*Papish v. Bd. of Curators of Univ. of Mo.*,
410 U.S. 667 (1973) ................................................................................................. 1

*R.A.V. v. City of St. Paul, Minn.*,
505 U.S. 377 (1992) ............................................................................................... 13

*Saxe v. State College Area School Dist.*,
240 F.3d 200 (3d Cir. 2001) ............................................................... 13, 16, 18, 21

*Snyder v. Phelps*,
562 U.S. 443 (2011) ............................................................................................... 24

*Solid Rock Found. v. Ohio State Univ.*,
478 F. Supp. 96 (S.D. Ohio 1979) ................................................................. 1

*Speet v. Schuette*,
726 F.3d 867 (6th Cir. 2013) ...................................................................... 14

*Street v. New York*,
394 U.S. 576 (1969) .................................................................................. 12

*Sypniewski v. Warren Hills Regional Bd. Of Educ.*,
307 F.3d 243, (3d Cir. 2002) ...................................................................... 18

*Texas v. Johnson*,
491 U.S. 397 (1989) .................................................................................. 12

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) .................................................................................. 12

*United States v. Playboy Entertainment Group*,
529 U.S. 803 (2000) .................................................................................. 13

*Virginia v. Black*,
538 U.S. 343 (2003) .................................................................................. 25

*Winter v. Nat. Resources Def. Council*,
555 U.S. 7 (2008) ...................................................................................... 12

## OTHER AUTHORITIES

FIRE, *Bias Response Team Report 2017* (Feb. 2017) ........................................ 23

Snyder & Khalid, *The Rise of "Bias Response Teams" on Campus*,
The New Republic (Mar. 30, 2016) ............................................................. 23

## CONSISE STATEMENT OF ISSUES PRESENTED

Issue 1:      Is Plaintiff entitled to a preliminary injunction?

Plaintiff Speech First argues that it is entitled to a preliminary injunction under Fed. R. Civ. Pro. 65(a) because the defendant officials at the University of Michigan have adopted several policies that unconstitutionally ban protected speech and expression and have a chilling effect on open discourse at the University. Plaintiff argues that these policies violate the First and Fourteenth Amendments, that Plaintiff will suffer irreparable harm in the absence of a preliminary injunction, and that the balance of equities and public interest tip in favor of an injunction.

## CONTROLLING AUTHORITY FOR RELIEF SOUGHT

Fed. R. Civ. Pro. 65(a)

*Winter v. Nat. Resources Def. Council*, 555 U.S. 7 (2008)

*United States v. Playboy Entertainment Group*, 529 U.S. 803 (2000)

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992)

*Texas v. Johnson*, 491 U.S. 397 (1989)

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)

*Dambrot v. Central Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995)

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994)

*Leonardson v. City of East Lansing*, 896 F.2d 190 (6th Cir. 1990)

*Doe v. University of Michigan*, 721 F. Supp. 852 (E.D. Mich. 1989)

## STATEMENT PURSUANT TO L.R. 7.1(a)

Counsel for Plaintiff notified counsel for Defendants of Plaintiff's intent to file this motion.  Defendants do not consent to the relief sought herein.

## INTRODUCTION AND SUMMARY OF ARGUMENT

"The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). After all, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979). Yet the University of Michigan ("the University") and its officials have created an elaborate investigatory and disciplinary apparatus to suppress and punish speech other students deem "demeaning," "bothersome," or "hurtful." This Court found the University's previous iteration of a speech code to violate the First and Fourteenth Amendments. *See Doe v. University of Michigan*, 721 F. Supp. 852 (E.D. Mich. 1989). The University's latest attempts at censorship should fare no better.

Plaintiff Speech First, Inc. ("Speech First") is a nationwide membership organization of students, alumni, and others—including current students who attend the University—that is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment to the U.S. Constitution. Speech First respectfully requests, before the start of the 2018-19 school year, a preliminary injunction enjoining two separate but related University policies that have a profound chilling effect on protected speech and expression.

First, the University's disciplinary code prohibits "harassment" and "bullying," and further increases the potential penalties if such actions were motivated by "bias." All of those concepts, as the University interprets and applies them, can capture staggering amounts of protected speech and expression. For example, the University defines "harassment" as "unwanted negative attention perceived as intimidating, demeaning, or bothersome to an individual." Ex. B. at 6.[1] A student can thus be subject to significant penalties (up to and including expulsion) if another student *perceives* his or her speech as "demeaning" or "bothersome." Under this regime, the most sensitive student on campus effectively dictates the terms under which others may speak. The University's expansive and amorphous prohibitions on "harassment," "bullying," and "bias-related misconduct" are having—and will continue to have—a profound chilling effect on protected activity, and are void for vagueness due to the utter lack of clear notice about the line between permissible and prohibited speech and expression.

Second, the University has created a "Bias Response Team" (BRT) that receives complaints of "bias" and "bias incidents" from offended students and is tasked with investigating and punishing those who commit such offenses. According to the University, "[b]ias comes in many forms," can be intentional or unintentional, and "can be a hurtful action based on who someone is as a person." Ex. F. at 3. In determining whether a bias incident has occurred, "[*t*]*he most important indication of bias is your own*

---

[1] All exhibits cited in this brief are exhibits to the Declaration of Jeffrey M. Harris.

*feelings*." *Id.* (emphasis added). As a result, a student whose speech is seen by another student as "hurtful" to his or her "feelings" may receive a knock on the door from a team of University officials (some of whom may be law enforcement officers) threatening to refer the student to formal disciplinary authorities unless he or she submits to "restorative justice" or "individual education." *See* Ex. I at 1; Ex. L. at 7. The BRT and its highly subjective definitions of "bias" and "bias incident" pose a grave threat to free expression at the University, and are unconstitutional under the doctrines of overbreadth, vagueness, and prior restraints.

Speech First is likely to prevail on the merits of its claims under the First and Fourteenth Amendments and readily meets the remaining preliminary-injunction criteria. Deprivation of a core constitutional right, even for a brief period of time, constitutes irreparable injury, and a preliminary injunction would not foreclose the University from adopting policies that advance its legitimate interests without chilling or burdening protected speech. There is no question, moreover, that the public has a strong interest in ensuring the protection of speech and expression at state-funded universities. Speech First thus respectfully requests that this Court grant a preliminary injunction and reaffirm that the First Amendment applies with full force even to speech the University deems "demeaning," "bothersome," or "hurtful."

## BACKGROUND

### I.    The University's Expansive and Ill-Defined Bans on "Harassment," "Bullying," and "Bias-Motivated Misconduct."

Because the University is a public institution, its policies must comply with the First and Fourteenth Amendments to the Constitution. Yet the University and its officials have a long record of seeking to limit some students' speech and expression in order to prevent other students from taking offense. This Court previously enjoined University officials from implementing an earlier iteration of a speech code. *See Doe*, 721 F. Supp. at 864-67 (holding that speech code prohibiting "verbal conduct" that "victimizes" or "stigmatizes" certain groups was unconstitutionally overbroad in violation of the First Amendment and void for vagueness under the Fourteenth Amendment). Despite that holding, the University and its officials have continued to maintain policies and take actions that have the purpose and effect of limiting speech that certain students might find offensive.

The University's Statement of Student Rights and Responsibilities ("Statement") "describes possible behaviors which are inconsistent with the values of the University community." Ex. A at 1. The Statement "outlines procedures to respond to such behaviors," and "suggests possible sanctions/ interventions which are intended to educate and to safeguard members of the University Community." *Id.* at 5. In short, the Statement prohibits certain actions and sets forth procedures and remedies for alleged violations. The University claims authority to punish misconduct that "occurs in the

city of Ann Arbor, on University controlled property, or at University sponsored events/programs." *Id.* at 4. Unsurprisingly, the Statement provides that students may be disciplined for conduct such as physically harming another person, illegally possessing drugs or alcohol, falsifying records, theft, and vandalism. *Id.* at 3-4.

The Statement also prohibits "[h]arassing or bullying another person—physically, verbally, or through other means." *Id.* at 3. Although the Statement does not define "harassment," it does cite a definition of that term from the University's "Expect Respect" initiative, which is a program designed to create a "[c]ampus social climate" that is "safe and inclusive." Ex. C. That program defines "harassment" as "unwanted negative attention *perceived* as intimidating, demeaning, or bothersome to an individual." Ex. B. at 6 (emphasis added). The Statement also cross-references Merriam-Webster's Dictionary, which defines "harassing" as "(1) to annoy persistently; (2) to create an unpleasant or hostile situation, especially by uninvited or unwelcome verbal or physical conduct." *Id.* In other words, a student may violate the University's prohibition on so-called "harassment" if he or she engages in "verbal[]" conduct (*i.e.*, speech) that another student *perceives* as being "demeaning," "bothersome," or "annoying."

As for "bullying," the only definition the University provides is a link to Merriam-Webster's Dictionary, which defines that term as: "(1) to frighten, hurt, or threaten (a smaller weaker person), (2) to act like a bully toward (someone), (3) to cause (someone) to do something by making threats or insults or by using force, (4) to treat abusively, (5) to affect by means of force or coercion." *Id.* A student could thus be reported,

5

investigated, and punished for "bullying" if she "verbally" or through "other means" engages in conduct that another student finds "frightening," "abusive," or "hurtful."

Any student, faculty member, or staff member may submit a complaint to the Office of Student Conflict Resolution ("OSCR") alleging a violation of the Statement. The OSCR will then investigate and decide whether to bring charges against the student. A student who violates the Statement can suffer a wide range of punishments. The OSCR can, among other things, formally reprimand the student; put the student on probation; order the student to attend a class or perform "community tasks" that will teach the student "why certain behavior is inappropriate"; suspend the student for a specific time; or permanently expel the student from the University. Ex. A. at 9-10.

In April 2018, the University announced amendments to the Statement that will take effect on July 1, 2018. Under those amendments, there will be a separate ban on "bias-related misconduct," which is defined as a violation of any of the other offenses in the Statement that is "motivated by bias or prejudice," including "behavior motivated on the basis of any person's identity as protected by the University of Michigan's Nondiscrimination Policy (race, color, national origin, age, marital status, sex, sexual orientation, gender identity, gender expression, disability, religion, height, weight, or veteran status)." Ex. K. Under this amendment, an action that violates the Statement that is "motivated on the basis" of "bias" can be subject to *two* sanctions—one for the underlying offense and one for the "bias." *Id.*

II.    **The University's "Bias Response Team" and its Expansive and Ill-Defined Ban on "Bias Incidents."**

The University has further supplemented the bullying/harassment provisions of the Statement with a "Bias Response Team" (BRT). The BRT is comprised of University administrators and law enforcement, and may also include students and "community representatives who serve the U-M community." Ex. F. The BRT is tasked with overseeing "the response and management of bias incidents." *Id.*

Like the Statement's bans on "harassment" and "bullying," the University has adopted a vague, open-ended, and subjective definition of "bias" that can encompass a wide array of conduct, including speech and expression protected by the First Amendment. The University defines "bias" as "a pre-formed negative *opinion* or *attitude* toward a group of persons who possess common physical characteristics, such as skin color; or cultural experiences, such as religion or national origin." Ex. E (emphasis added). Such "bias," according to the University, "often stems from fear, misunderstanding, hatred, and stereotypes, *and may be intentional or unintentional*." Ex. F (emphasis added). These definitions of "bias" encompass countless instances of protected speech and expression on all manner of topics. Under the plain text of these definitions, a student may be deemed to have acted with "bias" if, for example, she gives a speech sharply criticizing the Catholic Church and its adherents for not allowing women to become priests; this student has expressed a "negative opinion" or "attitude" about a certain group of people based on their "cultural experience" of religion.

7

The University further defines "bias incident" as "non-criminal activity committed against a person or property that is motivated, in whole or in part, by the offender's bias against a race, color, ethnicity, national origin, sex, gender identity or expression, sexual orientation, disability, age or religion." Ex. E. The BRT's website similarly defines "bias incident" as "conduct that discriminates, stereotypes, excludes, harasses, or harms anyone in our community based on their identity (such as race, color, ethnicity, national origin, sex, gender identity or expression, sexual orientation, disability, age, or religion." Ex. F. The University has emphasized that "[b]ias comes in many forms," and "can be a hurtful action based on who someone is as a person." *Id.* at 3. That standard is completely subjective:  according to the University, "[t]*he most important indication of bias is your own feelings.*" *Id.* (emphasis added).

Returning to the example discussed above, the student who holds a negative opinion of the Catholic Church and its adherents could be deemed to engage in a "bias incident" if she gives a speech in the Diag or passes out fliers articulating her opinion that the Church and its adherents are wrong to prohibit women from becoming priests. The speech or fliers would be an "activity" based on this student's "negative opinion" of the Catholic Church that could be seen as "hurtful" to the "feelings" of students who share the "cultural experience" of belonging to the Catholic faith.

The University has adopted an elaborate system through which "bias incidents" are reported, investigated, and potentially punished by the BRT. Students can file reports of "bias, intolerance, or discrimination" with the BRT anonymously or on the

record. After receiving a report of "bias," the BRT opens an investigation. The BRT is comprised of representatives from various units within the University, many of whom wield significant power over students. For example, the BRT includes representatives from the Dean of Students Office, the OSCR (which is responsible for handling disciplinary issues), the University Housing Office, and the Division of Public Safety and Security (which conducts police and security operations on campus). *See* Ex. F at 1-2. The University widely promotes the BRT system and strongly encourages students to report other students' "expression of bias."

When it receives a report of "bias," the BRT conducts an investigation into the incident. The University has stated unequivocally that students who engage in so-called "bias incidents" may be found to have "violate[d] University policies or community standards." Ex. H. And the University has further emphasized that "bias incidents" will be addressed through "a range of remedies that *may include disciplinary action* as well as community education and dialogue." *Id.* (emphasis added). Bias incidents may also "result in individual education," Ex. I, or "restorative justice," Ex. L at 7.

The BRT publishes online a "Bias Incident Report Log" in which it documents (at a high level of generality) its investigations and responses to incidents of "bias." This log identifies: (1) the date of the bias incident; (2) the "method of expression of bias"; (3) the nature of the bias expressed; (4) the location of the bias incident; (5) and the BRT's response. In little more than a year, the BRT has investigated and responded to more than 150 reports of "written," "verbal," "electronic," and "other" "expressions

of bias." Ex. J. Those "expressions of bias" have occurred through numerous modes of expression, both on and off campus, including posters, social media, whiteboards, email, online posts, pictures on dorm-room doors, fliers, verbal comments, "statements and drawings," group chat or text, Twitter, articles published online, Facebook posts, and "classroom behavior." *Id.* The alleged "expressions of bias" have concerned a wide array of subjects, including race, religion, sexual orientation, color, national origin, sex, disability, socio-economic status, organizational affiliation, political status, "race/politics," "cultural appropriation," "gender expression," and "other" topics. *Id.*

In connection with those investigations, the BRT has acted aggressively to censor what it considers "expression of bias." For example, the BRT has taken down signs, removed flyers, confronted faculty members, erased whiteboards, and interrogated students accused of bias (whom the University calls "offenders"). *Id.*

The BRT has imposed various forms of punishment on students whose speech purportedly expressed bias, including requiring students to attend "individual education" or participate in "restorative justice." *See* Ex. I; Ex. L at 7. For example, Defendant Schlissel has made clear that certain actions "causing emotional harm to impacted communities" will be treated as a violation of the Statement and will be handled in conjunction with the OSCR. *See* Ex. L. at 7. Schlissel has stated that students whose speech exhibits bias will face discipline ranging from "restorative justice" to official punishment, such as suspensions, under the Statement. *Id.* at 7-8. According to Schlissel, "[m]y job is to make sure that we have structures established and the right set

of rules to make sure when bad events do happen, we can investigate them, attempt to figure out who's responsible and then, once we've done that, find the appropriate punishment, be it restorative justice or, on the other extreme, sanctions against the people who are responsible." *Id.* at 8. Schlissel described "restorative justice" as a process in which the students in question "learn from" the incident and are "remediated." *Id.*

### III.    Speech First and This Litigation.

Plaintiff Speech First Inc. ("Speech First") is a nationwide membership organization of students, alumni, and others that is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment. In particular, Speech First seeks to protect the rights of students and others at colleges and universities, through litigation and other lawful means.

Speech First has several members who are current students at the University, in a variety of different class years. *See* Neily Decl. ¶¶ 3-5. Speech First's members want to engage in open, vigorous, and provocative debate and discussion about a wide array of often-controversial topics—including but not limited to politics, immigration, race, sex, gender identity, religion, abortion, gun rights, and cultural issues—and they want to be able to use humor, satire, and parody in their discussions both inside and outside of the classroom. *Id.* Yet Speech First's members are being chilled from openly articulating their views due to a credible fear that they will be accused of "harassment" or "bullying" under the Statement, or will be investigated and/or punished by the BRT for engaging

11

in "bias incidents." *Id.* Speech First has brought this suit to ensure that its members and other students at the University will not face investigations or discipline for engaging in the open and vigorous exchange of ideas that is at the core of the First Amendment merely because a University official or another student finds their views "demeaning," "bothersome," or "hurtful." *Id.*

## ARGUMENT

A plaintiff seeking a preliminary injunction must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Resources Def. Council*, 555 U.S. 7, 20 (2008).

## I.   Speech First Is Likely To Prevail On The Merits Of Its Claims.

### A.   The First Amendment Prohibits Vague and Overbroad Regulations Capturing Substantial Amounts of Protected Speech.

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). The Supreme Court has held time and again, both within and outside the school context, that the government may not prohibit speech based on the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969); *see also Street v. New York*, 394 U.S. 576, 592 (1969) ("[T]he public expression of ideas may not be prohibited merely

because the ideas are themselves offensive to some of their hearers."); *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 414 (1992) ("The mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected."). Moreover, humor, satire, and parody play an important role in a democratic society, and "it is clear that our political discourse would have been considerably poorer without them." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55-56 (1988).

Relatedly, "regulations that prohibit speech on the basis of listener reaction alone are unconstitutional both in public high school and university settings." *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 369 (M.D. Pa. 2003). The government may not prohibit speech "based solely on the emotive impact that its offensive content may have on a listener." *Saxe v. State College Area School Dist.*, 240 F.3d 200, 209 (3d Cir. 2001) (Alito, J.); *see also United States v. Playboy Entertainment Group*, 529 U.S. 803, 812 (2000) (regulation based on "the effect of the subject matter on [listeners]" is "the essence of a content-based regulation"). Indeed, "[c]ommunications which provoke a response, especially in the university setting, have historically been deemed an objective to be sought after rather than a detriment to be avoided." *Bair*, 280 F. Supp. 2d at 370-71. In short, when a restriction on speech is intended to "shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities 'simply by averting [our] eyes.'" *Playboy Enterprises*, 529 U.S. at 813.

13

Under the "overbreadth" doctrine, a statute or regulation violates the First Amendment—even if it has some constitutional applications—if it "so broad as to 'chill' the exercise of free speech and expression." *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995). In applying that standard, the court first considers whether the challenged policy "reaches a substantial amount of constitutionally protected speech." *Id.*; *see also Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013). The court then determines whether the policy "provides fair notice of the standard of conduct to which a citizen is held accountable," or instead "leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory, and overzealous enforcement." *Leonardson v. City of East Lansing*, 896 F.2d 190, 195-96 (6th Cir. 1990).

**B.**   **The Statement's Bans on "Harassment," "Bullying," and "Bias-Related Misconduct" Are Unconstitutionally Overbroad and Void for Vagueness.**

The University's Statement of Student Rights and Responsibilities—violation of which can subject students to investigations and penalties up to and including expulsion—prohibits "[h]arassing or bullying another person—physically, verbally, or through other means." Ex. A. at 3. On its face, there is no question this prohibition can sweep in enormous amounts of protected speech and expression. Pro-choice students may feel "harassed" by a demonstration by pro-life students that features photos of aborted fetuses. Students who support the rights of undocumented immigrants may feel "harassed" by expressions such as "Build the Wall!" and "Make America Great Again!" Students hosting an event that is protested by other students will likely feel

14

"harassed" by the protestors. Students who are devout Catholics may feel "harassed" by students who distribute condoms in the dorms. And the definition of "bullying" fares no better, as that amorphous term can encompass anything that "frighten[s]," "hurt[s]," or "threaten[s]" another student. Ex. B. at 6. Students who care deeply about abortion rights or same-sex marriage may feel "frightened" or "threatened" by speech urging the Supreme Court to overturn *Roe v. Wade* or *Obergefell v. Hodges*. The Statement's prohibitions on "harassment" and "bullying" plainly "reach[] a substantial amount of constitutionally protected speech." *Dambrot*, 55 F.3d at 1182.

The University's "Expect Respect" initiative—which claims to promote a "safe and inclusive" "[c]ampus social climate," *see* Ex. C—has further clarified the meaning of "harassment," but this expanded definition only underscores its constitutional infirmities. Under the Expect Respect definition, "harassment" entails "unwanted negative attention perceived as intimidating, demeaning, or bothersome to an individual." Ex. B. at 6; Ex. E. The Statement also links to a definition from Merriam-Webster's Dictionary that defines "harassing" as: "(1) to annoy persistently; (2) to create an unpleasant or hostile situation, especially by uninvited or unwelcome verbal or physical conduct." Ex. B. at 6. In other words, a student may violate the prohibition on so-called "harassment" if he or she engages in "verbal[]" conduct (*i.e.*, speech) that another student *perceives* as being "demeaning," "bothersome," "annoying," or "unpleasant."

These definitions of "harassment" hit the unconstitutional trifecta of being highly expansive, highly subjective, and hopelessly vague. Virtually any opinion or political belief—as well as any use of humor, satire, or parody—will be perceived by *somebody* as "demeaning," "bothersome," or "annoying." To paraphrase the Sixth Circuit, "[i]n order to determine what conduct will be considered ["harassment"] by the university, one must make a subjective reference" based on the listener's own perception of the speech. *Dambrot*, 55 F.3d at 1184. And, "[a]bsent any requirement akin to a showing of severity or pervasiveness—that is, a requirement that the conduct *objectively and subjectively* creates a hostile environment or substantially interferes with an individual's work—the policy provides no shelter for core protected speech." *DeJohn v. Temple Univ.*, 537 F.3d 301, 317-18 (3d Cir. 2008) (emphasis added); *see also Doe*, 721 F. Supp. at 867 (noting subjective nature of words such as "victimize" and "stigmatize").

In sum, the University's conception of "harassment" not only "reaches a substantial amount of constitutionally protected speech," *Dambrot*, 55 F.3d at 1182, but also utterly fails to provide "fair notice of the standard of conduct" to which students will be held, *Leonardson*, 896 F.2d at 195-96. As then-Judge Alito emphasized in *Saxe*, "[l]oosely worded anti-harassment laws may pose some of the same problems as the St. Paul hate speech ordinance [in *R.A.V.*]: they may regulate deeply offensive and potentially disruptive categories of speech based, at least in part, on subject matter and viewpoint." 240 F.3d at 208.

16

On top of its already-vague prohibitions on "bullying" and "harassment," the University recently announced amendments to the Statement that will add a separate, additional prohibition on "bias-related misconduct." That term is defined as a violation of any of the other enumerated offenses in the Statement (including "bullying" or "harassment") that is "motivated by bias or prejudice," including "behavior motivated on the basis of any person's identity as protected by the University of Michigan's Nondiscrimination Policy…." Ex. K. Under this amendment, an action that violates the Statement and is "motivated on the basis of" alleged "bias" can be subject to *two* sanctions—one for the underlying offense and one for the "bias." *Id.* As explained in greater detail below, the University's definitions of "bias" are every bit as amorphous and subjective as its prohibitions on "harassment" and "bullying." The new prohibition on "bias-related misconduct" merely adds an unconstitutional enhancement to the unconstitutional proscriptions on "harassment" and "bullying."

The Statement's prohibitions on "harassment," "bullying," and "bias-related misconduct" are strikingly similar to other university speech codes that courts have found to be unconstitutional. In *Bair*, for example, the university prohibited speech that would "provoke, harass, intimidate, or harm another," 280 F. Supp. 2d at 363, which closely tracks Michigan's prohibition on speech that is "intimidating, demeaning, or bothersome to an individual." *Bair* also involved a prohibition on "acts of intolerance" that were "maliciously motivated," which closely resembles Michigan's prohibition on "bias-related misconduct," *i.e.*, "behavior motivated on the basis of any person's

identity." The court in *Bair* held that each of the challenged provisions, by its plain terms, could extend to protected speech. *See id.* at 370-71. The prohibition on speech that "provoke[s], harass[es], or intimidate[s]" was especially problematic because it impermissibly turned on the listeners' reaction to the speech. *Id.* But "[c]ommunications which provoke a response, especially in the university setting have historically been deemed an objective to be sought after rather than a detriment to be avoided." *Id.* at 372; *see also Sypniewski v. Warren Hills Regional Bd. Of Educ.*, 307 F.3d 243, 264 (3d Cir. 2002) (citing *Saxe*, 240 F.3d at 209) ("confining prohibited speech to that which constitutes 'harassment' is not alone sufficient to ensure constitutionality … [Indeed], 'harassment,' when targeted on the basis of its expressive content, encompasses speech within the area protected by the First Amendment").

The Statement's prohibitions on "bullying" and "harassment" also contain none of the First Amendment safeguards that courts have cited in upholding other types of university disciplinary policies. For example, in *Marshall v. Ohio University*, the court rejected an overbreadth challenge to a university's anti-harassment policy because the policy required a showing that the individual's actions were "objectively and subjectively severe or pervasive." 2015 WL 1179955 (S.D. Ohio 2015). Michigan's policy, by contrast, turns on the subjective *perception* of the offended student and contains no requirement that the conduct be severe or pervasive. The absence of such safeguards is often fatal to a university's attempts to prohibit "harassment" or a "hostile environment." *See DeJohn*, 537 F.3d at 320 ("[U]nless harassment is qualified with a

18

standard akin to a severe or pervasive requirement, a harassment policy may suppress core protected speech."); *Saxe*, 240 F.3d at 217 (noting absence of "any threshold showing of severity or pervasiveness").

The effect of the University's amorphous bans on "bullying," "harassment," and "bias-motivated misconduct" is to profoundly chill free speech and open discourse. The University has "never articulated any principled way to distinguish sanctioned from protected speech," and "[s]tudents of common understanding [are] necessarily forced to guess at whether a comment about a controversial issue would later be found to be sanctionable." *Doe*, at 721 F. Supp. at 867. A student who voices a controversial or unpopular opinion—or who seeks to use humor or satire when discussing sensitive topics—risks punishment up to and including expulsion if even one other student perceives that speech as "demeaning," "bothersome," "annoying," or "unpleasant." Put differently, students must be certain before speaking that their words will not be perceived as offensive by even the most sensitive student on campus. Many students will inevitably choose not to speak about controversial or sensitive topics rather than risk investigation and punishment if another student takes offense at their words and files a complaint alleging "bullying," "harassment," or "bias-motivated misconduct."

## C. The Bias Response Team's Ban on "Bias Incidents" Is Unconstitutionally Overbroad and Void for Vagueness.

For similar reasons, the Bias Response Team's prohibition on "bias incidents" is grossly overbroad and poses a grave risk of chilling protected speech and expression.

The University defines "bias" as "a pre-formed negative *opinion* or *attitude* toward a group of persons who possess common physical characteristics, such as skin color; or cultural experiences, such as religion or national origin." Ex. E. Such "bias," according to the University, "often stems from fear, misunderstanding, hatred, and stereotypes, and may be intentional or unintentional." Ex. F. The University defines "bias incident" as "non-criminal activity committed against a person or property that is motivated, in whole or in part, by the offender's bias against a race, color, ethnicity, national origin, sex, gender identity or expression, sexual orientation, disability, age or religion." Ex. E. The BRT's website similarly defines "bias incident" as "conduct that discriminates, stereotypes, excludes, harasses, or harms anyone in our community based on their identity (such as race, color, ethnicity, national origin, sex, gender identity or expression, sexual orientation, disability, age, or religion." Ex. F. at 1. The University has emphasized that "[b]ias comes in many forms," and "can be a hurtful action based on who someone is as a person." *Id.* at 3. According to the University, "[*t*]*he most important indication of bias is your own feelings*." *Id.* (emphasis added).

Needless to say, a prohibition that turns on the listener's "own feelings"—and that covers even *unintentional* "negative opinion[s] or attitude[s]"—is unconstitutionally vague and overbroad. Like the University's prohibitions on "harassment" and "bullying," "bias incidents" are in the eye of the beholder, and can unquestionably encompass protected speech that merely causes another student to take offense. Speech critical of certain tenets of the Catholic faith could be deemed "hurtful" to Catholics.

Speech questioning whether a biological man can transition to become a woman could be deemed "hurtful" or "exclusionary" to transgender students. Speech criticizing the tactics of the #Blacklivesmatter movement could be deemed "hurtful" to African-American students. Speech encouraging a tough policy towards illegal immigration could be deemed "hurtful" to Latino students. Protected speech involving humor, satire, or parody is also particularly likely to cause offense to some group of students and thus be reported, investigated, and potentially punished as a "bias incident."

The University's definition of a "bias incident" suffers from the same flaws as the policy the Third Circuit invalidated in *Saxe*. Just as the University defines "bias" as a "negative opinion or attitude" about any group with shared "cultural experiences," Ex. E, the policy in *Saxe* similarly sought to prohibit "harassment" based on a person's "values" or "personal characteristics." 240 F.3d at 202-03. To paraphrase then-Judge Alito, "[b]y prohibiting disparaging speech directed at a person's ["cultural experiences"], the Policy strikes at the heart of moral and political discourse—the lifeblood of constitutional self-government (and democratic education) and the core concern of the First Amendment. That speech about ["cultural experiences"] may offend is not cause for its prohibition, but rather the reason for its protection: 'a principal function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.'" *Id.* at 210.

21

Students voicing disfavored or controversial viewpoints credibly fear that their actions will be reported to the BRT. The University has designed an elaborate system in which students who believe they have been subject to "bias incidents" may file complaints with the BRT (including anonymous complaints). The University widely advertises this reporting system and encourages students to file reports. The offending student is then investigated by representatives of the University's disciplinary apparatus, including the OSCR and the Division of Public Safety. The BRT has been summoned to investigate "bias incidents" more than 150 times since April 2017. Ex. J. Students found to have engaged in "bias incidents" can then face disciplinary action before the OSCR as well as sanctions including "restorative justice" and "individual education." *See*, *e.g.*, Ex. I; Ex. L at 7-8.

The BRT's vague and overbroad definitions of "bias" and "bias incident" have a profound chilling effect on speech and expression at the University. Indeed, the mere existence of the BRT mechanism chills protected expression even apart from any punishments that may result at the end of the process. *See*, *e.g.*, *Doe*, 721 F. Supp. at 865 (regardless of whether students were formally punished for protected speech, the University "forc[ed] the student to a hearing to answer for allegedly harassing statements made in the course of academic discussion and research"). The University has created and promoted a system in which students can file anonymous reports of "bias incidents" under an amorphous definition based on anything that harms their "feelings," which will then lead a team of university officials to spring into action to

investigate. The prospect of facing such an investigation will inevitably lead many students to refrain from speaking altogether, to steer clear of controversial or sensitive topics, or to speak about controversial matters only with students who already share their views. This chilling of protected speech and expression will exist *regardless* of whether a student is ultimately exonerated at the end of the BRT process.

A recent study found that bias response teams lead to "a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration." FIRE, *Bias Response Team Report 2017* at 28 (Feb. 2017), *available at* https://tinyurl.com/ycq8f8xu. The "posture taken by many Bias Response Teams is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus." *Id.* at 5; *see also* Snyder & Khalid, *The Rise of "Bias Response Teams" on Campus*, The New Republic (Mar. 30, 2016), *available at* https://tinyurl.com/jmnxhyb (bias response teams "result in a troubling silence: Students, staff, and faculty [are] afraid to speak their minds, and individuals or groups [are] able to leverage bias reporting policies to shut down unpopular or minority viewpoints").

## II.   Speech First Meets The Remaining Preliminary-Injunction Criteria.

If this Court concludes, as it should, that Speech First is likely to prevail on its constitutional challenge to the Statement and the BRT, then the remaining elements of the preliminary injunction analysis—irreparable harm, balancing of the equities, and the public interest—all cut strongly in favor of granting preliminary relief. *See*, *e.g.*, *Bair*, 280

23

F. Supp. 2d at 373 (finding remaining preliminary injunction factors satisfied after concluding that university's speech code was likely unconstitutional); *Monaghan v. Sebelius*, 916 F. Supp. 2d 802, 811-12 (E.D. Mich. 2012) (finding remaining factors satisfied after finding likelihood of success on First Amendment claim).

**A.**      Speech First and its members will suffer irreparable harm in the absence of preliminary injunctive relief. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (same); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[V]iolations of [F]irst [A]mendment rights constitute per se irreparable injury.").

**B.**      The balance of equities also tips overwhelmingly in favor of granting a preliminary injunction. Plaintiff and its members obviously have a powerful interest in ensuring the protection of open and vigorous discourse at the University without the threat of investigation or punishment.

On the other side of the ledger, the University has no legitimate interest in banning or chilling speech protected by the First Amendment, even if such speech is "particularly hurtful to many." *Snyder v. Phelps*, 562 U.S. 443, 456 (2011). Even if the current prohibitions are enjoined as vague and/or overbroad, the University remains "free to enact new regulations that are tailored so as to conform to First Amendment jurisprudence." *Bair*, 280 F. Supp. 2d at 373. For example, the University could adopt a narrower definition of "harassment," or could adopt a definition of "bullying" that

tracks the "true threats" doctrine. *See, e.g.*, *Virginia v. Black*, 538 U.S. 343, 360 (2003). Even if this Court grants preliminary injunctive relief, the University will have adequate time before the next school year to adopt new rules of conduct that advance the University's interests without trampling protected speech and expression.

**C.**    Finally, the impact of a preliminary injunction on the public interest also turns in large part on whether the plaintiff's First Amendment rights are likely to be violated. "The public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties." *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995); *see also G & V Lounge*, 23 F.3d at 1079. There is no question that the public has a strong interest in ensuring the protection of speech and expression at state-funded universities.

## CONCLUSION

This Court should grant Speech First's motion and enjoin Defendants from: (1) taking any actions to investigate, threaten, or punish students for violations of the prohibitions on "harassment," "bullying," and "bias-related misconduct" set forth in the Statement; and (2) using the Bias Response Team to investigate, threaten, or punish students (including informal punishments such as "restorative justice" or "individual education") for "bias incidents." Speech First respectfully asks that the Court expedite resolution of this motion to the extent necessary to ensure that a decision by this Court and by the Sixth Circuit, should either party decide to appeal this Court's ruling, is reached before the new school year begins on September 4, 2018.

Respectfully submitted,

By:/s/ John A. Di Giacomo

Dated: May 11, 2018

John A. Di Giacomo (P73056)
REVISION LEGAL, PLLC
5024 Territorial Road
Grand Blanc, MI 48439
(231) 714-0100
john@revisionlegal.com

*Local Counsel*

William S. Consovoy (application for admission forthcoming)
Jeffrey M. Harris (application for admission forthcoming)
J. Michael Connolly (application for admission forthcoming)
CONSOVOY MCCARTHY PARK PLLC
3301 Wilson Boulevard
Suite 700
Arlington, VA 22201
(703) 243-9423

*Counsel for Plaintiff Speech First, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2018, I electronically filed the foregoing with the Clerk of the Court using the ECF system. Pursuant to agreement with Defendants' counsel, an electronic copy of the foregoing was emailed to Defendants' counsel on May 11, 2018.

By: /s/ John A. Di Giacomo

John A. Di Giacomo (P73056)
REVISION LEGAL, PLLC
5024 Territorial Road
Grand Blanc, MI 48439
(231) 714-0100
john@revisionlegal.com