# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| SPEECH FIRST, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) 2:18-cv-11451-LVP-EAS |
| | ) |
| MARK SCHLISSEL, et al., | ) |
| | ) |
| Defendants. | ) |

# UNITED STATES' STATEMENT OF INTEREST IN SUPPORT OF
# <u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES…………………………………………. 4

BACKGROUND…..……………….................................................………… 6

ARGUMENT……………………………………………………….…….. 11

I.  BY THEIR TERMS, THE UNIVERSITY'S PROHIBITIONS ON "HARASSING," "BULLYING," "BIAS-RELATED MISCONDUCT," AND "BIAS INCIDENTS" VIOLATE THE FIRST AMENDMENT ........................................................................................ 13

    A. The Statement's Bans On "Harassing," "Bullying," And "Bias-Motivated Misconduct" Are Overbroad And Void For Vagueness... 15

    B. The Bias Response Policy Is Unconstitutionally Overbroad And Void For Vagueness.................................................................. 22

CONCLUSION.................................................................................... 25

# TABLE OF AUTHORITIES

**CASES:**                                                                                                  **PAGE**

*Baggett v. Bullitt*, 377 U.S. 360 (1964) ............................................................... 3, 21

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ............................................. 3, 14, 21

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) ..............................................12

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998)..............................11

*Dambrot v. Central Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995)...................... *passim*

*Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) ................................. 12, 16

*DeJohn v. Temple University*, 537 F.3d 301 (3d Cir. 2008)................ 16, 18, 19, 25

*Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989)...................... 13, 18, 19

*Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992) ......................... *passim*

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) ..............................................16

*Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*,
    385 U.S. 589 (1967) .......................................................................................5

*Leonardson v. City of East Lansing*, 896 F.2d 190 (6th Cir. 1990) ............... *passim*

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
    No. 16-111, Slip Op. (U.S. June 4, 2018) ............................................................4

*McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232 (3d Cir. 2010) ........... 23, 24

*NAACP v. Button*, 371 U.S. 415 (1933)...................................................................14

*Niemotko v. Maryland*, 340 U.S. 268 (1951).................................................... 3, 21

*R.A.V. v. City of St Paul*, 505 U.S. 377 (1992) ................................................ 12, 20

**CASES (continued):**                                                                                    **PAGE**

*Saxe v. State College Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001) .... 11, 12, 17, 20

*Shelton v. Tucker*, 364 U.S. 479 (1960) ...................................................................5

*Street v. New York*, 394 U.S. 576 (1969) ......................................................... 12, 20

*Sweezy v. State of New Hampshire by Wyman*, 354 U.S. 234 (1957) ......................2

*Texas v. Johnson*, 491 U.S. 397 (1989) ....................................................... 3, 11, 20

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ........... 6, 12, 20

*Virginia v. Black*, 538 U.S. 343 (2003) .................................................................12

*Widmar v. Vincent*, 454 U.S. 263 (1981) .................................................................4

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008) ........................................11

**STATUTES:**                                                                                              **PAGE**

18 U.S.C. § 249 ........................................................................................................12

20 U.S.C. § 1011a(a)(2) .............................................................................................2

28 U.S.C. § 517 ..........................................................................................................1

42 U.S.C. § 1681(a) ...................................................................................................5

42 U.S.C. § 2000c-6 ...................................................................................................5

42 U.S.C. § 2000d .....................................................................................................5

42 U.S.C. § 2000h-2 ..................................................................................................5

42 U.S.C. §§ 12132-12133 .......................................................................................5

**OTHER AUTHORITIES:**                                                                                     **PAGE**

Virginia Resolutions (Dec. 21, 1798), *in* 5 THE FOUNDERS' CONSTITUTION, 135,
   136 (Philip B. Kurland & Ralph Lerner, eds., 1987) .............................................4

The University of Michigan ("University") proclaims on its website that "[f]reedom of speech is a bedrock principle of [its] community and essential to [its] core educational mission as a university."[1]  Unfortunately, the University is failing to live up to that laudable principle.  Instead of protecting free speech, the University imposes a system of arbitrary censorship of, and punishment for, constitutionally protected speech.  The University's policies prohibit speech that any listener finds "bothersome" or "hurtful"—an overbroad, vague, and subjective standard that is a paradigmatic example of the chilling of free expression prohibited by the First Amendment.  Universities have a crucial legal obligation to protect students from harassment and harm, and wide latitude to promote tolerance and respectful dialogue on their campuses.  But state-run institutions like the University also must uphold the bedrock guarantees enshrined in the First Amendment.  The University's policies, even if well-intentioned, fail in this regard—they violate the Constitution's free speech guarantee and should be enjoined.

The United States respectfully submits this Statement of Interest under 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States."  The United States is resolutely committed to protecting First Amendment freedoms and to ensuring, as

---

[1] Free Speech on Campus, *available at* https://publicaffairs.vpcomm.umich.edu/free-speech-on-campus/ (last viewed June 8, 2018).

1

Congress has directed, that public "institution[s] of higher education . . . facilitate the free and open exchange of ideas." 20 U.S.C. § 1011a(a)(2).  In the United States' view, Plaintiff Speech First, Inc., has established that it is likely to succeed on the merits of its claim that the University of Michigan's Statement of Student Rights and Responsibilities ("Statement") and Bias Response Policy are facially unconstitutional under the First and Fourteenth Amendments.

"The essentiality of freedom in the community of American universities is almost self-evident." *Sweezy v. State of New Hampshire by Wyman*, 354 U.S. 234, 250 (1957).  "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id.*  Unfortunately, the University's Statement and Bias Response Policy are eroding that fundamental freedom and chilling the very free and open exchange of ideas that should define American university life for faculty and students alike.

In particular, the University's policies authorize University officials to dispense disciplinary consequences against a speaker who engages in constitutionally protected speech based on nothing more than a listener's "feelings" that the speech was "hurtful" or "bothersome."  The University's policies thus do precisely what the First Amendment forbids: they ban a broad swath of core protected speech based solely on "[l]isteners' reaction," *Forsyth Cty. v. Nationalist*

2

*Movement*, 505 U.S. 123, 134 (1992), that the speech is somehow "offensive or disagreeable," *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

The University's violation of the First Amendment does not end there. The University has also declined to bind itself to *any* definitions for key terms in the Statement, let alone "narrowly drawn, reasonable, and definite standards for [University] officials to follow" in enforcing it. *Niemotko v. Maryland*, 340 U.S. 268, 271 (1951). Instead, the University has identified only "example" definitions that University officials may or may not adhere to in applying the Statement's proscriptions on and punishments of speech. Accordingly, individuals "of common intelligence must necessarily guess at" the parameters of the Statement's speech prohibitions, *Broadrick v. Oklahoma*, 413 U.S. 601, 607 (1973), and are being forced to limit their speech and "'steer far wider of the unlawful zone,' than if the boundaries of the forbidden areas were clearly marked," *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). And members of the University community engage in such speech activities at the peril of potentially "arbitrary, discriminatory, and overzealous enforcement" by University officials, who may apply any definition or no definition at all to the Statement's key terms—or even different definitions across cases based on their own personal approval or disapproval of the challenged speech. *Leonardson v. City of East Lansing*, 896 F.2d 190, 196 (6th Cir. 1990) (internal quotation marks omitted). But as the Supreme Court reaffirmed just last week, "it is not, as the Court

3

has repeatedly held, the role of the State or its officials to prescribe what shall be offensive." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, No. 16-111, Slip Op. at 16 (U.S. June 4, 2018).

The First Amendment demands more.   The Court should apply the Constitution's guarantee of free and open discourse on public campuses and hold that the challenged portions of the Statement and the Bias Response Policy are unconstitutional.

## INTEREST OF THE UNITED STATES

The United States has an interest in protecting the individual rights guaranteed by the First Amendment.  The right to free speech lies at the heart of a free society and is an "effectual guardian of every other right."  Virginia Resolutions (Dec. 21, 1798), *in* 5 THE FOUNDERS' CONSTITUTION, 135, 136 (Philip B. Kurland & Ralph Lerner, eds., 1987).  State-run colleges and universities are no exception from this rule because "the campus of a public university, at least for its students, possesses many of the characteristics of a public forum." *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981).  Thus, public universities have "an obligation to justify [their] discriminations and exclusions under applicable constitutional norms." *Id.* at 267.

The United States has a significant interest in the vigilant protection of constitutional freedoms in institutions of higher learning.  In recent years, many institutions of higher education have failed to uphold these freedoms, and free

speech has come under attack on campuses across the country.  Such failure is of grave concern because freedom of expression is "vital" on campuses, *Shelton v. Tucker*, 364 U.S. 479, 487 (1960), which are "peculiarly the 'marketplace of ideas,'" *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967).

The United States also has a significant interest in ensuring that colleges and universities, including recipients of federal funds, do not discriminate in their educational programs.  The Attorney General is charged with enforcing laws to address such discrimination—including a university's failure to address actionable harassment that creates a hostile environment based on race, color, national origin, sex, religion, or disability.  *See, e.g.*, 42 U.S.C. § 2000d; 42 U.S.C. § 2000h-2; 42 U.S.C. § 2000c-6; 42 U.S.C. § 1681(a); 42 U.S.C. §§ 12132-12133.  Universities therefore are obligated to provide non-discriminatory educational environments to their students while also protecting First Amendment freedoms that are the hallmark of our public institutions of higher learning.

It is in the interest of the United States to lend its voice to enforce First Amendment rights on campuses because "'[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'"  *Keyishian*, 385 U.S. at 603.  "[O]ur history says that it is

this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508-09 (1969).

## BACKGROUND

The University's Statement lays out "the rights and responsibilities of membership in the University's academic and social community." Doc. 4-2, Ex. A, at 1. The Statement "describes possible behaviors which are inconsistent with the values of the University; it outlines procedures to respond to such behaviors; and it suggests possible sanctions/interventions which are intended to educate and to safeguard members of the University community." Doc. 4-2, Ex. A, at 1. The Statement directs that various "sanctions/interventions may be recommended" for violations, including "Formal Reprimand," "Disciplinary Probation," "Restitution," "Restriction from Employment at the University," "Class/Workshop Attendance," "University Housing Transfer or Removal," "Suspension," and "Expulsion." Doc. 4-2, Ex. A, at 9-10.

Section IV of the Statement, titled "Violations," identifies "behaviors" that "contradict the values of the University community and are subject to action under the Statement." Doc. 4-2, Ex. A, at 3. One of those "behaviors" is "[h]arassing or

6

bullying another person—physically, verbally, or through other means."  Doc. 4-2, Ex. A, at 3.

The Statement does not define "[t]he terms associated with the Statement," including "harassing" or "bullying."  Doc. 4-2, Ex. B, at 1, 6-7.  Instead, the Statement links to a smattering of definitions—from such disparate sources as the Merriam-Webster Dictionary, other University policies, and Michigan state law—"as examples of various interpretations that exist for terms used in the Statement." Doc. 4-2, Ex. B, at 1.  Those definitions identify four "interpretations" of "harassing," including one two-part alternative definition.  Doc. 4-2, Ex. B, at 6-7. Those "example" definitions include:

- Merriam-Webster Dictionary: Harassing: (1) to annoy persistently (2) to create an unpleasant or hostile situation for, especially by uninvited and unwelcome verbal or physical conduct.

- University Policies (Expect Respect Initiative): Harassment: unwanted negative attention perceived as intimidating, demanding, or bothersome to an individual.

- University Policies: Discriminatory harassment: Verbal or physical conduct by a member of the faculty or staff that is based upon race, color, creed, religion, national origin, sex, sexual orientation, ancestry, age, marital status, handicap or Vietnam-era veteran status.

- Michigan State Law: Harassment: means conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose.

7

The Statement also links to two "example" definitions of "bullying." Doc. 4-2, Ex. B, at 1. One of those example definitions is a four-part alternative definition from Michigan state law. Doc. 4-2, Ex. B, at 6. The other is a five-part alternative definition from the Merriam-Webster Dictionary that defines "bullying," in part, as (1) "to frighten, hurt, or threaten (a smaller or weaker person)" or (2) "to treat abusively." Doc. 4-2, Ex. B, at 6.

The University has announced new amendments to the Statement effective July 1, 2018. Doc. 4-2, Ex. K, at 1. Those amendments add "bias-motivated misconduct" as "a separate violation of the University community's values." Doc. 4-2, Ex. K, at 1. The "misconduct" referred to in "bias-motivated misconduct" is a violation of the Statement, such as "harassing" or "bullying." Doc. 4-2, Ex. K, at 2. "Bias-motivated" encompasses "behavior motivated on the basis of any person's identity as protected by the University of Michigan's Nondiscrimination Policy (race, color, national origin, age, marital status, sex, sexual orientation, gender identity, gender expression, disability, religion, weight, or veteran status)." Doc. 4-2, Ex. K, at 1-2. The amendments provide that "[s]anctions" for violations of the Statement—including "harassing" and "bullying"—"may be enhanced in instances of bias-motivated misconduct." Doc. 4-2, Ex. K, at 2. Thus, under the amendments, a student who engages in a single episode of constitutionally protected speech could

be sanctioned once for "harassing" or "bullying" and again for "bias-motivated misconduct." Doc. 4-2, Ex. K, at 1-2.

The University also has created a mechanism ("Bias Response Policy") to address "bias incidents." Doc. 4-2, Ex. F, at 1. The Bias Response Policy defines "bias incident" to encompass "non-criminal activities that harm another" based on their identity, Doc. 4-2, Ex. H, at 4, and "conduct that discriminates, stereotypes, excludes, harasses, or harms anyone in our community based on their identity (such as race, color, ethnicity, national origin, sex, gender identity or expression, sexual orientation, disability, age or religion)," Doc. 4-2, Ex. F, at 1. According to the University's Expect Respect Initiative, "bias" is "a pre-formed negative opinion or attitude toward a group of persons who possess common physical characteristics, such as skin color; or cultural experiences, such as religion or national origin." Doc. 4-2, Ex. E, at 1. The Bias Response Policy states that "[b]ias often stems from fear, misunderstanding, hatred, and stereotypes that may be intentional or unintentional." Doc. 4-2, Ex. F, at 1. It emphasizes that "[b]ias comes in many forms" and "can be hurtful action based on who someone is as a person," and it tells students that "[t]he most important indication of bias is your own feelings." Doc. 4-2, Ex. F, at 3.

The University has created the "Bias Response Team" ("BRT") to oversee "the response and management of bias incidents." Doc. 4-2, Ex. F, at 1. The BRT is comprised of University administrators and law enforcement, and may also

9

include students and "community representatives who serve the U-M community." Doc. 4-2, Ex. F, at 1. The BRT is authorized to impose "a range of remedies" for "bias incidents," including "disciplinary action," Doc. 4-2, Ex. H, "individual education," Doc. 4-2, Ex. I, or "restorative justice," Doc. 4-2, Ex. L. To date, the BRT has investigated and responded to more than 150 reports of "expressions of bias" in a wide array of forums and touching on a broad range of subjects, including race, religion, sexual orientation, color, national origin, sex, disability, socio-economic status, organizational affiliation, political status, "race/politics," "cultural appropriation," and "gender expression." Doc. 4-2, Ex. J.

The University has also promulgated a Freedom Of Speech And Artistic Expression Policy. *See* University Of Michigan, Standard Practice Guide Policy 601.1: Freedom Of Speech And Artistic Expression, *available at* http://spg.umich.edu/policy/601.01 (last visited June 8, 2018) (cited at Defs.' Mot. For Extension Of Time ¶ 2 (Doc. 9)). That policy, however, does "not cover . . . verbal harassment directed at individuals where there is no intent to communicate publicly or with a wider audience." *Id.* That policy "do[es] not apply to the classroom" or provide "general guidelines concerning freedom of expression among individuals." *Id.* Instead, that policy "concern[s]" only "how most fully to protect rights of free expression for speakers, performers, and protesters alike" in "settings in which an audience has been assembled for a talk or performance." *Id.*

10

## ARGUMENT

A plaintiff seeking a preliminary injunction must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor" because "it is well-settled that loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (internal quotation marks omitted). Plaintiff meets these standards here.

"[T]he Supreme Court has held time and again, both within and outside the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it." *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001) (Alito, J.). After all, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable." *Texas*, 491 U.S. at 414. The government thus may not prohibit speech based on the "mere desire to avoid the discomfort and unpleasantness that

always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509; *see also Street v. New York*, 394 U.S. 576, 592 (1969) ("[T]he public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."); *R.A.V. v. City of St Paul*, 505 U.S. 377, 414 (1992) ("The mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected.").  Nor may the government ban speech "based solely on the emotive impact that its offensive content may have on a listener."  *Saxe*, 240 F.3d at 209 (Alito, J.); *Forsyth Cty*, 505 U.S. at 134 (ordinarily "[l]isteners' reaction to speech is not a content-neutral basis for regulation").

State entities, including State-run colleges and universities, can—and, in certain circumstances, *must*—proscribe "harassment," "bullying," and "bias-related misconduct," but those efforts must comport with the First Amendment and the Constitution.[2]  As this Court noted nearly 30 years ago when it struck down a prior

---

[2] For example, State entities can prohibit fighting words, harassing speech that creates a hostile environment, and "true threats"—all of which are particularly salient in the context of college campuses—in accordance with the First Amendment.  *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (defining fighting words as those which "by their very utterance inflict injury or tend to incite an immediate breach of the peace"); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999) (establishing liability standards for damages under Title IX based on school district's failure to respond to hostile environment created by student-on-student sexual harassment); *Virginia v. Black*, 538 U.S. 343, 359 (2003) (defining true threats as speech that intends "to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.").  So, too, can States enact hate-crime statutes that comport with the First Amendment.  *See* 18 U.S.C. § 249.

speech policy of the University of Michigan, "[h]owever laudable or appropriate" the University's efforts to promote civility and inclusiveness on campus, a policy that "swe[eps] within its scope a significant amount of verbal conduct or verbal behavior which is unquestionably protected under the First Amendment" cannot pass constitutional muster. *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 853 (E.D. Mich. 1989). Unfortunately, the portions of the Statement and the Bias Response Policy that Plaintiff challenges stretch far beyond the objective, well-established legal definitions of "harassment" or "bias," and prohibit broad swaths of speech protected by the First Amendment. In particular, the Statement and the Bias Response Policy proscribe and punish core protected speech based upon nothing more than the listener's subjective "reaction," *Forsyth Cty.*, 505 U.S. at 134, fail to "provide fair notice of the standard of conduct to which the citizen is held accountable," and impermissibly expose faculty, students, and visitors to "arbitrary, discriminatory, and overzealous enforcement" by University officials, *Leonardson*, 896 F.2d at 195-96. The challenged portions of the Statement and the Bias Response Policy violate the First Amendment.

## I. BY THEIR TERMS, THE UNIVERSITY'S PROHIBITIONS ON "HARASSING," "BULLYING," "BIAS-RELATED MISCONDUCT," AND "BIAS INCIDENTS" VIOLATE THE FIRST AMENDMENT

The Supreme Court has warned against "the possibility that protected speech of others may be muted . . . because of the possible inhibitory effects of overly broad

13

statutes." *Broadrick*, 413 U.S. at 612.  The First Amendment overbreadth doctrine thus "ensure[s] that an overbroad statute does not act to 'chill' the exercise of rights guaranteed protection." *Leonardson*, 896 F.2d at 195; *see also NAACP v. Button*, 371 U.S. 415, 433 (1933) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.").

In this Circuit, a court's first step in applying the overbreadth doctrine is to consider whether the challenged policy "reaches a substantial amount of constitutionally protected speech." *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995) (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984)); *Leonardson*, 896 F.2d at 195.  The court then examines whether the policy is "substantially overbroad and constitutionally invalid under the void for vagueness doctrine." *Dambrot*, 55 F.3d at 1183; *Leonardson*, 896 F.2d at 195-96.  Unconstitutional vagueness can arise in "two forms, both of which result in a denial of due process." *Leonardson*, 896 F.2d at 195-96.  A policy is void for vagueness whenever it either fails to "provide fair notice of the standard of conduct to which the citizen is held accountable" or "leaves the definition of its term to law enforcement officers, and thereby invites arbitrary, discriminatory, and overzealous enforcement." *Id.*

14

Here, Plaintiff is likely to succeed on the merits because the challenged portions of the University's Statement and the Bias Response Policy reach a substantial amount of constitutionally protected speech and are void for vagueness.

## A.   The Statement's Bans On "Harassing," "Bullying," And "Bias-Motivated Misconduct" Are Overbroad And Void For Vagueness

The portions of the Statement that the Plaintiff challenges are a paradigmatic example of overbreadth and vagueness.  The University has declined to bind itself to a definition of either "harassing" or "bullying," Doc. 4-2, Ex. B, at 1, 6-7, both of which are incorporated in "bias-motivated misconduct," Doc. 4-2, Ex. K, at 2. Instead, the University has identified only "example" definitions of those terms. Doc. 4-2, Ex. B, at 1, 6-7.  The University has identified four such "example" definitions of "harassment," including one two-part definition, from such disparate sources as the Merriam-Webster Dictionary, other University policies, and Michigan state law.  Doc. 4-2, Ex. B, at 1, 6-7.  The University has also identified two "example" definitions of "bullying," one of which is a five-part alternative definition and the other of which is a four-part alternative definition.  Doc. 4-2, Ex. B, at 1, 6-7.  Neither the Statement, the Definitions, nor any other University pronouncement identifies which of those definitions, if any or all, governs the University's application of the Statement, its ban on "harassing," "bullying," and "bias-motivated misconduct," and its imposition of sanctions up to and including suspension or

15

expulsion.  Doc. 4-2, Ex. B, at 6-7.  These portions of the Statement contravene the First Amendment.

1.     First, the University's use of the terms "harassing," "bullying," and "bias-motivated misconduct" reaches "a substantial amount of constitutionally protected speech." *Dambrot*, 55 F.3d at 1182.  The hallmarks of the well-established definition of actionable harassment are severity, pervasiveness, and objective offensiveness.  *See, e.g.*, *Davis*, 526 U.S. at 651 (Title IX: "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities"); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (Title VII: "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment").  But in the absence of "any requirement akin to a showing of severity or pervasiveness—that is, that the conduct objectively and subjectively creates a hostile environment or substantially interferes with an individual's work"—a university's "harassment" policy violates the First Amendment when it "provide[s] no shelter for core protected speech." *DeJohn v. Temple University*, 537 F.3d 301, 317-18 (3d Cir. 2008).  Indeed, "[l]oosely worded anti-harassment laws may pose some of the same problems as the St. Paul hate speech ordnance [in *R.A.V.*]: they may regulate deeply offensive and potentially

16

disruptive categories of speech based, at least in part, on subject matter and viewpoint." *Saxe*, 240 F.3d at 208 (Alito, J.).

Three cases illustrate how an anti-harassment policy can overreach into areas of protected speech. In *Dambrot*, the Sixth Circuit invalidated a public university's "discriminatory harassment" policy on First Amendment grounds. *See* 55 F.3d at 1182-84. The policy challenged there stated that "discriminatory harassment will not be condoned" and defined "[r]acial and ethnic harassment" as "any intentional, unintentional, physical, verbal, or nonverbal behavior that subjects an individual to an intimidating, hostile or offensive educational, employment, or living environment." *Id.* at 1182. Such "harassment" could be shown through use of "symbols, [epithets], or slogans that infer negative connotations about the individual's racial or ethnic affiliation." *Id.* The Sixth Circuit held that "[o]n its face, the policy reaches a substantial amount of constitutionally protected speech" because "[i]t is clear from the text of the policy that language or writing, intentional or unintentional, regardless of political value, can be prohibited upon the initiative of the university." *Id.* at 1182-83. The policy was "sweeping and seemingly drafted to include as much and as many types of conduct as possible." *Id.* at 1182.

The Third Circuit reached a similar conclusion in *DeJohn*. The university's sexual harassment policy prohibited "all forms of sexual harassment, including . . . expressive, visual, or physical conduct of a sexual or gender-motivated nature" when

17

such conduct "has the purpose or effect of creating an intimidating, hostile, or offensive environment."  537 F.3d at 305.  The Third Circuit concluded that the policy's "use of 'hostile,' 'offensive,' and 'gender-motivated' is, on its face, sufficiently broad and subjective that they 'could conceivably be applied to cover any speech' of a 'gender-motivated' nature 'the content of which offends someone.'" *Id* at 318. (quoting *Saxe*, 240 F.3d at 217 (Alito, J.)).  The policy thus could prohibit "'core' political and religious speech, such as gender politics and sexual morality" or "opinions in class concerning women in combat and women in the military."  *Id.* at 317 & n.18.   The Third Circuit therefore held that the policy, absent "a requirement that the conduct objectively and subjectively creates a hostile environment or substantially interferes with an individual's work," was overbroad in violation of the First Amendment.  *See id.* at 317-19.

This Court's decision in *Doe* is also especially instructive.  At issue was a previous University of Michigan policy that included in its definition of harassment "[a]ny behavior, verbal or physical, that stigmatizes or victimizes an individual on the basis of race, ethnicity, religion, sex, sexual orientation, creed, national origin, ancestry, age, marital status, handicap or Vietnam-era veteran status."  721 F. Supp. at 856.   The Court explained that "[a] law regulating speech will be deemed overbroad if it sweeps within its ambit a substantial amount of protected speech along with that which it may legitimately regulate."  *Id.* at 864.   The challenged

policy was overbroad for precisely that reason: the Court pointed to occasions on which "the University considered serious comments made in the context of classroom discussion to be sanctionable under the Policy." *Id.* at 866. What mattered principally was the listener's *sense* of being victimized or stigmatized. *See id.*

Thus, in *Dambrot*, *DeJohn*, and *Doe*, the universities failed to include the hallmarks of the well-established legal standard for harassment in their policies—including the requirement of objective offensiveness—but instead allowed the subjective reaction of the listener to dictate whether the speech was permissible. Therefore, the policies were facially unconstitutional. *See Dambrot*, 55 F.3d at 1182-84; *DeJohn*, 537 F.3d at 317-19; *Doe*, 721 F. Supp. at 856, 864-66. Such is the case here as well: the Statement's ban on "harassing," "bullying," and "bias-motivated misconduct" turn on the listener's reaction to speech. For example, one of the University's myriad "example" definitions of "harassing" comes from the Merriam-Webster Dictionary and defines that term as "unwanted negative attention *perceived as* intimidating, demeaning, or bothersome to an individual." Doc. 4-2, Ex. B, at 6 (emphasis added). Moreover, one of the University's multi-part alternative "example" definitions of "bullying" defines that term in part as (1) "to frighten, hurt, or threaten (a smaller or weaker person)" or (2) "to treat abusively." Doc. 4-2, Ex. B, at 6.

19

Accordingly, a member of the University community may be found to have engaged in "harassing," "bullying," or "bias-motivated misconduct" in violation of the Statement based on nothing more than the listener's reaction that the speech is "demeaning," "bothersome," "hurt[ful]," or "abusive[]." Doc. 4-2, Ex. B, at 6. The Statement thus does precisely what the First Amendment *forbids*—it punishes speech merely because of "[l]isteners' reaction." *Forsyth Cty.*, 505 U.S. at 134-35; *see also Texas*, 491 U.S. at 414; *Tinker*, 393 U.S. at 509; *Street*, 394 U.S. at 592; *R.A.V.*, 505 U.S. at 414; *Saxe*, 240 F.3d at 209-15 (Alito, J.). Indeed, it is not difficult to imagine how speech regarding the "wide array of controversial topics on which Plaintiff's members wish to engage in open, vigorous, or provocative debate and discussion"—such as "politics, immigration, race, sex, gender identity, religion, abortion, gun rights, and cultural issues," Pl.'s Br. at 11 (Doc. 4)—would be "*perceived as*" "demeaning," "bothersome," or "hurt[ful]" by *some* individual in the University community, Doc. 4-2, Ex. B, at 6 (emphasis added); *see also* Pl.'s Br. at 15 (Doc. 4). The facial overbreadth of the Statement is clear.

2.     Second, the Statement's bans on "harassing," "bullying," and "bias-motivated misconduct" present "both problems" implicated by the void for vagueness doctrine: "fair notice and unrestricted delegation." *Dambrot*, 55 F.3d at 1184. In fact, the University's listing of "examples" and failure to bind itself to a definition of those terms alone establish that they are void for vagueness. Indeed,

because the University has not bound itself to controlling definitions, members of the University community "of common intelligence must necessarily guess at [the] meaning" of the Statement's proscriptions, *Broadrick*, 413 U.S. at 607, and may "'steer far wider of the unlawful zone,' than if the boundaries of the forbidden areas were clearly marked," *Baggett*, 377 U.S. at 372.

Moreover, the University's failure to bind itself to controlling definitions effects "an unrestricted delegation of power" to University officials. *Leonardson*, 896 F.2d at 196. Policies that confer discretionary power on government officials to regulate speech must contain "narrowly drawn, reasonable, and definite standards for the officials to follow." *Niemotko*, 340 U.S. at 271; *see also Forsyth Cty.*, 505 U.S. at 131 (holding that speech policies "must contain narrow, objective, and definite standards" to guide officials (internal quotation marks and citation omitted)). But the University provides *no* single definition of the challenged terms in the Statement, let alone a "narrowly drawn" one. *Niemotko*, 340 U.S. at 271. The University's failure to prescribe such a standard "in practice leaves the definition" to University officials because it leaves University officials free to choose *any*, *all, or none* of the "example" definitions of those terms. *Id.* In fact, this failure even allows University officials to apply *different* definitions across cases—including because of their own approval or disapproval of the content or viewpoint expressed by the speech challenged in any individual case. *See id.* Such a scenario opens up

21

precisely the risk of "arbitrary, discriminatory, and overzealous enforcement" that the First Amendment forbids. *Id.*

Finally, the subjective "example" dictionary definitions of "harassing" and "bullying" (and, by incorporation, "bias-motivated misconduct") are void for vagueness because they turn on what the listener subjectively "perceive[s]." Doc. 4-2, Ex. B, at 6. As the Sixth Circuit reasoned in striking down the anti-harassment policy *Dambrot*, "[i]n order to determine what conduct will be considered [demeaning, bothersome, or hurtful] to the university, one must make a subjective reference" based upon the listener's perception. 55 F.3d at 1184. Because "different people find different things" intimidating, demeaning, or bothersome, the definition "does not provide fair notice of what speech will violate the policy" but instead improperly leaves those definitions "wholly delegated to university officials." *Id.*

For these reasons, the challenged portions of the Statement are overbroad and void for vagueness in violation of the First Amendment.

**B.    The Bias Response Policy Is Unconstitutionally Overbroad And Void For Vagueness**

The University's overbroad proscription on and punishment of core protected speech in violation of the First Amendment does not end with the Statement. The University's Bias Response Policy addresses "bias incidents," which may arise from "non-criminal activit[y]," Doc. 4-2, Ex. H, at 4, that "excludes, harasses, or harms anyone . . . based on their identity," Doc. 4-2, Ex. F, at 1. Like the challenged

22

portions of the Statement, the Bias Response Policy incorporates a wholly subjective definition of "bias."  The Bias Response Policy emphasizes that "[b]ias comes in many forms" and "can be hurtful action based on who someone is as a person," and it tells students that "[t]*he most important indication of bias is your own feelings*."  Doc. 4-2, Ex. F, at 3 (emphasis added).  It also states that "[b]ias often stems from fear, misunderstanding, hatred, and stereotypes that may be intentional or *unintentional*."  Doc. 4-2, Ex. F, at 1 (emphasis added).  To date, the BRT has responded to more than 150 "bias incidents."  Doc. 4-2, Ex. J.

A university community undoubtedly has an interest in combatting harm to members of its community, in instilling respect for all persons, and in eradicating prejudice from its campus.  The rub here, however, is that the Bias Response Policy is wholly subjective: it authorizes disciplinary consequences based on the "most important indication" of the listener's "own feelings," Doc. 4-2, Ex. F, at 3; Ex. H; Ex. I; Ex. L, and thus can sweep in all manner of constitutionally protected speech. The Third Circuit already has held that a university policy prohibiting "conduct which causes emotional distress" is unconstitutionally overbroad.  *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 250-53 (3d Cir. 2010)*.*  The Third Circuit reasoned that "'[e]motional distress' is a very loose concept" that requires nothing more than a "state of feeling" involving "an exceedingly minimal threshold of harm."  *Id.* at 250.  Even on a "narrow understanding" of that term, the Third Circuit

concluded that it was "clear that the term is driven by the subjective preference of the individual," "without regard for whether the speech is objectively problematic." *Id.* at 250-51.

> Thus, "[t]he scenarios in which this [policy] may be implicated are endless":

> > [A] religious student organization inviting an atheist to attend a group prayer meeting on campus could prompt him to seek assistance in dealing with the distress of being invited to the event; minority students may feel emotional distress when other students protest against affirmative action; a pro-life student may feel emotional distress when a pro-choice student distributes Planned Parenthood pamphlets on campus; even simple name-calling could be so punished.

*Id.* at 251. "The reason all of these scenarios are plausible . . . is that the [policy] is not based on speech at all. It is based on a listener's reaction to speech." *Id.*

The University's reduction of "bias incidents" to the listener's "own feelings," Doc. 4-2, Ex. F, at 3, likewise violates the First Amendment because it is not "based on speech at all" but on "a listener's reaction to speech," *McCauley*, 618 F.3d at 251. The Bias Response Policy does not prescribe *any* "minimal threshold of harm" to the listener's "feelings." *Id.* at 250. Thus, the scenarios implicated by the Bias Response Policy are even more numerous, and no less "endless," than the scenarios that established the constitutional violation in *McCauley*. *Id.* at 251. Moreover, the Bias Response Policy focuses on the speaker's "motivat[ion]" and the subjective "hurtful[ness]" of the speech. Doc. 4-2, Ex. F, at 1-3; *see also Dambrot*, 55 F.3d at

24

1184.  Accordingly, as with the Statement, the Bias Response policy captures "a substantial amount of constitutionally protected speech," *Dambrot*, 55 F.3d at 1182, defeats any "fair notice of the standard of conduct to which the citizen is held accountable," and improperly "leaves the definition of its term to law enforcement officers, and thereby invites arbitrary, discriminatory, and overzealous enforcement," *Leonardson*, 896 F.2d at 195-96.  The Bias Response Policy "is rightly criticized" because it prohibits "'core' political and religious speech" in violation of the First Amendment.  *DeJohn*, 537 F.3d at 317.

## CONCLUSION

For the foregoing reasons, Plaintiff is likely to succeed on the merits of its claim that the challenged portions of the Statement and the Bias Response Policy violate the First and Fourteenth Amendments.

Dated:  June 11, 2018

Respectfully submitted:

/s/ John M. Gore
JOHN M. GORE
Acting Assistant Attorney General

DONALD R. LIVINGSTON
Deputy Assistant Attorney General
TARA HELFMAN
Special Counsel to the Assistant Attorney General
THOMAS CHANDLER
Acting Chief, Appellate Section
Civil Rights Division
United States Department of
Justice 950 Pennsylvania Avenue,
NW Washington, D.C. 20530
Telephone: (202) 514-4092
Facsimile: (202) 514-8337

MATTHEW SCHNEIDER
United States Attorney

*s/Peter A. Caplan*
PETER A. CAPLAN
Assistant U.S. Attorney
211 W. Fort St., Ste. 2001
Detroit, MI  48226
(313) 226-9784
Email:  Peter.Caplan@usdoj.gov
P30643

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing document with the

Clerk of Court using the CM/ECF system, which automatically sent counsel of

record e-mail notification of such filing.

This 11th day of June, 2018

*s/Peter A. Caplan*
PETER A. CAPLAN
Assistant U. S. Attorney