## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

—————————————————————— )
                                                          )
**SPEECH FIRST, INC.,**                                   )
                                                          )
                                                          )
**Plaintiff,**                                            )
                                                          ) Civil No. 4:18-cv-11451-LVP-EAS
**v.**                                                    ) Hon. Linda V. Parker
                                                          ) Mag. Judge Elizabeth A. Stafford
**MARK SCHLISSEL,** *et al.,*                             )
                                                          )
                                                          )
**Defendants.**                                           )
—————————————————————— )

## DEFENDANTS' OPPOSITION TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

HONIGMAN MILLER SCHWARTZ AND
COHN LLP

Leonard M. Niehoff (P36696)
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI 48108
Tel: (734) 418-4254

Rian C. Dawson (P81187)
660 Woodward Avenue
2290 First National Building
Detroit, MI 48226
Tel: (313) 465-7730

WILLIAMS & CONNOLLY LLP

Kevin T. Baine (DC 238600)
Stephen J. Fuzesi (DC 496723)
Kathryn "Kylie" Hoover (DC 1017260)
Amy B. McKinlay (DC 1034542)
725 Twelfth Street, N.W.
Washington, DC 20005
Tel: (202) 434-5000

OFFICE OF THE VICE PRESIDENT AND
GENERAL COUNSEL UNIVERSITY OF
MICHIGAN

Timothy G. Lynch (P77385)
David J. Masson (P37094)
Jack Bernard (P62975)
5010 Fleming Administration Building
503 Thompson Street
Ann Arbor, MI 48109
Tel: (734) 764-0305

## STATEMENT OF ISSUES PRESENTED

Whether Plaintiff is entitled to the "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008), of a preliminary injunction to bar University of Michigan officials from enforcing the school's prohibitions on harassing and bullying, and to enjoin the University from utilizing a Bias Response Team to receive complaints of alleged incidents of bias and provide support and educational services to affected students through a voluntary process.  In particular, the issues presented are:

1.    Whether Plaintiff's claims are moot.

2.    Whether Plaintiff has standing to pursue its claims.

3.    Whether Plaintiff is likely to prevail on its claims that the University's policies are unconstitutionally vague and overbroad.

4.    Whether, in the absence of a preliminary injunction, Plaintiff is likely to suffer irreparable injury.

5.    Whether the public interest favors a preliminary injunction here, and whether an injunction would cause substantial harm to others.

# CONTROLLING AUTHORITY

*Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644 (6th Cir. 2007)

*Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001)

*Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974 (6th Cir. 2012)

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)

*Glowacki ex rel. D.K.G. v. Howell Pub. Sch. Dist.*, 2013 WL 3148272 (E.D. Mich. June 19, 2013)

*Morrison v. Bd. of Educ.*, 521 F.3d 602 (6th Cir. 2008)

*People v. White*, 536 N.W.2d 876 (Mich. Ct. App. 1995)

*Staley v. Jones*, 239 F.3d 769 (6th Cir. 2001)

*Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014)

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993)

*Youngstown Publ'g Co. v. McKelvey*, 189 F. App'x 402 (6th Cir. 2006)

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED ..................................................................i

CONTROLLING AUTHORITY ..........................................................................ii

TABLE OF AUTHORITIES .............................................................................. iv

ABBREVIATIONS & CITATIONS.................................................................... vii

INTRODUCTION.............................................................................................. 1

BACKGROUND................................................................................................ 3

    A.    Statement of Student Rights and Responsibilities...................................... 3

    B.    Bias Response Team ............................................................................. 5

    C.    Students A, B and C and Free Speech on Campus .................................... 6

ARGUMENT ..................................................................................................... 8

I.    PLAINTIFF IS UNLIKELY TO PREVAIL ON THE MERITS. ................... 9

    A.    The Core of Plaintiff's Complaint Is Moot.................................................. 9

    B.    Plaintiff Lacks Standing. ..................................................................... 11

        1.    Claims Regarding the Statement ...................................................... 11

        2.    Claims Regarding the BRT .............................................................. 14

    C.    The Policies and Programs at Issue Are Not Overbroad or Vague........ 15

        1.    The University's Prohibition of "Harassing" and "Bullying" Is Constitutional.................................................................................. 15

        2.    The University's Enhancement for Bias-Motivated Conduct Is Constitutional................................................................ 21

        3.    The BRT Process Does Not Implicate the First Amendment. ..................................................................................... 23

II.    ADDITIONAL FACTORS WEIGH AGAINST AN INJUNCTION. ......... 24

CONCLUSION ............................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Abney v. Amgen, Inc.*, 443 F.3d 540 (6th Cir. 2006) ............................................................ 24

*Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644 (6th Cir. 2007) ................... 12

*Am. Library Ass'n v. Barr*, 956 F.2d 1178 (D.C. Cir. 1992) ................................................ 14

*Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357 (M.D. Pa. 2003) ..................................... 20

*Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974 (6th Cir. 2012) ............................ 10

*Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001) ............................................................ 8, 24

*Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153 (3d Cir. 2008) ........................ 21

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ..................................................................... 15

*Chaudhuri v. Tennessee*, 130 F.3d 232 (6th Cir. 1997) ........................................................ 24

*Connection Distrib. Co. v. Holder*, 557 F.3d 321 (6th Cir. 2009) ........................................ 15

*Corlett v. Oakland Univ. Bd. of Trs.*, 958 F. Supp. 2d 795 (E.D. Mich. 2013) ................... 18

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ........................................................ 11

*Dambrot v. Central Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995) ........................................... 20

*DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008) .................................................. 18, 20

*Doe v. Univ. of Michigan*, 721 F. Supp. 852 (E.D. Mich. 1989) .................................... 13, 20

*Fieger v. Mich. Sup. Ct.*, 553 F.3d 955 (6th Cir. 2009) ....................................................... 13

*Glowacki ex rel. D.K.G. v. Howell Pub. Sch. Dist.*, 2013 WL 3148272 (E.D.
    Mich. June 19, 2013) ................................................................................................ 17, 18

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ........................................................................... 21

*Grutter v. Bollinger*, 539 U.S. 306 (2003) .......................................................................... 18

*Hill v. Colorado*, 530 U.S. 703 (2000) ............................................................................... 15

*Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274 (1986) .......................................................... 11

*Johnson v. PHH Mortg. Corp.*, 2018 WL 1324742 (E.D. Mich. Mar. 15, 2018) ........................................................................................ 9

*Kowalski v. Berkeley Cty. Schs.*, 652 F.3d 565 (4th Cir. 2011) ............................................. 18

*Ky. Right to Life, Inc. v. Terry*, 108 F.3d 637 (6th Cir. 1997) ................................. 9

*Laird v. Tatum*, 408 U.S. 1 (1972) .................................................................. 14

*Love v. Johnson*, 2016 WL 4437667 (E.D. Mich. Aug. 23, 2016) ...................................... 10

*Marshall v. Ohio Univ.*, 2015 WL 1179955 (S.D. Ohio Mar. 13, 2015) ........................... 19

*Massachusetts v. Oakes*, 491 U.S. 576 (1989) .......................................................... 9

*McGlone v. Bell*, 681 F.3d 718 (6th Cir. 2012) ...................................................... 11

*Meese v. Keene*, 481 U.S. 465 (1987) ................................................................ 24

*Morrison v. Bd. of Educ.*, 521 F.3d 602 (6th Cir. 2008) .................................. 12, 14

*Munaf v. Geren*, 553 U.S. 674 (2008) .................................................................. 8

*Muslim Cmty. Ass'n v. Ashcroft*, 459 F. Supp. 2d 592 (E.D. Mich. 2006) ........................ 13

*N.E. Ohio Coal. for Homeless and Serv. Emp. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999 (6th Cir. 2006) ........................................................ 13

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 404 F. Supp. 2d 1015 (M.D. Tenn. 2005) .................................................................. 9

*People v. White*, 536 N.W.2d 876 (Mich. Ct. App. 1995) ........................................... 16, 17

*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001) ....................................... 20

*So. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844 (6th Cir. 2017) .................................................................. 24

*Staley v. Jones*, 239 F.3d 769 (6th Cir. 2001) ........................................................ 17

*Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014) ............................................. 11, 12

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ............................... 17, 19

*United States v. Miller*, 767 F.3d 585 (6th Cir. 2014) .......................................................... 22

*Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) ....................................................................... 18

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) .............................................................. 8

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) .................................................................... 21, 22

*Youngstown Publ'g Co. v. McKelvey*, 189 F. App'x 402 (6th Cir. 2006) ................................ 9

## STATUTES

Mich. Comp. Laws Ann. § 380.1310b(1)(b) ........................................................................ 17

Mich. Comp. Laws Ann. § 750.411i(d) ............................................................................... 16

## ABBREVIATIONS & CITATIONS

The following abbreviations are used in the citations in this brief.  We note them below for ease of reference:

- Baine Decl. = Declaration of Kevin Baine, filed as Exhibit A in support of this Opposition.

- Br. = Plaintiff's Memorandum in Support of Motion for Preliminary Injunction, ECF No. 4.

- Compl. = Plaintiff's Complaint, ECF No. 1.

- DOJ Br. = Department of Justice's Statement of Interest in Support of Plaintiff's Motion for Preliminary Injunction, ECF No. 14.

- Galvan Decl. = Declaration of Evelyn Galvan, filed as Exhibit B in support of this Opposition.

- Harper Decl. = Declaration of E. Royster Harper, filed as Exhibit C in support of this Opposition.

- Jones Decl. = Declaration of Laura Blake Jones, filed as Exhibit D in support of this Opposition.

- PI Ex. = Exhibits to the Declaration of Jeffrey M. Harris, filed with Plaintiff's Motion for Preliminary Injunction, ECF No. 4-2.

- Wessel Decl. = Declaration of Erik Wessel, filed as Exhibit E in support of this Opposition.

In addition, unless otherwise specified, all internal quotation marks and brackets are omitted from quotations and all emphasis is added.

## INTRODUCTION

Speech First, Inc., a Washington, D.C.-based advocacy group, has sued the University of Michigan alleging that the University has adopted policies that chill the expression of conservative political views on campus.  Perhaps because Speech First itself has no connection with the University, however, the picture it paints of the University and its policies is a false caricature.  The principal policy that Speech First challenges—the Statement of Student Rights and Responsibilities ("Statement")— begins with a strong commitment to "freedom of expression," noting that the University's "long tradition of student activism and . . . freedom of expression . . . includes voicing unpopular views and dissent."  PI Ex. A at 2.  As this brief and the accompanying declarations show, the University's implementation of its policies has been completely faithful to this overriding commitment.  And, in fact, the actual intellectual life on campus includes student groups, student publications and outside speakers who are comfortable advocating and debating strongly held and sometimes controversial views across the full ideological spectrum.

Ignoring altogether the University's strong commitment to freedom of expression, Speech First focuses solely on policy provisions that promote another important objective—that of treating others "fairly and with dignity."  *Id.*  To this end, the Statement provides that a student may be subject to disciplinary action for "[h]arassing or bullying another person—physically, verbally, or through other means." *Id.* at 3.  An amendment to the Statement, taking effect in July, also provides for

enhanced penalties for violations motivated by racial, sexual or other specified forms of bias.  Separate from these disciplinary policies, the University has created a Bias Response Team to assist students who have been affected by conduct they perceive as biased.

Speech First claims that these policies and programs chill the expression of politically conservative views on campus.  But that claim ignores not only the University's repeated emphasis on the priority of free expression; it also ignores how these policies have been implemented.  No student at the University has been disciplined under the Statement for harassing or bullying based on the mere expression of a point of view.  And the Bias Response Team that is the focus of much of the Plaintiff's attack is not a disciplinary body at all.  Its work is purely supportive and educational, and it works only with students "who agree to participate."  PI Ex. J at 1.

No threat exists—much less an imminent threat warranting a preliminary injunction—that the University will subject any student to discipline for the expression of views.  The Complaint refers to three anonymous students—Students A, B and C—who claim that they have "been chilled and deterred from speaking openly" about their views on such subjects as gun rights, illegal immigration, abortion, the welfare system, gender identity, affirmative action and Title IX.  Compl. ¶¶ 100, 119, 128.  Each one alleges that he "wants to engage in open and robust intellectual debate with his fellow students about his beliefs in the classroom, online, in University housing, in other areas of the campus, and in the city of Ann Arbor."  *Id.* ¶¶ 97, 118, 127.  But there is no

reason why those students or any others should not feel free to engage in such debate. The University's policies explicitly guarantee them that freedom and do not threaten disciplinary action against any student for expressing any view, no matter how unpopular or controversial. Indeed, as the Declaration of Dean of Students Laura Blake Jones shows, student organizations and publications, as well as outside speakers, routinely express the same views Plaintiff claims these students are afraid to express.

## BACKGROUND

### A.    Statement of Student Rights and Responsibilities

The Statement of Student Rights and Responsibilities begins by affirming that the "central purpose" of the University is to "promote[] intellectual inquiry through vigorous discourse." PI Ex. A at 1. Under the heading of "Student Rights," it explains:

> These rights include freedom of expression, press, religion, and assembly. The University has a long tradition of student activism and values freedom of expression, which includes voicing unpopular views and dissent.

*Id.* at 2.[1]

Following its discussion of student rights, the Statement enumerates 21 categories of violations that are subject to discipline, including "[h]arassing or bullying

---

[1] The Statement is in accord with the University's policy on Freedom of Speech and Artistic Expression, which states: "Expression of diverse points of view is of the highest importance, not only for those who espouse a cause or position and then defend it, but also for those who hear and pass judgment on that defense. The belief that an opinion is pernicious, false, or in any other way detestable cannot be grounds for its suppression." Baine Decl. Ex. 1 at 1. The specific guidelines in that policy apply to public events, but the quoted principle applies generally.

another person—physically, verbally, or through other means."   PI Ex. A at 3. Harassing and bullying are not defined in the Statement.   But the Office of Student Conflict Resolution ("OSCR") provided on its website a series of definitions for these and other terms.   *See* PI Ex. B.   At the time the Complaint was filed, the website contained several definitions for "harassing" and "bullying" drawn from the *Merriam-Webster Dictionary*, other University policies and Michigan statutes.   The Complaint in this case challenged only the definitions drawn from the dictionary and other University policies; it did not challenge the statutory definitions.

Before the Complaint was filed, University officials had begun a review of the University's website and policies to ensure their consistency with principles of free speech.   Harper Decl. ¶ 8.   That review was then accelerated, and on June 11 the University announced revised definitions.   *Id.* ¶¶ 8–9.   The definitions that have been challenged in this case were eliminated altogether, and the definitions drawn from the Michigan statutes were tightened even further.   "Harassing" now has a single definition:

> Harassing: conduct directed toward a person that includes repeated or continuing unconsented contact that would cause a reasonable individual to suffer substantial emotional distress and that actually causes the person to suffer substantial emotional distress.   Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose.

*Id.* ¶ 11.   "Bullying" also has a single definition:

> Bullying: any written, verbal, or physical act, or any electronic communication, directed toward a person that is intended to cause or that a reasonable person would know is likely to cause, and that actually causes, physical harm or substantial emotional distress and thereby adversely

affects the ability of another person to participate in or benefit from the University's educational programs or activities. Bullying does not include constitutionally protected activity or conduct that serves a legitimate purpose.

*Id.* ¶ 12. These streamlined definitions were approved by senior University officials, including the President. *Id.* ¶ 14. They are "definitive" and will govern all disciplinary proceedings. *Id.* ¶ 15.

Speech First also challenges an amendment to the Statement effective in July. This amendment provides for sanctions to be "enhanced in instances of bias-motivated misconduct"—that is, where misconduct is "motivated on the basis of any person's identity as protected by the University of Michigan's Nondiscrimination Policy," which enumerates categories of protected characteristics. PI Ex. K at 1–2. This enhancement will only apply when an underlying violation has occurred. *Id.*; Harper Decl. ¶ 16.

## B. Bias Response Team

During the 2010–11 academic year, the University created a Bias Response Team ("BRT") to serve as a resource for students who believe they have been affected by incidents of bias. Jones Decl. ¶ 2. The BRT provides educational and support services to these students, which may involve simply having a BRT representative talk with them, helping them to develop coping mechanisms, or referring them to other campus resources or affinity groups. *Id.* ¶¶ 9–10; Galvan Decl. ¶ 7; *see* PI Ex. H at 7.

The BRT does not—and cannot—discipline students. Jones Decl. ¶ 8. It does not investigate reports of bias or make findings about whether any misconduct has

occurred.  *Id.* ¶¶ 8, 12–13; Galvan Decl. ¶ 10.  The BRT process is entirely educational and supportive—and purely voluntary.  Jones Decl. ¶¶ 9–10, 12.  As a general matter, the student whose conduct triggered the report is only contacted if the reporting student requests it—not for any punitive purpose, but to discuss "how their conduct impacted other students," to "help them navigate any reactions they may be experiencing," and in some cases to "discuss strategies for how to express opposing views without harming others."  Galvan Decl. ¶ 12.  No student is required to engage in these discussions; the process is limited to "involved parties *who agree to participate*."  PI Ex. J at 1.  In short, no student is compelled to take part, no judgments are made and no discipline results.

In the interest of transparency, the BRT publishes a log of all reported incidents, with general, anonymous descriptions of the allegations.  Galvan Decl. ¶ 4.  The listing of an incident does not mean that bias was in fact involved or that any violation of University policy occurred.  *Id.*  The log specifically notes that some of the reported incidents may "include legally protected speech."  PI Ex. J at 1.[2]

### C.    Students A, B and C and Free Speech on Campus

According to the Complaint, Students A, B and C are undergraduate students who wish to "engage in open and robust intellectual debate" on a variety of subjects.  Compl. ¶¶ 97, 118, 127.  For example, "Student A disagrees with students who believe

---

[2]  The BRT website was revised on June 11 "to emphasize the voluntary and non-disciplinary nature of the BRT" and that "inclusion of an incident on the log does not mean that bias was in fact involved."  Jones Decl. ¶ 18.

that women should be permitted to have abortions, who do not support the President, and who advocate for open borders and the protection of illegal immigrants." *Id.* ¶ 96. Student B holds what he considers to be "unpopular" views on issues such as immigration, welfare reform, the Second Amendment, and affirmative action. *Id.* ¶¶ 107–16. Student C "disagrees with many of the University's 'diversity' initiatives," with students and professors who "disparage the Western canon due to its authorship by 'dead white men,'" and with the "insertion of identity politics into discussions of topics such as Shakespeare's plays." *Id.* ¶¶ 123–24. Plaintiff asserts that the University's policies on harassing and bullying, and the existence of the BRT, unconstitutionally chill these students' right to engage in such speech.

Views such as those held by Students A, B and C may not reflect the views of a majority at the University, but they are expressed openly and confidently on campus on a regular basis. Those views are advanced or supported by student groups such as the Young Americans for Freedom, College Republicans, the Federalist Society and the Michigan Review, all of which have enjoyed official University recognition and access to University space. Jones Decl. ¶¶ 21–25. Students writing for campus publications have defended President Trump, argued that abortion should be illegal, condemned welfare, endorsed the right to carry concealed weapons and ridiculed identity politics with satire. *Id.* ¶¶ 30, 35, 38, 40, 41, 54. University student groups have hosted some of the country's most controversial voices—including Charles Murray, author of "The Bell Curve"; Milo Yiannopoulos, a Breitbart contributor with the Twitter hashtag

#FeminismIsCancer; and commentator Jonah Goldberg, author of "Liberal Fascism: The Secret History of the American Left from Mussolini to the Politics of Meaning." *Id.* ¶¶ 58, 61, 74.

No student at the University is subject to discipline for "engag[ing] in open and robust debate," as Students A, B and C propose to do.  *See* Wessel Decl. ¶¶ 22–24. Those students, like all students, may express their opinions or beliefs, no matter how unpopular or offensive those opinions or beliefs may be, without any fear of a disciplinary proceeding.  *Id.* ¶ 24; Jones Decl. ¶ 91.

## ARGUMENT

"A preliminary injunction is an extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008).  It should "only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Natural Resource Defense Council*, 555 U.S. 7, 22 (2008), and "should not be extended to cases which are doubtful or do not come within well-established principles of law," *Bonnell v. Lorenzo*, 241 F.3d 800, 826 (6th Cir. 2001).

Here, Plaintiff cannot satisfy any of the four factors that govern its request for a preliminary injunction:  (1) it does not have a strong likelihood of success on the merits—it does not even have standing, and its principal claim is moot; (2) it would not suffer irreparable injury absent the injunction, because the three students it purports to represent face no credible threat of disciplinary action; (3) an injunction would cause substantial harm to the University and its students; and (4) the public interest would be

disserved by the issuance of an injunction.  *See Johnson v. PHH Mortg. Corp.*, 2018 WL 1324742, at *2 (E.D. Mich. Mar. 15, 2018) (Parker, J.).

## I.     PLAINTIFF IS UNLIKELY TO PREVAIL ON THE MERITS.

### A.     The Core of Plaintiff's Complaint Is Moot.

At the core of Plaintiff's Complaint and motion is the contention that the Statement's prohibition of "harassing or bullying" is unconstitutional because of certain dictionary definitions of those terms that were posted online.  *E.g.*, Br. 5.  But the definitions that Plaintiff challenges have since been eliminated by the University, leaving only definitions based on Michigan statutes with which Plaintiff takes no issue.  *See* Harper Decl. ¶¶ 10–12.  In other words, the predicate for Plaintiff's claim no longer exists, and the claim is therefore moot.

Because "Article III of the Constitution confines the power of the federal courts to adjudication of 'cases' or 'controversies,'" "in the First Amendment context, the Supreme Court has routinely declared moot those claims effectively nullified by statutory amendment."  *Ky. Right to Life, Inc. v. Terry*, 108 F.3d 637, 644 (6th Cir. 1997); *Massachusetts v. Oakes*, 491 U.S. 576, 582 (1989) ("[O]verbreadth analysis is inappropriate if the statute being challenged has been amended or repealed.").  While a *private* party may have difficulty showing that allegedly wrongful conduct will not recur, the "cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties."  *Youngstown Publ'g Co. v. McKelvey*, 189 F. App'x 402, 406 (6th Cir. 2006); *Nat'l Wildlife Fed'n v. U.S. Army*

*Corps of Eng'rs*, 404 F. Supp. 2d 1015, 1019 (M.D. Tenn. 2005) ("[T]he Sixth Circuit has repeatedly found to be moot claims negated by subsequent, permanent rule and policy adoptions by the government."). As long as the changes "appear[] genuine," "such self-correction provides a secure foundation for a dismissal based on mootness." *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012).

Here, there is no risk of the University's reversing course and reinstating the definitions it just discarded. The revised definitions were reviewed and approved by senior University officials, including the President, and are "definitive." Harper Decl. ¶¶ 14–15. They reflect a "considered judgment" that the revised definitions "more precisely and accurately reflect the [University's] commitment to freedom of expression." *Id.* ¶ 14. The University's Vice President for Student Life has stated unequivocally that "[t]hese definitions, and no others, now will govern the initiation and conduct of disciplinary proceedings involving harassing or bullying." *Id.* ¶ 15; *see Love v. Johnson*, 2016 WL 4437667, at *3 (E.D. Mich. Aug. 23, 2016) (crediting policymaker's sworn declaration that she has "absolutely no intention of changing the new Policy"). These changes and assurances provide "a secure foundation for a dismissal based on mootness." *Bench Billboard Co.*, 675 F.3d at 981.[3]

_____

[3] Indeed, the president of Speech First has publicly stated that she believes "these are just well-intentioned policies that weren't well written." Baine Decl. Ex. 2 at 3. As described above, they have now been revised. *See also id.* (quoting the Speech First president as explaining that "I don't think that this is a bad-faith effort. . . . I don't think there was any one administrator or President Schlissel that has gone in to say 'let's

## B.    Plaintiff Lacks Standing.

Under the doctrine of associational standing, an organization like Speech First has standing only if its members would have standing. *Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 289 (1986).  To demonstrate constitutional standing, Speech First must show, among other things, that its members—Students A, B and C—have "suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *McGlone v. Bell*, 681 F.3d 718, 729 (6th Cir. 2012).  In a facial challenge like this one, this injury-in-fact requirement may be satisfied by showing that Students A, B and C have "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014).  "[A] plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

### 1.    *Claims Regarding the Statement*

Plaintiff lacks standing to challenge the University's prohibition of "harassing or bullying," because there is no credible threat that Students A, B and C will face disciplinary action for expressing their opinions.  The Statement itself emphasizes that

---

stomp on student's speech rights'. . . . I'm presuming good faith on the part of Michigan's administrators.").

the University's "central purpose" is to "promote vigorous discourse," and that the University is committed to "freedom of expression, which includes voicing unpopular views and dissent." PI Ex. A at 1–2. Consistent with that purpose, the University's definitions of "harassing" and "bullying" expressly exclude constitutionally protected expression. *See* Harper Decl. ¶¶ 11–12. There is no credible threat that the University would, in the face of these commitments, seek to punish students for speaking publicly about politics and policy—for using the expression "Make America Great Again!" or "urging the Supreme Court to overturn *Roe v. Wade*," as Plaintiff claims. Br. 14–15. The speech in which these students seek to engage is simply not proscribed conduct under the Statement. *See Susan B. Anthony List*, 134 S. Ct. at 2342.

Plaintiff alleges that Students A, B and C feel "chilled" by the prohibition on harassing and bullying. The Court should not accept these general, unverified allegations about unidentified students at face value—especially given Plaintiff's refusal in response to repeated requests by counsel to identify these students for the purpose of assessing their standing. But even if they are true, "[a]llegations of a subjective 'chill,'" "absent proof of a concrete harm," are not enough to constitute an injury-in-fact. *Morrison v. Bd. of Educ.*, 521 F.3d 602, 608–09 (6th Cir. 2008) ("[A]bsent proof of a concrete harm, where a First Amendment plaintiff only alleges inhibition of speech, the federal courts routinely hold that no standing exists."); *see also Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 661 (6th Cir. 2007) ("[T]o allege a sufficient injury under the First Amendment, a plaintiff must establish that he or she is regulated,

constrained, or compelled directly by the government's actions, instead of by his or her own subjective chill."); *Muslim Cmty. Ass'n v. Ashcroft*, 459 F. Supp. 2d 592, 598 (E.D. Mich. 2006) ("[T]he 'chill' on First Amendment expression normally stands as the reason why the government imposition is invalid rather than as the harm which entitles a party to challenge it." (quoting *Adult Video Ass'n. v. U.S. Dep't of Justice*, 71 F.3d 563, 566 (6th Cir. 1995)). "In order to have standing, therefore, a litigant alleging chill must still establish that a concrete harm—i.e., enforcement of a challenged statute—occurred or is imminent." *Fieger v. Mich. Sup. Ct.*, 553 F.3d 955, 962–63 (6th Cir. 2009). And "the threat of enforcement must be specific and direct and against a particular party." *Doe v. Univ. of Michigan*, 721 F. Supp. 852, 859 (E.D. Mich. 1989).

Speech First has not cited a single instance in which a student has faced discipline for harassing or bullying based on the expression of controversial views. The "record on the standing issue consists only of the unverified complaint" and its general allegations of "chill" felt by unidentified students. *N.E. Ohio Coal. for Homeless and Serv. Emp. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1010 (6th Cir. 2006) ("The weakness of plaintiffs' showing of standing leads us to conclude that their likelihood of success on the merits is not strong."). Contrary to those unsupported allegations, the record demonstrates that the University has embraced student groups and publications who have expressed many of the same positions that Students A, B and C wish to espouse, without any threat of sanction. Jones Decl. ¶ 20. And the Director of OSCR

has stated unequivocally that these students are "free . . . to express any opinions or beliefs they have . . . , without any fear of a disciplinary proceeding." Wessel Decl. ¶ 24.

Plaintiff lacks standing for the same reason that the Sixth Circuit found standing lacking in *Morrison*. There, a high school student alleged that his school's codes of conduct "chilled" his ability to express his views on homosexuality in violation of the First Amendment. 521 F.3d at 606–08. The court held that he lacked standing, because he was unable to show a concrete harm—that enforcement of the policies against him "occurred or is imminent." *Id.* at 610. The plaintiff's "choice to chill his own speech based on his perception that he would be disciplined for speaking" did not constitute a sufficient injury in fact. *Id.*; *see also, e.g.*, *Laird v. Tatum*, 408 U.S. 1, 13 (1972) ("speculative apprehensiveness" about what action the Army may someday take was insufficient for standing purposes); *Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1193 (D.C. Cir. 1992) ("[W]hether plaintiffs have standing . . . depends on how likely it is that the government will attempt to use these provisions against them . . . and not on how much the prospect of enforcement worries them."). As in *Morrison*, the Plaintiff here has demonstrated no likelihood that enforcement has "occurred or is imminent."

## 2. *Claims Regarding the BRT*

Likewise, Plaintiff lacks standing to challenge the BRT, because the BRT poses no credible threat to any student. No student is required to participate in the BRT process, and no adverse action can result from it. As explained above, the BRT does not make findings nor mete out discipline. Its efforts are designed to provide support

14

to students who feel aggrieved.  Only rarely are students whose conduct triggered a report to the BRT even contacted by the BRT, and they only become involved in discussions with the BRT if they "agree to participate."  PI Ex. J at 1; *see* Galvan Decl. ¶ 11.  It is entirely speculative to suggest that Students A, B and C would ever be contacted by the BRT.  But even if they were, they would face no credible threat from a process that is entirely voluntary and cannot result in any adverse action.

### C.   The Policies and Programs at Issue Are Not Overbroad or Vague.

Issues of standing and mootness aside, Plaintiff's constitutional claim has no likelihood of success.  To succeed on an overbreadth challenge, Plaintiff must show that the policies "prohibit[] a substantial amount of protected speech both in an absolute sense and relative to the [policies'] plainly legitimate sweep."  *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 336 (6th Cir. 2009); *accord Hill v. Colorado*, 530 U.S. 703, 731–32 (2000).  Striking down a policy as overbroad is "strong medicine" that should be used "sparingly and only as a last resort."  *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).  To succeed on its vagueness challenge, Plaintiff must show that people "of common intelligence must necessarily guess at [the policies'] meaning."  *Id.* at 607. Plaintiff cannot meet these exacting tests.

#### 1.   The University's Prohibition of "Harassing" and "Bullying" Is Constitutional.

Speech First does not question the University's ability to prohibit conduct amounting to harassment or bullying—and the Department of Justice affirmatively

acknowledges that "Universities have a crucial legal obligation to protect students from harassment and harm, and wide latitude to promote tolerance and respectful dialogue on their campuses." DOJ Br. 1.[4]  Instead, Speech First focuses its Complaint on some, but not all, of several definitions that appeared on OSCR's website.  But the definitions Plaintiff challenges have since been removed, and those that remain are based on Michigan statutes that have been specifically upheld as constitutional.

The definition of harassing is drawn from the definition of harassment in Michigan's anti-stalking statute, *see* Mich. Comp. Laws Ann. § 750.411i(d), which has been upheld against a challenge of overbreadth and vagueness.[5]  In *People v. White*, 536 N.W.2d 876 (Mich. Ct. App. 1995), the Michigan Court of Appeals held that the definition of "harassment" was not overbroad because, by its terms, "harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose." *Id.* at 883.  The court also concluded that the statutory language was not vague, because "the meaning of the words used to describe the conduct can be

---

[4] *See also* DOJ Br. 23 ("A university community undoubtedly has an interest in combatting harm to members of its community, in instilling respect for all persons, and in eradicating prejudice from its campus."); *id.* at 12 (noting that "State-run colleges and universities can—and in certain circumstances, *must*—proscribe 'harassment,' 'bullying,' and 'bias-related misconduct'" (emphasis in original)).

[5] The statute defines "[h]arassment" as "conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose."

ascertained fairly by reference to judicial decisions, common law, dictionaries, and the words themselves because they possess a common and generally accepted meaning." *Id.* at 884. In *Staley v. Jones*, 239 F.3d 769 (6th Cir. 2001), the Sixth Circuit held that these conclusions were reasonable. The court concluded that the anti-stalking statute (a) was not overbroad because "the thrust of this statute is proscribing unprotected conduct" and "any effect on protected speech is marginal when weighed against the plainly legitimate sweep of the statute," *id.* at 787; (b) was not vague because "a person of reasonable intelligence would know whether his conduct was violating the statute," *id.* at 792; and (c) did not allow for arbitrary enforcement because of its "detailed nature," *id.* at 793.

Similarly, the definition of "bullying" reflects the definition found in Michigan law, *see* Mich. Comp. Laws Ann. § 380.1310b(1)(b),[6] which has been upheld by a court in this district. *See Glowacki ex rel. D.K.G. v. Howell Pub. Sch. Dist.*, 2013 WL 3148272, at *12 (E.D. Mich. June 19, 2013). In *Glowacki*, the court noted that under *Tinker v. Des*

---

[6] Section 380.1310b(1)(b) defines "[b]ullying" as "any written, verbal, or physical act, or any electronic communication, including, but not limited to, cyberbullying, that is intended or that a reasonable person would know is likely to harm 1 or more pupils either directly or indirectly by doing any of the following: (i) Substantially interfering with educational opportunities, benefits, or programs of 1 or more pupils. (ii) Adversely affecting the ability of a pupil to participate in or benefit from the school district's or public school's educational programs or activities by placing the pupil in reasonable fear of physical harm or by causing substantial emotional distress. (iii) Having an actual and substantial detrimental effect on a pupil's physical or mental health. (iv) Causing substantial disruption in, or substantial interference with, the orderly operation of the school."

*Moines Independent Community School District*, 393 U.S. 503 (1969), "well-crafted anti-bullying policies are constitutionally permissible when they focus on preventing either substantial disruption of school activities or interference with the rights of other students." 2013 WL 3148272, at *12[7]; *see also Kowalski v. Berkeley Cty. Schs.*, 652 F.3d 565, 572 (4th Cir. 2011) ("[T]he language of *Tinker* supports the conclusion that public schools have a 'compelling interest' in regulating speech that interferes with or disrupts the work and discipline of the school, including discipline for student harassment and bullying."); *DeJohn v. Temple Univ.*, 537 F.3d 301, 319–20 (3d Cir. 2008) ("[A] school has a compelling interest in preventing harassment."). To be acceptable, a policy "must target truly harassing speech, not mere expressions of unpopular opinions, and the policies must not discriminate on the basis of viewpoints." *Glowacki*, 2013 WL 3148272, at *13. These criteria are easily met here. The Statement's bullying policy is limited to conduct that "a reasonable person would know is likely to cause, and that actually causes, physical harm or substantial emotional distress and thereby adversely affects the

---

[7] While *Tinker* and *Glowaski* dealt with the K-12 setting, universities also have a strong interest in furthering their educational mission and preventing bullying that interferes with that mission. *See Corlett v. Oakland Univ. Bd. of Trs.*, 958 F. Supp. 2d 795, 805–06 (E.D. Mich. 2013) ("While universities arguably may not bear the same responsibility as elementary and secondary schools to act *in loco parentis* . . . universities undoubtedly retain some responsibility to teach students proper professional behavior, in other words, to prepare students to behave and communicate properly in the workforce."); *see also Ward v. Polite*, 667 F.3d 727, 733–34 (6th Cir. 2012) (applying *Hazelwood* test in university setting and noting "the latitude educational institutions—at any level—must have to further legitimate curricular objectives"); *cf. Grutter v. Bollinger*, 539 U.S. 306, 328 (2003) (deferring to university's judgment on how to further its academic mission).

ability of another person to participate in or benefit from the University's educational programs or activities." Harper Decl. ¶ 12. It also expressly exempts speech protected by the First Amendment. *Id.* Nothing in the definition discriminates based on viewpoint, and the policy focuses on conduct that would substantially interfere with the University's academic mission and its students' rights. *See Tinker*, 393 U.S. at 513.

Addressing definitions of "harassing" and "bullying" that have since been removed entirely, Plaintiff argues that the Statement is constitutionally infirm because it "turns on the subjective *perception* of the *offended student* and contains no requirement that the conduct be severe or pervasive." Br. 18; *see id.* 14–18. But the operative definition of "harassing" contains both subjective and *objective* components— prohibiting only conduct "that would cause a *reasonable* individual to suffer substantial emotional distress." Harper Decl. ¶ 11. This is exactly the type of "First Amendment safeguard[] that courts have cited in upholding other types of university disciplinary policies." *See* Br. 18 (citing court's finding in *Marshall v. Ohio Univ.*, 2015 WL 1179955 (S.D. Ohio Mar. 13, 2015) that anti-harassment policy had an objective and subjective component). Likewise, the operative definition of "bullying" prohibits only conduct "that is *intended* to cause or that a *reasonable* person would know is likely cause, and that *actually causes*, physical harm or substantial emotional distress." Harper Decl. ¶ 12. Moreover, these definitions target only severe or pervasive conduct: the harassing definition is directed towards conduct of a "repeated or continuing" nature, and both definitions require that the resulting emotional distress be "substantial." *Id.* ¶¶ 11–12.

For these reasons, the cases on which Plaintiff relies are inapposite. In *Doe v. University of Michigan*, the court focused on the subjective nature of the words "victimize[]" and "stigmatize[]," which appear nowhere in the Statement or definitions here.  721 F. Supp. at 859.  Moreover, the court held that the factual record demonstrated that the "drafters of the policy intended that speech need only be offensive to be sanctionable," and that the policy "was consistently applied to reach protected speech." *Id.* at 860, 865, 867.[8]  None of these factors is present here.[9]

Even before the University streamlined its definitions, the prohibition on harassing and bullying easily met constitutional standards.  The definitions always included definitions drawn from Michigan law that Speech First does not challenge and that have been upheld by the courts.  Because those definitions were *legal* in nature, they

---

[8] Indeed, the court explained that "if the plain language of the policy were all the Court had before it, it would probably conclude that Doe had failed to demonstrate a reasonable probability that the Policy would be construed to cover his anticipated speech"—and, therefore, that the plaintiff would lack standing.  721 F. Supp. at 859.

[9] Other cases cited by Plaintiff are similarly inapposite.  *See Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 370–71 (M.D. Pa. 2003) (invalidating policy provision that "focus[ed] upon listeners' reactions to speech"); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (invalidating policy that did not require a "showing of severity or pervasiveness" such that it could apply "to cover any speech . . . the content of which offends someone"); *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1184 (6th Cir. 1995) (invalidating policy that required "subjective reference in identifying prohibited speech"); *DeJohn*, 537 F.3d at 317–18 ("Absent any requirement akin to a showing of severity or pervasiveness—that is, a requirement that the conduct objectively and subjectively creates a hostile environment or substantially interferes with an individual's work—the policy provides not shelter for core protected speech.").

set forth specific elements of the offenses.  The inclusion of other non-legal material, such as dictionary definitions, obviously did not nullify or supplant the more specific legal definitions approved by the Michigan legislature.  Nor, in the context of a Statement that specifically affirmed students' free speech rights, including the right to "voic[e] unpopular views and dissent," PI Ex. A at 2, could those definitions have reasonably been understood as encroaching on students' First Amendment prerogatives.  *See, e.g., Gonzales v. Oregon*, 546 U.S. 243, 273 (2006) ("[S]tatutes should not be read as a series of unrelated and isolated provisions."); *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 167 (3d Cir. 2008) ("Standing alone, the word 'participate' may be vague.  However, 'participate' cannot be read in isolation, but must be read in the context of the entire paragraph . . . .").  In sum, even if Plaintiff's claims based upon the discarded definitions were not moot, they would lack merit.

For these reasons, Plaintiff's challenge to the University's policy against harassing and bullying cannot succeed.

### 2.    *The University's Enhancement for Bias-Motivated Conduct Is Constitutional.*

The Constitution does not prohibit the University's policy of enhancing sanctions for violations motivated by bias.  That separate prohibition merely increases the sanction for bias-motivated conduct that has otherwise been determined to violate the Statement.  As such, it is akin to motive-based sentencing enhancements that are routinely upheld.  *See Wisconsin v. Mitchell*, 508 U.S. 476, 484–85 (1993) (upholding

Wisconsin statute that allowed for "the same criminal conduct [to] be more heavily punished if the victim is selected because of his race or other protected status than if no such motive obtained"); *see also United States v. Miller*, 767 F.3d 585, 592 (6th Cir. 2014) ("The government may punish 'bias-inspired conduct' without offending the First Amendment"). Although a person may not be punished for her "abstract beliefs," "the Constitution does not erect a *per se* barrier" to consideration of one's beliefs "simply because [they] are protected by the First Amendment." *Mitchell*, 508 U.S. at 485–86. Rather, where bias-motived conduct "is thought to inflict greater individual or societal harm," it may be punished more severely. *Id.* at 487–88.

The reasoning of *Mitchell* is directly applicable here: the Statement's penalty enhancement for bias-motivated conduct requires a primary offense under the Statement prior to its application, and it aims to deter bias-motived conduct that the University reasonably believes uniquely harms students and threatens campus security. The Statement's penalty enhancement is plainly constitutional.[10]

---

[10] Speech First argues that the terms "bias" and "bias-related misconduct" are impermissibly vague, Br. 17, but its argument confuses the BRT's definition of "bias"— which is not intended to set out a standard for discipline, *see supra* pp. 5–6—with the more specific definition of "bias-motivated misconduct" in the Statement's new policy. (The term "bias-related misconduct" does not appear.) The Statement defines "bias-motivated misconduct" as "behavior motivated on the basis of any person's identity as protected by the University of Michigan's Nondiscrimination Policy (race, color, national origin, age, marital status, sex, sexual orientation, gender identity, gender expression, disability, religion, height, weight, or veteran status)." Harper Decl. ¶ 17. Speech First does not argue that this detailed definition is vague, nor could it.

22

### 3.     *The BRT Process Does Not Implicate the First Amendment.*

Plaintiff takes issue with the descriptions of "bias" and "bias incidents" on the BRT website—in particular, with the notion that the determinative consideration in whether an incident should be reported is the student's "own feelings."  PI Ex. F at 3.  But this emphasis is entirely consistent with the purpose of the BRT—to assist students who feel aggrieved.  Jones Decl. ¶ 9.  The description of a "bias incident" for purposes of providing support to the person who feels aggrieved has nothing to do with the definition of "harassing" and "bullying" for purposes of disciplinary proceedings.  The definition of a "bias incident," therefore, cannot be unconstitutionally vague or overbroad—because nothing is proscribed and no one can be punished.  Contrary to Plaintiff's contention, the University does not have a "ban" or "prohibition" against "bias incidents."  In fact, the BRT website emphasizes that "[b]ias incidents can be things that do not violate any law or policies."  PI Ex. F at 3.

Indeed, because the BRT process is neither disciplinary nor compulsory, it does not implicate the First Amendment at all.  No one is required to participate in the BRT process, and the BRT does not investigate reports of bias, make findings, pass judgment or impose discipline.  Jones Decl. ¶¶ 8, 12.  Speech First may question the need for a BRT and may even object to it.  But the decision whether to provide support for students who feel aggrieved by perceived bias, and through what process or programs, is for the University to make.  When such a decision "places no burden on protected

expression," no violation of the First Amendment occurs.  *Meese v. Keene*, 481 U.S. 465, 480 (1987).

## II.   ADDITIONAL FACTORS WEIGH AGAINST AN INJUNCTION.

Plaintiff gives short shrift to the considerations of harm that must be balanced in deciding whether to impose a preliminary injunction—for good reason.  They all weigh against granting the motion.

First, Plaintiff cannot show any harm, let alone that it "would suffer irreparable injury absent the injunction."  *So. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017).  The thrust of Plaintiff's claims is based on definitions that are no longer applicable, and the University has stated under oath that Students A, B and C are free to engage in the expression of their views without fear of discipline.  Wessel Decl. ¶ 24.  In these circumstances, there is no threat of harm.  *See Chaudhuri v. Tennessee*, 130 F.3d 232, 235 (6th Cir. 1997) (noting district court denied preliminary injunction in an Establishment Clause case because the university president changed the prayer policy and issued a statement confirming it); *see also Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (holding irreparable harm must be "actual and imminent harm rather than harm that is speculative or unsubstantiated").

Second (and third), an injunction here would "cause substantial harm to others," *Glazer's Distribs.*, 860 F.3d at 849, and the public interest weighs against it.  *See Bonnell*, 241 F.3d at 826 (setting aside preliminary injunction against college's sexual harassment policy that was challenged on First Amendment grounds, explaining that enjoining it

24

"may cause harm to . . . students . . . forced to endure a hostile learning environment" and would disserve "the public interest").  The policies and programs that Speech First seeks to enjoin advance objectives that are critical to the University's overall educational mission—ensuring that students are treated "fairly and with dignity," PI Ex. A at 3, and "[c]reating and maintaining a respectful and welcoming environment for all to live, learn, work and thrive," Jones Decl. Ex. 1.  It hardly serves the public interest or the interest of the University community as a whole to prohibit the University from enforcing rules against harassing and bullying, or from providing resources to students who feel victimized by racial, gender or other forms of bias.  Should these programs and policies be enjoined, the cost will be borne directly by students who are among the most vulnerable on campus.  And the University's educational mission itself will suffer, for surely an important element of that mission is to prepare its students to freely express their own views while respecting the rights and feelings of others.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion should be denied.

Respectfully Submitted,

HONIGMAN MILLER SCHWARTZ AND COHN LLP

Leonard M. Niehoff (P36696)
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI 48108
Tel: (734) 418-4254
lniehoff@honigman.com

WILLIAMS & CONNOLLY LLP

/s/ Kevin T. Baine
Kevin T. Baine (DC 238600)
Stephen J. Fuzesi (DC 496723)
Kathryn "Kylie" Hoover (DC 1017260)
Amy B. McKinlay (DC 1034542)
725 Twelfth Street, N.W.
Washington, DC 20005

Rian C. Dawson (P81187)
660 Woodward Avenue
2290 First National Building
Detroit, MI 48226
Tel: (313) 465-7730
rdawson@honigman.com

Tel: (202) 434-5000
kbaine@wc.com
sfuzesi@wc.com
khoover@wc.com
amckinlay@wc.com

OFFICE OF THE VICE PRESIDENT AND
GENERAL COUNSEL UNIVERSITY OF
MICHIGAN

Timothy G. Lynch (P77385)
David J. Masson (P37094)
Jack Bernard (P62975)
5010 Fleming Administration Building
503 Thompson Street
Ann Arbor, MI 48109
Tel: (734) 764-0305
timlynch@umich.edu
dmasson@umich.edu
bernar@umich.edu

*Attorneys for Defendants*

Dated: June 15, 2018

## CERTIFICATE OF SERVICE

This is to certify that on June 15, 2018, a copy of the foregoing was electronically filed with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record.

/s/ Kevin T. Baine