# EXHIBIT 28



# Abortion Debate Series: Abortion Should Not Be Legal

Features, Politics       November 28, 2016       Deion Kathawa



*Should the United States government (federally or through states and territories) restrict (totally or partially) a woman's right to an abortion? This article is the first round in a debate series on the topic of abortion. Read the opposing argument here.*

As a matter of legislative, jurisprudential, and/or constitutional policy, we as a country must move, sooner rather than later, to make abortion illegal—as should all countries. But before we can understand why the law must proscribe abortion acts, we must first explore the proposition philosophically.

Proponents of abortion will often say that they are merely interested in securing a woman's right to "choose," to which the retort must be: *Choose* what*, precisely?* The ability to choose from various options is typically seen as a great good, but one must be specific about the object of one's volition, otherwise, we are doomed to deal with little more than an empty platitude. When we talk about abortion, we must first ask what we mean when we say "abortion," i.e., what is it, and what does it entail?

Abortion, I submit, is the intentional cessation of the life of an *in utero* human being, a member of our species: *Homo sapiens*. Basic embryology tells us unequivocally that what exists at the moment of conception is a zygote: a human organism with its own distinct set of DNA at a very early stage of development. Whatever else it might be, it is without a doubt and inalienably a member of our species. Abortion, then, is necessarily concerned with a particular object: human life.

With those basic facts out of the way, we can turn to investigating the issue philosophically. What is the nature of the fetus? (For reasons owing to economy of language, I will restrict myself to the term "fetus," but it is meant as a general stand-in term, inclusive of various other developmentally-specific names one might assign to the preborn organism, such as "embryo.")

Something has a "nature" in the relevant sense when it possesses an internal principle of change, growth, and development. This is self-evidently the case for the fetus. It needs nothing more than what we born human beings, at any age, need to survive: nourishment and not being intentionally killed. No one denies that the consequence of an elective abortion is the termination of the existence of a fetus.

Since our concern is with what the law ought to say regarding abortion, we must now inquire into the nature of the State. At a minimum, the State must protect those persons within its domain from physical violence of any sort, and so we can say with certainty that the State has a duty to protect the fetus from the physical aggression of those who would seek to destroy it, just as it would for any born person. Whatever else a State can do, it cannot rightfully be called a State unless it does at least this—for without life, one cannot hope to exercise any other rights (whatever you happen to think those are). Without the right to life, all other rights are meaningless.

Exponents of abortion may concede to the argument thus far but insist that abortion ought to remain legal because the fetus is not a "person"—only human, not a person: a bearer of rights, worthy of the protection of the laws. But this is incorrect, for it misunderstands the nature of the human being.

Consciousness, rationality, and/or the ability to be self-aware are the most cited candidates for markers of personhood by pro-choice advocates. Absent the ability to exercise them, the human organism which we are discussing is not a person and so is not reached by the protection of the laws—the very same protections afforded to all of us outside the womb. The fetus is not conscious, rational, and/or self-aware and cannot exercise those abilities; for that reason it is not a person; therefore, abortion is, if not morally good, then at least permissible, and the law should not ban it.

But the abortion exponent equivocates with respect to the idea of "exercising" those properties. A distinction must be

made between the immediate capacity to, say, be rational or exercise rationality, and the *root capacity* to actualize that natural ability that comes with being the type of thing the fetus is *by nature*: an immature, though internally complete, human being.

If we were only concerned with the immediate ability to be conscious, rational, or self-aware, then children as young as five might not be persons, nor would sleeping people, nor would very sick people. All, then, would logically be candidates for termination in what we might charmingly call "after-birth abortion."

Logically, neither are the circumstances of the conception or the pregnancy, difficult though they may be, able to tip the scales in a pro-choice direction. That a fetus was created in rape does not change its nature as a human being, nor does it change the fetus' status as a person worthy of the State's protection, nor does it change the State's duty to protect all persons in its domain. How could it? Further, that a mother has a difficult pregnancy changes nothing either. Remember, we are here concerned with elective abortion: that procedure which has as its principal end the destruction of a human person—not cases where legitimate medical triage must be employed.

Finally, nothing in this argument necessarily entails that mothers ought to be legally punished for seeking or obtaining an abortion. Traditionally, the law has never punished mothers in these circumstances but has always deemed it sufficient to sanction, fine, and jail only their enablers: abortionists, colleagues, friends, and family. It is therefore not unreasonable to posit that the normal demands of the law simply do not apply, at least not as stringently, when it comes to the unique and intimate relationship a mother has with her unborn child.

But the law also acts as teacher and educator. If, by some miracle, *Roe* v. *Wade* (1973) were to be overturned tomorrow, it is obvious that this would not change the reality that the populace has received a perverse education at the Court's proverbial knee these last 40-plus years. Time would be needed to reverse the twisted and incorrect lesson that abortion is morally permissible.

Society might at some future time, however, move, via the democratic process, to decide whether its people had truly internalized and learned the new, anti-*Roe* lesson well enough that punishment for women for procuring abortions or attempting to procure them would be harsher than the historical norm, but, again, there is no reason to believe that the punishment of women in those potential circumstances is required by the pro-life position just expounded.

We must therefore accept that the location, size, state of dependency, and seeming foreignness of the fetus—*It is just a blob of cells!*—are not relevant considerations when deciding whether it ought to be free from the threat of abortion.

(Visited 2,764 times, 1 visits today)

SHARING

TAGS

abortion, ethics, law, legality, morality, philosophy, pro-choice, pro-life

---



### About Deion Kathawa

Deion Kathawa studies philosophy and political science at the University of Michigan. He enjoys ice skating and binge watching Netflix (who doesn't, though?) in his spare time. He can be reached via email at kathawad@umich.edu. Deion tweets @DeionKathawa and invites you to friend him on Facebook. View all posts by Deion Kathawa →

PREVIOUS POST

What is the Congo? Mindless Americans and Our Impacts

NEXT POST

Abortion Debate Series: Abortion Should Be Legal

Search

---

POPULAR POSTS

---

Sorry. No data so far.

CONNECT WITH US

E    F    T    Y

THE MICHIGAN REVIEW ON TWITTER

REASON MAGAZINE PODCASTS

- 'The Libertarian Party Is the Right Answer, as Broken as It Is:' Larry Sharpe June 12, 2018
- Expect Fully Legal Weed Within 5 Years, Says Former Top Pharma Lobbyist and Congressman Billy Tauzin June 8, 2018

LATEST FROM NATIONAL REVIEW

- Trump Downplays Kim's Brutality, Says 'A Lot of People' Are Guilty of Atrocities June 14, 2018 *Jack Crowe*
- Before Going to Bed . . . June 13, 2018 *Jay Nordlinger*

Copyright © 2018 by The Michigan Review. Theme: DW Focus by DesignWall.

Proudly powered by WordPress

# EXHIBIT 29



# Abortion Debate Series: Abortion Should Be Legal

Politics, Uncategorized        November 28, 2016        Andrew Beddow



*Should the United States government (federally or through states and territories) restrict (totally or partially) a woman's right to an abortion? This article is the first round in a debate series on the topic of abortion. Read the opposing argument here.*

Some preliminary remarks will be necessary to clarify the purpose of this debate. First, the resolution covers the *lawfulness* of abortion, not the *morality* of abortion. Surely the law has something to do with morality, but there is a difference between the two, so my opponent and I will have to do some work if we want to proceed from the (im)morality of abortion to its (un)lawfulness. Second, this debate principally concerns the right to coerce—for the state to coerce on behalf of the unborn, for physicians to coerce on behalf of women, and so on.

Any advocate of coercion faces a significant justificatory burden. We demand a special justification of those who use

force, which we do not demand of those who set about their projects without coercing others. It will not be possible to offer a complete explanation of this burden here, but I will attempt to motivate it in terms that should seem intuitively plausible.

Human beings are intrinsically valuable, and this sets them apart from ordinary objects. When I regard some object outside of myself (e.g. wealth) as valuable, it is so only insofar as I regard it as an end worth pursuing, but it has no moral worth apart from its relation to my judgment. Yet, as a person, I am morally valuable in a way distinct from these conditional ends, because I possess a quality which makes judgments of value possible. Objects are only ever conditional ends of contingent value, but persons are ends-in-themselves of objective moral value, precisely because underlying every volition is the necessary acceptance of the inner worth of humanity, the ability of individuals to determine their wills autonomously and through reason.

This constitutes the supreme limiting condition on all choice. Since humanity is of objective value, it is not up to my discretion as to whether I ought to honor it. I owe persons respect simply because they are persons, and it is for this reason that I am obligated always to treat humanity, (in myself or in others, ) as an end-in-itself, and never as mere means to be used or disposed of in the pursuit of some subjective end. It is clear, then, why coercion faces such a high burden of justification: I am not entitled to treat others as objects to be forcibly manipulated, since this is inconsistent with their value as persons. I must accept their freedom in choosing to pursue their own conception of the good, and I am entitled to do the same. So we are all reciprocally constrained in our choices by the limits that our right to freedom imposes on one another.

If our first right is to freedom, and if this is a constraint on how we may treat one another, then any right to use coercion must have freedom as its justification. Specifying all the conditions required for the justification of coercion is beyond the scope of this debate, but in a civil society it should be recognized that the proper place of coercion is in the defense of the rightful freedom of persons, since it is here consistent with the promotion of humanity as an objective value. I am entitled to make choices about the use of objects in the external world, (including my own body), and this entitlement constrains others not to abuse me (in my rightful possessions) as an instrument for their purposes. When the actions of another violate my sphere of freedom and infringe upon my rights, then I am authorized to employ coercion to secure my rights.

Since the first right of humanity is that of freedom, and since freedom is first actualized in one's determination of the use of one's own body, therefore the right to bodily autonomy is our most immediate entitlement, and the violation of this right is the clearest authorization for the use of coercion. A mother has a right to determine the use of her body insofar as this is compatible with the equal freedom of self-determination of all others. As the fetus, (being in the body of the mother against her will, ) violates this right of self-determination, the mother is authorized to coercively remove the fetus from her body.

Now, for the sake of argument, we may grant that the fetus is a person with rights. Yet recall that the supreme limiting condition on rightful choice is the value of humanity, where humanity is the capacity for rational self-determination. The mother's self-determination (with respect to the use of her body) is in the first place compatible with the equal right of the fetus, since the mother in no way disrespects the fetus's humanity by being pregnant. Yet the fetus, in as much as it is present in the body of the mother against *her* wish, infringes upon her right to unilaterally determine the use of her body.

Our judgment here does not require us to say that the humanity of the mother is "more important" than that of the fetus, but only that, in pregnancy, the mother alone is authorized to use coercion, since only her self-determination, (with respect to her own body,) is originally violated. In exercising her right to her own body, the mother certainly harms the *interests* of the fetus, but she does not violate its *rights*, since the fetus's existence was never fully rightful, being parasitic upon the use of what was another's by right (that is, the body of the mother).

No doubt this account suffers from further complicating issues which have yet to be addressed, and I'm sure my opponent will raise them in his reply. I would warn, though, that any argument must appeal to the value of self-determination, so an explanation of why a woman would be obliged to allow her body to be used by another must be consistent with her innate right of freedom, *not* with some independent value (e.g. life) extraneous to her own will.

(Visited 1,385 times, 1 visits today)

SHARING

TAGS

abortion, body, choice, legal, permissible, pro, pro-choice, self



About Andrew Beddow

Andrew Beddow studies philosophy and German at the University of Michigan. He also writes for the Michigan Journal of International Affairs. He can be reached at abeddow@umich.edu. View all posts by Andrew Beddow →

PREVIOUS POST

Abortion Debate Series: Abortion Should Not Be Legal

NEXT POST

Abortion Debate Series: Round Two

Search

POPULAR POSTS

Sorry. No data so far.

CONNECT WITH US

E   F   T   Y

THE MICHIGAN REVIEW ON TWITTER

## REASON MAGAZINE PODCASTS

- 'The Libertarian Party Is the Right Answer, as Broken as It Is:' Larry Sharpe June 12, 2018
- Expect Fully Legal Weed Within 5 Years, Says Former Top Pharma Lobbyist and Congressman Billy Tauzin June 8, 2018

## LATEST FROM NATIONAL REVIEW

- Trump Downplays Kim's Brutality, Says 'A Lot of People' Are Guilty of Atrocities June 14, 2018 *Jack Crowe*
- Before Going to Bed . . . June 13, 2018 *Jay Nordlinger*

Copyright © 2018 by The Michigan Review. Theme: DW Focus by DesignWall.

Proudly powered by WordPress

# EXHIBIT 30

# Abortion Debate Series: Round Two

Politics      November 29, 2016      Michigan Review



*Should the United States government (federally or through states and territories) restrict (totally or partially) a woman's right to an abortion? This article is the second round in a debate series on the topic of abortion by authors Deion Kathawa and Andrew Beddow.  Read the original arguments* here.



### Deontology is more in Keeping with a Regime of Illegal—not Legal—Abortion

### (Deion Kathawa)

I find myself in wholehearted agreement with my opponent, Mr. Beddow, in his assertion that human beings "are intrinsically valuable" and are thus "ends-in-themselves of objective value," which means that they are both owed "respect simply because they are persons" and that, consequently, no person is "entitled to treat others as objects to be forcibly manipulated." But I find myself wondering how he moves from that robust position to, in the final analysis,

concluding that abortion acts—instances of great disrespect, naked objectification, non-deontological (i.e., consequentialist) means-end calculation, and violent coercion—ought to be legal.

I would begin by asking why freedom itself, our supposed "first right," is both (1) objective in the sense that it makes demands on us in the way Mr. Beddow insists that it does, and (2) why something else cannot take its place: duty to family, perhaps, or religious obligations. It seems that one might plausibly make the case that freedom itself is a mere subjective good, especially when paired with the reality that none of is so free as my opponent alleges that we are: All of us are entangled beings, restrained and constrained by our biology, resources, and societal structures and institutions. As for the second point: Even if freedom is objective, why is freedom the prime good/capacity/principle? Mr. Beddow seems to simply assume this without providing an argument establishing it as the case. Why not obedience to a Divine authority?

He goes on to makes a strong claim: "I owe persons respect simply because they are persons, and it is for this reason that I am obligated always to treat humanity (in myself or in others) as an end-in-itself, and never as mere means to be used or disposed of in the pursuit of some subjective end." And yet, it would seem abortion is a paradigmatic case of a person's abjectly failing to "honor" humanity as objectively valuable, instead opting to take illegitimate moral discretion by using or disposing of the preborn human organism via an abortion "in the pursuit of some subjective end." Women seek abortions for various reasons. What they all have in common, however, is that they are merely subjective ends in which the preborn human organism, what my opponent grants may be called a "person," is treated as being of merely "contingent value"—a position manifestly at odds with our duty to treat all persons as intrinsically valuable, according to my opponent's view recapitulated at the outset.

Mr. Beddow then writes: "A mother has a right to determine the use of her body insofar as this is compatible with the equal freedom of self-determination of all others. As the fetus (being in the body of the mother against her will) violates this right of self-determination, the mother is authorized to coercively remove the fetus from her body."

But this is too quick. I would ask: Does freedom have consequences? Assuming the mother freely chose (whatever the word "freely" means in the world in which we live—one in which we are bundles of psychological contradictions, bound up in societal webs which spawn for us competing obligations and pressures) to engage in sexual intercourse, should she not bear the results of those free choices, i.e., the pregnancy?

There is also a contradiction later on. Mr. Beddow reminds us that the "value of humanity" is found in our "capacity for self-determination," but then he goes on to say that, in abortion, the mother "certainly harms the *interests* of the fetus, but she does not violate its *rights*, since the fetus's existence was never fully rightful, *being parasitic upon the use what was another's by right (that is, the body of the mother)*" (emphasis added). Which is it? Is the fetus unprotected from the abortionist's forceps because it is not able to immediately exercise self-determination via acts of rationality, or because it is living within the mother? This mystery remains unsolved.

Ultimately, Mr. Beddow's argument, one which contained so much promise, goes off the rails because of its infidelity to its central redeeming feature (that humanity is valuable in itself), contradictory intermediate conclusions, and insufficiently defined key terms, such as freedom.

### Abortion Should Be Legal: A Response to Deion Kathawa

### (Andrew Beddow)

In my first post, I outlined a general theory of rights: insofar as human beings are practically rational, they are both entitled to freedom and constrained by the same entitlement of others. As best as I can tell, Mr. Kathawa appeals to a similar moral intuition: people have at least a *prima facie* right not to have coercion used against them. Since he believes fetuses are persons, they have the same set of rights as adults, and this entitles them to the protection of the law.

The first important thing to note is that nothing in this account actually conflicts with my own justification of the right to abortion. As I stated in my opening post, we can accept that fetuses are not only humans but also *persons,* and therefore entitled to rights. My argument does *not* rest on the differing "degrees" of humanity in women and fetuses —only the conflict between their rights that occurs in an unwanted pregnancy.

Still, it's unclear to me why *biological* humanity carries with it any moral value. Corpses and disembodied organs are all 'human,' but we wouldn't ordinarily say that any of these things have *rights.* This is not to say that a fetus has no rights (in fact, I think it is likely they do), but that any argument for the independent moral worth of a fetus will require an appeal to something other than its biological constitution. As a good Catholic, perhaps Mr. Kathawa will offer a Thomistic theory that roots the value of the fetus in its innate purpose (telos), but how exactly *rights* follow from this (and how we are to resolve conflicts between rights) is not a trivial matter. He will need to pick out some part or implication of human nature that grounds rights.

In any case, Mr. Kathawa's argument hinges on one premise in particular—that "the State must protect those persons within its domain from physical violence of any sort." While an appealing platitude, this seems straightforwardly absurd to me. As I mentioned in my opening post, coercion faces a significant justificatory burden, but that does not mean that coercion is always and everywhere unjust. If the duty of the state is to prevent physical violence, then clearly the state must itself use physical violence (e.g. arresting criminals) for the sake of protecting its subjects, so at least *some* forms of coercion are justified.

Mr. Kathawa has not given us any general standard for determining when the use of force is or is not justified. I have provided this criterion in my opener: coercion is justified when it is used against rights violations. This is why assault (which violates the right of freedom) is unjust, but self-defense (which protects freedom against a rights violation) is just. Because people's choices regularly conflict (my making use of some object X prevents your making use of the same object X, so we cannot both at once freely act upon X), there must be some general principle for resolving our conflicts in a way that respects our equal right to freedom. All this is to say that justice is *innately coercive*—there can be no such thing as justice without the authorization to use force.

Now, the last point worth considering is the objection that alternative criteria of personhood (e.g. consciousness) justify too much—that my ethic entails repugnant conclusions like the right to use violence against children or sleeping people. This, I admit, is a complicated objection, since it requires an explanation of the persistence of identity over time. Still, a short answer should suffice for now: it is *rational nature* that grounds the dignity of human beings, not the *actual exercise* of that rational nature. I do not lose my rights when I go to sleep: clearly, if I have rights *essentially* at T=0 when I am awake, then, as long as I am *essentially* the same person at T=1 when I am asleep (and it would be truly bizarre to think that I regularly pass into and out of existence every night), I should also have rights. One might say that fetuses have rights then, because fetuses—like children—have a rational nature that is not yet developed. Recall again that this is fully consistent with my justification of abortion, since I don't need to deny the personhood of the fetus.

Mr. Kathawa's argument suffers because it does not give any consideration to the rights of women. Even if he succeeds in justifying the moral worth of the fetus, both the fetus *and its mother* have equal rights to bodily self-determination. Mr. Kathawa has given no reason to think that the right of one person to his own body carries with it an entitlement to make use of the body of another without her consent. If you have a right to use force to prevent me (a person) from using your body, then it's unclear why a woman should not have the same right to prevent a fetus from using hers.

(Visited 267 times, 1 visits today)

SHARING

TAGS

abortion, choice, debate, ethics, fetus, legal, Life, morality, philosophy, pro



## About Michigan Review

View all posts by Michigan Review →

PREVIOUS POST

Abortion Debate Series: Abortion Should Be Legal

NEXT POST

Although 'The Game' is Lost, the B1G is Back

Search

POPULAR POSTS

Sorry. No data so far.

CONNECT WITH US

E    F    T    Y

THE MICHIGAN REVIEW ON TWITTER

## REASON MAGAZINE PODCASTS

- 'The Libertarian Party Is the Right Answer, as Broken as It Is:' Larry Sharpe June 12, 2018
- Expect Fully Legal Weed Within 5 Years, Says Former Top Pharma Lobbyist and Congressman Billy Tauzin June 8, 2018

## LATEST FROM NATIONAL REVIEW

- Trump Downplays Kim's Brutality, Says 'A Lot of People' Are Guilty of Atrocities June 14, 2018 *Jack Crowe*
- Before Going to Bed . . . June 13, 2018 *Jay Nordlinger*

Copyright © 2018 by The Michigan Review. Theme: DW Focus by DesignWall.

Proudly powered by WordPress

# EXHIBIT 31



# Abortion Debate Series: Round Three

Politics      November 30, 2016      Michigan Review



*Should the United States government (federally or through states and territories) restrict (totally or partially) a woman's right to an abortion? This article is the final installment in a debate series on the topic of abortion by authors Deion Kathawa and Andrew Beddow.  Read their original arguments here, and their rebuttals here.*

2014_1_5-Post-2-Abortion-Question

### Abortion Should Be Legal: A Reply to Mr. Kathawa's Critique of My Original Position

**(Andrew Beddow)**

Mr. Kathawa's first criticism concerns human freedom—why it (1) entails rights that constrain others in how they may treat us, and (2) is a non-arbitrary value on which to ground morality. I'll answer the second point before returning to the first. As I said in my first article, only a good will can be regarded as good in itself, since any external object is only ever of conditional worth. Morality is concerned with the exercise of our will; we make choices when we believe that an object of choice is worth selecting, but the goodness of this object always presupposes a good will to use it. Wealth can be good or bad depending on its use, but only a person (considered apart from all material ends of choice) has inner worth. Since the will is the limiting condition on the value of all objects of choice, it is the will alone which is good in itself.

Since will is a precondition on any extraneous objects having value contingently, it is of objective value. Further, since in any volition will serves to ground the worth of a particular object of choice, the will is never to be treated as a mere means, but always as an end-in-itself. This is why, per (1), freedom is an innate right, since I must always regard your will as an end-in-itself, and you must treat mine the same. Nothing extraneous to the will could ever justify constraining it—not even the command of God. Freedom alone does, because freedom alone is of absolute value.

Mr. Kathawa next claims that abortion disregards the worth of the fetus, since ending the life of another *always* treats that other as a mere means. This seems straightforwardly untrue—in cases of self-defense, I am authorized to use deadly force in defense of my own life, but that coercion respects the dignity of my assailant, since the justification for my coercion is my right to self-determination, and the assailant only surrenders that same and equal right inasmuch as he violates my own. The fetus does not *intend* to violate the right of the mother (and for this reason it is not morally blameworthy), but it does so all the same, justifying the use of force.

In "A Defense of Abortion," J.J. Thomson offers a compelling analogy. Imagine waking up one day to find that you have been strapped into a machine which will make use of your body to sustain the life of a comatose man. This man did not *intend* to violate your right to self-determination (he's comatose), but almost everyone recognizes that you have a right to step out of the machine, even though this will kill the man. Your right to your body is not a blank check to make use of others, but it *is* a right to prevent others from making use of your body. Therefore, a comatose man and a fetus have no enforceable rights to your body, but you have a claim to your body against them.

The penultimate objection concerns the assumed obligation of the mother. Even were this argument true, it would not justify the absolute prohibition (in cases of rape, unintentional pregnancy, and so on) that my opponent advocates. Still, the argument is bizarre on its own terms. That my choice to go outside results (even routinely) in

my being mugged is no reason why I consent to mugging. Even if a pregnancy were intentional, how does this obligation become enforceable? Does the woman contract out the use of her body to a person who did not even exist at the time of conception (and who certainly was not able to agree to the arrangement throughout pregnancy)? Special obligations can't be legitimately imposed unilaterally. They require consent of the obliged party, and it's unclear how this is possible in the case of pregnancy.

Mr. Kathawa's last argument seems confused. I've been quite explicit that the right to kill the unborn in no way depends upon the inhumanity of the fetus, and I clarified in my last reply that human dignity does not concern our particular choices, but only rational nature itself. The justification for abortion is analogous to the justification of self-defense for reasons outlined above, and clearly those against whom we defend are people with rights.

I've justified why the right to freedom is a foundational principle that orders adjudicates between rival moral claims. My opponent raised some skepticism about this, but I'm not sure what (if any) moral principle he offers as an alternative, since he proceeds to appeal to the right to freedom in his main arguments anyway. Only one of these arguments (that mothers assume obligations by having sex) even addresses the right of a mother to her own body, and it does so (a) without much elaboration, (b) only to a limited degree (e.g. excluding cases of rape), and (c) highly implausibly.

Nowhere else does Mr. Kathawa attempt to resolve the tension between the rights of the mother and those of the fetus. He has neglected the fundamental question of this debate: he's focused on refuting arguments for a mother's claim on a fetus's body, but nowhere has he justified the right of a fetus to the use of the mother's body. But this is clearly a prior question, if only because pregnancy is prior to abortion! If an ordinary adult has no right to make use of my body (even unintentionally, as in the case of the comatose man), and if I am ordinarily licensed to use coercion to maintain control of my body, then Mr. Kathawa will need to offer compelling reasons why pregnancy is a special case wherein this principle does not hold. It is pregnancy, not abortion, which stands in need of extraordinary justification, since the presumption holds that it is only by consent that one acquires a right to make use of the body of another.

### Abortion Should Be Illegal: A Reply to Mr. Beddow's Critique of My Original Position

### (Deion Kathawa)

I want to begin by thanking Mr. Beddow for this spirited discussion, and the purpose of this final post will be to demonstrate why I believe that his critique of my original position—that abortion should be illegal—fails.

I would begin by making a brute, bird's-eye view observation/assertion, i.e., one lacking explicit and immediate argumentative justification for its own merit, though hopefully made clear by the train of logic I have espoused thus far, both in my original argument and in my critique of Mr. Beddow's original argument, as well as by my defense of my own position against his critique here: *Legitimate rights never conflict.*

As an example, in America, one has the right to speak one's mind freely so long as one is neither threatening others nor inciting a mob to commit violence. If we accept that we in fact do have this right, then when some other person objects and says, "I have a right not to be offended by your exercise of your right to free speech," it would be inappropriate for us to toss the right to free speech out the window, or attempt to balance it in some way with the objector's emotional sensibilities. They are free to exit conversations or block others on social media, for example, but they are not free to silence me or anyone else. (If they were forced to stay in the free speech advocates' vicinity and thereby be triggered by their words, then that would obviously be a different story; but the real justification for why that is unacceptable is that no one has a right to constrain another's movement without cause/sufficient justification, not because emotional equilibrium or "safety" trumps the right of free exercise of speech.)

In the same way, then, there just is no balancing to be done in the case of abortion. Either a fetus has a moral right

to be protected from the abortionist's forceps, or not. If we have a *prima facie* right not to be attacked, as Mr. Beddow admits that we do, then there is no "rights calculus" in which to engage.

Mr. Beddow opens his salvo against my argument specifically by making a fatuous observation with respect to my contention that biological humanity is an overriding consideration if we are to reason well in answering the question of abortion's legal status, namely, "Corpses and disembodied organs are all 'human,' but we wouldn't ordinarily say that any of these things have *rights*" (emphasis in original). But I never argued that merely sharing human DNA, cells, or tissue was what was relevant. Rather, I maintained that a fetus ought to be protected by the law from being aborted because it has a (human) "nature"—"an internal principle of change, growth, and development"—*as well as* the "*root capacity* to actualize that natural ability [e.g., rationality] that comes with being the type of thing the fetus is *by nature*" (emphasis in original). In other words, the fetus is, from the moment of conception, "an immature, though internally complete, human being." It is this reality which is ought to be controlling in the debate.

To give a full defense of the legitimacy of the State and my assertion that it has a duty to "protect those persons within its domain from physical violence of any sort" *contra* Mr. Beddow's glib retort that this is a "straightforwardly absurd" though "appealing platitude" is beyond the scope of this reply. It will suffice to say, however, that I am not a radical anarchist (thank God), and I suspect most persons reading this are not either (neither is most of the world's population). Therefore, I believe that the State, in some form or another, is legitimate and ought to exist (I quite like our constitutional republic, as it happens), and I make the not-so-radical assumption that most people accept intuitively that States *as a general category of thing* are legitimate. (Note that this does not commit me to saying that, e.g., the State of North Korea at present is good, or legitimate, or as good as the State of France, only that States *qua* States are legitimate.)

In addition, one must ask what the essential feature(s) of a State would be; what must a State be or possess *necessarily* to be properly designated as a State and not some other type of thing? It seems obvious that it must, at some level and to some minimally sufficient degree, be invested with, in the words of Hobbes' *Leviathan*, a "power able to overawe them all [i.e., those living within its domain]": to have a monopoly on the use of force, in more modern parlance. Surely that extends to protecting fetuses from aggression, especially since, as Mr. Beddow concedes, they are indeed persons!

Finally, Mr. Beddow attempts to deal with my claim that his view entails that various persons—young children, those who are asleep, and very ill people—would be legitimate candidates for what I termed "after-birth abortion" by saying that "it is *rational nature* that grounds the dignity of human beings, not the *actual exercise* of that rational nature" (emphasis in original). Recall that this is precisely what I wrote in my original post: Abortion ought to be illegal because a "distinction must be made between the immediate capacity to, say, be rational or exercise rationality, and the *root capacity* to actualize that natural ability that comes with being the type of thing the fetus is *by nature*."

From the remarkable congruence of these two quotations, it is difficult to resist the conclusion that Mr. Beddow seems to eventually come around full circle to support my position, especially when he writes afterward (in tandem with his repeated assertion that he doesn't "need to deny the personhood of the fetus") that "fetuses have rights then, because fetuses—like children—have a rational nature that is not yet developed."

I enjoyed thoroughly Mr. Beddow's candor and the intellectual honesty of this exchange and invite him to join me on my side of the aisle because I remained convinced that he (admirably) failed to justify his position that abortion ought to be legal.

(Visited 364 times, 1 visits today)

SHARING

TAGS

abortion, argument, choice, debate, Life, morality, philosophy, pro, round, series, three



About Michigan Review

View all posts by Michigan Review →

PREVIOUS POST

Movie Review: Maybe Snowden Isn't So Bad

NEXT POST

Materials Stolen at Event on Censorship

Search

---

POPULAR POSTS

Sorry. No data so far.

---

CONNECT WITH US

E    F    T    Y

---

THE MICHIGAN REVIEW ON TWITTER

## REASON MAGAZINE PODCASTS

- 'The Libertarian Party Is the Right Answer, as Broken as It Is:' Larry Sharpe June 12, 2018
- Expect Fully Legal Weed Within 5 Years, Says Former Top Pharma Lobbyist and Congressman Billy Tauzin June 8, 2018

## LATEST FROM NATIONAL REVIEW

- Trump Downplays Kim's Brutality, Says 'A Lot of People' Are Guilty of Atrocities June 14, 2018 *Jack Crowe*
- Before Going to Bed . . . June 13, 2018 *Jay Nordlinger*

Copyright © 2018 by The Michigan Review. Theme: DW Focus by DesignWall.
Proudly powered by WordPress

# EXHIBIT 32

The Michigan Daily

# Michigan College Democrats and Republicans reflect on 2017 plans following Trump victory

Thursday, January 12, 2017 - 11:20am



State Representative Jeff Irwin (D-Ann Arbor) speaks to students at a College Democrats meeting at the Union on October 1, 2015. Buy this photo

File Photo/Daily

HEATHER COLLEY
Daily Staff Reporter

The beginning of a new semester is traditionally a time of recruitment and increased student involvement in different organizations on campus. At Winterfest, the University of Michigan chapters of both College Republicans and College Democrats had tables to promote mobilization and their respective agendas for 2017.

With President-elect Trump's inauguration only a week away, the two political groups are focused on how the new administration will affect their future efforts to promote

various ideologies, as well as increasing student political efficacy, which would lead to wider involvement and student knowledge about current political events.

While the University College Republicans are "thrilled" about President-elect Donald Trump's victory, according to LSA junior Enrique Zalamea, president of the organization, they plan to focus largely on local Michigan state politics during the winter semester. They have specifically decided to support University Regent Ron Weiser in his campaign for Michigan Republican Chair.

"We decided to support him, and we're going to be helping him out throughout conventions — there's one convention in February that he told us we could send as many volunteers over there as we can, and we definitely plan on doing so," Zalamea said.

According to Weiser's website, his campaign for Regent included promises to "straighten U of M's books and reduce the burden on the taxpayers of Michigan." Weiser also states on his website his history and political credentials are focused centrally on "defeating Barack Obama's liberal agenda" and fighting hard against the power of Unions. Similarly, Weiser ran with the promise of cutting costs so students at campuses such as UM-Flint or UM-Dearborn may receive the same quality education as that which is provided by the University's main Ann Arbor campus.

College Republicans also expressed their plan to tackle the issue of identity politics — the phenomenon of people in particular groups of society, such as race, religion or socioeconomic status, forming political alliances that deviate from traditional broad-based parties — within the campus community this semester.

The Michigan College Republicans believe this tendency has a profound impact on free speech on college campuses, and has decided to take a firm stance on expanding free speech rights at the University. On campus, the question of what constitutes hate speech, and whether or not the vocalization of certain ideas may lead to an unsafe environment, has been called into question. Immediately following Trump's victory, certain violent images painted on the Rock, a University landmark at the intersection of Hill Street and Washtenaw Avenue, caused the community to examine potential divisive issues of certain speech.

"We definitely want to address identity politics, and how it plays a role in the University," said Zalamea. "That's one of our biggest focuses, and how it ties into free speech on college campuses."

The College Democrats at the University too are changing their trajectory for the winter semester and replacing electoral work, which focused largely on the potential success of Hillary Clinton in the general election, with work toward progressive issue advocacy.

Four issue committees are housed within the greater College Democrats organization: women's rights, the LGBTQ community, social justice and the environment. Each of these committees has wide discretion regarding policy and the ability to confront very specific issues that are increasingly relevant.

Despite the loss during election season, Michigan College Democrats stated their objective is not abandoned, but rather that their agenda has been altered to promote and recognize progressive ideals. According to LSA junior Colin Kelly, president of College Democrats, they plan to mobilize students through transparency, Democratic values and awareness within the campus community.

"Though we don't have a central goal like we did last semester, we now have an opportunity — and obligation — to continue fighting for and advocating our progressive values that we know are the right choices for our campus, state and nation," Kelly said.

Nursing freshman Kristen Reynolds, a member of College Democrats at the University, agrees that mobilization is vital to progress, especially following the impassioned atmosphere at the University in the wake of Trump's victory in November.

"I read so many Facebook posts from friends that aren't usually politically active, but were angry with the outcomes," Reynolds said. "I hope that College Democrats can get more people involved on campus politically and harness that passion."

In the wake of the 2016 election, many students have shared a desire to promote togetherness by increasing cordiality between Michigan College Democrats and Republicans. LSA freshman Haya Akbik criticized both the College Democrats' and the College Republicans' uncompromising natures.

"I think both campus groups need to show that compromise and respectful dialogue must occur in order to create good political change," said Akbik. "Being so stuck on being a Democrat or a Republican is harmful to our country and our relations with one another."

Reynolds agreed with the sentiment of togetherness and stated that the prevention of a hateful atmosphere following the Trump victory supersedes loyalty to traditionally stagnant party differences.

"After the election, many College Republican clubs came out and said they don't stand for this racism, bigotry, hate and sexism," said Reynolds. "I would love for our groups to put our political beliefs aside to fight the hate and hate crimes that have occurred as a result of the election."

## MORE LIKE THIS

College Republicans officially endorse Trump-Pence ticket

After Trump victory, many students are left feeling fearful while others celebrate

Student and faculty concerned over Trump administration policy platform

subscribe to our daily newsletter, the Daily Digest

## MOST READ

1. To the white men who told me that they "prefer" white women

2. Faking 21: How bouncers catch fake IDs and underage students get past the rope

3. Beilein to stay in Ann Arbor following contract extension

4. Ian Harris: 'The Last Jedi' and the state of film criticism

5. Emma Chang: Confessions of a closeted Rosshole

About                Contact us                Advertise                Subscribe

Join the staff                Merchandise                View Print Issue

   

## The Michigan Daily

420 Maynard St, Ann Arbor, MI 48109

734-418-4115

Edited and managed by the students at the University of Michigan since 1890.

Copyright © 1998-2018, all rights reserved.

# EXHIBIT 33

# Nicholas Tomaino: The mythology of illegitimacy

Wednesday, February 1, 2017 - 11:07am
NICHOLAS TOMAINO (/AUTHOR/OPCONTRIBUTOR)
Columnist

Rhetoric since the inauguration has not only perpetuated a narrative
(http://www.cnn.com/2017/01/13/politics/john-lewis-donald-trump-legitimate/) that Donald Trump is not
a legitimate president, but has also invoked fear as a would-be mandate that those of us who merely hear
its words might be called to action. A productive dialogue has not been encouraged; rather, the left has
focused on unilateral criticism and a hateful rebuke of Donald Trump.

I listened, incredulously, to the words Ashley Judd
(http://www.vox.com/identities/2017/1/21/14345984/watch-ashley-judd-speech-trump-women-
march) and Madonna (http://www.breitbart.com/live/womens-march-washington-live-updates/madonna-
drops-f-bombs-anti-trump-rally-ive-thought-lot-blowing-white-house/) selected for their speeches at the
Women's March the day after we, as a country, celebrated our peaceful transition of power — a hallmark
of our democracy. I felt somewhat embarrassed by, at the very least, their lack of civility. The speeches
suggested that Trump bathes in Cheeto dust, that he has traded a "Hitlerian" mustache for a toupee, and
that we, the American public, must refuse (http://www.itv.com/news/update/2017-01-21/madonna-urges-
rebellion-against-new-age-of-tyranny/) "to accept this new age of tyranny," in which
(http://ew.com/news/2017/01/21/madonna-womens-march-speech/) "being uniquely different right now
might truly be considered a crime." Such incendiary and insulting rhetoric complements a dialogue that
attempts to represent Trump's presidency as illegitimate.

This type of rhetoric deliberately invokes feelings of mistrust, vulnerability and protest. Notwithstanding
the value of a women's march as an opportunity for dialogue and solidarity on behalf of shared views and
values, remarks like these were a call to action to those who did not vote for our 45th president and to
those inclined to join an ever-growing voice inspired by an insurgency. One need look no further than
Saul Alinsky's "Rules for Radicals: A Pragmatic Primer for Realistic Radicals" to appreciate the
collective action and antagonistic tactics at the core of the "not my president" agenda
(https://www.washingtonpost.com/news/post-politics/wp/2016/11/10/not-my-president-thousand-protest-
trump-in-rallies-across-the-u-s/?utm_term=.ec594a6e45d2).

Here's the problem: This proclamation of illegitimacy is not merely mythological — it further divides
America, even though its advocates seek to assign
(http://www.independent.co.uk/news/world/europe/donald-trump-build-the-wall-mexico-border-
executive-order-berlin-mayor-warning-dont-suffering-a7550696.html) sole accountability for divisiveness
to Trump. Similar to Hillary Clinton's comment (http://www.politifact.com/truth-o-
meter/article/2016/sep/11/context-hillary-clinton-basket-deplorables/) that 50 percent of Trump
supporters can be put in a "basket of deplorables," the contention that Trump is not a legitimate president

Case 4:18-cv-11451-LVP-EAS  ECF No. 18-1 filed 06/15/18  PageID.645  Page 37 of 147

effectively questions the authenticity of nearly half of the American public who voted for him and for change. These Americans included decent people with diverse backgrounds and religious beliefs from varied cultures and races.

On "Meet the Press" (http://www.nbcnews.com/meet-the-press/video/conway-press-secretary-gave-alternative-facts-860142147643) two days after the inauguration, Kellyanne Conway, counselor to the president, introduced the dubious concept of "alternative facts" to challenge reports that Trump's inauguration was far less attended than Barack Obama's. Sadly, both she and Sean Spicer, Trump's press secretary, remind me of the famous quote from Shakespeare's Hamlet (http://www.bartleby.com/70/4232.html), "The lady doth protest too much, methinks." In contesting media reports comparing Trump and Obama's inaugural attendance numbers or presidential approval ratings, for that matter, Spicer and Conway seem ready and willing to dispute the claims of illegitimacy, and in doing so, they make them appear relevant. Trump similarly appears to seek legitimacy in suggesting that he lost the popular vote because of voter fraud. (http://thehill.com/blogs/blog-briefing-room/news/315786-trump-continues-to-insist-mass-voter-fraud-robbed-him-of) However, instead of giving credence to skeptics of his popularity, he needs to remember that the results of the popular vote are irrelevant since in our system the Electoral College determines who wins the presidency.

President Trump and his advisers need not tune into the noise of insurgency if it insists on using foul, antagonistic language to spread unsubstantiated fear of tyranny or imminent loss (https://www.bustle.com/p/mike-pence-just-solidified-trumps-commitment-to-taking-away-your-rights-33502) of constitutional rights. When Bill Clinton beat Bush senior, when George W. Bush beat Clinton and when Obama took office eight years ago, a significant number of Americans saw their candidates lose, yet shared optimism, for social and economic progress was the basis, at least in theory, for offering hopeful support.

I dare say that public outrage on par with what we have witnessed since the inauguration of Trump would have been rebuked strongly by the media and many Americans had this occurred following Obama's inauguration. Trump's early executive orders to build a wall (https://www.nytimes.com/2017/01/24/us/politics/wall-border-trump.html?_r=0), rollback the Affordable Care Act (http://www.cnn.com/2017/01/20/politics/trump-signs-executive-order-on-obamacare/) and his most recent travel decree (http://www.foxnews.com/politics/2017/01/30/trumps-travel-decree-what-it-means-and-how-it-works.html) are evidence of not only his authenticity, but also of his embrace of his legitimate position.

Similarly, Trump's most recent proffering of uniquely qualified Supreme Court Justice Neil Gorsuch and his deliberate and strategic selection of his cabinet reflect his legitimacy. Furthermore, the Electoral College proved his legitimacy by electing him as president. When interviewed (http://www.cnn.com/2017/01/25/politics/donald-trump-waterboarding-torture/index.html) on ABC on Jan. 24, Trump acknowledged his own belief that torture and waterboarding work, but unequivocally stated that he would defer to CIA Director Mike Pompeo and Defense Secretary General James Mattis on such issues. I ask you, if this does not resemble legitimacy, what does?

Sure, Trump's own rhetoric has been, and likely will continue to be, incendiary. But, so too is the rhetoric — often hypocritical and inflammatory — of those who cling to identity politics (https://www.thenation.com/article/what-is-the-left-without-identity-politics/) and behave with

antagonism. Messages like Judd's and Madonna's are proffered expressly to incite fear and to dampen optimism for economic and social change that prompted many Americans to elect Trump. Mutuality and collaboration are the way forward; alternative facts, by either the right or the left, are not.

President Trump is unquestionably a work in progress. Our democracy affords us with the First Amendment right to freedom of speech. So, though I tire of the too often specious criticism of Trump and its hateful rhetoric, it will strengthen his resolve to deliver favorable results for all Americans. In other words, the endless protest and rebuke that I anticipate over the next four years will likely foster his execution of his vision — which got him elected. Hope is the only thing stronger than fear. So, for the sake of our great democracy, let's agree on the mythology of illegitimacy.

*Nicholas Tomaino can be reached at* ntomaino@umich.edu (mailto:ntomaino@umich.edu).

## MORE LIKE THIS

Nicholas Tomaino: Celebrate the good in our presidents (/section/columns/nicholas-tomaino-celebrate-good-our-presidents)

Nicholas Tomaino: "Deal or No Deal?" (/section/columns/nicholas-tomaino-deal-or-no-deal)

Ben Charlson: When character transcends policy (/section/columns/ben-charlson-when-character-transcends-policy)

## MOST READ

1. To the white men who told me that they "prefer" white women (/section/mic/white-men-who-told-me-they-%E2%80%9Cprefer%E2%80%9D-white-women)

2. Faking 21: How bouncers catch fake IDs and underage students get past the rope (/news/faking-21)

3. Beilein to stay in Ann Arbor following contract extension (/section/mens-basketball/beilein-stay-ann-arbor-following-contract-extention)

Case 4:18-cv-11451-LVP-EAS   ECF No. 18-6 filed 06/15/18   PageID.647   Page 39 of 147

4.  Ian Harris: 'The Last Jedi' and the state of film criticism (/section/arts/ian-harris-last-jedi-and-state-film-criticism)

5.  Emma Chang: Confessions of a closeted Rosshole (/section/columns/emma-chang-confessions-closeted-rosshole)

---

subscribe to our daily newsletter, the Daily Digest (https://mail.michigandaily.com/lists/?p=subscribe&id=4)

About (/about)      Contact us (/contact)      Advertise (/advertise)      Subscribe (https://mail.michigandaily.com?p=subscribe&id=4)

Join the staff (/join-us)      Merchandise (http://store.michigandaily.com)      View Print Issue (http://issuu.com/michigandaily/)



(https://www.facebook.com/michigandaily/)



(https://twitter.com/michigandaily)



(https://www.instagram.com/michigandaily/)



(https://www.youtube.com/user/michdailymultimedia)

## The Michigan Daily

420 Maynard St, Ann Arbor, MI 48109 (http://maps.google.com/?q=420 Maynard St, Ann Arbor, MI 48109) 734-418-4115

Edited and managed by the students at the University of Michigan since 1890.

Copyright © 1998-2018, all rights reserved.

# EXHIBIT 34



# Is U-M's Students4Justice Demanding a Segregated Space on Campus?

Campus     February 13, 2017     Cole Carnick



In response to racist and anti-Semitic emails sent to College of Engineering students last week, Students4Justice, a student organization at the University of Michigan, coordinated a sit-in at the Michigan Union on February 9. The sit-in sought to bring attention to the organization's list of demands for the University, which criticizes the school's "dedication to 'defend' the right to Freedom of Speech" and supposed lack of concern for student safety. Among the list of demands, Students4Justice called upon the University to express solidarity with students of color, streamline the bias incident report system and increase African-American enrollment.

One of Students4Justice's  particularly astounding demands outlines a plan for the University to "create a permanent designated space on central campus for Black students and students of color to organize, and do social justice work." The author of the list of demands specifies that the space would be separate from the Trotter Multicultural Center, which the University plans to relocate to Central Campus with a price tag of ten million dollars,

because the proposed space would be "solely dedicated to community organizing and social justice work specifically for people of color."

The same organization that criticizes the University for failing to create "an environment that engages in diversity, equity and inclusion," is calling upon the University to undermine these ideals by facilitating a sort of *de facto* segregation? One where space and resources are designated for students based solely on the color of their skin?

To advocate for the ideals of diversity, equity and inclusion, while simultaneously calling upon the University to sanction these spaces on campus is both unprincipled and laughably regressive. The establishment of such a space is exclusionary and inequitable in its intent, and incompatible with the goals set forth by the University at its Diversity, Equity and Inclusion (DEI) plan launch.

Students4Justice's demand follows a nation-wide trend of university groups calling for racially assigned spaces on their campuses, with the most notable example of California State University, Los Angeles's decision to establish separate dorm housing for black students. Proponents of self-segregation argue that these spaces allow marginalized students to share their experiences with students with similar backgrounds and therefore ease racial tensions on campus. However, current studies indicate that participation in racially designated organizations often fosters sentiments of zero-sum competition, where one ethnic group benefits at the expense of another. One particular study, conducted by Harvard social psychologist Jim Sidanius, found that membership in ethnically-oriented student groups heightened sentiments of victimization and hostility toward inter-group relationships.

If Students4Justice genuinely wants to foster an inclusive and diverse campus, then it would be best to avoid propositions that seek to divide and separate students. The ugly history of racially designated public spaces should remain in our past—revisiting it would only fulfill the dreams of our most depraved members of society.

(Visited 16,845 times, 4 visits today)

SHARING

TAGS

diversity, Equity, Inclusion, Jim Sidanius, Students4Justice, University of Michigan



About Cole Carnick

Cole is a junior at the University of Michigan. He can be contacted at carnick@umich.edu, or on Twitter @ColeCarnick. View all posts by Cole Carnick →

PREVIOUS POST
## He Will Not Divide Us: A Case Study

NEXT POST
## Fake News: Is Social Media to Blame?

Search

POPULAR POSTS

Sorry. No data so far.

CONNECT WITH US

E     F     T     Y

THE MICHIGAN REVIEW ON TWITTER

🔲 REASON MAGAZINE PODCASTS

- 'The Libertarian Party Is the Right Answer, as Broken as It Is:' Larry Sharpe June 12, 2018
- Expect Fully Legal Weed Within 5 Years, Says Former Top Pharma Lobbyist and Congressman Billy Tauzin June 8, 2018

🔲 LATEST FROM NATIONAL REVIEW

- Trump Downplays Kim's Brutality, Says 'A Lot of People' Are Guilty of Atrocities June 14, 2018 *Jack Crowe*
- Before Going to Bed . . . June 13, 2018 *Jay Nordlinger*

Copyright © 2018 by The Michigan Review. Theme: DW Focus by DesignWall.
Proudly powered by WordPress

# EXHIBIT 35



# Ninety Days: Donald Trump and the Refugee Crisis

Politics      March 27, 2017      Jonathan Farran





Ninety days. I believe Donald Trump simply wanted ninety days to focus on America first, but he was denied.

America desperately needs a mere ninety days for Trump to address its most pressing issues, from fixing our broken infrastructure and renegotiating the poorly-crafted trade deals the United States has made in the past, to forming a plan to remedy the "mass instability overseas" as stated in his latest press conference. Additionally, ninety days grants Trump the opportunity to design an immigrant vetting system that is just, efficient, and most importantly, safe. Trump acknowledged the fact of administrative lag –all he wanted was ninety days to fully understand the rather overwhelming problems that, *domestically*, the United States has, and form plans of action according to each issue.

Legally, unless one is on US soil, no person may claim asylum in the United States; The US, essentially, has no

obligation to let anyone into the country, with the only exception being the USRAP. Though Trump's ninety-day ban was unanimously overturned, the court system ruled the ban unconstitutional on basis that "procedural protections provided by the Fifth Amendment's Due Process Clause are not limited to citizens", as if the *United States'* Constitution applied to other countries' citizens as well.

Moreover, why is the United States lavishly foregrounded in media around the world, while other countries like Sweden have expulsion plans of about 80,000 refugees? Germany recently released a police report claiming refugees committed or tried to commit some 69,000 crimes in the first quarter of 2016", and the US mainstream media failed to cover it, opting instead to focus on whether or not Donald Trump is a sociopath. On February 16th, *Daily Mail* UK reported that a "Syrian asylum seeker is jailed for life in Sweden after horrifying footage emerged of him taking part in the execution of seven men in 2012". The US mainstream media, besides Fox News, who interviewed the film-maker, Ami Horowitz, has reported on a refugee documentary made in Sweden detailing "an absolute surge in both gun violence and rape in Sweden," since the acceptance of 163,000 refugees.

Most Importantly, the safety of our country is at stake, many of the refugees lack documentation; these people could be anybody. They could be average people, genuine, kind-hearted; but many come from a region in which the radical Islamic terrorist organization, the Islamic State of Iraq and Syria (ISIS) controls about 23,300 square miles as of December 2016. I believe Trump solely wanted a ninety day *delay* in order to organize proper and secure vetting for all refugees.

(Visited 144 times, 1 visits today)

SHARING

TAGS

100 days, controversy, crisis, emigration, ethics, global, immigrants, immigration, presidency, refugee, trump



### About Jonathan Farran

Jonathan is a sophomore staff writer for the Review, pursuing a Bachelor's Degree in Organizational Studies with a concentration in business consulting. He determined to become a successful business consultant, and eventually become heavily involved with politics with hopes of becoming a cabinet member for a future President of the United States. When he is not writing articles, you will probably find him scoring hundreds of goals playing Intramural Soccer at Mitchell Field or The Coliseum. View all posts by Jonathan Farran →

PREVIOUS POST

## Disabled Americans Fight for Justice in Vending Machine Court Case

NEXT POST

## Humanitarianism and the Refugee Crisis

Search

POPULAR POSTS

Sorry. No data so far.

CONNECT WITH US

E    F    T    Y

THE MICHIGAN REVIEW ON TWITTER

REASON MAGAZINE PODCASTS

- 'The Libertarian Party Is the Right Answer, as Broken as It Is:' Larry Sharpe June 12, 2018
- Expect Fully Legal Weed Within 5 Years, Says Former Top Pharma Lobbyist and Congressman Billy Tauzin June 8, 2018

LATEST FROM NATIONAL REVIEW

- Trump Downplays Kim's Brutality, Says 'A Lot of People' Are Guilty of Atrocities June 14, 2018 *Jack Crowe*
- Before Going to Bed . . . June 13, 2018 *Jay Nordlinger*

Copyright © 2018 by The Michigan Review. Theme: DW Focus by DesignWall.
Proudly powered by WordPress

Case 4:18-cv-11451-LVP-EAS   ECF No. 18-6   filed 06/15/18   PageID.660   Page 52 of 147

EXHIBIT 36



# Signs of Bigotry Ignored in Angell Hall Architecture

Satire    April 1, 2017    Satire





As campus tour guides lead flocks of parents and their children up the steps of Angell Hall, they may speak of the various academic departments located within the building. They may mention how many classes they have had in the Angell-Mason Hall complex, but they will never acknowledge the overtly bigoted symbolism their tour groups pass.

Somehow every day, as hundreds traverse through the Angell Hall columns, they ignore the very clear swastikas, hidden slyly at the base of each column. These columns are Dorian in architectural tradition, yet the Dorians were the most ruthless and oppressive of all the peoples of ancient Greece. The centaurs armed with bows depicted on the entrance invoke violence in a community billed by the University as a place of inclusion and safety. Setting aside the fact that the Greek motif of the building is clearly a case of cultural appropriation, the architecture of neoclassical tradition invokes the memory of western colonialism and Eurocentrism. The four bas reliefs by Ulysses Ricci,

flanking the entrance like bigoted sentinels, not only continue to advocate for the gender norms of an unenlightened and bygone era, but also reinforce impossible body image standards. To top it all off, the inscription above the entrance—a quote from the Northwest Ordinance, a document written by land stealing, slave holding white men—blatantly refers to the necessity of religion, no doubt the Christian faith, in addition to using the term "mankind" rather than a more neutral term.

The moral disposition of this university is very clear; it claims to be one thing yet presents itself as another. We should not rest until the Dorian columns are replaced with columns from a range of diverse architectural traditions. We shall not rest until the centaurs hold each other lovingly in their arms rather than bows, until the beings depicted flanking the entrance are androgynous beings of various body types, and until the inscription above it all reads "No Fascists Allowed On This Campus." But Angell Hall is just one of many symbols of the oppressive nature of this University. We have a lot of work to do. With the victory of eMerge in the most recent Central Student Government election, an election with a historic voter turnout of 17.9% of the student population, I am sure that we are well on our way to bringing about a just and inclusive campus.

**-Buckley Conti Kong**

(Visited 826 times, 1 visits today)

SHARING

About Satire

View all posts by Satire →

PREVIOUS POST

President Schlissel Announces the "Glassificaiton" of U-M

NEXT POST

Pope Francis Issues Unexpected Exhortation, Admits to Superiority of Protestant Movement

Search

---

POPULAR POSTS

Sorry. No data so far.

---

CONNECT WITH US

E   F   T   Y

THE MICHIGAN REVIEW ON TWITTER

REASON MAGAZINE PODCASTS

- 'The Libertarian Party Is the Right Answer, as Broken as It Is:' Larry Sharpe June 12, 2018
- Expect Fully Legal Weed Within 5 Years, Says Former Top Pharma Lobbyist and Congressman Billy Tauzin June 8, 2018

LATEST FROM NATIONAL REVIEW

- Trump Downplays Kim's Brutality, Says 'A Lot of People' Are Guilty of Atrocities June 14, 2018 *Jack Crowe*
- Before Going to Bed . . . June 13, 2018 *Jay Nordlinger*

Copyright © 2018 by The Michigan Review. Theme: DW Focus by DesignWall.

Proudly powered by WordPress

# EXHIBIT 37



# Affirmative Action in College Admissions

Campus        April 5, 2017        Corey Walker





*Racial preferences in college admissions are always a contentious topic. Liberals tend to view affirmative action as a way to fix the systemic inequalities resulting from our country's legacy of racial oppression. On the other hand, Conservatives view affirmative action as overtly racist because it gives one group an unearned advantage over another. I find both of these arguments deeply flawed.*

**Where Liberals are Wrong:**

Would you believe me if I told you that affirmative action was never meant to truly help the black community?

Well … it's true.

The modern form of affirmative action was created by Richard Nixon as a way to quell the violent inner city protests that erupted as a result of large unemployment. In his first congressional address, Nixon spoke about the

**Philadelphia Plan.** The policy called for goals and timetables for increased diversity in the city's unions. In 1969, this policy spread to any sector receiving federal funding of any kind, including universities. It is here that race-based quotas were introduced as a component of university admissions.

Blacks were hired in higher numbers in both the public and private sector. In the early 1970s, over half of black male college graduates and three-fourths of black female college graduates were government employed. Major corporations even began hiring blacks in larger numbers. Between 1969 and 1972, total black income increased by 32 percent nationwide.

The program, however, had major flaws. The mandated quotas were easily gamed and manipulated. Employers and contractors would often just move blacks around to worksites where the federal inspectors were expected to show up. Employers would also place blacks in governmentally-backed job sites and not hire them anywhere else. Essentially, they were doing the bare minimum under the auspices of increased levels of employment.

This was especially apparent in the private sector. Private sector employers would hire blacks in back office roles, giving them little power or leverage. Oftentimes, blacks were hired to positions in "community outreach" or "urban outreach." Although blacks earned decent money, they were kept away from the boardroom—where *real* decisions were, and still are, made.

Affirmative actions was further flawed in that it was only designed to help the black middle class. If you look at areas where the program exists (corporate hiring, unions, college admissions) it's apparent that one needs a high school education to have access.

Richard Nixon himself believed poor blacks were not worth the trouble of working with. He infamously said in leaked tapes, "just little Negro bastards on welfare rolls at $2,400 a family." His policies meant to back the blacks with economic privilege and ignore the poor. In this, he created a social divide within the black community. Middle class blacks with stable families were able to rise up the economic ladder, meanwhile poor blacks were left behind.

For the black lower class, Nixon had much different plans. During the 1968 election, he pushed for harsher laws that criminalized the black poor. He launched the "War on Drugs" that pushed countless black men into prison. While poor blacks were being incarcerated, middle class blacks  moved into nicer homes in the suburbs.

Because of affirmative action, talented blacks were pushed into different social tracks that took their destiny out of their own hands. Blacks became nothing more than a cog in a toxic system that the Civil Rights Movement wanted to destroy.

It is here where we see affirmative action's real goal. It was never about equality. It was to give middle-class blacks just enough to stop violently protesting and allow the white establishment to continue to do continue business as usual.

For example, half of Harvard's black students come directly from Africa. Affirmative action serves as a way for elite institutions to pat themselves on the back for appearing diverse, while ignoring the actual people who need those handouts.

**Where Conservatives Are Wrong:**

Conservatives believe affirmative action is wrong since it gives racial preferences to some groups at the expense of others. While that is true, it is hardly limited to black and latino students. Legacy applicants, students from geographically desirable areas, student-athletes, and men all receive preference in college admissions across the country.

In 2011, Harvard accepted 30% of its legacy applicants as opposed to 6% of the overall pool. Therefore, being a

legacy increased your odds of admission by roughly five times. One could argue that this unfairly advantages those lucky enough to have highly educated parents. Yet we rarely see conservatives railing against legacy admissions. Legacy admits are even as likely to drop out of college as affirmative action admits.

Elite colleges also seek students from as many states as possible. In this way, they are seeking geographic diversity. If you are a student applying to the Ivy League, you're more desirable if you are applying from an underrepresented state like Hawaii or Wyoming than applying from New Jersey or California.  Is this unfair, even though students from these states are usually better students than those from states with lower educational quality?

Men, in general, benefit from Affirmative Action in college admissions. Seventy-percent of high school valedictorians are girls. Girls generally outperform boys in high school and are more academically qualified. Women now make up 57% of college students nationwide, and it is only expected to increase in the upcoming years. Colleges believe gender-imbalances in education do a disservice to society; as such, men have become more valued applicants in schools. Using the logic of affirmative action opponents, women are being wrongfully discriminated against by top institutions. There are multiple statistics to back the claim up. In 2007, Yale University accepted 9.8% of male applicants as opposed to 7.5% of women, despite there being more female applicants.

Additionally, many college athletes are admitted to top academic programs despite having grades and test scores well below the school average. In 2008, the average gap in SAT scores between athletes and the rest of the student body at UCLA averaged 247 points.

If we are to eliminate racial preferences because of unfairness, then we should consider eliminating these other backdoors to admission as well. If not, then conservatives are being highly hypocritical.

**Conclusion:**

I'm largely indifferent about affirmative action.

I believe colleges should try to create dynamic communities that foster the intellectual and social growth of their students. College is one of few spaces in the world where a wide array of people from all kinds of racial and socioeconomic backgrounds can interact with one another. This diversity helps expose students to perspectives inside and outside the classroom that they might not have any actual exposure to otherwise. This creates students that will eventually graduate into a multiracial society with more experience and cultural enrichment.

Despite this, the flaws of affirmative action are very clear. The program does little to actually solve the problem of K-12 education.

If institutions wanted to make a difference, they would invest heavily in Pre-K education and fixing public schools in poor communities. They would also work to ensure that children have access to nutrition and summer academic programs that would help them retain their knowledge. There needs to be a formation of pipelines that would allow people of color to thrive on their own merits rather than receive handouts.

A stigma is placed on black students at elite institutions because it is assumed their admission was based solely on affirmative action. And while I do believe this is unfair, it is the reality of the situation.

Affirmative action is a touchy, yet small issue. I don't believe the specific institution one attends really matters that much and students that feel slighted should try to make the best of where they end up. Given the fact that colleges admit students for a wide variety of reasons other than academics, there really is no "fair" way to conduct the admissions process.

(Visited 1,604 times, 1 visits today)

SHARING

TAGS

action, admissions, affirmative, college, permanent, policies, racism



About Corey Walker

Corey Walker is an undergraduate student at the University of Michigan. View all posts by Corey Walker →

PREVIOUS POST

We Need to Overthrow Capitalism

NEXT POST

It's Official: Picketers are Pro-Nazi "Hate Group"

Search

POPULAR POSTS

Sorry. No data so far.

CONNECT WITH US

E    F    T    Y

THE MICHIGAN REVIEW ON TWITTER

## REASON MAGAZINE PODCASTS

- 'The Libertarian Party Is the Right Answer, as Broken as It Is:' Larry Sharpe June 12, 2018
- Expect Fully Legal Weed Within 5 Years, Says Former Top Pharma Lobbyist and Congressman Billy Tauzin June 8, 2018

## LATEST FROM NATIONAL REVIEW

- Trump Downplays Kim's Brutality, Says 'A Lot of People' Are Guilty of Atrocities June 14, 2018 *Jack Crowe*
- Before Going to Bed . . . June 13, 2018 *Jay Nordlinger*

Copyright © 2018 by The Michigan Review. Theme: DW Focus by DesignWall.

Proudly powered by WordPress

# EXHIBIT 38



# Students Act like Little Fascists Because They Refuse to Grow Up

Politics     April 15, 2017     Deion Kathawa





It's no secret that elite university campuses are hostile to a broad swathe of ideas and that many enrolled at them often reject with a zealous fanaticism any ideas that are even slightly to the right of those of Bernie "I Have Three Houses But You Need To Pay More In Taxes" Sanders. The latest victim of the now all-too-common displays of intolerance by campus progressives is Heather Mac Donald, a leading authority on race and policing. Mac Donald was slated to speak at both UCLA and Claremont McKenna College in the last several days about her recent book, *The War on Cops*, in which she carefully defends the thesis that "There is no government agency more dedicated to the proposition that black lives matter than the police."

It's critically important to note, partisan politics and ideologies aside, that it's not at all obvious if that key contention of Mac Donald's (or the many others she makes) is correct. No person can possibly conclude that she's wrong by

merely *thinking* about the matter in isolation—let alone by surrendering their critical thinking skills as the price of admission to join a wannabe jackbooted mob. To refute her requires evidence, logic, and open discussion to test out alternative theories. At minimum, it requires *reading* her book and *listening* to her talk.

But the students at these two elite colleges, bless them, were not in the mood to do either thing.  No. They cared only to smear Mac Donald (wholly without argument) as a "notorious white supremacist fascist"—all in the name of "social justice." What is needed in response to these lawless individuals' dangerous foolishness is for consequences to be meted out so that universities, little by little, can be restored to their essential purpose: the pursuit of truth. But that appears very unlikely to happen, unfortunately.

Read the rest at American Greatness.

(Visited 181 times, 2 visits today)

SHARING

TAGS

Campus , Claremont McKenna , fascist , free speech , liberty , UCLA

---



### About Deion Kathawa

Deion Kathawa studies philosophy and political science at the University of Michigan. He enjoys ice skating and binge watching Netflix (who doesn't, though?) in his spare time. He can be reached via email at kathawad@umich.edu. Deion tweets @DeionKathawa and invites you to friend him on Facebook. View all posts by Deion Kathawa →

PREVIOUS POST

## It's Official: Picketers are Pro-Nazi "Hate Group"

NEXT POST

## LSA Student Government Passes Pro-Free Speech Resolution

Search

POPULAR POSTS

Sorry. No data so far.

CONNECT WITH US

E   F   T   Y

THE MICHIGAN REVIEW ON TWITTER

REASON MAGAZINE PODCASTS

- 'The Libertarian Party Is the Right Answer, as Broken as It Is:' Larry Sharpe June 12, 2018
- Expect Fully Legal Weed Within 5 Years, Says Former Top Pharma Lobbyist and Congressman Billy Tauzin June 8, 2018

LATEST FROM NATIONAL REVIEW

- Trump Downplays Kim's Brutality, Says 'A Lot of People' Are Guilty of Atrocities June 14, 2018 *Jack Crowe*
- Before Going to Bed . . . June 13, 2018 *Jay Nordlinger*

Copyright © 2018 by The Michigan Review. Theme: DW Focus by DesignWall.
Proudly powered by WordPress

# EXHIBIT 39

# Trump releases revised budget that would significantly cut environmental programs

Tuesday, May 23, 2017 - 10:42pm



. Buy this photo

Zoey Holmstrom/Daily

JENNIFER MEER
Summer Managing News Editor

President Donald J. Trump's revised — and first complete — budget proposal, released Tuesday, sparked controversy among state officials and students, particularly with regard to spending cuts in higher education and environmental protections.

In terms of education, the proposal calls for a $9.2 billion spending cut, down 13.5 percent from 2017 — the same as in the March proposal.

According to The Atlantic, the cuts would terminate more than two dozen programs.

In a statement, Secretary of Education Betsy DeVos said the budget "reflects a series of tough choices we have had to make when assessing the best use of taxpayer money," and "ensures funding for programs with proven results for students while taking a hard look at programs that sound nice but simply haven't yielded the desired outcomes."

The budget would eliminate the Federal Supplemental Educational Opportunity Grant program, which provides need-based aid to 1.6 million undergraduates each year, though is sometimes considered subordinate to the Pell Grant program — the largest federal grant opportunity for low-income students — which is being extended through a year-round Pell program.

LSA senior Enrique Zalamea, president of the University of Michigan's chapter of the College Republicans, does not view the cut as a loss, seeing as the program has been deemed inefficient.

"A large portion of this budget cut comes from the reduction of the Supplemental Education Opportunity Grant, an outdated program that gives money directly to colleges as opposed to low-income students," he said in a March interview.

Cuts have also been made to the TRIO and GEAR UP programs, which serve to support low-income students and those from disadvantaged backgrounds. Seeing as the University has come under fire for low rates of socioeconomic diversity, LSA senior Rowan Conybeare, chair of the University's chapter of College Democrats, said in a March interview the University's diversity will be damaged without these programs.

"Low-income, first-generation and disabled students are unfortunately few and far between at UM," Conybeare said. "Cuts to TRIO programs will only augment this issue."

After the release of the budget Tuesday, Conybeare echoed her earlier statement and continued disapproval of Trump's policies in a message to the Daily.

"It is disappointment to hear that the president aims to further cut necessary and important programs, including higher education," she wrote.

The plan would also cut subsidized student loans by $1 billion and public service loan forgiveness, which effectively voids student loans if an individual works for the government or a designated nonprofit organization for 10 years, according to NPR.

In a message to the Daily, LSA junior Amanda Delekta, who is the vice president of internal affairs for the University chapter of College Republicans, said she is "optimistic" the budget will lead to better appropriation of spending.

"Senator Thom Tillis of North Carolina said it best when he said President Trump's

budget 'started a very important discussion,' " she said. "I am optimistic that President Trump's proposed budget will motivate our lawmakers to closely evaluate government spending and eliminate unnecessary costs."

In a statement Tuesday, Sen. Gary Peters expressed concern over spending cuts to programs that affect Michigan families and businesses, deeming the cuts "counterproductive" and calling on Congress to meet the needs of the middle class.

"Rather than investing in policies that promote manufacturing, support small businesses, strengthen education and drive our economy forward, President Trump's budget only offers counterproductive cuts that would stifle Michigan's economic growth and strain the pocketbooks of Michigan families," he said. "While Congress has a responsibility to ensure taxpayer dollars are being used efficiently and effectively, any budget passed by Congress must address the needs of middle class families, seniors and small businesses."

Similarly, in a statement, U.S. Rep. Debbie Dingell (D–Mich.), said the budget does not reflect true American values, acknowledging cuts to specific programs, including Medicaid.

"By cutting billions from nondefense services, including programs like Medicaid, student aid and Meals on Wheels, this budget jeopardizes critical programs that help working families get ahead when times are tough — and frankly keep seniors alive — all while cutting taxes for the wealthiest and big corporations," she said. "This is not who we are."

The budget also puts forth cuts to the Great Lakes Restoration Initiative, authored by Sen. Debbie Stabenow in 2010. The GLRI aims to protect and restore the Great Lakes as well as control invasive species and reduce nutrient runoff, among other goals, according to its website.

In March, after the release of Trump's budget blueprint, there was concern over such cuts to the program. However, a bipartisan effort, led by Stabenow, to restore funding for the fiscal year 2017 put an end to the concern in early May.

Stabenow reaffirmed the funding in a statement on Tuesday.

"It's official — President Trump's 2018 budget zeros out funding for our Great Lakes," she said. "Thanks to thousands of people across Michigan speaking out, we already stopped cuts for this year. This is a moment for Michigan when we all need to stand together to protect our Great Lakes."

In her statement, Dingell also specified concern for cuts in such programs, emphasizing the importance of jobs and livelihood in the area, particularly with regard to the Environmental Protection Agency, which will see a funding cut of 31.4 percent, down

$2.6 billion if the proposal passes Congress as it stands.

"By virtually eliminating funding for the Great Lakes Restoration Initiative — the single most successful program cleaning up toxic pollution and combating invasive species — this budget jeopardizes the Great Lakes ecosystem, jobs and our way of life," she said. "It is also disappointing that the President is moving forward with cuts that jeopardize current operations and jobs at the EPA National Vehicle and Fuel Emissions Lab in Ann Arbor, which does critical work to reduce vehicle emissions and ensure the U.S. stays at the forefront of innovation."

Earlier in May, Dingell addressed a crowd of media personnel and EPA employees outside the EPA office in Ann Arbor. She aimed to draw attention to severe cuts in EPA funding, but more specifically the closure of the lab — a part of the Ann Arbor facility that employs 435 people. Unique to Ann Arbor's office, the facility provides emission testing services for engine programs and certifies vehicles and engines that meet federal emissions and fuel economy standards.

In a letter written in April, Dingell asked Trump to reconsider closing the facility. She reflected on the contents of her letter during the press conference — expressing gratitude and support for EPA employees.

"To the employees — the working men and women here — the work you do here every single day keeps our air clean to breathe and keeps our nation on the cutting edge," she said. "You are our true public servants and your work here has got to be protected."

She also said the facility is the world's "premier environmental compliance and transportation research center" — an opportunity for jobs in the country.

"This facility does critical work every single day to reduce the vehicle emissions and ensure that the United States remains at the forefront of innovation in this critical field, and that is critical to our staying competitive and creating jobs in this country," she said.

In a message to the Daily Jacob Sigman, a recent University graduate who was part of LSA's Program in the Environment, said the budget reaffirms environmentalists' concerns.

"I think Trump's worldview is made clear by his decision to cut the budget of the EPA by 2.6 billion dollars, a 31% cut," he wrote. "Not only this but it would cut grants to state environmental programs by 500 million dollars. Federal clean up initiatives for the Great Lakes: cut. Energy star: cut. Clean power plan: gutted. When Trump came into office environmentalists knew the next 4-8 years would be an uphill battle. This budget confirms their worries. The big question now is: Will we stay in the Paris climate accords?"

*This article was updated to include a recent statement from Rowan Conybeare of College Democrats.*

## MORE LIKE THIS

Trump administration budget to affect Great Lakes Restoration Initiative

Dingell rallies support for EPA in light of proposed budget cuts

Trump meets with automakers, discusses industry in Ypsilanti

**NodeBox:**

subscribe to our daily newsletter, the Daily Digest

## MOST READ

1. To the white men who told me that they "prefer" white women

2. Faking 21: How bouncers catch fake IDs and underage students get past the rope

3. Beilein to stay in Ann Arbor following contract extension

4. Ian Harris: 'The Last Jedi' and the state of film criticism

5. Emma Chang: Confessions of a closeted Rosshole



About                    Contact us              Advertise                    Subscribe
Join the staff                    Merchandise                    View Print Issue

      

The Michigan Daily

420 Maynard St, Ann Arbor, MI 48109
734-418-4115

Edited and managed by the students at the University of Michigan since 1890.

Copyright © 1998-2018, all rights reserved.

# EXHIBIT 40



# Richard Spencer Has a Right to Speak

Campus    December 6, 2017    Michigan Review



The University of Michigan is in turmoil over the administration's recent decision to move forward with accommodating alt-right leader and white-nationalist Richard Spencer's request to speak on campus. Spencer is a pathetic and repulsive provocateur who appeals to the most noxious degenerates in our country. He is also a U.S. citizen, and is entitled to the protections of free expression guaranteed in the First Amendment of the U.S. Constitution. The Michigan Review Editorial Board firmly believes that the University is making the right decision by upholding free-speech and seeking accommodations for Richard Spencer's request.

As a public institution, the University cannot partake in content-based discrimination of speech that does not fall within legally-determined categories of prohibited speech, like defamation or incitement toward violence. Legal precedent restrains the state from discriminating against the content of speech to prevent it from suppressing certain ideas, no matter how incendiary they are.

Many have argued, including the Michigan Daily Editorial Board, that the University should fight back against Richard Spencer under the pretense that his speech would make the campus unsafe. They argue the University could establish legal precedent for other public universities to follow in denying speech requests to agitators like Spencer. Ignoring that a victory for the University would not have binding precedent on other court decisions, the burden of justification for the school is remarkably high. The current precedent held by the Supreme Court decision

derives from *Brandenberg v. Ohio* (1969), ruling that the government cannot suppress speech unless it is "directed to inciting or producing imminent lawless action." Considering this precedent has protected public freedom of expression for unabashed Nazis in numerous decisions, the University has an abysmally weak case.

We believe this legal precedent exists for good reason. The Supreme Court opinions behind it are multitudinous; they reach a critical mass of sound reasoning for content-blind free speech, from a politically diverse majority of Justices.

> ❝ Even for those prone to extreme and harmful psychological distress upon exposure to hateful ideas, there is a simple solution: don't listen to Spencer if you don't want to.

If the University of Michigan were able to block Richard Spencer from his speaking engagement due to the unsavory nature of his ideas, we as Michigan students and American citizens would face a dire threat to our civil liberties. As a public institution, the University can not be granted the authority to decide what is acceptable speech. If Spencer is barred this principle would be severed – it would thereafter be within the school's (and thus, state's) power to monitor all campus speech for unacceptable content and to censor any such speech. To the editors of the Michigan Daily this might sound like an appealing response to noxious speech such as the racist fliers posted around campus over the past year. However, they must understand the legacy of our campus free speech laws. Most of the 20th century's landmark cases on free expression at public universities were not concerned with discriminatory speech; they were concerned with speech suspected of Communist sympathies. The principle one must draw from this is one of *consistent* liberties in the face of changing times and moral concerns. While American society has largely eschewed the Communist witch hunt of the 'red scare' McCarthy era, we must not forget how quickly some turned to censorship in the face of growing fear around the Soviet Union.

Much like the brand of totalitarian communism we feared from Stalin's Russia, racism is dangerous and holds a grim and bloody history. However, we cannot conflate speech supporting these ideologies with the historical violence they actually produced. Contrary to rhetoric popularized by activists, speech cannot be violent. Obviously this is true from a physical standpoint, as common sense would dictate. Even for those prone to extreme and harmful psychological distress upon exposure to hateful ideas, there is a simple solution: don't listen to Spencer if you don't want to.

This perfectly workable solution seems lost upon the *ad hoc* group #StopSpencer, who recently orchestrated a "Week of Action" in the form of multiple protests, strikes, and demonstrations across campus. Such outbursts fundamentally misunderstand the complexities surrounding these negotiations. While we at the *Review* certainly support one's right to protest, we find these outpourings of outrage hold the university to a far too quixotic standard.

> ❝ Richard Spencer is the Hydra of our modern times; cutting off one appearance can only lead to more.

These protests, rather than advocating for a just cause, portray student activists as stubborn and completely ignorant to the issues of free speech and legal precedent that plague a rejection of Spencer's appearance.  It seems as though students will not rest until the administration denies Spencer's request, even though their demands might bring even greater harm to the University.  Again, we support every student's right to protest, but these protesters

must at least acknowledge the difficult situation the University finds itself in.  Instead, we see students blindly criticizing the administration for not getting what they want.

Demanding the University to follow student requests on a whim is absurd, especially when what they're demanding might bring even more attention to the man they seek to expel from campus.  Richard Spencer is the Hydra of our modern times; cutting off one appearance can only lead to more.  Student activists appear fundamentally unwilling to address this fact.

The Michigan Review Editorial Board unanimously condemns the ideology of Richard Spencer, as well as the actions of his supporters. The Board is also unanimous in our belief that ideologies such as Spencer's can only be eradicated through exposure to the light of truth. Relegating racism to darkness, forcing it out of the public eye, does much more harm than good. Such ideas take a more monstrous and radical form while festering underground – a form much harder to fight back against. If we approach Spencer's ideas head-on, however, we may expose them for what they are: shallow pandering to tribal impulses, designed to breed hatred and resentment among disenfranchised whites and imbue them with a false sense of superiority. Only with the clarity that rational discourse can provide can we take the wind out of Spencer's sail and bring his supporters back to reason.

Signed,

**The Michigan Review Editorial Board**

(Visited 973 times, 1 visits today)

SHARING

TAGS

Campus, MR, neonazi, protests, richard, spencer



About Michigan Review

View all posts by Michigan Review →

PREVIOUS POST

#StopSpencer Protests Rock Campus

NEXT POST

Affirmative Action Frankenstein: How U of M Bypasses Prop. 2

Search

POPULAR POSTS

Sorry. No data so far.

CONNECT WITH US

E   F   T   Y

THE MICHIGAN REVIEW ON TWITTER

📶 REASON MAGAZINE PODCASTS

- 'The Libertarian Party Is the Right Answer, as Broken as It Is:' Larry Sharpe June 12, 2018
- Expect Fully Legal Weed Within 5 Years, Says Former Top Pharma Lobbyist and Congressman Billy Tauzin June 8, 2018

📶 LATEST FROM NATIONAL REVIEW

- Trump Downplays Kim's Brutality, Says 'A Lot of People' Are Guilty of Atrocities June 14, 2018 *Jack Crowe*
- Before Going to Bed . . . June 13, 2018 *Jay Nordlinger*

Copyright © 2018 by The Michigan Review. Theme: DW Focus by DesignWall.
Proudly powered by WordPress

# EXHIBIT 41



# Affirmative Action Frankenstein: How U of M Bypasses Prop. 2

Campus      December 7, 2017      Amo Manuel



This October, the Michigan Daily published an article detailing the progress of the University of Michigan's five-year Diversity, Equity & Inclusion (DEI) plan, an initiative launched in October 2016. The article features quotes from an interview with LSA Dean Andrew Martin, particularly on the topic of faculty diversity. Speaking candidly, Martin states that recently-launched tenureship 'pipelines' for postdoctoral students were intentionally designed to "help increase the diversity of our faculty." For one such program, the Collegiate Postdoctoral Fellowship, this certainly seems to be the case. The Daily article cites Associate Dean of the DEI and professor of Psychology Fiona Lee on the topic:

> *In its first year, Lee said, the program received 762 applicants, hiring seven new faculty members out of that pool — all of whom are underrepresented minorities. This year, they received 936 applications, from*



> *which they will make up to 13 new hires.*

These numbers are intriguing from a statistical point of view — what was the racial breakdown of the 762 initial applicants? What about the next year's thirteen acceptances? How many white people applied, and have any been accepted? Even without all the data (which may be sealed shut), these questions point to a larger one: how exactly do these admissions processes work? Both Martin's comments and the numbers seem to suggest hiring committees actively give preference to minority applicants on grounds of race and ethnicity. If so, this program would necessarily violate Article I of Michigan's state constitution, amended via referendum in 2006 (Prop. 2) to include, "The University of Michigan… and any other public college or university… shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting."

In researching the University's ongoing efforts to diversify faculty, largely carried out through the Office of Diversity, Equity & Inclusion and its five-year plan, I discovered a fascinating pattern. In short, administrators have spent an enormous amount of effort planning and implementing techniques designed to circumvent Prop. 2 *by any means necessary*. The DEI in particular has explored every conceivable policy loophole to tiptoe past the law. This was done in order to meet their bottom line: greatly increased numbers of new minority faculty hires. While some of these strategies are harmless, others seem to present serious ethical, intellectual, and legal concerns. As a rule of thumb, these less savory tactics are intentionally obfuscated. They are kept as far away from the surface as possible, documented only deep within lengthy internal materials and masked with the opaque language of academic jargon.

Returning to the Collegiate Postdoctoral Fellowship, one begins to see the contours of this pattern to which I refer. Despite its rather unassuming name, the Fellowship seeks to financially support the research of one particular type of academic, namely "diversity scholars." The LSA's National Center for Institutional Diversity (NCID) defines "diversity scholars" as academics "committed to enhancing diversity, equity and inclusion in higher education." The nature of this 'scholarship' might partially explain a comparatively higher level of interest in the Fellowship from academics who are minorities. But it certainly wouldn't account for the Fellowship's statistically near-flawless minority hiring record; surely countless white academics are also engaged in such work. Reading on, the Fellowship's online application page prominently features the following text directly above the application itself:



> *The program is particularly interested in scholars with a demonstrated interest in bringing to their research and undergraduate teaching the critical perspective that comes from their non-traditional educational background and/or scholarly understanding of the experiences of groups historically underrepresented in higher education.*

What exactly is a "scholarly understanding of the experiences of groups historically underrepresented in higher education" and why is it paired with the phrase "non-traditional educational background?" One might note that this convoluted sentence, if read quickly enough, appears to openly indicate special preference for minority applicants. In fact, removing a couple carefully chosen words, the text reads: "The program is… particularly interested in scholars with… the critical perspective that comes from their… experiences [in] groups historically underrepresented in higher education."

If you have ever applied for a job with any sort of affirmative action-style program, you may have seen a sentence nearly identical to this one in a similar location. This subtle substitution, along with the clever wording of the Fellowship text itself, are not mere coincidences. Exploring further, the NCID website features an embedded YouTube video entitled, "What is Diversity Research?" Around the 40 second mark, retired professor Leslie Richards from the University of the District of Columbia defines the work of diversity scholars as such: "you bring a perspective to an issue that comes not from the mainstream perspective, or the majority white male perspective." It goes without saying that, of the video's five featured panelists, none outwardly fit this 'mainstream' bill.

Professor Richards' comment is the final piece of the puzzle. Diversity scholars do not just *promote* policies that boost the number of minority faculty members — they are almost always minorities to begin with. By the very definition of diversity research, hiring diversity scholars and guiding them to tenure track positions *automatically* increases faculty diversity. When Dean Martin and Professor Lee refer to the Fellowship's success in "increasing faculty diversity," they are actually referring to the fact that the Collegiate Postdoctoral Fellowship *does not recruit white men*.

Does this particular diversity strategy violate Section 26 of the Michigan constitution? The University might argue the following point: the Fellowship discriminates only *incidentally*, since being a minority is just part and parcel of being a hirable diversity scholar. However, the particular wording of the amendment leads me to believe this would not hold up in court. In one subsection, the amendment explicitly makes an exception for "*bona fide* qualifications based on sex that are reasonably necessary to the normal operation of public employment, public education, or public contracting." Even without a legal background, I'd imagine this subsection implies that *any other* bona fide qualifications besides sex (IE, race) are *not* exceptions, and thus fall under the amendment's primary definition of prohibited practices.

The Collegiate Postdoctoral Fellowship is just the tip of the iceberg. Earlier this year the DEI published a 170-page Year One Progress Report. Organized by each 'unit' at the University, the report lists virtually every academic department's DEI-themed goals, and how each goal has been specifically pursued. Some variation of "diversify our faculty" appeared in virtually every department subsection, suggesting a rather strong mandate from above. Different departments listed a sentence or two of their own "individualized approach" for getting the job done, including:

- Add extensive language to application materials designed to signal an explicit commitment to recruiting minorities (11).
- Create interview questions designed to allow a favorable response from minority applicants (44).
- Require all individuals who make hiring decisions to participate in mandatory DEI training (48).
- Insert one "diversity champion" into each hiring committee who is tasked with advocating DEI principles and goals during the hiring process (56).
- All hiring committee members must sign agreement to "uphold principles of DEI" during hiring processes (59).
- Shift core standard of admission from "specific experience" to "capacity" (71).

As previously mentioned, these "individualized approaches" appeared on a spectrum, ranging from tame candidate targeting to blatant (but unspoken) affirmative action. The Matthaei Botanical Garden & Nichols Arb seemed a bit helpless defending their humble operation, duly addressing staff diversity concerns by promising to "extend our existing unbiased hiring processes" (71). For the record, I take little issue with several of the most frequently cited tactics, such as utilizing networking software to identify qualified minority candidates. At the very least, such methods do not undermine fair, merit-based competition amongst candidates of all races.

However, the less palatable examples (like those bulleted above) evoke Kafka and Orwell in their unsubtle, bureaucratic intimidation tactics. Mandatory training sessions and coerced agreements to "uphold" DEI ideology

sound fitting of *The Trial* or *1984*. One can only imagine the practical function of a "diversity champion" in a hiring committee; do they simply force through every minority candidate who meets minimum qualifications? Moreover, doing away with standardized measures of academic merit as neutral as "specific experience" in order to meet DEI demands is nothing short of insulting to minority applicants. Finally, wording job listings and applications to signal "we are not interested in white men" without outright saying the words themselves is an unacceptable means to an unsettling end. Perhaps those behind programs like the Collegiate Postdoctoral Fellowship might consider how their logic — that you have to be a certain race to 'understand' a given scholarly study — has extremely dangerous historical implications.

Whether or not the DEI's faculty diversity campaign is wholly legal (I'll leave this for lawyers to decide), Michigan students and taxpayers should be aware of what is going on behind the scenes. Any white male Sociology major looking for postgraduate work might want to know that his identity effectively discounts him from certain opportunities at the U of M. Those who voted "yes" on Prop. 2 might also be interested to know that the University has entirely rejected the spirit of their amendment. Rather than respect the state of Michigan's democratically decided values, University administrators have worked tirelessly to revive an affirmative action Frankenstein. Finally, the DEI's fixation on diversity numbers have naturally led to some profoundly disturbing administrative practices. It is imperative that we bring these practices out of their bureaucratic hiding places and into the light of critical discussion.

(Visited 2,821 times, 1 visits today)

SHARING

TAGS

affirmative action, DEI, discrimination, diversity, Prop 2, UM



About Amo Manuel

Amo Manuel is a Junior studying History, Computer Science and English at the University of Michigan. From Boston, Massachusetts, he is a 'political agnostic' and plays jazz bass in his spare time. He can be reached at amory@umich.edu. View all posts by Amo Manuel →

PREVIOUS POST
Richard Spencer Has a Right to Speak

NEXT POST
What Does it Really Mean to be Pro-Life?

Search

POPULAR POSTS

Sorry. No data so far.

CONNECT WITH US

E    F    T    Y

THE MICHIGAN REVIEW ON TWITTER

📶 REASON MAGAZINE PODCASTS

- 'The Libertarian Party Is the Right Answer, as Broken as It Is:' Larry Sharpe June 12, 2018
- Expect Fully Legal Weed Within 5 Years, Says Former Top Pharma Lobbyist and Congressman Billy Tauzin June 8, 2018

📶 LATEST FROM NATIONAL REVIEW

- Trump Downplays Kim's Brutality, Says 'A Lot of People' Are Guilty of Atrocities June 14, 2018 *Jack Crowe*
- Before Going to Bed . . . June 13, 2018 *Jay Nordlinger*

Copyright © 2018 by The Michigan Review. Theme: DW Focus by DesignWall.
Proudly powered by WordPress

# EXHIBIT 42

[ ? ]

# What Does it Really Mean to be Pro-Life?

Politics    December 15, 2017    Michigan Review Staff



Our political discourse is nonsensical. The Republican party is at war with itself, with Reganites clashing with Trumpian-populists for the soul of the GOP. In the Midwest, the Democratic platform feels like it was airdropped from Mars, with the laughably out of touch party losing Ohio, Pennsylvania, Michigan and Wisconsin in the 2016 presidential election for the first time since 1984. What we need is some sanity — a new path forward for a reasonable political ideology.

What I, and the rest of my fellow whole-life Democrats, propose is a new approach that values the individual from the moment of conception until natural death. If you consider yourself 'pro-life' and consistently vote Republican, I understand where you're coming from. The Democratic platform has been pushed to the farthest extremes by groups like Planned Parenthood and its lobbying-arm NARAL. Consider Hillary Clinton, who went from the moderate stance of permitting abortion in "rare instances, and I mean rare," during her presidential run in 2008 to advocating continued legalization of partial birth abortion in her 2016 run — a position that shows tepid public support at best. As a pro-life voter, I urge you to think beyond the issue of abortion and how the ideal pro-life candidate would not

just be anti-abortion but also in favor of a family-supporting wage, access to healthcare and high-quality education.

> **We affirm and advocate for the dignity of all Americans in the face of those who would otherwise deny it. Who could be more voiceless in our country then the unborn?**

For open-minded Democrats who may have never seriously considered their position on abortion, I urge you to critically evaluate what it truly means to be a Democrat. Our party has a cherished legacy of being the voice for the voiceless in Washington D.C. and Lansing. We affirm and advocate for the dignity of all Americans in the face of those who would otherwise deny it. Who could be more voiceless in our country then the unborn?

I also urge fellow Democrats to do an honest assessment of where we are as a party, specifically the electoral cost of our current purity-driven platform on sexual ethics outside of San Francisco and New York City. Since 2008 we have lost close to 1,000 seats nationwide, and are the least relevant at the federal level we've been since 1928. It can be easy for us as Democrats to retreat into the headlines of the *New York Times* or clips from the latest Jimmy Kimmel monologue to convince us of the superiority of our ideas; but, at times these institutions of refuge save us from having to do brutally honest self-reflection. Why is it that we as Democrats are the party of the vulnerable and individual dignity, until the issue of abortion where we deny the humanity of the unborn? The same can be said of Republicans who espouse 'individual liberty' until the issue of abortion, where their tone shifts to a need for government intervention. It is time for some ideological consistency. It is time for whole-life Democrats and way past time for the Democratic Party to allow pro-life Democrats to vote their conscience on the issue of abortion.

There is precedent for a Democratic resurgence built off the contributions of pro-life Democrats. In 2006, Democrats captured Congress on a wave of pragmatic, pro-life Democrats who were later ousted because of abortion-lobby extremists who pushed the Affordable Care Act way to the left of what the public was ready to accept. If this cause speaks to you, and you're tired of the partisan gridlock I implore you to get involved. Whole-life Democrats are a rapidly organizing constituency, and the group Democrats for Life of America gives us a voice.

*Peter Geppert is a guest author for the Review representing Democrats for Life of Michigan, a state chapter for Democrats for Life of America. Democrats for Life of America is the organized pro-life voice and wing of the Democratic Party.*

(Visited 557 times, 1 visits today)

SHARING

TAGS

---

abortion, Democrats, for, Life, Planned Parenthood, PP, pro, Republican

About Michigan Review Staff

View all posts by Michigan Review Staff →

PREVIOUS POST

Affirmative Action Frankenstein: How U of M Bypasses Prop. 2

NEXT POST

# Why CSG is Wrong About Having a Student on the Board of Regents

Search

POPULAR POSTS

Sorry. No data so far.

CONNECT WITH US

E   F   T   Y

THE MICHIGAN REVIEW ON TWITTER

REASON MAGAZINE PODCASTS

- 'The Libertarian Party Is the Right Answer, as Broken as It Is:' Larry Sharpe June 12, 2018
- Expect Fully Legal Weed Within 5 Years, Says Former Top Pharma Lobbyist and Congressman Billy Tauzin June 8, 2018

---

🔲 LATEST FROM NATIONAL REVIEW

- Trump Downplays Kim's Brutality, Says 'A Lot of People' Are Guilty of Atrocities June 14, 2018 *Jack Crowe*
- Before Going to Bed . . . June 13, 2018 *Jay Nordlinger*

Copyright © 2018 by The Michigan Review. Theme: DW Focus by DesignWall.

Proudly powered by WordPress

# EXHIBIT 43



DONATE | Research | Projects | Events | About | Contact

ACADEMICS   ATHLETICS   COSTS   GOVERNANCE
INNOVATION   POLITICIZATION



## The University of Michigan's Costly and Pointless Diversity Plan

JAN 5, 2018     Amory Manuel    Comments    

ust over a year ago, the University of Michigan launched a new,

### MORE IN GOVERNANCE

**Diversity and Inclusion of Identity Groups Often Means Uniformity and Exclusion of Ideas**  JUN 13, 2018
"'Diversity and inclusion' is the moral be…

**Proposed Bills Could Improve Teacher Quality in the Tar Heel State**  JUN 11, 2018
Increasing teacher pay to improve teac…

**Can Public Universities Practice Ideological Discrimination?**  JUN 6, 2018
If a university were to state that it will n…

### POPULAR ARTICLES

**At This New College, Yes to Latin and Hiking but No to Cellphones and Federal Aid**  JUN 8, 2018
This spring, graduates throughout America will exit the...

**Diversity and Inclusion of Identity Groups Often Means Uniformity and Exclusion of Ideas**  JUN 13, 2018
"'Diversity and inclusion' is the moral benchmark of ou...

**Postmodern Physics**  MAY 16, 2007
Editor's Note: Guest writer Frank Tipler is a professor...

J five-year-long initiative named the Diversity, Equity, and Inclusion (DEI) plan. In an official statement by President Mark Schlissel, the plan's primary goal is stated to be the creation of a "vibrant climate of inclusiveness" on campus.

In order to heighten campus diversity, the plan pledged to increase enrollment of students from underrepresented backgrounds. These targeted demographics include the usual race and gender groups, but also, notably, students with underrepresented "political perspective[s]."

As for equity, the plan pledged to rid campus of discrimination based on the aforementioned identities—although without mentioning "political perspective"—and for inclusion, the plan promised to foster a campus culture that welcomes different perspectives by "support[ing] innovative and inclusive scholarship and teaching." DEI is designed to achieve "progress" through tangible actions, its administrators held accountable by measurable results.

Despite this no-nonsense branding, the plan contains an enormous amount of inanity.

Read through the official DEI materials and you soon feel overwhelmed by inspiring platitudes and glossy pictures of smiling minorities. As I noted in an earlier *Michigan Review article*, the administration has a nasty habit of hiding potentially controversial policy decisions deep in a matrix of feel-good fluff and pages of meaningless drivel, such as:

> Your passion for making us better, your belief that all individuals deserve an equal opportunity to succeed and your unwavering dedication to the highest aspirations of our university.

Whether DEI will accomplish that is questionable, but the plan certainly succeeded in adding new positions within the administration, including the vice provost for equity, inclusion, and academic affairs. According to UM Salary, the University of Michigan's open salary database, the provost earned $385,000 during the 2016-2017 school year.

Robert Sellers, who occupies this provost position, wrote an op-

## RECENT ARTICLES

Diversity and Inclusion of Identity Groups Often Means Uniformity and Exclusion of Ideas  JUN 13, 2018
"'Diversity and inclusion' is the moral be…

Proposed Bills Could Improve Teacher Quality in the Tar Heel State  JUN 11, 2018
Increasing teacher pay to improve teac…

At This New College, Yes to Latin and Hiking but No to Cellphones and Federal Aid  JUN 8, 2018
This spring, graduates throughout Amer…

## Martin Center Updates

Sign up to receive email updates from the Martin Center.

 Sign Up

ed in the *Michigan Daily* last April defending those developments. Citing the importance of DEI's "personal, professional, and educational benefits," Sellers boasted of over 200 University of Michigan community members "who are devoting all or a portion of their professional lives to this work."

He didn't say exactly what are the "historic and contemporary contributions" those staff members provide, that Michigan taxpayers now sponsor.

DEI resources mostly highlight various "advisory boards" and councils composed of graduate and undergraduate students. In practice, those bodies monitor Michigan's various administrative bodies for policy in academics and student life. The boards and councils approach this task with a specific angle: promote diversity principles through reform and increased DEI presence.

One such body, the Multicultural Leadership Council, is a collective of graduate students who seek to ensure "that diversity, equity, and inclusion are integral parts of the graduate student experience at UM." This means advocating for mandatory graduate education programs that "demonstrate meaningful allyhood by acknowledging privilege and accepting as truth the unique lived experiences of members."

What exactly does such advocacy entail? In a write-in to the *Michigan Daily* entitled "Pay Students for Diversity Labor," representatives of the Multicultural Leadership Council attempt to explain their value to the community. They write of their active role in pushing "school units to adhere to aggressive implementation timelines" of DEI plans and programs. In sum, the DEI appears to have enlisted undergraduate and graduate students to do its dirty work of maintaining strategic footholds and pressure points across the university.

A major theme of the DEI plan thus emerges: to perpetuate the existence of our school administration's diversity industry. Committees are formed to produce unreadable diversity pamphlets; these committees recommend more committees, and finally, the diversity provost makes sure everyone gets paid.

This self-serving cycle is most transparent in the plan's faculty recruitment initiatives designed to increase minority faculty numbers.

One such initiative is the Collegiate Postdoctoral Fellowship, aimed at supporting the research of "diversity scholars." The university's National Center for Institutional Diversity defines "diversity scholars" as academics "committed to enhancing diversity, equity and inclusion in higher education."

Diversity scholars are tasked with propagating one particular set of educational policies; namely, the exact policies that got them hired in the first place. Undoubtedly, the DEI cabal uses the scholarly works those academics produce to justify the growth of their programs and administrative power. The DEI plan has also implemented a new system of mandatory faculty workshops designed to promote inclusivity and combat racism in the classroom.

One might ask what value such workshops could add to the progressive classroom environment that most students already experience at Michigan. LSA Dean Andrew Martin tells us that these workshops provide additional strategies to "talk to students about racial hatred in a physics class or a mathematics class." Although students have already learned about the disproved science of implicit bias in computer science classes, they may now hear a Calc 1 graduate student instructor awkwardly attempt to broach the topic of "racial hatred." As staff reporters at the *Michigan Daily* have pointed out, many students see the DEI plan as ineffective at addressing discrimination on campus, specifically the "racist incidents" of racial slur graffiti and alt-right propaganda posters.

Whether or not you believe these offensive actions were actually carried out by a covert league of racist Michigan students (I highly doubt this), the DEI can't possibly affect the situation at hand. The mythos of "equity and inclusion" boils down to the fantastical assumption that a hateful racist can be brought back into reason by his local "diversity peer educator." Short of destroying student privacy and installing a camera in every dorm room, the university has very little power to stop anonymous vandalism around campus.

---

The mythos of 'equity and inclusion' boils down to the fantastical

President Schlissel chose to promote the DEI plan at a community gathering in October 2016, wherein Michigan students "shed tears as they gave their

assumption that a hateful racist can be brought back into reason by his local 'diversity peer educator.'



accounts of being the lone black student in a classroom, being called derogatory names and the depression they've experienced after incidents of racism on campus and across the country." However, to the dismay of protesters and those who felt targeted by racial incidents, Schlissel added, "I can't legally take down a poster—I think I'd be sued and fired."

It seems, then, that President Schlissel's stamp of approval on the DEI initiative mainly represents an attempt at appeasing the angry mobs outside his home and a way of saying, "Look, we're doing *something*, we're *trying.*"

What *should* the university do about our racial atmosphere on campus?

One intuitively feels that something should be done to prevent rabble-rousers from peddling divisive racial rhetoric on campus. Racial slurs on dorm room doors and anti-race mixing posters undoubtedly disturb our learning environment through the small-minded bigotry they promote. However, free speech exists in this country and on its public educational campuses for good reason. We must accept free speech's monumental benefits along with its drawbacks.

Perhaps the administration's most ethically and intellectually sound response to "racial incidents" would be the following: emphasize that the best way of dealing with truly prejudiced speech is simply to ignore it. The best punishment for racial instigators would be to let them fester alone and not give them the angry response they desire. Unfortunately, the Michigan administration won't do that and instead pushes the DEI plan's empty gestures of appeasement—which come with the hefty price tag of $85 million. Such wasteful spending and administrative abuse of power must be opposed now since it will not die out on its own. The nature of Michigan's DEI is one of self-preservation and entrenchment.

Moreover, calls for "justice" on campus will not cease. President Schlissel, in his awkward bind, will feel compelled to increase

appeasement expenses in the future. There are hardly any examples of American campus activists bribed into contentment; the Evergreen State fiasco, on the other hand, demonstrates just how far progressive activists will go once appeasement begins.

Michigan should stop now.

diversity      implicit bias      Michigan      University of Michigan



**The University of Michigan's Costly and Pointless Diversity Plan**

JAN 5, 2018 › Governance

AUTHOR
**Amory Manuel**

More Articles ›

© 2018 The James G. Martin Center for Academic Renewal — Privacy Policy

# EXHIBIT 44



# No More Sitting Ducks: An Argument for Concealed Carry at UM

Campus     March 6, 2018     Robin Akston



Trigger warning: some insensitivity to gun-phobia, as well as calls to end safe spaces for shooters are explored.

There is no such thing as a safe space from shooters, but gun-control advocates have succeeded in creating a safe space for shooters. When quacks like Nikolas Cruz want to massacre innocent people, like what occurred at Marjory Stoneman Douglas High School last week, there's no time to wait on a 911 call. Law enforcement response times are too slow. According to research from the Department of Homeland Security, the average school shooting lasts 12.5 minutes, while the average police response time is 18 minutes.

Even the presence of assigned deputies at school is no guarantee of survival, as the Coral Springs Police Department confirms, alleging 4 deputies were in range, but didn't confront Cruz at the scene of the crime. The result: 17 innocent souls lost, and not even a day went by before the NRA and law-abiding gun owners were villainized by the media. Understandably, outrage is a natural outgrowth of grief, but must be directed by reason and

toward the killer, not toward law-abiding citizens – as if defending the Second Amendment makes them accessories to the crime. What should be an outrage is that, in the first 12.5 minutes of an active shooter crisis, everyone in the building is free game for the shooter.

It should comfort no one to know that, at the University of Michigan, there is an absolute ban on carrying a concealed weapon on campus, barring a waiver by the Chief of Police for "extraordinary circumstances". That means even if student veterans, active military, or former police officers who are trained in the proper handling of firearms and hold a valid State license wish to carry, they can't. I suppose the increasing occurrence of garden-variety crooks shooting up schools full of disarmed victims is not extraordinary enough. Short of shouting loudly, throwing items, running, or barricading yourself and others in a room, you would be utterly defenseless if an active shooter occurred at the University. This should alarm everyone.

> " The solution should be simple: allow certain students and faculty on campus, who are trained and licensed in handling weapons – like active military — to voluntarily carry concealed so they can be a first line of defense in a crisis.

The solution should be simple: allow certain students and faculty on campus, who are trained and licensed in handling weapons – like active military — to voluntarily carry concealed so they can be a first line of defense in a crisis. To ensure maximum safety, give them background checks and routinely evaluate their proficiency and safety standards. The counterargument is equally simple, but uniquely foolish: leftists equate more guns with a higher risk of shooting incidents. The facts, however, don't merit this gun-phobic claim.

Before jumping on the gun ban bandwagon, we should get our ducks in a row and look at the raw facts. First, statistics show an inverse relationship between gun supply and gun violence. Far fewer individuals are killed annually by firearms than are slain by automobiles. A study by the National Highway Traffic Safety Administration in 2010 cites that "33,808 traffic related deaths occurred, and an additional 10,839 were caused from drunk driving." That same year, the FBI recorded that only 8,775 murders involved firearms. When you compare these statistics, from a total of 136,000,000 automobiles owned and a total of 270,000,000 firearms, the rate of murder per 100,000 firearms owned is one fiftieth the rate of murder per 100,000 automobiles. Given that limiting firearms because they are far too dangerous is the crux of the gun-control advocate's argument then, by this data, automobiles are more lethal and should be banned first. They can even be weapons for terrorists, as we saw in the 2016 car attack in Nice, France. What if we try to apply gun control language to these cases: perhaps ban only certain kinds of cars? Maybe we should just ban cargo trucks? Of course, automobiles provide transportation, which is crucial to society's function. So, too, are firearms crucial to society's self-defense.

A time-tested study from Kennesaw Georgia highlights how profoundly firearms deter would-be criminals. In 1982, Kennesaw passed a law requiring each household to own at least one firearm. That year, crime against persons plummeted to 74 percent compared to '81, and fell another 45 percent in '83 when compared to crime levels from '82. To this day, Kennesaw is "murder free." Furthermore, in a recent study of convicted felons, 60 percent admitted they avoided committing crimes when they knew the victim was armed, and 40 percent of those same felons reported they avoided committing a crime if they had merely suspected the victim was armed (page 27). All this should lead us to conclude that signs declaring a building gun-free succeed only in repelling law-abiding (CCW) permit holders, while glowing like a giant neon sign for criminals, reading "Safe Space for Shooters." Of note, 98% of public mass shootings take place in gun-free zones. Despite these troubling facts, leftists still want to clip our wings as citizens, enabling mass shootings; our laws and their underpinning philosophy, however, forbid this.

>  What about the right to defend ourselves in the face of a mass shooting? What about our negative right to demand spaces in which our ability to defend ourselves is not so restricted? At UM, an unabashedly proud gun-free campus, one of too many likewise campuses in the US, this liberty has been marginalized.

That we have a right to carry a firearm is not only enshrined in the Second Amendment, but was further affirmed by the Supreme Court of the United States in "District of Columbia Et Al Versus Heller." Indeed, empiricist John Locke, who's thought inspired the philosophy of our constitution, went as far to write, in his "Second Treatise of Government," that, "every man…has the power to kill a murderer, both to deter others from doing the like injury… and also to secure men from the attempts of a criminal who…by the unjust violence and slaughter…declared war against all mankind; and therefore may be destroyed." Even Alexander Hamilton, almost defaced from the $10 bill before liberals fell in love with the Broadway musical on his life, boldly declared in Federalist No. 29 circa 1788, that no threat can intimidate citizens, "little, if at all, inferior to them in discipline and the use of arms, who stand ready to defend their own rights and those of their fellow-citizens."

What about the right to defend ourselves in the face of a mass shooting? What about our negative right to demand spaces in which our ability to defend ourselves is not so restricted? At UM, an unabashedly proud gun-free campus, one of too many likewise campuses in the US, this liberty has been marginalized. We can't be afraid of ruffling the feathers of the gun-phobic UM command structure. We must get tough and end safe spaces for shooters, arguing to expand concealed carry on campus. We must be jealously protective of our own lives and those of our peers, and be prepared to violently defend them, lest we be prepared to violently lose them. The University of Michigan can no longer ask us to be sitting ducks.

(Visited 1,392 times, 1 visits today)

SHARING

TAGS

carry, concealed, control, gun, NRA, regulation, School, shooting, violence

About Robin Akston

View all posts by Robin Akston →

PREVIOUS POST
Winners and Losers of CPAC 2018

NEXT POST
Oscars Grandstanding: Since When are Celebs our Moral Compass?

Search

---

POPULAR POSTS

Sorry. No data so far.

---

CONNECT WITH US

E   F   T   Y

---

THE MICHIGAN REVIEW ON TWITTER

## REASON MAGAZINE PODCASTS

- 'The Libertarian Party Is the Right Answer, as Broken as It Is:' Larry Sharpe June 12, 2018
- Expect Fully Legal Weed Within 5 Years, Says Former Top Pharma Lobbyist and Congressman Billy Tauzin June 8, 2018

## LATEST FROM NATIONAL REVIEW

- Trump Downplays Kim's Brutality, Says 'A Lot of People' Are Guilty of Atrocities June 14, 2018 *Jack Crowe*
- Before Going to Bed . . . June 13, 2018 *Jay Nordlinger*

Copyright © 2018 by The Michigan Review. Theme: DW Focus by DesignWall.

Proudly powered by WordPress

# EXHIBIT 45

🔲 [?]

# A Fond Farewell

Campus     April 28, 2018     Jake Thorne



Nearly four years ago today, a meek and uninspired caricature of myself stumbled into his first ever meeting with the *Michigan Review*, hoping to find a welcoming community through which he could vent his frustrations into the ether of campus reporting.  What he found instead was an admittedly lackluster gathering of only six or seven students, many of whom appeared to spend most of their time complaining endlessly about the prevailing liberal zeitgeist on college campuses.  For someone seeking an established presence on campus, the *Review* left much to be desired.

Despite my initial hesitations, I noticed an intoxicating sense of passion among each member of the *Review*, particularly from its Editor-in-Chief at the time, Derek Draplin.  His iteration of the often unstable and frequently defunct publication sought to challenge the campus orthodoxy head-on, covering hard-hitting and controversial stories without any fear of repercussion.  As Editor-in-Chief, his pieces exuded an aura of witty, yet snarky, vitriol toward the actions of Ann Arbor's more progressive crowd, calling for students of all backgrounds to share their stories of oppression and unfair treatment under this purported regime.  He took aim especially at the university's

administration, calling for increased transparency and chastising their wasteful spending at every opportunity.

Above all else, Derek's passion for his work kept me on board.  While I seldom ventured into the realm of political commentary — most of my early pieces covered Michigan hockey —  I was inspired by the dedication of each staff member to pursuing the truth, even if that meant ruffling a few feathers along the way.  In my early days with the *Review*, I did all that I could to contribute to this mission, eventually rising to the rank of Editorial Editor and Publisher.

As my role in the *Review* grew, my attachment to the pursuit of truth and freedom of expression grew concurrently.  During my sophomore year, while editor Omar Mahmood dealt with the ridiculous backlash from his satire piece, Do the Left Thing, I finally found my passion.  I was less enraged by the particulars of the controversy than I was by the substance of it all. Sure, his article was purposefully provocative and maybe a bit offensive; however, the bitter criticism he received for simply expressing his opinion angered me in a way I had never been before.  I realized that my mission with the *Review* was not to cover controversial news stories or relay the trite gripes of campus conservatives; rather, it was to preserve the inalienable right of all writers on campus to share their own opinions — however provocative or controversial — without fear of unjust censorship.  All this was underscored by a diligent commitment to the *truth*, whatever that may entail.

Now, as I reflect back on my time with the *Review* through the lens of my computer screen, I cannot adequately express in words what this institution has done for both myself and the campus community at large.  I can, however, say with great confidence that we have made excellent strides toward creating a space on campus where *all* opinions are welcome, regardless of partisan ties.  We have enshrined a publication for which any student can let their viewpoint be heard and contribute to difficult conversations regarding complex issues both in Ann Arbor and across the globe.  We even successfully hosted an immigration debate on campus and weren't booed off stage or shut down by protestors! That counts as a massive success in my book.

While I certainly have my regrets, especially regarding the more controversial and unsavory events I played a role in hosting, I believe the *Review* was able to offer me something no other organization could: an escape from the status quo of journalism.  In my view, the journalistic community is insular to a fault. As an editor, I traveled to multiple conservative-oriented conferences across the country, meeting young and budding journalists looking to express their opinions much like myself.  Much to my disappointment, I found these events did nothing more than reinforce pervasive stereotypes about the "oppressive left" and the "Failing New York Times," never once giving proper credence to opposing viewpoints. One such conference I attended held truth in such disdain that its hosts peddled the narrative that climate change is a hoax. While I definitely met unique and interesting people at these events, I loathed the instinct of these journalists to consolidate their editorial work to one point of view or ideology.

This single-mindedness, I believe, handcuffs democracy.  Like it or not, we are a nation of fragmented ideas, carrying a diverse set of interpretations on constitutional freedoms and notions of our own perfect America.  We cannot continue to be a citizenry hell-bent on segregating ourselves into distinct baskets that serve no purpose other than reinforcing our preexisting notions of the truth, as we do with our consumption of news.  If we are to proactively make strides toward making America "great again," we must embolden our commitment towards pursuing the truth, which necessarily entails communicating with those across the aisle.  This cannot happen without a commitment from news organizations to interact with opposing viewpoints, critique our biases, and learn from those who live in an entirely different America. In doing so, we as a people can learn from our diversity and work together toward solving problems that we mutually agree upon, rather than hiding in our respective corners and lambasting conservatives as Nazis or liberals as cucklords.

The *Review* operates on far too small a scale to enact these proposed societal changes in any sort of meaningful way.  However, I believe our commitment to publishing all opinions, so long as they are based in fact, has opened

up our campus community to a diverse, untapped mass of *real* opinions from *real* people.  I do not wish to live in an America where people are afraid to speak their minds and participate in the active forum of democracy.  Through the actions of the *Review*, I believe we have been able to share some of these censored and often unspoken opinions, and I am proud to have played a role in unearthing them.

In closing, I have far too many people to thank for this opportunity.  I am indebted to the mentoring I received from each of the editors who preceded my tenure — Derek, Omar, and Deion.  Without their support, I would quite literally have no clue how to do this job. I must also thank our editorial board for their time and effort spend improving the *Review* this past year, making it more accessible to a broader audience and improving our own operational procedures.  In particular, I want to thank Rachel Neitzke for being a fantastic copy editor, enabling my petulant behavior by revising articles when I was either unable or unwilling.  Finally, none of this would have been possible without the support of my parents, for which I am forever grateful.

As I gear up to leave the coddling womb of undergraduate life and set my sights toward Wisconsin for three years of legal education and a slow death by exhaustion in the library, I wish the best of luck to our new Editor-in-Chief Cole Carnick, joined by Executive Editor Amo Manuel, that they may preserve the legacy of this publication going forward.  And, as always, I must leave by thanking you, our readers, for your continued readership. Your support has given me more than I can ever repay.

(Visited 274 times, 1 visits today)

SHARING

TAGS

Graduation, Jake Thorne, Senior Farewell, University of Michigan



### About Jake Thorne

Jake Thorne is Editor-in-Chief of the Review, studying Honors Political Science and Economics at the University of Michigan. He has been an active contributor to the Review since 2014. He can be reached at jnthorne@umich.edu View all posts by Jake Thorne →

PREVIOUS POST
## High School Student Invited to Guest Lecture for Advanced Physical and Computational Chemistry Course

NEXT POST
## My Life in the Shadows: Growing Up With a Learning Disability

Search

POPULAR POSTS

Sorry. No data so far.

CONNECT WITH US

E    F    T    Y

THE MICHIGAN REVIEW ON TWITTER

🔲 REASON MAGAZINE PODCASTS

- 'The Libertarian Party Is the Right Answer, as Broken as It Is:' Larry Sharpe June 12, 2018
- Expect Fully Legal Weed Within 5 Years, Says Former Top Pharma Lobbyist and Congressman Billy Tauzin June 8, 2018

🔲 LATEST FROM NATIONAL REVIEW

- Trump Downplays Kim's Brutality, Says 'A Lot of People' Are Guilty of Atrocities June 14, 2018 *Jack Crowe*
- Before Going to Bed . . . June 13, 2018 *Jay Nordlinger*

Copyright © 2018 by The Michigan Review. Theme: DW Focus by DesignWall.
Proudly powered by WordPress

# EXHIBIT 46

HOME    COMMUNITIES    CREATE    SHOP    ☰



## What I've Learned From Being A Conservative On The Most Liberal Campus In America


William Wayne Horne III
Mar 29, 2016

Let's be honest, we all have a feel for the political atmosphere surrounding our college. Whether it be noticing which clubs get the most funding from the university, the subtle messages some professors hint at during lecture, or even what your fellow students strut across campus in. Politics is a natural part of college life. It is the first time we are able to form our own opinions, openly express our ideas, and most importantly vote. But, my campus is a little different than most. The University of Michigan is often ranked as one of the most liberal campuses across the country and believe me we show it. Our students are liberal, our faculty is liberal, and our city is liberal.

  



shine a negative light on liberal campuses. But, being on a liberal campus is not necessarily a bad thing. And while I do not "Feel the Bern" or want "Hillary for America," I've learned a tremendous amount from my campus.



I have learned that open and respectful debate about government, policy, and ideology is why our country is so great. At Michigan I am never more than a person away from an engaging policy discussion and I love it. These small dialogues are intense and heated, but at the same time my liberal counterparts love to bring facts and ideas to my mind that I never would have considered. Before coming to college I knew the basics of conservatism: small government, free enterprise, and strong national defense. But now—because of my lovely liberal friends—I know where I stand on education, environmentalism, single payer healthcare, and just about every other possible policy. They challenge me to know more.

There is no room for political complacency at the University of Michigan, and I learned that the hard way. Michigan has taught me that constructive and respectful discussions are crucial; they allow people to explore new ideas and learn from one another. In truth, my liberal campus has made me a better conservative. I bet they regret that.

My time as a conservative on campus has also taught me that it is alright not to fit in with university norms; in reality it is kind of fun being an outlier, it makes me unique. Coming into college I was worried that being a conservative on campus was going to be a problem. I didn't know if the professors would be pushy with their ideologies or if the student body was going to discount my conservative views.

# Like Odyssey on Facebook

However, these fears have turned out to be somewhat unwarranted. Sure, I have had my fair share of disputes with a few presumptuous students on campus, but it hasn't been anything serious. Being one of the few conservatives on campus is actually refreshing. It allows me to be different and helps me to separate myself in a school of nearly 44,000 students. I've learned that, like everywhere else, if you search hard enough you will find a community of people like you. And sure enough, I was able to find those fellow conservatives, even at the University of Michigan.





But, the most important thing that I have learned from being a conservative on a liberal campus is that, contrary to common belief, it is alright to like people of the other political party. As a country we are more partisan than ever before and our political ideology is even affecting the way we look at others. In David Frum's article, "The Great Republican Revolt", he discusses how one-third of Democrats and one-half of Republicans would be upset if their child married someone of the other party. Let's be honest this is crazy.

Yes, I want my future wife to be a conservative, but her political ideology is going to have little influence over whether or not I marry her. Having strong beliefs are great, but being at Michigan has taught me that some of my favorite people are liberals. My closest friends here are far from conservative and we often get into intense debates over different policies, but at the end of the day they are still my friends and I still love them. Being a conservative here is important, but not nearly as important as loving others or finding yourself. The University of Michigan may be liberal, but it has showed me—a strong conservative—that life is about so much more than politics.

Cover Image Credit: The Atlantic



# I'm A Christian And I Have A Tattoo

*Stop judging me for it.*



Courtney Rae Johnson
Jun 6, 2017

Like most people, I turned 18 years old during the course of my senior year of high school. I'll never forget the months prior to my birthday, though, because I spent hours making a decision that would be with me forever, the decision of where I would go to get my first tattoo and where that tattoo would go, and of course I spent a lot of time deciding on the font, the colors, and all of the other aspects of the tattoo I wanted. Throughout this time, two things stood firm 1) the fact that I was going to get a tattoo, and 2) the six letter name that it would consist of.

Now, three years later, I'm 21 years old and I still get the occasional dirty look at church on Sunday or in line at Walmart, and more often than not this look is accompanied by the following words: "Why

| Keep Reading |
| :---: |

# Connect with a generation of new voices.

We are students, thinkers, influencers, and communities sharing our ideas with the world. Join our platform to create and discover content that actually matters to you.

Learn more    Start Creating



## A Single Word Or A Single Action Can Change The World

It starts with you.



Tishtrya Cama
Jun 13, 2018

Single Words. They hold little to no substance when they stand alone. Think of a couple words that are commonly used throughout the day:

Keep Reading

# EXHIBIT 47

# Conservative author talks political climate at colleges



(Zach Moore/Daily)
Author Jonah Goldberg speaks about his book on "Liberal Fascism" at Rackham Amphitheater on Thursday. Buy this photo (/photostoredetail/57776)

Print (/print/83197) | E-mail (/forward?path=node/83197) | Letter to the editor (/letters)
By Will Greenberg (/people/wrgree/Will Greenberg), Daily News Editor
Published February 12, 2015

It was with attention-grabbing language and crowd-pleasing wit that Jonah Goldberg discussed his views on American history and politics — offering a perspective rarely seen at the University.

Goldberg, author of the 2008 bestseller "Liberal Fascism" and 2013's "The Tyranny of Clichés," talked misinterpretations of world history, debunking liberal heroism and political correctness in the Rackham Amphitheatre on Thursday. Goldberg is also a frequent columnist for National Review Online, and it appeared he had many in fans in the crowd.

During the lecture, he discussed the arguments of his books — that fascist movements, contrary to popular belief, are left wing at their core, and how liberals profess to be pragmatic problem solvers when they, in fact, have an ideological agenda.

Goldberg walked through his argument of liberal fascism by elaborating on the Nazi party in Germany. He asked: "Except for the murder, bigotry, genocide and war, what is it, exactly, about Nazism you don't like?" He argued that the Nazi's support of nationalism, condemnation of consumerism and denouncement of religion exemplified how "fascism" and "communism" were not opposites.

Additionally, going deeper into "The Tyranny of Cliches," he discussed how clichés tend to "do our thinking for us," and cited a favorite of his: "Violence never solves anything."

"Violence is very useful is some specific situations — they're called violent situations," he said, adding how he feels the phrase is too often addressed at the respondent to violence and not the original aggressor.

Goldberg also addressed political dialog and political correctness more generally. In an interview with The Michigan Daily before his speech, he said he took issue with the idea that liberal students see themselves as "sticking it to the man" when they are surrounded by mostly liberal professors and peers.

He said it's problematic how students assume college is a time to join protests and social movements when they have no knowledge of the conflict they're involved in.

On the topic of campus inclusiveness and productive dialogue, Goldberg said while people generally support social change, they are not given the chance to be included or else are condemned for not joining fully. He said liberals use "moral bullying" on conservatives to attack them politically rather than create discussion.

"The same people who say we need an honest dialogue on race, we need to have an open and frank conversation on race — the second anybody takes that bait and says something even remotely 'un-PC' or offensive in any way — or not even offensive but that can be used to pretend that they were offended — they get beaten over the head with it," he told the Daily.

"In a culture, the majority owes tolerance and respect to the minority, but the minority owes tolerance and respect to the majority, too," he said. "What is not constructive is when the minority responds by simply shouting, by this sort of moral bullying and guilt tripping that says 'you are a bigot' for absolutely well-intentioned language that was acceptable five minutes ago."

LSA freshman Grant Strobl, chairman and founder of the University's chapter of Young Americans for Freedom, said he was happy to have Goldberg on campus to bring different ideas to the forefront on campus.

Strobl mentioned Communications Prof. Susan Douglas' December article (http://inthesetimes.com/article/17426/we_cant_all_just_get_along) in which she states, "I hate Republicans," and describes conservatives as against change and social tolerance. The column resulted in backlash (http://www.michigandaily.com/news/university-professor-faces-controversy-over-column-hating-republicans) from Republicans across the state. Strobl said Douglas' piece was an example of the one-sided nature among University faculty and students.

"It kind of coerces people into a certain ideology and that's kind of where 'liberal thought police' comes from," he said. "It's deciding what gets heard rather than allowing for a fair discussion between viewpoints."

Strobl also cited the Inclusive Language Campaign (http://www.michigandaily.com/news/inclusion-programs) as an example of how the University professes to promote positive discussion, but excludes conservative students. Having gone through the program himself, Strobl said the ILC doesn't highlight terms attacking conservatives — like "right-winger" or "tea-bagger" — but it should.

While he said he agrees with the end goal of promoting diversity and inclusion, he said he took issue with the idea of the program trying to manage the words students used, saying there are unintended consequences to that approach.

"I feel like we should be embracing the diversity rather than trying to be too politically correct about it because I think that almost makes us more divisive," he said. "I think it all comes through education and I think we're all adults here and I think we can all approach each other in an adult-like manner and discuss the real issues."

ILC is part of the University's larger "Expect Respect" campaign. Amanda McLittle, associate director of diversity and inclusion in University Housing, wrote in an e-mail interview with the Daily that ILC is not a political organization and does not focus on "conservative" or "liberal" terms.

"Students chose the words that we are highlighting in this first year of ILC," she wrote. "Multiple student focus groups were asked which words they would like to see included this year. The list of words is not meant be exhaustive."

The ILC drew national attention this week after "The College Fix" reported (//www.thecollegefix.com/post/21174/") the campaign cost $16,000 to implement, confirmed by University spokesperson Rick Fitzgerald. He said it's difficult to put the cost of the program into perspective with other programs, but that the money went to brochures and other awareness measures, not staff.

LSA senior Derek Draplin, the editor in chief of the student publication The Michigan Review, has been vocal about the ILC and attended the speech Thursday night. He said speakers like Goldberg are important to creating opening people's minds on campus.

"The frontlines of culture-wars, so to speak, is on college campuses," Draplin said. "There is a lockstep belief in opinions on campus so that's kind of why I came (to the Goldberg lecture) to challenge those establishment-type beliefs and comments and movements."

Strobl said YAF plans to bring more speakers by the end of the semester, though the schedule is not yet set.

## MOST READ

1. To the white men who told me that they "prefer" white women (/section/mic/white-men-who-told-me-they-%E2%80%9Cprefer%E2%80%9D-white-women)

2. Faking 21: How bouncers catch fake IDs and underage students get past the rope (/news/faking-21)

3. Beilein to stay in Ann Arbor following contract extension (/section/mens-basketball/beilein-stay-ann-arbor-following-contract-extention)

4. Ian Harris: 'The Last Jedi' and the state of film criticism (/section/arts/ian-harris-last-jedi-and-state-film-criticism)

5. Emma Chang: Confessions of a closeted Rosshole (/section/columns/emma-chang-confessions-closeted-rosshole)

subscribe to our daily newsletter, the Daily Digest (https://mail.michigandaily.com/lists/?p=subscribe&id=4)



About (/about)      Contact us (/contact)      Advertise (/advertise)      Subscribe (https://mail.michigandaily.com/?p=subscribe&id=4)

Join the staff (/join-us)      Merchandise (http://store.michigandaily.com)      View Print Issue (http://issuu.com/michigandaily/)


(https://www.facebook.com/michigandaily/)


(https://twitter.com/michigandaily)


(https://www.instagram.com/michigandaily/)

(https://www.youtube.com/user/michdailymultimedia)

## The Michigan Daily

420 Maynard St, Ann Arbor, MI 48109 (http://maps.google.com/?q=420 Maynard St, Ann Arbor, MI 48109)
734-418-4115

Edited and managed by the students at the University of Michigan since 1890.

Copyright © 1998-2018, all rights reserved.

# EXHIBIT 48

# At his alma mater, mixed impressions of Ben Carson

Thursday, December 10, 2015 - 8:36pm



Republican presidential candidate Ben Carson speaks to supporters at a campaign rally at Spring Arbor University Field House in Spring Arbor Township on September 23, 2015. Buy this photo (http://store.pub.umich.edu/michigan-daily-buy-this-photo/)

Amanda Allen/Daily

EMMA KINERY (/AUTHOR/KINERYEM)
Daily Staff Reporter

With a third-place position in the Republican presidential primary, Ben Carson is not an unknown name for most Americans.

The now-presidential hopeful first made his mark as the first neurosurgeon to separate conjoined twins in 1987 — a feat rooted in the medical training he received at the University's Medical School.

But while he's known to many Americans, his alum status at the University isn't as well known — and little has been done to connect the presidential-hopeful to his alma mater, by both the campaign and the University.

Case 4:18-cv-11451-LVP-EAS   ECF No. 1-13 filed 06/15/18   PageID.743   Page 135 of 147

Until Wednesday, Carson had yet to visit Ann Arbor while on the campaign trail, and when he did, the visit (https://www.michigandaily.com/section/news/ben-carson-visit-universitys-medical-school) was brief — a closed-press meeting with Medical School leaders and students before a campaign stop in Ypsilanti and a fundraiser in Ann Arbor. The meeting on campus was closed per the University's request, according to the Carson campaign.

Later in the day, Carson introduced his health care reform plans not on campus but 30 minutes away, at Eastern Michigan University in Ypsilanti. During previous visits to the state, Carson hasn't visited Ann Arbor, and the University hasn't made much mention of the candidate since he launched his campaign in May.

The University declined requests for comment about Carson's time at the University for this story. Mary Masson, a spokesperson for the University of Michigan Health system, also declined multiple interview requests to UMHS and Medical School faculty and administrators on their behalf.

Public Policy senior Cody Giddings, vice chair of the University's chapter of the College Republicans, said the organization has not been in contact with the Carson campaign, and he does not foresee the candidate making an official visit to the University.

"I do not think Ann Arbor will be one of his future campaign stops, but anything is possible," he said.

The majority of students approached for this article were not aware Carson had graduated from the University, though a large-scale survey was not conducted.

"I knew, but then again I wouldn't expect most people to know that he graduated here," said LSA senior Stephen Culbertson, communications director for the University's chapter of College Democrats.

"Most people do not associate him with the University of Michigan as far as I know," he said.

Political Science Prof. Michael Traugott agreed with that sentiment, noting that individuals in the University community are more familiar with his presidential campaign than his University roots.

"I don't think he is well known as an alumnus because he graduated from the Medical School and that was about a generation ago," Traugott said. "He's much better known as a candidate than he is as an alum."

Even those who do know him as a graduate said they do not associate him with the University — or believe he fully represents what the University stands for.

Medical School student Brian Desmond said though he knew Carson was a graduate of the University and his accomplishments as a doctor have made him a figure to be celebrated in the Medical School, he said Carson's political beliefs are disheartening.

"The thing that I find kind of surprising, or that makes me a little bit sad, is that one of the things that brought me to U of M was the emphasis on kind of celebrating diversity," Desmond said. "And I don't think that those are things that Dr. Carson — at least in his political campaign — has represented well."

Desmond also noted that while Carson's medical career might align with the education emphases of the Medical School — such as evidence-based methodology — his political career has not.

"I think, unfortunately, and it might be because of the political climate he's in, but I think unfortunately he kind of has a mixed record of actually doing that," he said. "Some of his statements about climate change kind of go against what is the scientific consensus so I think his practices may be a little more mixed than what he said about using evidence."

However, Medical School student Ben Long said he knew Carson was a graduate and felt the fact was well regarded. Ever since reading Carson's autobiography, "Gifted Hands," the doctor has been highly influential on Long's life. Long said Carson's story is the "main reason" he decided to go into medicine, and he has now attended the same undergraduate and medical school as Carson.

"I'd say he's one of our best-known graduates," Long said. "He is obviously really successful in the field of neurosurgery, he's running for president and I think that reflects highly on the Medical School because the sort of motto is 'the leaders and the best' and he's one of our probably most prominent graduates but also one of our most prominent minority graduates."

One of Carson's draws to many Republican voters are his strong religious ties, which a number of news outlets have contrasted with his scientific background.

However, many students interviewed said they didn't think those contrasts — for example, Carson has expressed a belief in creationism — have had much of an impact on people's perceptions of the candidate.

"His life story and how he rose from poverty, and he worked really hard to go to school, I think it's really inspiring," Long said. "I don't entirely agree with his creationist views, but it is his religion though so I can sort of understand why that is ... I don't think it reflects badly on him."

Traugott said he didn't think being both a doctor and strongly religious individual would necessarily present issues with regard to public opinion.

"There must be a wide range of religious beliefs among doctors, and he has a particular one which he apparently has had throughout his career," he said. "We won't know until they start voting in the primaries and caucuses how attractive they are to Republicans."

Traugott also noted the fact that being a Michigan alum wasn't necessarily something that would be a draw or a negative for voters.

Culbertson said he believes most Republican candidates don't appeal to University students, and Carson isn't an exception.

"As far as the student body is concerned, I don't really believe that Ben Carson appeals to Michigan students, despite what people say about students not being involved or engaged in politics," he said. "He's kind of an appeal gap here and I don't think the University association is going to be able to overcome that."

Students who support the Republican Party said Carson's alum status is also not a draw, though they noted there were many other reasons they could have for supporting him.

"Carson's accomplishments in the medical field as a University of Michigan Medical School graduate certainly serve as a source of pride for those that support him within the University of Michigan College Republicans but I believe his political policies are the primary reason some in UMCR support him."

## MORE LIKE THIS

University alum to consider run for president in 2016 (/news/ben-carson-might-run-president)

Ben Carson to visit University's Medical School (/section/news/ben-carson-visit-universitys-medical-school)

Carson talks social issues, education during Michigan stop (/section/government/ben-carson-talks-education-speech-spring-arbor-university)

## MOST READ

1. To the white men who told me that they "prefer" white women (/section/mic/white-men-who-told-me-they-%E2%80%9Cprefer%E2%80%9D-white-women)

2. Faking 21: How bouncers catch fake IDs and underage students get past the rope (/news/faking-21)

3. Beilein to stay in Ann Arbor following contract extension (/section/mens-basketball/beilein-stay-ann-arbor-following-contract-extention)

4. Ian Harris: 'The Last Jedi' and the state of film criticism (/section/arts/ian-harris-last-jedi-and-state-film-criticism)

5. Emma Chang: Confessions of a closeted Rosshole (/section/columns/emma-chang-confessions-closeted-rosshole)

subscribe to our daily newsletter, the Daily Digest (https://mail.michigandaily.com/lists/?
p=subscribe&id=4)



About (/about)          Contact us (/contact)          Advertise (/advertise)          Subscribe
                                                                                        (https://mail.michigandaily.co
                                                                                        p=subscribe&id=4)

Join the staff (/join-us)                    Merchandise                    View Print Issue

(http://store.michigandaily.com)    (http://issuu.com/michigandaily/)



(https://www.facebook.com/michigandaily/)



(https://twitter.com/michigandaily)



(https://www.instagram.com/michigandaily/)



(https://www.youtube.com/user/michdailymultimedia)

# The Michigan Daily

420 Maynard St, Ann Arbor, MI 48109 (http://maps.google.com/?q=420 Maynard St, Ann Arbor, MI 48109)
734-418-4115

Edited and managed by the students at the University of Michigan since 1890.

Copyright © 1998-2018, all rights reserved.

# EXHIBIT 49

Join or Log Into Facebook

Sign Up



## Events

Events

Calendar

Birthdays

Discover

Past

**Free Speech on Campus**

Create Event

Email or Phone

Password

Forgot account?

Log In

Do you want to join Facebook?

Sign Up

English (US)
Français

Privacy
Cookies
Facebook

**FEB 9**

### Free Speech on Campus

Public · Hosted by The Federalist Society at the University of Michigan Law School

Interested

---

Tuesday, February 9, 2016 at 11:45 AM - 1:00 PM EST
More than a year ago

1225 SH      Show Map

| About | Discussion |
|---|---|

**0 Went · 0 Interested**
Share this event with your friends

---

### Details

Join FedSoc, with guest speaker Ari Cohn of the Foundation for Individual Rights in Education, for a panel on the state of free speech on campuses. Prof. Frier will be providing commentary.

Hunter House will be served.

# EXHIBIT 50

6/14/2018    Milo Yiannopoulos vs. Julie Bindel: Does feminism have a free speech problem?

Case 4:18-cv-11451-LVP-EAS   ECF No. 18-1   filed 06/15/18   PageID.751   Page 143 of 147

Sign Up

Join or Log Into Facebook

Email or Phone

Password

Forgot account?

Log In

Do you want to join Facebook?

Sign Up

Privacy
Cookie
Faceb



FEB
23

## Milo Yiannopoulos vs. Julie Bindel: Does feminism have a free speech problem?

Public · Hosted by The Michigan Review

Interested

Tuesday, February 23, 2016 at 7:00 PM - 9:00 PM EST
More than a year ago

University of Michigan Michigan League     Show Map
911 N University Ave, Ann Arbor, Michigan 48109

**About**     Discussion

**334 Went · 337 Interested**
Share this event with your friends

**Details**

Does feminism have a free speech problem?

Milo Yiannopoulos has been banned from speaking at a dozen different universities in the UK in the past calendar year alone, including the University of Manchester and Bristol University. The wildly popular, shockingly offensive, and devoutly anti-feminist British journalist has been called "Digital Media's Citizen Kane" by Forbes, and derided as "The Ultimate Troll" by Fusion. He was kicked out of Amber Rose's Slut Walk last year for holding a sign reading "Harry Potter and Rape Culture: Both Fantasy" and had his Twitter account suspended and unverified just this past week after starting the hashtag #FeminismIsCancer. His provacative articles at Breitbart include "Attack of the Killer Dykes!", "Feminist Bullies are Tearing the Video Game Industry Apart", and "Does Feminism Make Women Ugly?"

Julie Bindel is Milo's ideological opposite who has also faced a wave of bans from British universities. The freelance journalist and founder of Justice for Women is a self-proclaimed "radical lesbian feminist" and a research fellow at the University of Lincoln who frequently writes articles such as "Why I Hate Men" for The Guardian. She has been quoted as suggesting that men should be "put in some type of camp" and has called for a "truce on heterosexuality."

On February 23rd, from 7-9 pm at the 2nd Floor Ballroom of the Michigan League, Milo and Julie will square off on the topic: "Does Modern Feminism Have a Problem with Free Speech?"

Moderating the debate is University of Michigan Women's Studies and Political Science Professor Lisa Disch.

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Ad Choices

Events
Calendar
Birthdays
Discover
Past

Milo Yiannopoulos vs. Julie Bindel: Does feminism have a free speech problem?

Create Event

6/14/2018                    Milo Y: Cannot DHS schedule Bingei: Closed for first time a free speech problem?

Case 4:18-cv-11451-LVP-EAS   ECF No. 18-6   filed 06/15/18   PageID.752   Page 144 of 147

Events

This event is free and open to the public. It is part of Milo's Dangerous Faggot Tour 2016.

See Less

Privacy · Terms · Advertising · ·
Cookies · More
Facebook © 2018

**About the Venue**

**University of Michigan Michigan League**
College & University · 190 likes

Go to Page

95 posts in the discussion.

See Discussion

# EXHIBIT 51

Sign Up

Join or Log Into Facebook

## Events

Events

Calendar

Birthdays

Discover

Past

**Why we are [politically] conservative: A conversation with leaders from the Jewish community**

Create Event



English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More
Facebook © 2018

MAR
16

### Why we are [politically] conservative: A conversation with leaders from the Jewish community

Public · Hosted by Young Americans for Freedom at the University of Michigan

Interested

Wednesday, March 16, 2016 at 7:00 PM EDT
More than a year ago

Hutchins Hall 250 (Dykema-Gossett room in the Law School)    Show Map

**About**                              Discussion

---

**28 Went · 70 Interested**
Share this event with your friends

---

**Details**

Why we are [politically] CONSERVATIVE.

A conversation with leaders from the Jewish community:

Andrea Fischer Newman- University of Michigan Regent
Jeff Sakwa- Michigan Republican Party Co-Chair & Defeat The Label President
David Littmann- The Mackinac Center for Public Policy Senior Economist
Moderated by: Ezra Drissman- Editor at the The New Paine

Wed. March 16, 7pm, Hutchins 250

Sponsored by:
Young Americans for Freedom at the University of Michigan

See More

---



4 posts in the discussion.

See Discussion