# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

SPEECH FIRST, INC.,

          *Plaintiff*,

v.

MARK SCHLISSEL, et al.,

          *Defendants*.

Civil Action 2:18-cv-11451-LVP-EAS

## PLAINTIFF'S REPLY IN SUPPORT OF PRELIMINARY INJUNCTION

John A. Di Giacomo (P73056)
REVISION LEGAL, PLLC
5024 Territorial Road
Grand Blanc, MI 48439
(231) 714-0100
john@revisionlegal.com

William S. Consovoy
Jeffrey M. Harris
J. Michael Connolly
CONSOVOY MCCARTHY PARK PLLC
3301 Wilson Boulevard
Suite 700
Arlington, VA 22201
(703) 243-9423

In an effort to keep this Court from reaching the merits of Speech First's claims, the University has now changed or "clarified" several of the challenged policies. But those developments provide no basis for allowing the University's speech-chilling policies to evade scrutiny under the First Amendment.

At the outset, the University does not—and cannot—argue that Speech First's challenge to the Bias Response Team (BRT) is moot. Instead, the University argues that the BRT does not implicate the First Amendment *at all* because this is a "voluntary" process. But that label does not negate the fact that the BRT has the purpose and effect of deterring certain types of (poorly defined) speech that University administrators classify as "bias incidents." Courts have recognized in a number of different contexts that even so-called "voluntary" policies can violate the First Amendment when they are designed to deter the expression of disfavored speech.

The University's efforts to avoid First Amendment scrutiny of the Statement fare no better. Given the University's history of attempting to ban expression that certain students find offensive, its unilateral changes to its definitions of prohibited student conduct do not moot this case. And the Statement's inclusion of boilerplate language about the importance of free expression cannot save it on the merits; similar language was included in several other speech codes that have been declared unconstitutional. Regardless of any changes to the Statement the University has made in response to this suit, the Court should hold in no uncertain terms that the definitions challenged by Speech First are unconstitutionally overbroad.

1

I. **Speech First is likely to prevail in its First Amendment challenge to the University's use of the Bias Response Team to confront students accused of "Bias Incidents."**

The University's sole defense of the Bias Response Team (at 23) is that "because the BRT process is neither disciplinary nor compulsory, it does not implicate the First Amendment at all." For the same reasons, the University contends (at 14-15) that Speech First lacks standing to challenge the BRT because its members "face no credible threat from a process that is entirely voluntary and cannot result in any adverse action." Those arguments fail at every level.

"[T]he fact that no direct restraint or punishment is imposed upon speech or assembly does not determine the free speech question. Under some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions, or taxes." *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 402 (1950). This Court has already rejected the notion that labeling a speech-restrictive policy as "voluntary" forecloses a First Amendment challenge. In *Doe*, the University claimed that the challenged policy merely led to "voluntary" or "informal" sanctions against students, such as having to apologize or attend a class. *See Doe v. Univ. of Michigan*, 721 F. Supp. 852, 857, 866 (E.D. Mich. 1989) (noting "preference of the University to employ informal mechanisms for mediation and resolution of complaints whenever possible"). This Court squarely rejected that argument, holding that behind any "voluntary" sanction "was, of course, the subtle threat that failure to accept such sanctions might result in a formal hearing." *Id.*

2

Courts have routinely invalidated policies in which speakers with disfavored messages are invited to "cooperate" with the government or "voluntarily" cease certain activities. For example, in *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003), a religious group posted a billboard advertisement displaying biblical verses condemning homosexuality. A local politician sent a letter to the billboard company asking to "establish a dialogue" because many citizens "find this message unnecessarily confrontational and offensive" and "this message … of intolerance … is not welcome in our Borough." *Id.* at 341-42. In an opinion joined by then-Judge Sotomayor, the Second Circuit reversed the dismissal of the plaintiff's claims. Even though there were no explicit threats and the letter merely called for a "dialogue"—and, indeed, the politician lacked regulatory authority over the billboard company—the court held that the letter "could be found to contain an implicit threat of retaliation if [the company] failed to accede to Molinari's requests." *Id.* at 344; *see also Bantam Books v. Sullivan*, 372 U.S. 58, 67-71 (1963) (morality commission that nominally operated through voluntary "cooperation" in fact sought to "achieve the suppression of publications deemed 'objectionable'"); *Playboy v. Meese*, 639 F. Supp. 581, 587 (D.D.C. 1986) (even though responses to pornography commission were voluntary, "the only purpose served by the letter was to discourage distributors from selling the publications; a form of pressure amounting to an administrative restraint of the plaintiffs' First Amendment rights.").

Here, the record makes clear that the BRT mechanism "rest[s] decisively upon disagreement with constitutionally protected ideas …, or upon a desire on [the

3

University's] part to impose on students … a political orthodoxy to which [the University] adhere[s]." *Bd. of Educ., Island Trees Union Free S.D. v. Pico*, 457 U.S. 853, 874 (1982). The University readily concedes that *even protected expression* may result in a report being filed with the BRT and an attempt to confront the student who displayed "bias." *See* Doc. 18-5 at 7 ("A bias incident may involve speech that is protected by the First Amendment."); Opp. Br. 6 (BRT will contact "the student whose conduct triggered the report" if "the reporting student requests it"). Indeed, the BRT mechanism is the paradigm of a *content-based* policy because it is triggered only by certain types of expression (so-called "bias incidents") that the University deems disfavored based on its highly subjective and discretionary standards. *See, e.g., Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.").

Imagine that in the wake of the September 11th attacks, a public university established a "Patriotism Response Team" (PRT) to foster a sufficiently patriotic "campus climate." If a student witnessed anti-American behavior on campus, he or she could file a report and receive counseling and support about how to cope with unpatriotic actions. The PRT would also contact the offending student and offer to facilitate a "voluntary" conversation about why that student's anti-American actions were hurtful to others and how the student could be more patriotic in the future. No one could argue with a straight face that the PRT would not implicate the First

4

Amendment *at all* because of its purportedly "voluntary" nature. It would instead be roundly criticized—and held unconstitutional—for what it actually is: a fundamentally coercive policy designed to deter students from expressing disfavored views.

The University's challenge to Speech First's Article III standing also fails. The University and several student groups have broadly promoted the BRT, and more than 150 reports of "bias" have been filed in the last year alone. *See* Doc. 4-2 Ex. J. And there is no doubt that views such as those held by Students A, B, and C are strongly disfavored on campus. Defendant Schlissel announced that certain political views are equivalent to "hate." Compl. ¶70. University administrators have looked the other way as events have been disrupted and speakers have been shouted down. *Id.* ¶¶72-73. And hundreds of students signed a letter emphasizing that professors, administrators, and fellow students have dismissed their views as racist, sexist, or hateful—the very labels likely to result in a call to the BRT. *Id.* ¶¶75-84. It is hardly speculative to think that views such as those held by Speech First's members could result in an intervention by the BRT to cleanse them of their "bias." Indeed, the Dean of Students carefully hedged in noting that "[t]he incidents reported to the BRT *generally* do not involve the type of debate described by Students A, B and C." Doc. 18-5 at 5 (emphasis added).

Regardless of its merits as a matter of pedagogy, Speech First does not dispute the University's ability to create an organization to "provide support for students who feel aggrieved by perceived bias." Opp. Br. 23. Where the University crosses the line, however, is when that organization seeks to intervene with students to purge them of

5

their alleged "bias" based on utterly subjective and meaningless standards. *Cf. Nat'l Inst. of Family & Life Advocates v. Becerra*, No. 16-1140 (U.S. June 26, 2018) (Kennedy, J., concurring) ("[I]t is not forward thinking to force individuals to 'be an instrument for fostering public adherence to an ideological point of view [they] fin[d] unacceptable.'"). This Court should preliminarily enjoin the BRT from confronting students based on their protected expression.

II. **The University's voluntary cessation does not moot Speech First's challenge to the definitions in The Statement.**

As for the Statement, the University argues (at 9-10) that Speech First's claims are now moot because the University has changed several of the challenged definitions. But a party "'cannot automatically moot a case simply by ending its unlawful conduct once sued,' else it 'could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where [it] left off, repeating this cycle until [it] achieves all [its] unlawful ends.'" *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 n.* (2018). Nearly all of the University's cases (at 9-10) involved legislative changes to a statute or ordinance rather than unilateral action by the defendant. By contrast, the defendant's voluntary cessation of the challenged conduct does not moot a case when—as here— "[t]he promulgation of the [ ] rules appears to be solely within the discretion of the [defendant]" and there is thus "no guarantee that [the defendant] will not change back to its older, stricter Rule as soon as this action terminates." *Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003).

6

Moreover, that the University "defended and continues to defend not only the constitutionality of its prior [ ] harassment policy, but also the need for the former policy" cuts strongly against mootness. *DeJohn v. Temple Univ.*, 537 F.3d 301, 309 (3d Cir. 2008). Far from recognizing the profound flaws with its previous definitions, the University argues that "[e]ven before the University streamlined its definitions, the prohibition on harassing and bullying easily met constitutional standards." Opp. Br. 20. And the fact that the University continued to proscribe protected speech in contravention of *Doe* only underscores the need for renewed judicial supervision.[1]

On the merits, the University repeatedly notes (at 3, 11-12, 21) that the Statement contains language about the importance of free expression. But generalized statements that a university will not "'interfere impermissibly with individuals' right to free speech'" cannot salvage an overbroad and highly subjective anti-harassment policy. *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1183-84 (6th Cir. 1995); *see Doe*, 721 F. Supp. at 856-57 (invalidating speech code even though "[t]he Policy by its terms recognizes that certain speech which might be considered in violation may not be sanctionable").

## CONCLUSION

The court should grant Speech First's motion for a preliminary injunction.

---

[1] Although the University disputes Speech First's Article III standing, the posture of this case is identical in all relevant respects to many other school speech cases that proceeded to a decision on the merits. *See, e.g., DeJohn*, 537 F.3d at 305; *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 203-04 (3d Cir. 2001) (Alito, J.); *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 364-65 (M.D. Pa. 2003).

                                                Respectfully submitted,

                                                By:/s/ John A. Di Giacomo

Dated: June 29, 2018                John A. Di Giacomo (P73056)
                                                REVISION LEGAL, PLLC
                                                5024 Territorial Road
                                                Grand Blanc, MI 48439
                                                (231) 714-0100
                                                john@revisionlegal.com

                                                *Local Counsel*

                                                William S. Consovoy
                                                Jeffrey M. Harris
                                                J. Michael Connolly
                                                CONSOVOY MCCARTHY PARK PLLC
                                                3301 Wilson Boulevard
                                                Suite 700
                                                Arlington, VA 22201
                                                (703) 243-9423

                                                *Counsel for Plaintiff Speech First, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2018, I electronically filed the foregoing with the Clerk of the Court using the ECF system. Pursuant to agreement with Defendants' counsel, an electronic copy of the foregoing was emailed to Defendants' counsel on June 29, 2018.

By: /s/ John A. Di Giacomo

John A. Di Giacomo (P73056)
REVISION LEGAL, PLLC
5024 Territorial Road
Grand Blanc, MI 48439
(231) 714-0100
john@revisionlegal.com