UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SPEECH FIRST, INC.,

       Plaintiff,

v.                                           Civil Case No. 18-11451
                                           Honorable Linda V. Parker

MARK SCHLISSEL, et al.,

       Defendants.
_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

This action reflects a conflict faced by many public universities in their attempt to balance the First Amendment rights of students and the need to provide a safe learning environment free from discrimination and harassment. Speech First, Inc., an organization that seeks to preserve the civil rights of students at colleges and universities, filed this action on behalf of three unidentified students at the University of Michigan ("University") who claim their rights to free speech have been chilled by the University's disciplinary code prohibiting "harassment," "bullying," and "bias-related conduct." Speech First also challenges the University's "Bias Response Team," which it claims is tasked with investigating and punishing students for "bias" conduct. The matter presently is before the

Court on Speech First's motion for preliminary injunction, filed May 11, 2018.

(ECF No. 4.)

In its motion, Speech First seeks an injunction enjoining Defendants,

members of the University's Board of Regents, from:

> (1) taking any actions to investigate, threaten, or punish students for violations of the prohibitions on "harassment," "bullying," and "bias-related misconduct" set forth in the University's Statement of Student Rights and Responsibilities (the "Statement"); and

> (2) using the Bias Response Team to investigate, threaten, or punish students (including informal punishments such as "restorative justice" or "individual education") for "bias incidents."

(*Id*. at Pg ID 82.)  The United States submitted a statement of interest in support of

Speech First's motion on June 11, 2018.  (ECF No. 14.)  After requesting and

receiving an extension of time, Defendants filed a response to the motion for

preliminary injunction on June 15, 2018.  (ECF No. 18.)  Speech First filed a reply

brief on June 29, 2018.  (ECF No. 21.)  The Court held a hearing with respect to

the motion on July 31, 2018.

## I.    Factual and Procedural Background

The University's Statement of Student Rights and Responsibilities

("Statement") "describes possible behaviors which are inconsistent with the values

of the University community[.]"  (Mot., Ex. A(1) at 1, ECF No. 4-2 at Pg ID 125.)

The Statement "outlines procedures to respond to such behaviors," and "suggests

2

possible sanctions/interventions which are intended to educate and to safeguard

members of the University community." (*Id.*)  While the Statement indicates that

the University's standards of conduct "may exceed federal, state, or local

requirements[,] it further indicates that "[s]tudents at the University have the same

rights and protections under the Constitutions of the United States and the State of

Michigan as other citizens." (*Id.* at 1-2, Pg ID 125-26.)  The Statement elaborates:

> These rights include freedom of expression, press, religion, and
> assembly.  The University has a long tradition of student activism and
> values freedom of expression, which includes voicing unpopular
> views and dissent.  As members of the University community,
> students have the right to express their own views, but must also take
> responsibility for according the same right to others.

(*Id.* at 2, Pg ID 126.)

The "Violations" section of the Statement provides a list of behaviors

deemed to "contradict the values of the University community" and which "are

subject to action." (*Id.* at 3, Pg ID 127.)  The list includes "[h]arassing or bullying

another person—physically, verbally, or through other means." (*Id.*)  These terms,

like the remaining "[t]erms associated with Statement violations[,] are not defined

within the Statement." (*See* Pl.'s Mot. Ex. 2(B) at 1, ECF No. 4-2 at Pg ID 141;

*see also id.* Ex. 2(A) at 1-14, Pg ID 124-38.)  The Statement governs behaviors

occurring on University controlled property, at University sponsored events and

programs, and in the city of Ann Arbor. (*Id.* Ex. 2(A) at 4, Pg ID 128.)

3

University students, faculty members, and staff members may file a complaint alleging a violation of the Statement with the University's Office of Student Conflict Resolution ("OSCR").  (*Id.*, at 5, Pg ID 129.)  A Resolution Coordinator ("RC") then investigates the complaint and decides how to respond. (*Id*.)  The Statement identifies the following possible "sanctions/interventions": (A) formal reprimand, (B) disciplinary probation, (C) restitution, (D) restrictions on University employment, (E) enrollment and completion of a class or workshop to help the student understand why the behavior is inappropriate, (F) completion of an educational project, (G) community service, (H) removal or transfer from university housing, (I) removal from specific courses or activities, (J) no contact restrictions, (K) suspension, and (L) expulsion.  (*Id*. at 9-10, Pg ID 133-34.)

OSCR's website, where the Statement is posted, also contains a "Definitions" webpage for terms associated with Statement violations.  (*Id*., Ex. 2(B), ECF No. 4-2 at Pg ID 141.)  This webpage begins: "Terms associated with Statement violations are not defined within the Statement.  The following explanations are provided as examples of various interpretations that exist for terms used in the [Statement]."  (*Id*., emphasis removed.)  When this lawsuit was filed on May 8, 2018, the webpage included definitions for "harassing" and "bullying" from Merriam-Webster Dictionary, University policies, and Michigan

4

law.  (*Id*., Pg ID 146-47.)  The Court recites the dictionary definition, as it is the

one Speech First highlights in support of its First Amendment claim:

> Harassing (http://www.merriam-webster.com/dictionary/harassing):
> (1) to annoy persistently (2) to create an unpleasant or hostile situation
> for, especially by uninvited and unwelcome verbal and physical
> conduct[.]
>
> Bullying (http://www.merriam-webster.com/dictionary/bully): (1) to
> frighten, hurt, or threaten (a smaller weaker person), (2) to act like a
> bully toward (someone), (3) to cause (someone) to do something by
> making threats or insults or by using force, (4) to treat abusively, (5)
> to affect by means of force or coercion[.]

(*Id*. at Pg ID 146.)

Before Speech First filed this lawsuit, the University was reviewing its

websites and policies to ensure they complied with the law.  (Defs.' Resp., Ex. C

¶ 8, ECF No. 18-4 at Pg ID 395.)  On June 11, 2018, the University announced that

it had revised the definitions of "harassing" and "bullying" that appeared on the

OSCR website.  (*Id*. ¶ 9, citing Ex. 1, Pg ID 395, 400; *see also* ECF No. 18-4 at Pg

ID 402-03.)  Specifically, the University eliminated the definitions from the

dictionary and other University policies and left those drawn from Michigan

statutes.  (*Id*. ¶ 10, Pg ID 395, 400.)  The remaining definitions are:

> Harassing: conduct directed toward a person that includes repeated or
> continuing unconsented contact that would cause a reasonable
> individual to suffer substantial emotional distress and that actually
> causes the person to suffer substantial emotional distress. Harassing

does not include constitutionally protected activity or conduct that serves a legitimate purpose.

Bullying: any written, verbal, or physical act, or any electronic communication, directed toward a person that is intended to cause or that a reasonable person would know is likely to cause, and that actually causes, physical harm or substantial emotional distress and thereby adversely affects the ability of another person to participate in or benefit from the University's educational programs or activities. Bullying does not include constitutionally protected activity or conduct that serves a legitimate purpose.

(*Id*. ¶¶ 11, 12, Pg ID 396.)

According to E. Royster Harper, the University's Vice President for Student Life, who oversees the OSCR, the revised definitions were considered and approved by multiple members of the University's leadership, including the President. (*Id.* ¶ 14, Pg ID 396.) Mr. Harper indicates that the earlier definitions had not gone through such review. (*Id.*) Mr. Harper states in his declaration, made under penalty of perjury: "These definitions, and no others, now will govern the initiation and conduct of disciplinary proceedings involving harassing or bullying." (*Id.* ¶ 15, Pg ID 397.) The definitions are now the only ones appearing on the OSCR website. (*Id.*, Ex. 2, ECF No. 18-4 at Pg ID 412-13.)

In April 2018, the University also announced amendments to the Statement to take effect on July 1, 2018. (*Id.* ¶ 16, Pg ID 397; *see also* Pl.'s Mot., Ex. K, ECF No. 4-2 at Pg ID 263-64.), These amendments include the addition of a new

6

"violation" for engaging in the previously-listed prohibited behaviors (i.e.,

behaviors labelled "A" through "U") when "motivated by bias or prejudice":

> V.  Engaging in misconduct as defined in violations "A" through "U"
> motivated by bias or prejudice. This includes behavior motivated on
> the basis of any person's identity as protected by the University of
> Michigan's Nondiscrimination Policy (race, color, national origin,
> age, marital status, sex, sexual orientation, gender identity, gender
> expression, disability, religion, height, weight, or veteran status)
> [201.89-1 and Regents bylaw 14.06]. Sanctions may be enhanced for
> any misconduct listed in sections IV of the Statement of Student
> Rights and Responsibilities that is determined to be motivated on the
> basis of the above classifications. This violation will be evaluated
> under current legal standards.

(Defs.' Mot., Ex. C ¶ 17, ECF No. 18-4 at Pg ID 397; Pl.'s Mot. Ex. 2(K), ECF

No. 4-2 at Pg ID 263-64.)  An amendment to the sanctions section of the Statement

reflects that bias-motivated misconduct will be treated as two separate violations,

evaluated separately in the sanctions/interventions stage: one for the specific act of

misconduct and a second for the bias motivation.  (*Id.*)  The "Definitions" page on

the OSCR's website does not define "bias" or "prejudice."  *See*

https://oscr.umich.edu/article/definitions.

During the 2010-2011 academic year, the University created a Bias

Response Team ("BRT") as an informal resource to support students who believe

they have been affected by incidents of bias, to report them to other campus

resources as appropriate, and to educate the University community regarding bias

issues.  (Defs.' Resp., Ex. D ¶ 2, ECF No. 18-5 at Pg ID 424.)  The BRT is based out of the office of the University's Dean of Students, Laura Blake Jones.  (*Id.* ¶¶ 1, 2, Pg ID 423-24.)  According to Ms. Jones and the BRT webpage on the Dean of Students' website, the BRT is not a disciplinary body; it cannot punish or sanction anyone and does not make a determination whether a reported incident should be considered an instance of "bias."  (*Id.* ¶ 8, Pg ID 424; *see also id.*, Ex. 1 at Pg ID 455.)  Instead, the BRT's role is to listen to students who feel negatively impacted by conduct they perceive as "bias" and to serve as an educational resource.  (*Id.* ¶ 9, Pg ID 425-26.)

Ms. Jones explains that the webpage for the BRT on the Dean of Students' website provides an intentionally broad description of a "bias incident" because the BRT is focused on providing support for students who need it, rather than punishing anyone or proving anything.  (*Id.* ¶ 11, Pg ID 426.)  "It is an invitation to students who feel impacted by what they consider to be bias to seek support from professionals who are equipped to help them should the students voluntarily wish to do so."  (*Id.*)  The Dean of Students' website explains that "[b]ias often stems from fear, misunderstanding, hatred, and stereotypes and may be intentional or unintentional."  (Ex. F at Pg ID 4-2 at Pg ID 169.)  The website also states: "Bias incidents may involve conduct that does not violate any law or university policy,"

8

although some cases "do involve conduct that may violate federal, state, or local laws or U-M policies."  (Ex. 2 ¶ 13, citing Ex. 1, Pg ID 427, 454.)  According to Ms. Jones, when the conduct is deemed unlawful or in violation of University policies, the BRT may discuss appropriate referrals with the student reporting the incident.  (*Id.* ¶ 13.)

In an affidavit attached to Defendants' response brief, Evelyn Galvan, one of the two Bias Incident Prevention and Response Team Coordinators on the BRT, describes how a report to the BRT is handled.  (Defs.' Resp. Ex. B, ECF No. 18-3.) As Ms. Galvan describes, when received, a report is entered on the Bias Incident Log, which the Interim Dean of Students, Dr. Julio Cardona, and Ms. Jones review before it is published.  (*Id.* ¶ 4, ECF No. 387.)  No determination is made as to whether the conduct described is a "bias incident" or not, all reports are logged. (*Id.*)

Ms. Galvan then determines whether the incident falls within the purview of University Housing (e.g., a roommate dispute) or the Office for Institutional Equity (i.e. incidents between employees).  (*Id.* ¶ 5.)  In those instances, the report is referred to a BRT member from one of those offices to address it through the unit's internal procedures.  (*Id.*)  Ms. Galvan handles the remaining incidents.  (*Id.*)

Ms. Galvan first tries to reach out to the person who made the report and will meet with that person, if he or she is willing. (*Id*. ¶ 6, at Pg ID 387-88.) In that meeting, Ms. Galvan discusses the experience that prompted the report and the support the University offers, which may include:

> educating the reporter on healthy coping mechanisms in the face of bias or how to listen and respond to people with different views; safety planning; discussions about free speech law; a referral to Counseling and Psychological Services ("CAPS"); introductions to relevant student groups; or brainstorming on how to find a mentor or support network.

(*Id*. ¶ 7, Pg ID 388.) If the reporter is interested in utilizing OSCR's ACR pathways program, or if it seems like an appropriate resource, Ms. Galvan explains the program and will facilitate an introduction to the individual who oversees it. (*Id*. ¶ 8, Pg ID 388.) If Ms. Galvan or the reporter believes the incident violates the Statement, Ms. Galvan will discuss the possibility of the reporter making a report to OSCR. (*Id*. ¶ 9, Pg ID 388.)

Ms. Galvan will reach out via email to the person whose conduct is reported if the reporter wants her to do so, although this does not occur in the majority of cases. (*Id*. ¶ 11, Pg ID 389.) In her email, Ms. Galvan invites the person to meet with her to discuss the report. (*Id*.) Ms. Galvan states that a response to her request is entirely voluntary (although it is not clear whether this is expressed in

her email) and that many of the people who she emails decline to meet.  (*Id*.)  In that case, she does not follow up with the individual.  (*Id*.)

The University also is running a campaign called "Expect Respect," which it describes as "an educational initiative that includes annual proactive programming aimed at supporting a campus climate in which all persons are treated with respect."  *See* http://expectrespect.umich.edu.  Speech First quotes definitions of "bias" and "harassment" found on the "Definitions" page of the Expect Respect website, to demonstrate the overbreadth of the University's policies.  (Pl.'s Br. in Supp. of Mot. at 7, ECF No. 4 at Pg ID 96.)  On that webpage, "bias" is defined as "a pre-formed negative opinion or attitude toward a group of persons who possess common physical characteristics, such as skin color; or cultural experiences, such as religion or national origin."  (Pl.'s Mot., Ex. E, ECF No. 4-2 at Pg ID 164.)  "Harassment" is defined as "unwanted negative attention perceived as intimidating, demeaning or bothersome to an individual."  (*Id.* at Pg ID 165.)  The following appears at the top of the webpage:

> Below are definitions of terms that are commonly used in conversations about creating a safe and respectful climate, as adopted by the University of Michigan.  **These definitions, however, should not be interpreted as legal definitions used to determine if a violation of law has occurred.**

11

(*Id*. at Pg ID 164, emphasis in original.)  The definitions page no longer appears on the website.

According to Speech First's President, the organization has several members who are current students at the University who feel that they cannot openly and vigorously debate and discuss a wide array of often-controversial topics without running afoul of the University's harassment and bullying policies.  (Pl.'s Mot., Ex. 1 ¶¶ 3, 7-8, ECF No. 401 at Pg ID 117-18.)  The Complaint describes three of these students: which it identifies as "Student A", "Student B", and "Student C." The topics these students wish to debate and discuss include, but are not limited to: (a) support for gun rights, President Trump, the border wall, and the right of "highly unpopular speaker[s]" to lecture on campus; (b) opposition to illegal immigration, abortion, affirmative action, and having children outside of marriage; and (c) criticism of the Black Lives Matter and "gender identity" movements, welfare, affirmative action, and Title IX.  (Compl. ¶¶ 87-124.)  According to the Complaint, these students "credibly fear" that they will be reported to the BRT or OSCR if they attempt to discuss or debate these topics.  (*Id*.)

## II.    Preliminary Injunction Standard

A district court must balance four criteria in deciding whether to issue a preliminary injunction:

"(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction."

*Bailey v. Callaghan*, 715 F.3d 956, 958 (6th Cir. 2013) (quoting *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011)) (brackets omitted). "'When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits will often be the determinative factor.'" *Id.* (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)).

## III.   Likelihood of Success on the Merits

Defendants first argue that Speech First is not likely to prevail on the merits of its claims because it lacks standing and its challenges are moot. While Defendants also argue that the University's current policies are constitutional, the Court lacks jurisdiction to reach those arguments if Speech First lacks standing or its claims are moot. *See Assoc. Builders & Contractors v. Perry*, 16 F.3d 688, 693 (6th Cir. 1994); *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 464-65 (6th Cir. 1997) (Moore, J., dissenting) (explaining that the court is without jurisdiction to consider the merits when Article III standing is lacking or a case has become moot).

### A.     Speech First's Standing

In response to Speech First's motion, Defendants assert that Speech First

lacks standing to pursue this action.

Under the doctrine of associational standing, an organization like Speech

First has standing if the following three requirements are satisfied:

> "(a) its members would otherwise have standing to sue in their own
> right; (b) the interests it seeks to protect are germane to the
> organization's purpose; and (c) neither the claim asserted nor the
> relief requested requires the participation of individual members in the
> lawsuit."

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*,

477 U.S. 274, 282 (1986) (quoting *Hunt v. Washington State Apple Advert.*

*Comm'n*, 432 U.S. 333, 343 (1977)).  Defendants challenge the satisfaction of the

first requirement—that is, the standing of Speech First's members, Students A, B,

and C.

The Supreme Court has identified the following elements necessary to

establish standing:

> First, [the p]laintiff must have suffered an injury in fact—an invasion
> of a legally-protected interest which is (a) concrete and particularized;
> and (b) actual or imminent, not conjectural or hypothetical.  Second,
> there must be a causal connection between the injury and the conduct
> complained of—the injury has to be fairly traceable to the challenged
> action of the defendant, and not the result of the independent action of
> some third party not before the court.  Third, it must be likely, as

14

opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife ("Lujan II")*, 504 U.S. 555, 560-61 (1992) (internal citations and quotation marks omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id*. at 561.

Defendants argue that Speech First "lacks standing to challenge the University's prohibitions of 'bullying' or 'harassing[]' because there is no credible threat that Students A, B, or C will face disciplinary action for expressing their opinions." (Defs.' Resp. Br. at 11, ECF No. 18 at Pg ID 354.) Defendants point to the Statement's emphasis that the University's "central purpose" is to "promote vigorous discourse" and that it is committed to "freedom of expression, which includes voicing unpopular views and dissent." Defendants contend that "[t]here is no credible threat" that the University would punish students for speaking openly about the matters these students wish to express. In fact, Defendants maintain, "the record demonstrates that the University has embraced student groups and publications who have expressed many of the same positions that Students A, B, and C wish to espouse, without any threat of sanction." (*Id*. at 13, Pg ID 356.) Defendants point out that Speech First does not cite a single instance in which a student faced discipline for the expression of such views.

With respect to the BRT, Defendants argue that Speech First lacks standing "because the BRT poses no credible threat to any student." (*Id*. at 14, Pg ID 357.) Defendants indicate that the BRT neither makes findings nor metes out discipline. Instead, its focus is providing support for members of the University community who feel that they are the victim of a biased incident. Defendants represent that the BRT rarely becomes involved with the individual(s) whose conduct triggered the report, and that any participation is then voluntary.

Speech First asserts a facial—as opposed to an as-applied challenge—to the University's "bullying" and "harassing" policies. In that instance, there is an exception to the general standing rules. "It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 129 (1992) (citing *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798-99, n.15 (1984); *Bd. of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987)). As the Supreme Court explained in *Forsyth County*: "[t]his exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court." *Id*. (citing *New York v. Ferber*,

458 U.S. 747, 772 (1982); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1985)).

As to the University's "bullying" and "harassing" prohibitions, even if the University is not likely to punish Students A, B, or C for speaking about the varying issues important to them, it cannot be said that students speaking about other matters might not be subject to punishment despite the fact that their speech is protected by the First Amendment.  In fact, when questioned at the motion hearing, counsel for Defendants indicated that there were sixteen disciplinary cases involving "bullying" or "harassing" misconduct from 2016-2018.  The policy's alleged overbreadth means that members of the University cannot pre-determine what matters of speech may or may not subject them to punishment.  In that instance, Supreme Court precedent dictates that Speech First—on behalf of Students A, B, and C—has standing to challenge the University's policies.[1]  *See Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980) ("Given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court.").

---

[1] Defendants do not challenge Speech First's ability to satisfy the remaining elements for associational standing.

While the overbreadth doctrine may allow Speech First to bring this lawsuit even if the University's policies do not infringe the First Amendment rights of Students A, B, and C, specifically, Speech First still must satisfy the remaining core Article III standing requirements. *Savage v. Gee*, 665 F.3d 732, 740 (6th Cir. 2012); *Jones v. Coleman*, 848 F.3d 744, 749 (6th Cir. 2017). As the Sixth Circuit has explained:

> While the doctrines of overbreadth and vagueness provide an exception to the traditional rules of standing and allow parties not yet affected by a statute to bring actions under the First Amendment based on a belief that a policy is so broad or unclear that it will have a chilling effect, *Coates v. City of Cincinnati*, 402 U.S. 611, 619-20, 91 S. Ct. 1686, 29 L.Ed.2d 214 (1971); *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995), "allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408, U.S. 1, 13-14, 92 S. Ct. 2318, 33 L.Ed.2d 154 (1972). "In order to have standing … a litigant alleging chill must still establish that a concrete harm—i.e., enforcement of a challenged statute—occurred or is imminent." *Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602, 610 (6th Cir. 2008) (citation omitted); *accord Prima Media, Inc.[v. City of Brentwood*, 485 F.3d 343, 350 (6th Cir. 2007)] ("Because overbreadth creates an exception only to the prudential standing inquiry, the Supreme Court has made clear that the injury in fact requirement still applies to overbreadth claims under the First Amendment.").

*Savage*, 665 F.3d at 740; *see also Jones*, 848 F.3d at 749 (quoting *Laird*, 408 U.S. at 13-14) ("[T]he Supreme Court has repeatedly held that individuals or groups need not wait to be prosecuted for the exercise of First Amendment rights before

18

they can bring a lawsuit, *provided* there is a "claim of specific present objective harm or a threat of specific future harm.") (emphasis added).

Speech First establishes a concrete and objective threat of harm in connection with the Statement's prohibited conduct.  Speech First alleges, and Defendants do not deny, that students engaged in "bullying" and "harassing" behavior can be and have been punished through OSCR proceedings.  Speech First, however, fails to demonstrate that the BRT poses anything but a "subjective chill" on students' free speech rights.

Speech First asserts in its Complaint that the BRT "is tasked with investigating and punishing" individuals who engage in biased behavior.  (Compl. ¶ 4, ECF No. 1 at Pg ID 3.)  Speech First further asserts that a student engaged in such conduct "may receive a knock on the door from a team of University officials threatening to refer the student to formal disciplinary authorities unless he or she submits to 'restorative justice,' 'individual education,' or 'unconscious bias training.'"  (*Id*.)  According to Speech First, the BRT "conducts a full investigation" when it receives a report of "bias" and "will confront the student or students whose speech was deemed to be 'biased.'"  (*Id*. ¶ 46, Pg ID 14.)  Speech First alleges that the BRT "has … imposed various forms of punishment on students whose speech purportedly expressed bias . . .."  (*Id*. ¶ 55, Pg ID 16.)

When a preliminary injunction is sought, however, a plaintiff's burden to demonstrate standing "will normally be no less than that required on a motion for summary judgment." *Lujan v. Nat'l Wildlife Fed'n ("Lujan I")*, 497 U.S. 871, 907 n. 8 (1990).  Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot "rest on such 'mere allegations,' [as would be appropriate at the pleading stage] but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Lujan II*, 504 U.S. at 561 (internal citation omitted).  Speech First has presented no evidence to support the above allegations.

In fact, the record evidence reflects that the BRT neither investigates reports of "bias" nor has the authority to mete out any form of punishment for "bias" or "bias conduct."  It is not a disciplinary body and cannot punish or sanction anyone. On those occasions where the BRT contacts the person whose conduct is the subject of a report (which occurs in a minority of cases), the person's response or willingness to become involved in discussions is voluntary.  This is stated on the homepage of the BRT's website: "The BRT cannot impose discipline and no one is required to participate in any aspect of the BRT's work."  *See* https://deanofstudents.umich.edu/bias-incidents.  As the webpage also states: "if you wish, the person alleged to be responsible for the incident *may* be contacted

20

and invited to *voluntarily* meet with a member of the BRT.  Such a meeting *cannot be compelled*, however.  *Id*., emphasis added.

According to BRT Coordinator Galvan, in most cases, she does not contact the subject of a report.  (Defs.' Resp., Ex. B ¶ 11, ECF No. 18-3 at Pg ID 389.)  In only one case where she reached out to the subject did the individual agree to meet. (*Id*. ¶ 13, Pg ID 390.)  In the remaining cases where the individual declined to meet, Ms. Galvan did not follow up with the individual.  (*Id*. ¶ 11, Pg ID 389.)

Speech First nevertheless argues that this type of "voluntary" response still has a coercive effect on the exercise of First Amendment rights by members of the University community.  Speech First contends that "'[u]nder some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions, or taxes.'" (Pl.'s Reply Br. at 2, quoting *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 402 (1950).)  Counsel for Speech First argued at the motion hearing that fear of being approached by a university official about one's speech in itself chills speech. Counsel argued that the threat posed by the BRT is similar to that posed in the 1980's pornography cases it has cited.  Those cases are inapposite, however.

Specifically, the courts in the cases cited by Speech First found implicit threats of sanctions or retaliation if there was a refusal to engage in the voluntary

and informal resolution mechanisms offered.  For example, in *Doe v. University of Michigan*, 721 F. Supp. 852 (E.D. Mich. 1989), the challenged policy stated a preference for the university "to employ informal mechanisms for mediation and resolution of complaints whenever possible[.]"  *Id*. at 857.  Nevertheless, the court found that "[b]ehind this persuasion was … the subtle threat that failure to accept such sanctions might result in a formal hearing."  *Id*. at 866.  The policy at issue in *Doe* provided for a range of sanctions, from formal reprimand to expulsion.  *Id.* at 857.

In *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003), the court concluded that a reasonable juror could find a city borough president's letter to a billboard company to be threatening some form of punishment or adverse regulatory action and therefore an unconstitutional infringement of the plaintiff's free speech rights. *Id.* at 344.  In *Okwedy*, a religious organization contracted with the billboard company to post billboards denouncing homosexuality in or near neighborhoods containing a significant number of gay and lesbian residents.  *Id*. at 340.  The billboards did not identify the sponsor of the message.  *Id.* at 341.

When controversy ensued concerning the message on the billboards, the borough's president sent a letter to the billboard company, on city letterhead, requesting "a dialogue with [the company] and the sponsor as quickly as possible"

22

and stating that "many members of the Staten Island community, myself included, find this message unnecessarily confrontational and offensive."  The borough president concluded the letter, writing:

> [The billboard company] owns a number of billboards on Staten Island and derives substantial economic benefits from them.  I call on you as a responsible member of the business community to please contact Daniel L. Master, my legal counsel and Chair of my Anti-Bias Task Force … to discuss further the issues I have raised in this letter.

*Id*. at 342.  Later that day, the billboard company removed the plaintiff's signs. The Second Circuit concluded that the letter could be interpreted as containing an implicit threat of retaliation if the billboard company did not remove the plaintiff's signs, even if the borough president lacked direct regulatory or decisionmaking authority.  *Id*. at 344.

Similarly, the Supreme Court concluded that the plaintiff had standing in *Bantam Books v. Sullivan*, 372 U.S. 58 (1963), based on the lower court's finding that vendors complied with the Rhode Island Commission to Encourage Morality out of fear of criminal prosecution.  *Id*. at 68-69.  The Court wrote:

> People do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around, and [one distributor]'s reaction [i.e., stopping further circulation of the books the Commission found "objectionable"], according to uncontroverted testimony, was no exception to this general rule.  The Commission's notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations, in fact stopped the circulation of the

> listed publications ex proprio vigore.  It would be naïve to credit the
> State's assertion that these blacklists are in the nature of mere legal
> advice, when they plainly serve as instruments of regulation
> independent of the laws against obscenity.

*Id.* (footnote omitted).  In the present matter, in comparison, there is no evidence of

any "thinly veiled threat[]" from the BRT to individuals reported to have engaged

in "biased" conduct.

While Speech First also cites *Playboy v. Meese*, 639 F. Supp. 581 (D.D.C.

1986), this Court finds the decision in the subsequent appeal of that decision more

instructive:  *Penthouse International, Ltd. v. Meese*, 939 F.2d 1011 (D.C. Cir.

1991).  In that case, the United States Attorney General and members of his

Commission on Pornography, sent letters to distributors of adult magazines

indicating that, if they failed to respond to allegations that they were selling

pornography, the accusations would be included in the commission's final report.

*Penthouse Int'l*, 939 F.2d at 1012-13.  Distinguishing *Bantam Books*, the Court of

Appeals for the D.C. Circuit indicated that the commission "had no equivalent tie

to prosecutorial power nor authority to censor publications.  The letter it sent

contained no threat to prosecute, nor intimation of intent to proscribe the

distribution of the publications."  *Penthouse Int'l*, 939 F.2d at 1015.  The court

further found no evidence that the "Commission ever threatened to use the

coercive power of the state against recipients of the letter."  *Id.*

The court found no First Amendment violation, reasoning that "the Supreme Court has never found a government abridgement of First Amendment rights in the absence of some actual or threatened imposition of governmental power or sanction."  *Id.* (citing *Meese v. Keene*, 481 U.S. 465, 480-83 (1987); *Laird v. Tatum*, 408 U.S. 1, 11 (1972)).  The court further reasoned:

> We do not see why government officials may not vigorously criticize a publication for any reason they wish.  As part of the duties of their office, these officials surely must be expected to be free to speak out to criticize practices, even in a condemnatory fashion, that they might not have the statutory or even constitutional authority to regulate.  *Cf. Reuber v. United States*, 750 F.2d 1039, 1059 (D.C. Cir. 1984) (a government actor may openly criticize a study produced by an employee so long as no job-threatening sanction is employed).  If the First Amendment were thought to be violated any time a private citizen's speech or writings were criticized by a government official, those officials might be virtually immobilized.

*Penthouse Int'l*, 939 F.2d at 1015-16.  The court continued:

> At least when the government threatens no sanction—criminal or otherwise—we very much doubt that the government's criticism or effort to embarrass the distributor threatens anyone's First Amendment rights.  "We know of no case in which the first amendment has been held to be implicated by governmental action consisting of no more than governmental criticism of the speech's content."

*Id*. at 1016 (quoting *Block v. Meese*, 793 F.2d 1303, 1313 (D.C. Cir. 1986)).

The evidence in the present matter similarly reflects no threats—direct, subtle, or implied—from the BRT.  As indicated, the BRT website expressly states

that it lacks the authority to impose discipline and that no one is required to participate in any aspect of its work and cannot be compelled to meet.  Speech First presents no evidence of any communication from the BRT to an individual reported to have engaged in "bias" or "biased conduct" conveying something different—more specifically, pressure or an intimation that some form of punishment or adverse action will follow the failure to accede the BRT's requests.

The evidence does not even reflect an instance where the BRT criticized the speech of an individual who is reported to have engaged in biased conduct.  But even if the record reflected that the BRT had criticized an individual's speech, there would be no First Amendment violation "in the absence of some actual or threatened imposition of governmental power or sanction."  *Penthouse Int'l*, 939 F.2d at 1015.  The Court agrees with defense counsel's assertion at the motion hearing that a university should be able to address a student when his or her speech may offend or hurt other students without running afoul of the First Amendment. As counsel stated:

> That's education.  That's what a professor should do.  That's what the university should do when someone comes to a body that's created in order to promote respect and understanding on the campus.  Respect and understanding are not enemies of the First Amendment ....
> Respect is a condition for effective speech.  Understanding is the goal of speech.

In short, Speech First fails to demonstrate that the BRT poses a concrete or objective threat of harm to the First Amendment rights of University students.  The Court therefore holds that Speech First fails to demonstrate the injury-in-fact necessary to establish Article III standing with respect to its challenge to the BRT.

**B.      Whether Plaintiff's Challenge to the University's Policy Regarding "Harassing," "Bullying," and "Bias-Related" Conduct are Moot**

Defendants argue that Speech First's claims are moot in light of the University's elimination of the challenged definitions for "harassing" and "bullying" conduct, leaving definitions based only on Michigan statutes which Speech First does not challenge.  Speech First argues in reply that the University's unilateral changes to its definitions do not moot the case and that the changes do not impact Speech First's challenges with respect to the BRT.

Article III of the United States Constitution restricts the power of federal courts to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  A case and controversy no longer exist, and the matter "is moot[,] when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969).

"[A]s a general rule, 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not

make the case moot.'" *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979)

(quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)); *Friends of*

*the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 708 (2000) (quoting

*City of Mesquite v. Alladin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).  " 'If it did,

the courts would be compelled to leave the defendant free to return to his old

way.'"  *Id.* (brackets and ellipsis omitted) (quoting *City of Mesquite*, 455 U.S. at

289 n.10).  Nevertheless, the Supreme Court has held that a case does become

moot if:

> (1) it can be said with assurance that there is no reasonable
> expectation that the alleged violation will recur, and
>
> (2) interim relief or events have completely and irrevocably eradicated
> the effects of the alleged violation.
>
> When both conditions are satisfied it may be said that the case is moot
> because neither party has a legally cognizable interest in the final
> determination of the underlying questions of fact and law.

*Davis*, 440 U.S. at 631 (internal citations, ellipsis, and quotation marks omitted).

The burden of proving that a matter has become moot falls upon the party

claiming mootness—a burden which the Supreme Court has described as "a heavy

one."  *Id.* (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)); *see*

*also Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 531 (6th Cir.

2001).  The Sixth Circuit, however, views the voluntary cessation of allegedly

28

illegal conduct by governmental actors "with more solicitude" than similar conduct by private parties. *Ammex, Inc. v. Cox*, 351 F.3d 697, 705 (6th Cir. 2003) (citing *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990)); *see also Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981-82 (6th Cir. 2012) (citation omitted) (indicating that the *Friends of the Earth* standard applies where a private defendant is involved, but the court "place[s] greater stock in [government officials'] acts of self-correction, so long as they appear genuine"). Under either standard, this Court finds that Defendants have met their burden of demonstrating mootness with respect to the University's "bullying" and "harassment" policies.

First, the University removed the objected to definitions of "bullying" and "harassing" within a month of Speech First's initiation of this lawsuit. The revisions were the product of a review started before the action was filed to ensure the University's website and policies complied with First Amendment principles and the University's legal obligations. Unlike the previous definitions challenged by Speech First, the revisions were considered and approved by multiple members of the University's leadership, including the President. The changes were announced to the University community.

Second, the University has not defended to any degree the constitutionality of the previous definitions. And, the University represents in a statement made

under penalty of perjury that the revised definitions, and no others, will govern the initiation and conduct of disciplinary proceedings involving "harassing" and "bullying" behavior.  Speech First insinuates that the University routinely adopts policies that infringe the First Amendment rights of its students, referencing *Doe v. University of Michigan*, 721 F. Supp. 852,.  However, the fact that the University adopted a policy *thirty years ago* that was immediately overturned, does not persuade this Court that it is likely to reverse course once this lawsuit terminates. Nothing suggests that the University will resume using the challenged definitions once this litigation terminates.

The OSCR website does not define "bias" or "prejudice."  *See* https://oscr.umich.edu/article/definitions.  Thus, Speech First may maintain that the allegedly overbroad definitions of those terms, which still appear on other University materials, could be used to define such prohibited conduct. Nevertheless, a violation of the Statement occurs only if the "bias" or "prejudice" motivates other prohibited conduct.  This requirement prevents the prohibited conduct from being interpreted in an unconstitutionally overbroad manner.

The University's conduct after this lawsuit was filed "ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to

recur." As such, the Court finds Speech First's constitutional challenge to the University's previous "bullying" and "harassing" definitions to be moot.

## IV.    Irreparable Harm to Speech First and Others

Speech First argues that it and its members will suffer irreparable harm absent a preliminary injunction because "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (Pl.'s Br. in Supp. of Mot. at 24, ECF No. 4 at Pg ID 113, quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976).) The University's removal of the challenged "bullying" and "harassing" definitions, however, removes the threat to students' free speech rights. Speech First does not argue that the remaining definitions, which are based on Michigan statutes, are overbroad or otherwise unconstitutional. In fact, Michigan state and federal courts have upheld the constitutionality of those statutes. *See People v. White*, 536 N.W.2d 876, 883, 884 (Mich. Ct. App. 1995) (holding that the definition of "harassment" in Michigan Compiled Laws § 750.411i(d) is not vague or overbroad); *Staley v. Jones*, 239 F.3d 769, 787, 792-93 (6th Cir. 2001) (finding the *White* court's conclusions to be reasonable); *Glowacki ex rel. D.K.G. v. Howell Pub. Sch. Dist.*, No. 2013 WL 3148272, at *12 (E.D. Mich. June 19, 2013) (upholding definition of "bullying" found in Michigan Compiled Laws § 380.1310b(1)(b)).

31

As discussed above, there is no credible fear of punishment from the BRT, and thus there is no harm to students' rights if its actions are not enjoined.

On the other hand, the Sixth Circuit has found that enjoining a university's harassment policies may cause harm to students because they "may be forced to endure a hostile learning environment and may be intimidated into remaining silent." *Bonnell v. Lorenzo*, 241 F.3d 800, 826 (2001). Speech First's counsel acknowledged at the motion hearing that a university must do all it can to promote respect among students. Further, as the *Bonnell* court found, enjoining such policies harm the public's interest "in knowing that such goings on are properly investigated and not allowed to continue in any given arena." *Id.*

Thus, the Court finds that the second, third, and fourth preliminary injunction factors also weigh against the issuance of injunctive relief.

## V.    Conclusion

For these reasons, the Court is **DENYING** Speech First's motion for a preliminary injunction.

**IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: August 6, 2018

32

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, August 6, 2018, by electronic and/or U.S. First Class mail.

s/ R. Loury
Case Manager