### UNITED STATES COURT OF APPEALS
#### FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  September 23, 2019

Mr. Kevin T. Baine
Mr. Stephen Joseph Fuzesi
Ms. Kathryn Elizabeth Hoover
Mr. Amy Beth McKinlay
Williams & Connolly
725 Twelfth Street, N.W.
Washington, DC 20005

Mr. William Spencer Consovoy
Mr. Jeffrey Matthew Harris
Consovoy McCarthy
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209

Mr. Lawrence John Joseph
1250 Connecticut Avenue, N.W
Suite 700-1A
Washington, DC 20036

Mr. Thomas W. Kidd Jr.
8913 Cincinnati-Dayton Road
West Chester, OH 45069-3131

Mr. Leonard M. Niehoff
Honigman
315 E. Eisenhower Parkway, Suite 100
Ann Arbor, MI 48108

Re:  Case No. 18-1917, *Speech First, Inc. v. Mark Schlissel, et al*
      Originating Case No. : 4:18-cv-11451

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0249p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

SPEECH FIRST, INC.,

*Plaintiff-Appellant*,

*v.*

MARK SCHLISSEL, in his official capacity as President
of the University of Michigan, et al.,

*Defendants-Appellees*.

No. 18-1917

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:18-cv-11451—Linda V. Parker, District Judge.

Argued: May 2, 2019

Decided and Filed: September 23, 2019

Before: COOK, McKEAGUE, and WHITE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** William S. Consovoy, CONSOVOY MCCARTHY PARK PLLC, Arlington, Virginia, for Appellant. Kevin T. Baine, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Appellees. **ON BRIEF:** William S. Consovoy, Jeffrey M. Harris, CONSOVOY MCCARTHY PARK PLLC, Arlington, Virginia, for Appellant. Kevin T. Baine, Stephen J. Fuzesi, Kathryn "Kylie" Hoover, Amy B. McKinlay, WILLIAMS & CONNOLLY LLP, Washington, D.C., Leonard M. Niehoff, HONIGMAN MILLER SCHWARTZ AND COHN LLP, Ann Arbor, Michigan, for Appellees. Thomas W. Kidd, Jr., KIDD & URLING LLC, West Chester, Ohio, Lawrence J. Joseph, Washington, D.C., for Amici Curiae.

McKEAGUE, J., delivered the opinion of the court in which COOK, J., joined. WHITE, J. (pp. 16–23), delivered a separate dissenting opinion.

—————————————

## OPINION

—————————————

McKEAGUE, Circuit Judge.   Universities have historically been fierce guardians of intellectual debate and free speech, providing an environment where students can voice ideas and opinions without fear of repercussion.   According to Speech First, the University of Michigan has not lived up to this historic ideal.   Instead, Speech First contends that the University of Michigan has stifled student speech through its policy prohibiting bullying and harassing behavior and its Bias Response Team initiative.   Speech First claims that the policy and initiative violate the First Amendment, sweeping in protected speech through overbroad and vague prohibitions.

Shortly after filing its complaint, Speech First moved for a preliminary injunction enjoining enforcement of the policy and use of the initiative.   The district court declined to issue the preliminary injunction, based in part on its findings that Speech First lacked standing to challenge the Bias Response Team initiative and that the claims challenging the policy were moot.   We disagree.   Accordingly, for the reasons set forth below, we vacate the district court's denial of injunctive relief and remand the case for the district court to consider the merits of Speech First's motion for a preliminary injunction.

## I.

Speech First first challenges the University of Michigan's policy prohibiting harassing and bullying behavior.   The Statement of Student Rights and Responsibilities (the Statement) contains the University's policies.   The Statement prohibits, among other things, "[h]arassing or bullying another person—physically, verbally, or through other means." Punishments for violating the Statement—called "interventions" and "sanctions"—range from a formal reprimand to expulsion.   Speech First does not challenge the prohibition of harassing or bullying behavior itself.   Rather, Speech First argues that one set of the University's definitions of "bullying" and "harassing" behavior is overbroad and vague, sweeping in protected speech.

Although "harassing" and "bullying" are not defined in the Statement, the Office of Student Conflict Resolution (OSCR)—which investigates alleged violations of the Statement—defines both terms on its website. The definitions page was changed shortly after Speech First filed its complaint. Prior to this litigation, however, the website page included definitions from three sources: the Merriam-Webster Dictionary, University policies, and Michigan state law. Speech First challenges only the Merriam-Webster Dictionary definitions. The dictionary definitions were:

> Harassing (http://www.merriam-webster.com/dictionary/harassing): (1) to annoy persistently (2) to create an unpleasant or hostile situation for, especially by uninvited and unwelcome verbal and physical conduct[.]

> Bullying (http://www.merriam-webster.com/dictionary/bully): (1) to frighten, hurt, or threaten (a smaller weaker person), (2) to act like a bully toward (someone), (3) to cause (someone) to do something by making threats or insults or by using force, (4) to treat abusively, (5) to affect by means of force or coercion[.]

After this lawsuit was filed, the University removed these definitions and the definitions taken from University policies, leaving only the definitions derived from Michigan state law, which Speech First does not contend are unconstitutional.

Speech First also challenges the University's Bias Response Team (Response Team) initiative, which responds to student-reported "bias incidents." The Response Team's page on the University's website defines a "bias incident" as "conduct that discriminates, stereotypes, excludes, harasses or harms anyone in our community based on their identity (such as race, color, ethnicity, national origin, sex, gender identity or expression, sexual orientation, disability, age, or religion)." Causing a bias incident is not punishable under the Statement, unless the conduct that caused the bias incident violated some policy in the Statement. Speech First contends, however, that the term "bias incident" is overbroad and that the Response Team's practices in responding to bias incidents intimidate students, quashing their speech.

The Response Team acts as an "informal resource to support students who feel they have experienced bias in the University community, to refer them to other campus resources as appropriate, and to educate the University community with respect to issues related to bias." The Response Team acts when someone files a report indicating that he or she has experienced a bias

incident. It does not make determinations about whether reported conduct is a bias incident and follows a similar procedure following each report. After a report is filed, a Response Team member contacts the individual who filed the report to "discuss what happened and offer support and assistance." If the reporting individual wishes, "the person alleged to be responsible for the incident may be contacted and invited to voluntarily meet with a member of the [Response Team]. Such a meeting cannot be compelled, however." Additionally, the Response Team maintains a log of reported bias incidents containing "general information on the type of conduct that is being reported, where the conduct is occurring, and what actions have been taken to address the reported incidents." The log is posted on a publicly available website page and the events are anonymized. The Response Team has no direct punitive authority—it cannot, for example, suspend a student or impose academic sanctions. It can, however, make referrals to police, OSCR, or other school resources such as counselling services.

Speech First is a freedom-of-speech advocacy organization with members who attend the University. After filing its complaint, Speech First moved for a preliminary injunction enjoining the University from:

> (1) taking any actions to investigate, threaten, or punish students for violations of the prohibitions on "harassment," "bullying," and "bias-related misconduct" set forth in the University's Statement of Student Rights and Responsibilities . . . and

> (2) using the Bias Response Team to investigate, threaten, or punish students (including informal punishments such as "restorative justice" or "individual education") for "bias incidents."

The district court denied Speech First's motion.

## II.

Courts consider four factors when ruling on a motion seeking a preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits;
> [(2)] whether the movant would suffer irreparable injury without the injunction;
> (3) whether issuance of the injunction would cause substantial harm to others; and
> (4) whether the public interest would be served by the issuance of the injunction.

*Bailey v. Callaghan*, 715 F.3d 956, 958 (6th Cir. 2013) (quoting *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011)). We review the district court's determination of

the likelihood of success on the merits de novo. *Hunter*, 635 F.3d at 233. The "ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief is reviewed for abuse of discretion. This standard of review is 'highly deferential' to the district court's decision." *Id.* (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540–41 (6th Cir. 2007)).

The district court concluded that Speech First was not likely to succeed on the merits of its claim against the Response Team because Speech First lacked standing to assert that claim. We disagree. Speech First does not allege that the University has violated Speech First's constitutional rights. Rather, Speech First asserts that the University violated the rights of its members who attend the University and, therefore, that it has associational standing to bring a lawsuit on behalf of those members. An association has standing to bring a suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 282 (1986) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). It is the first requirement—that the association's members would have standing to sue in their own right—that is at issue here.

Relevant here, for litigants to have standing to sue in their own right, they "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). "The party invoking federal jurisdiction bears the burden of establishing" injury-in-fact. *Id.* at 561.

The injury-in-fact requirement means that litigants will have standing to challenge government action only when it restricts their *own* constitutionally protected activities. *Massachusetts v. Oakes*, 491 U.S. 576, 581 (1989); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980). But the Supreme Court has recognized an exception to this general principle for First Amendment challenges alleging that a statute or regulation is overbroad. *Vill. of Schaumburg*, 444 U.S. at 634 ("[A] litigant whose own activities are

unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court.").

Even where a litigant challenges a law or regulation as overbroad, that litigant must still "show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action." *Laird v. Tatum*, 408 U.S. 1, 13 (1972) (quoting *Ex parte Levitt*, 302 U.S. 633, 634 (1937)). We use the term "objective chill" to refer to laws or regulations that produce direct injuries and the term "subjective chill" where a law or regulation does not.

Under the First Amendment, mere "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) (quoting *Laird*, 408 U.S. at 13). The regulation need not amount to a "direct prohibition against the exercise of First Amendment rights" to be constitutionally objectionable. Still, there must be something more than "the individual's knowledge that a governmental agency was engaged in certain activities or . . . the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual." *Laird*, 408 U.S. at 11. We have noted that "the mere existence, *without more*, of a governmental investigative and data-gathering activity" is insufficient to present anything more than allegations of a subjective chill of First Amendment speech. *Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602, 608 (6th Cir. 2008). "In order to have standing, therefore, a litigant alleging chill must still establish that a concrete harm—i.e., enforcement of a challenged statute—occurred or is imminent." *Id.* at 610. That an official or regulator lacks actual authority to punish an individual, although relevant to the question of concrete harm, is not dispositive. Even if an official lacks actual power to punish, the threat of punishment from a public official who *appears* to have punitive authority can be enough to produce an objective chill. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963). S*ee also Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003); *Levin v. Harleston*, 966 F.2d 85, 88–89 (2d Cir. 1992). Governmental activity constitutes an injury-in-fact when "the challenged exercise of governmental power [is] regulatory, proscriptive, or compulsory in nature, and the complainant [is] either presently or prospectively

subject to the regulations, proscriptions, or compulsions that he [is] challenging." *Laird*, 408 U.S. at 11.

Speech First has standing to challenge the Response Team here because its members face an objective chill based on the functions of the Response Team. Speech First recognizes that the Response Team lacks any formal disciplinary power and that bias incidents are not directly punishable under the Statement, but maintains that the Response Team acts by way of implicit threat of punishment and intimidation to quell speech. We agree.

The Response Team's ability to make referrals—*i.e.*, to inform OSCR or the police about reported conduct—is a real consequence that objectively chills speech. The referral itself does not punish a student—the referral is not, for example, a criminal conviction or expulsion. But the referral subjects students to processes which could *lead* to those punishments. The referral initiates the formal investigative process, which itself is chilling even if it does not result in a finding of responsibility or criminality. *See Bantam Books, Inc.*, 372 U.S. at 68. Furthermore, nothing in the record suggests that the Response Team may refer matters only if the reporting student assents. By instituting a mechanism that provides for referrals, even where the reporting student does not wish the matter to be referred, the University can subject individuals to consequences that they otherwise would not face.

Additionally, the invitation from the Response Team to meet could carry an implicit threat of consequence should a student decline the invitation. Although there is no indication that the invitation to meet contains overt threats, the referral power lurks in the background of the invitation. It is possible that, for example, a student who knows that reported conduct might be referred to police or OSCR could understand the invitation to carry the threat: "meet or we will refer your case." Additionally, the very name "Bias Response Team" suggests that the accused student's actions have been prejudged to be biased. The name is not the "Alleged Bias Response Team" or "Possible Bias Investigatory Team." It is the "Bias Response Team." And as such, the name intimates that failure to meet could result in far-reaching consequences, including reputational harm or administrative action. Nobody would choose to be considered biased, and an individual could be forgiven for thinking that inquiries from and dealings with the Bias Response Team could have dramatic effects such as currying disfavor with a professor, or

impacting future job prospects. Attending the meeting *is* voluntary. But the record is silent as to whether being labeled "voluntary" ameliorates any of these objectively implied threats.

Both the referral power and the invitation to meet with students objectively chill speech. Therefore, we find that Speech First has standing to challenge the Response Team.[1]

As with its claim regarding the Response Team, Speech First must have associational standing to assert a claim regarding the definitions of bullying and harassment in the Statement. We agree with the district court that Speech First has standing. The University contends that Speech First lacks standing because there is no "credible threat" that its members would be subject to discipline for protected speech. In support, the University argues that there is no evidence in the record that a student has faced discipline for having an "intellectual debate." This misses the point. The lack of discipline against students could just as well indicate that speech has already been chilled. Further, as the district court noted, there have been "sixteen disciplinary cases involving 'bullying' or 'harassing' misconduct from 2016-2018." Students who violate the Statement are subject to a range of consequences, including expulsion. Although evidence might eventually show that students participating in protected speech would not be subject to disciplinary proceedings, that evidentiary showing is not currently supported by the record. Thus, Speech First has established a concrete and objective threat of harm and therefore has standing to challenge the definitions.

The dissent faults us for overlooking *Morrison v. Board of Education.* However, because Speech First brings a facial challenge to the definitions of harassment and bullying, this case is distinguishable from *Morrison*.[2] In *Morrison,* a student brought a lawsuit seeking nominal damages because his high school's policy "prohibiting students from making stigmatizing or

---

[1] We note that our determination of standing rests on the preliminary posture of the case. We do not foreclose the possibility that the University could introduce facts which, if unrebutted, would demonstrate that Speech First lacks standing. The University has simply failed to do so here.

[2] We are aware that, in general, "[f]acial challenges are disfavored." *Washington State Grange v. Washington State Republican Party,* 552 U.S. 442, 450 (2008); *Warshak v. United States,* 532 F.3d 521, 530 (6th Cir. 2008). However, in the First Amendment context, the preference for as-applied challenges is relaxed. Sometimes facial challenges are even "*required* in free-speech cases." *Connection Distrib. Co. v. Holder,* 557 F.3d 321, 335 (6th Cir. 2009) (emphasis in original). "[T]he whole point of a facial challenge, or what the courts in the First Amendment context have come to call an overbreadth challenge, is to permit the claimant to strike the law in its entirety . . . ." *Id.*

insulting comments regarding another student's sexual orientation" chilled his speech. 521 F.3d at 605. Unlike Speech First, Morrison didn't dispute the constitutionality of the school rule as written. *Id.* at 608. He challenged only the rule as applied to him. *Id.* But the rule had never actually been applied to him, nor had the school ever threatened to apply it to him, nor was the school likely to apply it to him in the future since the school board changed the rule shortly after litigation commenced. *Id.* at 607, 610. Because the school board took no specific action that supported Morrison's fear of punishment, his choice to stay silent constituted only a "subjective chill" and thus he didn't have an injury-in-fact for standing purposes. *Id*. at 610. In cases like *Morrison*, where the plaintiff brings an as-applied pre-enforcement challenge*,* it only makes sense to require "some specific action on the part of the defendant in order for the litigant to demonstrate an injury-in-fact." *Id.* at 609. There must be some evidence that the rule would be applied to the plaintiff in order for that plaintiff to bring an as-applied challenge. But Speech First is not bringing an as-applied challenge. Speech First is challenging Michigan's "harassment" and "bullying" definitions for overbreadth on their face.

The distinction between facial and as-applied challenges bears legal significance when assessing standing. In *Dambrot v. Central Michigan University*, the court found that Central Michigan students had standing to challenge their university's discriminatory-harassment policy. *See* 55 F.3d 1177, 1182, 1192 (6th Cir.1995). The students hadn't been punished under the policy, nor had the university acted concretely so as to threaten them with punishment. *See id.* at 1182. Yet, because the students were bringing a facial overbreadth challenge, the court found that the students had standing, even if they had "not yet [been] affected by [the policy.]" *Id. See also Adult Video Ass'n v. U.S. Dep't of Justice*, 71 F.3d 563, 566–67 (6th Cir. 1995) (drawing the same distinction between facial challenges and as-applied challenges).

The final issue is mootness. The district court held that Speech First was not likely to succeed on its claim challenging the definitions of bullying and harassing because it found that claim moot. We disagree with the district court's determination. In addition to requiring that a party have standing, the Constitution's case or controversy requirement mandates that a claim must not become moot prior to the court's decision on the merits. "[A] case is moot when the

issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969).

Voluntary cessation of the alleged illegal conduct does not, as a general rule, moot a case and "deprive the tribunal of power to hear and determine the case." *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953)). Voluntary cessation will only moot a case where there is "no reasonable expectation that the alleged violation will recur," and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis*, 440 U.S. at 631 (cleaned up). "The burden of demonstrating mootness is a heavy one." *Id.*

Although the bar is high for when voluntary cessation by a private party will moot a claim, the burden in showing mootness is lower when it is the government that has voluntarily ceased its conduct. When a private party has voluntarily ceased its alleged illegal conduct, the Supreme Court has explained that "[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). We have noted, however, "that 'cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties' and that '[the government's] self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine.'" *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012) (quoting *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990)). As the Ninth Circuit has commented, government action receives this solicitude because courts assume "that [the government] acts in good faith." *Fikre v. FBI*, 904 F.3d 1033, 1037 (9th Cir. 2018) (citation omitted). Namely, we presume that the same allegedly wrongful conduct by the government is unlikely to recur. *See Friends of the Earth*, 528 U.S. at 189. *See also* 13C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris. § 3533.7 (3d ed. 2008) ("Courts are more likely to trust public defendants to honor a professed commitment to changed ways; individual public defendants may be replaced in office by new individuals, with effects that have little parallel as to private defendants; remedial calculations may be shaped by radiations of public interest; administrative orders may seem to die or evolve in ways that leave

present or future impact unclear."). We have employed this solicitude for both legislative and non-legislative governmental actions. *See Hanrahan v. Mohr*, 905 F.3d 947, 961-62 (6th Cir. 2018); *Ammex, Inc. v. Cox*, 351 F.3d 697, 705 (6th Cir. 2003).

The University's voluntary cessation receives the same amount of solicitude as any analogous government action would. The University is a public entity, provided for in the Michigan Constitution, and run by state officials. Mich. Const. Art. VIII, § 5. Although it is not part of the executive, it acts in many ways as the executive branch and is presided over by duly elected Regents who appoint the University President. *Id.* Because it is an arm of the state government, it receives the same presumption that it acts in good faith.

While all governmental action receives some solicitude, not all action enjoys the same degree of solicitude. Determining whether the ceased action "could not reasonably be expected to recur," *Friends of the Earth*, 528 U.S. at 189, takes into account the totality of the circumstances surrounding the voluntary cessation, including the manner in which the cessation was executed.

Where the government voluntarily ceases its actions by enacting new legislation or repealing the challenged legislation, that change will presumptively moot the case unless there are clear contraindications that the change is not genuine. *See Hill v. Snyder*, 878 F.3d 193, 204 (6th Cir. 2017) ("Legislative action ordinarily moots a case midstream, when a challenged provision is repealed or amended during the pendency of the litigation."); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982) (finding that legislative action did not moot the case because of the legislature's announced intention of reenacting the statute). *See also Jones v. Haynes*, 736 F. App'x 585, 589 (6th Cir. 2018); *Bench Billboard Co.*, 675 F.3d at 982; *Ky. Right to Life, Inc. v. Terry*, 108 F.3d 637, 645 (6th Cir. 1997); *Mosley*, 920 F.2d at 415.

On the other hand, where a change is merely regulatory, the degree of solicitude the voluntary cessation enjoys is based on whether the regulatory processes leading to the change involved legislative-like procedures or were ad hoc, discretionary, and easily reversible actions.

If the discretion to effect the change lies with one agency or individual, or there are no formal processes required to effect the change, significantly more than the bare solicitude itself is

necessary to show that the voluntary cessation moots the claim. *See Carpenter-Barker v. Ohio Dep't of Medicaid*, 752 F. App'x 215, 222–23 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 928 (2019) (finding the case not mooted by voluntary cessation where rulemaking authority lay solely with the defendant); *Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003). S*ee also United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (holding that a change of policy by the Southern District of California did not moot an issue when the Southern District intended to reinstate its policy once it was not bound by the court of appeals); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017) (changing a policy at the direction of the governor did not moot the case).

Where regulatory changes are effected through formal, legislative-like procedures, we have found that to moot the case the government need not do much more than simply represent that it would not return to the challenged policies. *See Hanrahan*, 905 F.3d at 961–62 ("The new policies were formally promulgated and approved by the [department] director after a lengthy internal process. And there is no indication that [department] will return to its previous policies, and the defendants have represented that the new policies will remain in place. Thus, we conclude that the 'self-correction' 'appears genuine.'"); *Youngstown Publ'g Co. v. McKelvey*, 189 F. App'x 402, 405 (6th Cir. 2006) (finding that the election of a new mayor who did away with a previous administration's edict mooted the case).

Here, the University notes that the new definitions were "approved by senior University officials, including the University's president." The University has not, however, pointed to any evidence suggesting that it would have to go through the same process or some other formal process to change the definitions again. Thus, the solicitude the University receives is the same as any ad hoc regulatory action would. Which is to say that the solicitude does not relieve the University of much of its burden to show that the case is moot.

The University has not affirmatively stated that it does not intend to reenact the challenged definitions. The University cites to University Vice President for Student Affairs Royster Harper's testimony that the new definitions "'and no others' will govern the initiation and conduct of disciplinary proceedings." All this statement stands for, however, is that the new definitions are what the University intends to use presently. It does not indicate any future

intentions. Although the University characterizes this construction of Harper's statement as "hair-splitting," it is simply not a meaningful guarantee that the definitions will remain the same in the future. We do not assume that words mean more than what they say. Further, there is no evidence in the record that Harper—or any potential future Vice President for Student Affairs—has control over whether the University will reimplement the challenged definitions. So even if Harper stated that the University would never reenact the challenged definitions, it is difficult to understand why that statement should be construed to have any binding or controlling effect as far as mootness goes.

The timing of the University's change also raises suspicions that its cessation is not genuine. The University removed the definitions after the complaint was filed. If anything, this increases the University's burden to prove that its change is genuine. *See A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 713 (6th Cir. 2016) *rev'd on other grounds*, 138 S. Ct. 1833 (2018) ("[T]he circumstances of the Secretary's issuance of the new form do not inspire confidence in his assurances regarding the likelihood of recurrence—he issued that new form on the same day as the parties' final merits briefs were due before the district court, attaching the form as an exhibit to his brief and only then presenting his mootness argument. This fact makes the Secretary's voluntary cessation appear less genuine."); *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 342–43 (6th Cir. 2007) ("In this case, that burden is increased by the fact that the voluntary cessation only appears to have occurred in response to the present litigation, which shows a greater likelihood that it could be resumed."). The University states that "before the complaint was filed," it was in the process of "review[ing] . . . the University's website and policies to ensure their consistency with principles of free speech." There is no indication, however, that the University was so much as *considering* changing the definitions as part of its review. Without any indication that its review would have resulted in changing or removing the definitions, the fact of the review does not buttress the legitimacy of the University's actions. Nor does it explain the expedient timing of the definition's removal.

Significantly, the University continues to defend its use of the challenged definitions. Although not dispositive, the Supreme Court has found whether the government "vigorously defends the constitutionality of its . . . program" important to the mootness inquiry. *Parents*

*Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007). In its response to Speech First's motion for a preliminary injunction, the University argued that "[e]ven before the University streamlined its definitions, the prohibition on harassing and bullying easily met constitutional standards." The University argued that the definitions were acceptable because they were situated alongside definitions that were legal in nature and that the legal definitions "set forth specific elements of the offenses." Additionally, the University argued that the Statement "specifically affirmed students' free speech rights, including the right to 'voic[e] unpopular views and dissent,'" and therefore there was no way the definitions could "have reasonably been understood as encroaching on students' First Amendment prerogatives." The University contends that its arguments in response to the preliminary injunction motion are not the same as defending the definition's constitutionality. If those arguments do not constitute a defense of its practices, we would be hard pressed to come up with anything that would.

In sum, the University has not put forth enough evidence to satisfy its burden to show that its voluntary cessation makes it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189. Therefore, Speech First's claim challenging the definitions of bullying and harassing behavior is not moot.

In assessing Speech First's likelihood of success on the merits, the district court did not address the merits beyond what was necessary for determining mootness and standing. Although we find that the district court was incorrect in its determination of Speech First's standing to challenge the Response Team and whether the challenge to the definitions of bullying and harassing was moot, we will not resolve the ultimate question of Speech First's likelihood of success on the merits. Instead, we remand this case for the district court to consider in the first instance Speech First's likelihood of success in light of our findings here. Further, although we review the district court's findings on the likelihood of success de novo, we grant the district court substantial deference in its weighing of the preliminary injunction factors. Therefore, we decline Speech First's invitation to instruct the district court to issue the preliminary injunction, especially in light of the district court's findings that the other three preliminary injunction considerations weigh against granting the preliminary injunction. For a similar reason, we also decline the dissent's suggestion that we affirm the district court's decision. Even if the other

three factors weigh against a preliminary injunction, the district court may still grant one if it determines that, in light of our holding, Speech First does have a strong likelihood of success. This is a distinct possibility because "when a party seeks a preliminary injunction on the basis of a potential constitutional violation, likelihood of success on the merits will often be the determinative factor." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

## III

For the foregoing reasons, we **VACATE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

———————————

## DISSENT

———————————

HELENE N. WHITE, Circuit Judge, dissenting.  In seeking a preliminary injunction, Speech First bears the burden of establishing a strong likelihood of prevailing, including on the issue of standing.  *See Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 255 n.3, 256 (6th Cir. 2018); *id.* at 259 (Stranch, J., concurring).  Because Speech First failed to meet its burden, and because the district court correctly found that the remaining preliminary-injunction factors weigh against it, I would affirm the district court's denial of a preliminary injunction.

*Bias Response Team*.  There is no evidence in the record that any of the anonymous students have had any interaction with the Response Team, that any outreach is imminent, or that any such outreach would result in any "concrete harm."  *See Laird v. Tatum*, 408 U.S. 1, 13 (1972).  The majority nevertheless concludes that Speech First "has standing"—by which it presumably means that Speech First has established a strong likelihood of standing—to challenge the Response Team because "the Response Team acts by way of implicit threat of punishment and intimidation to quell speech," based on the Response Team's ability to make referrals and the supposed implicit threat that an invitation to meet carries.  (Maj. Op. at 7.)  In reaching this conclusion, the majority improperly places the evidentiary burden on the University and disregards the evidence in the record.

The majority's reliance on the ability of Response Team members to make referrals is unavailing.  As an initial matter, the evidence is unclear about whether the Response Team itself refers any matters to the OSCR or police department.  Evelyn Galvan, one of two Bias Incident Prevention and Response Team Coordinators on the Response Team, submitted a declaration stating:

> If the reporter or I believe that the reported bias incident possibly constitutes a violation of a law or the Statement of Student Rights and Responsibilities, I may also discuss with the reporter the possibility of him or her making a report to the Division of Public Safety and Security or filing a complaint with the [OSCR]. Although a [Bias Response Team ("BRT")] member could serve as the complainant in an OSCR proceeding, I am not aware of that ever happening.

> Furthermore, BRT does not make an independent determination as to whether the conduct constitutes a Statement violation, nor does it conduct any investigation to make such a determination.

(R. 18-3, PID 388–89.) Although the district court did not discuss this argument in its opinion—Speech First never fully developed the argument that the referral power establishes standing—its recitation of the facts accepts the statements in Galvan's declaration, and that determination has not been shown to be clearly erroneous.

Further, as the majority acknowledges, even if the Response Team does refer matters to the OSCR or police in appropriate circumstances (such as when a violation of the Statement or a crime has occurred), it is not the Response Team that imposes any punishment for this violation of the Statement or the law; rather, that is left to the independent determination of the OSCR or the police. As Speech First acknowledged below, "[a]ny student, faculty member, or staff member may submit a complaint to the [OSCR] alleging a violation of the Statement" (R. 4, PID 95), and anyone can likewise file a report with the police. Thus, even if Response Team members did refer reported conduct to the OSCR or police, any member of the University community was already able to do so. Regardless, because there is no evidence that a Response Team member has or would refer a "bias incident" to the OSCR or police without that incident constituting a violation of the Statement or a crime, the Response Team itself poses no threat of a concrete harm.

The sole case the majority relies on to support its conclusion is readily distinguishable. In *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), the Rhode Island Commission to Encourage Morality in Youth sent dozens of notices to a publication distributor stating that certain publications it distributed were inappropriate for sale to youths. *Id.* at 59–61. The Supreme Court characterized the notices as "phrased virtually as orders, reasonably understood to be such by the distributor," which were "invariably followed up by police visitations, [and] in fact stopped the circulation of the listed publications ex proprio vigore." *Id.* at 68. The Court thus concluded that the "record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim" through "a scheme of state censorship effectuated by extralegal sanctions." *Id.* at 67, 72. The distributor's "compliance with the Commission's directives was not voluntary" given that

"[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." *Id.* at 67–68. In contrast, as the district court found, in this case "there is no evidence of any thinly veiled threat[]' from the [Response Team] to individuals reported to have engaged in 'biased' conduct." (R. 25, PID 980 (first alteration in original).)

The majority also relies on the mere invitation from a Response Team member to meet with the subject of the report—an invitation that, based on the evidence, only rarely is extended and is even more rarely accepted—reasoning that this could be threatening because the "referral power lurks in the background of the invitation." (Maj. Op. at 7.) The majority then speculates that it is "possible" that "a student who knows that reported conduct might be referred to police or OSCR could understand the invitation to carry the threat: 'meet or we will refer your case.'" (*Id.*) But the record to date only reflects that one student has ever accepted the invitation to meet, strongly supporting an inference that students do *not* feel compelled to meet. Further, although the majority acknowledges that actually "[a]ttending the meeting *is* voluntary," the majority claims that these facts do not matter because "the record is silent as to whether being labeled 'voluntary' ameliorates any of these objectively implied threats." (*Id.* at 8.) Rather than rely on speculation and fault the University for the absence of evidence—even though Speech First bears the burden on this question—the district court appropriately examined the evidence in the record and correctly concluded that Speech First failed to meet its burden.

> The evidence in the present matter similarly reflects no threats—direct, subtle, or implied—from the BRT. . . . Speech First presents no evidence of any communication from the BRT to an individual reported to have engaged in "bias" or "biased conduct" conveying something different—more specifically, pressure or an intimation that some form of punishment or adverse action will follow the failure to accede [to] the BRT's requests.

> The evidence does not even reflect an instance where the BRT criticized the speech of an individual who is reported to have engaged in biased conduct. But even if the record reflected that the BRT had criticized an individual's speech, there would be no First Amendment violation "in the absence of some actual or threatened imposition of governmental power or sanction." *Penthouse Int'l[, Ltd. v. Meese*, 939 F.2d 1011, 1015 (D.C. Cir. 1991)]. The Court agrees with defense counsel's assertion at the motion hearing that a university should be able to address a student when his or her speech may offend or hurt other students without running afoul of the First Amendment. As counsel stated:

> That's education. That's what a professor should do. That's what the university should do when someone comes to a body that's created in order to promote respect and understanding on the campus. Respect and understanding are not enemies of the First Amendment. . . . Respect is a condition for effective speech. Understanding is the goal of speech.
>
> In short, Speech First fails to demonstrate that the BRT poses a concrete or objective threat of harm to the First Amendment rights of University students.

(R. 25, PID 981–83 (fourth alteration in original).)

The majority does not identify any clear error in the district court's factual findings. Based on those findings, I agree with the district court that Speech First failed to meet its burden to establish a strong likelihood of establishing standing to challenge the Response Team.

*"Harassment" and "Bullying" Definitions*. The majority also concludes that Speech First established a strong likelihood of establishing standing to challenge the Statement's definition of harassment and bullying. The University disputes that conclusion, relying primarily on *Morrison v. Board of Education of Boyd County*, 521 F.3d 602 (6th Cir. 2008). I find *Morrison* materially indistinguishable from this case.

In *Morrison*, a student who believed that homosexuality is a sin and that it was his responsibility to speak out about it challenged his high school's policy "prohibiting students from making stigmatizing or insulting comments regarding another student's sexual orientation." 521 F.3d at 605. After the student filed a lawsuit, the school board changed the policy to permit anti-homosexual speech unless it was "sufficiently severe or pervasive that it adversely affects a student's education or creates a climate of hostility or intimidation for that student, both from the perspective of an objective educator and from the perspective of the student at whom the harassment is directed." *Id.* at 607. The majority found no standing to challenge the school board's initial policy—a conclusion that is more definitive than merely denying a preliminary injunction for failure to establish a strong likelihood of standing:

> The claim at stake here involves Morrison's choice to chill his own speech based on his perception that he would be disciplined for speaking. But whether he would have been so punished, we can only speculate. The school district—again, the actual defendant here—stated that its former discipline policy regarding

        instances of harassment or discrimination "shall not be interpreted as applying to speech otherwise protected under the state or federal constitutions where the speech does not otherwise materially or substantially disrupt the educational process." The record is silent as to whether the school district threatened to punish or would have punished Morrison for protected speech in violation of its policy. Morrison asks us, essentially, to find a justiciable injury where his own subjective apprehension counseled him to choose caution and where he assumed—solely on the basis of the Board's 2004-05 policies and without any specific action by the Board—that were he to speak, punishment would result. We decline to do so. Absent a concrete act on the part of the Board, Morrison's allegations fall squarely within the ambit of "subjective chill" that the Supreme Court definitively rejected for standing purposes. *Laird*, 408 U.S. at 13, 92 S. Ct. 2318 (quotation marks omitted). Morrison cannot point to anything beyond his own "subjective apprehension and a personal (self-imposed) unwillingness to communicate," *ACLU* [*v. NSA*, 493 F.3d 644, 662 (6th Cir. 2007)], and those allegations of chill, without more, fail to substantiate an injury-in-fact for standing purposes.

*Id.* at 610.[1]

        Similarly, here, the Statement itself says that "[s]tudents at the University have the same rights and protections under the Constitutions of the United States and the State of Michigan as other citizens" and specifically notes that "[t]hese rights include freedom of expression, press, religion, and assembly. The University has a long tradition of student activism and values freedom of expression, which includes voicing unpopular views and dissent." (R. 4-2, PID 126.) And there is no evidence that the University has ever punished students who engaged in only protected speech like the speech in which the anonymous students allegedly want to engage. The Dean of Students submitted a lengthy declaration summarizing numerous groups, events, and speakers at the University that expressed views similar to those allegedly held by Students A, B, and C. "None of the students who have engaged in any of the speech or speech-related activities described . . . have been subjected to any disciplinary action or any threat of disciplinary action." (R. 18-5, PID 452.) Director of OSCR, Erik Wessel, submitted a declaration stating that "no student has ever been sanctioned under the harassing and bullying provision of the Statement for expressing views like those held by Students A, B and C regarding such political or policy issues

---

[1]Judge Moore dissented and persuasively argued that the "policy itself amounted to a specific threat regarding future harm and is sufficient to confer standing on" the student. 521 F.3d at 619 (Moore, J., dissenting).

as gun rights, illegal immigration, abortion, welfare, affirmative action, gender identity, or gender equity." (R. 18-8, PID 926.) "If a complaint were submitted that alleged that the respondent had expressed views like those held by Students A, B and C, the complaint . . . would be dismissed." (*Id.*) "In sum, I can assure Students A, B and C that they are free to engage in open and robust debate on any of the topics mentioned in the Complaint and to express any opinions or beliefs they have on those subjects, no matter how unpopular or offensive those opinions or beliefs may be, without any fear of a disciplinary proceeding." (*Id.*)

Speech First submitted no contradictory evidence. Although the district court relied on defense counsel's representation at a hearing that the anti-harassment or anti-bullying provisions have been enforced against sixteen students—one of the only facts cited by the majority— defense counsel also made clear that the provisions were not enforced against protected speech by itself, and that ten of the sixteen cases involved violence or threats of violence.

Speech First argues that *Morrison* is distinguishable, asserting that the majority opinion in that case was grounded in the belief that no objective student could have thought that the relevant policies would cover a student expressing his belief that homosexuality is a sin. Nothing in the opinion supports this reading, however. Rather, the *Morrison* majority stated that "a litigant alleging chill must still establish that a concrete harm—i.e., enforcement of a challenged statute—occurred or is imminent"; relied on a portion of the policy, similar to language in the Statement here, that the policy would not apply to speech otherwise protected by the Constitution; noted that the record was silent about whether the school district would have punished the student; and ultimately rejected the student's challenge because it was made "solely on the basis of the Board's 2004-05 policies and without any specific action by the Board." *Morrison*, 521 F.3d at 610 (citation omitted).

The majority also believes *Morrison* is distinguishable because the plaintiff in *Morrison* brought only an as-applied challenge, whereas Speech First raises a facial challenge. Speech First did not make this argument, either below or on appeal. Further, the majority in *Morrison* did not make this distinction. In fact, it rejected this majority's apparent conclusion that the overbreadth doctrine allows for a relaxed version of standing for those making facial challenges: "the doctrine of overbreadth relies on a 'chill' theory to permit a litigant—who *already has*

*standing* by virtue of demonstrating a concrete harm—to challenge a rule that may only affect others." *Id.* (citing *Midwest Media Prop., L.L.C. v. Symmes Township*, 503 F.3d 456, 463 (6th Cir. 2007); *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1379 (6th Cir. 1984)). And in formulating the framework for its analysis, the *Morrison* majority relied on cases addressing facial challenges on overbreadth grounds. Our cases interpreting *Morrison* likewise indicate that *Morrison*'s articulation of standing is not limited to as-applied challenges, as we have cited *Morrison* and applied the standard from *Morrison* in determining whether a plaintiff has standing to assert a facial challenge, including to a university's policy. *See Savage v. Gee*, 665 F.3d 732, 741 (6th Cir. 2012); *see also Fieger v. Mich. Supreme Court*, 553 F.3d 955, 662–64 (6th Cir. 2009) (discussing *Morrison* at length in determining whether the plaintiff had standing to make a facial overbreadth challenge to professional-conduct rules). Accordingly, the majority's attempt to distinguish *Morrison* is unpersuasive.[2]

Speech First also relies on *McGlone v. Bell*, 681 F.3d 718, 731 (6th Cir. 2012). There, the court discussed *Morrison* at length and concluded it was distinguishable because in *McGlone* there were additional facts, beyond just a written policy, that resulted in an objective chill:

> Here, the record is not "silent" as to a threat of punishment. McGlone *is alleging more than the apprehension based on a written policy*. McGlone attempted to seek a waiver of the fourteen-day notice requirement by speaking in the south patio/plaza area of the campus. He was denied the waiver and was told that he could only speak on the north patio. Furthermore, he was approached by a campus police officer who threatened to arrest him for trespass if he did not stop

---

[2]The primary case the majority relies on is unhelpful, as the case did not conduct a standing analysis. Rather, it made one mention of standing as follows: "The overbreadth doctrine provides an exception to the traditional rules of standing and allows parties not yet affected by a statute to bring actions under the First Amendment based on a belief that a certain statute is so broad as to 'chill' the exercise of free speech and expression." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995). We have since clarified that "overbreadth creates an exception only to the prudential standing inquiry," *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 350 (6th Cir. 2007), and reaffirmed that to raise a facial overbreadth challenge a party must establish that a concrete injury beyond a mere subjective chill has either occurred or is imminent, *see Savage*, 665 F.3d at 740; *see also Phillips v. DeWine*, 841 F.3d 405, 417 (6th Cir. 2016) (rejecting as "simply lack[ing] merit" plaintiffs' argument that they have standing to challenge a law "as overbroad or facially invalid 'even if [they] have not themselves suffered or been threatened with actual injury'" because "this exception applies only to the prudential standing doctrines, such as the prohibition on third-party standing, and not to those mandated by Article III itself, such as the injury-in-fact requirement" (second alteration in original)). The other case the majority cites appears to have misconstrued the quote in *Dambrot* as applying to Article III standing and suggests in dicta that a party has Article III standing to make a facial challenge to a law simply by stating a belief that a law is so broad that it chills expression. *See Adult Video Ass'n v. U.S. Dep't of Justice*, 71 F.3d 563, 566–67 (6th Cir. 1995).

> speaking and leave the campus. Appellees also sent a letter to McGlone notifying
> him that he would not be allowed on campus if he did not first obtain permission.
> We hold that McGlone has suffered an injury in fact that is concrete and
> particular. He was not allowed to speak on campus and was not afforded a
> waiver. His First Amendment rights have also been objectively chilled by the
> threat of arrest. The injury is actual, as it already occurred and will imminently
> occur again if he violates the policy.

*Id.* (emphasis added). Thus, the court in *McGlone* held that the plaintiff had standing to challenge the relevant policy, both on its face and as applied. Unlike *McGlone*, all that Speech First and the majority can point to are *allegations* that students feel subjectively chilled and sixteen incidents that did not involve these anonymous students or protected speech resembling what these students allegedly want to say. On this record and applying this court's precedents, Speech First did not meet its burden to establish a strong likelihood of standing.

*Denial of the Preliminary Injunction.* The majority declines Speech First's invitation to grant a preliminary injunction, recognizing that such relief would be unjustified given the district court's findings that the other three preliminary-injunction considerations weigh against granting a preliminary injunction. This is ample reason to affirm the district court's discretionary determination even assuming that its standing and mootness determinations were erroneous. Although, as the majority notes, we have previously explained that "when a party seeks a preliminary injunction on the basis of a potential constitutional violation, likelihood of success on the merits will often be the determinative factor," *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012), here there is no threat of current harm from the challenged definitions because they are not in effect. Accordingly, at least as to the challenged definitions, there is no reason to presume that there will be irreparable injury, substantial harm to others, or that the public interest would be served by the issuance of the injunction because all that is alleged is a past constitutional injury. *See Gale v. O'Donohue*, 751 F. App'x 876, 885 (6th Cir. 2018).

I would affirm the district court's denial of Speech First's motion for preliminary injunction.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 18-1917

SPEECH FIRST, INC.,

     Plaintiff - Appellant,

    v.

MARK SCHLISSEL, in his official capacity
as President of the University of Michigan, et al.,

     Defendants - Appellees.

**FILED**
Sep 23, 2019
DEBORAH S. HUNT, Clerk

Before:  COOK, McKEAGUE, and WHITE, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Flint.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is VACATED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk